# EXHIBIT D

# *In The Matter Of:*

## Dafinka Stojcevski v. County of Macomb

## Gerald Shiener, M.D.

## May 22, 2018



## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAFINKA STOJCEVSKI, a/k/a
STEPHANIE STOJCEVSKI, Individually,
and as Personal Representative of
the Estate of DAVID STOJCEVSKI,
Deceased,

        Plaintiffs,

vs.          Case No. 15-cv-11019
          Hon. Linda V. Parker
          Mag. David R. Grand

COUNTY OF MACOMB, SHERIFF ANTHONY M.
WICKERSHAM, MICHELLE M. SANBORN,
CORRECT CARE SOLUTIONS (CCS),
LAWRENCE M. SHERMAN, M.D., DAVID
ARFT, NATALIE PACITTO, MONICA CUENY,
RN, TIFFANY DELUCA, LPN, VICKI
BERTRAM, LPN, SARA BREEN, LPN, MICAL
BEY-SHELLEY, LPN, DIXIE DEBENE, LPN,
THRESSA WILLIAMS, LPN, LINDA PARTON,
LPN, AMBER BARBER, LPN, DEANN PAVEY,
LPN, CHANTALLE BROCK, LPN, KELLY MANN,
DANYELLE NELSON, MHP, OXLEY, COONEY,

## Page 2

1  HARRISON, TALOS, PINGILLEY, AVERY,
2  VANEENOO and HELHOWSKI,
3         Defendants.
4  _____
5
6
7      The Deposition of GERALD ALAN SHIENER, M.D.
8      Taken at 251 East Merrill Street, Suite 230
9      Birmingham, Michigan
10     Commencing at 5:08 p.m.
11     Tuesday, May 22, 2018
12     Before Mary Jo Power, CSR-1404, RPR, RMR, CRR
13
14 APPEARANCES:
15
16 ROBERT D. IHRIE
17 HAROLD A. PERAKIS
18 Ihrie O'Brien
19 24055 Jefferson Avenue
20 Suite 2000
21 Saint Clair Shores, Michigan  48080
22 586.778.7778
23 office@ihrieobrienlaw.com
24 hperakis@ihrieobrienlaw.com
25     Appearing on behalf of the Plaintiffs

## Page 3

1  ROBERT S. GAZALL (Appearing via telephone)
2  Macomb County Corporation Counsel
3  One South Main Street
4  8th Floor
5  Mount Clemens, Michigan  48043
6  586.469.6346
7  robert.gazall@macombgov.org
8      Appearing on behalf of the Defendants County of
9  Macomb County Defendants
10
11 JOHN T. EADS, III (Entered proceedings at 5:11 p.m.)
12 Wilson, Elser, Moskowitz, Edelman & Dicker, LLP
13 17197 North Laurel Park Drive
14 Suite 201
15 Livonia, Michigan  48152
16 313.327.3100
17 john.eads@wilsonelser.com
18     Appearing on behalf of the Defendants County of
19 Macomb, Sheriff Wickersham, and Michelle Sanborn
20
21
22
23
24
25

## Page 4

1  RONALD W. CHAPMAN
2  Chapman Law Group
3  1441 West Long Lake Road
4  Suite 310
5  Troy, Michigan  48098
6  248.644.6326
7  rchapman@chapmanlawgroup.com
8      Appearing on behalf of the Defendant Correct Care
9  Solutions and appearing as co-counsel for Defendants County
10 of Macomb
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1 (Pages 1 to 4)

Page 5

TABLE OF CONTENTS

WITNESS                           PAGE
GERALD ALAN SHIENER, M.D.

    EXAMINATION BY MR. IHRIE:..................... 6
    EXAMINATION BY MR. EADS:.....................172

EXHIBITS                          PAGE
(Exhibits attached to transcript.)

DEPOSITION EXHIBIT 1......................... 6
  (Dr. Shiener report, CV, fee schedule - 18 pgs)
DEPOSITION EXHIBIT 2......................... 71
  (Progress note of Dr. Sherman - 1 pg)
DEPOSITION EXHIBIT 3......................... 97
  (Correct Care Solutions pamphlet - 17 pgs)

Page 6

Birmingham, Michigan
Tuesday, May 22, 2018
5:08 p.m.

        MARKED BY THE REPORTER:
        DEPOSITION EXHIBIT 1
        5:08 p.m.
        GERALD ALAN SHIENER, M.D.,
was thereupon called as a witness herein, and after
having first been duly sworn to testify to the truth,
the whole truth and nothing but the truth, was
examined and testified as follows:
        MR. IHRIE:  Let the record reflect that
this is the deposition of Dr. Gerald A. Shiener, taken
pursuant to appropriate notice, and that it may be
used for any purposes permitted under the applicable
court rules.
        EXAMINATION
BY MR. IHRIE:
Q.  Dr. Shiener, I know that you've given numerous
depositions in the past, so I don't think I have to go
over the ground rules too much with you, do I?
A.  I wouldn't think so.
Q.  I'm going to ask you at the end of the dep -- if I
remember; if I don't, you may remind me -- if there

Page 7

are any answers that you have given that you wish
to -- that you wish to modify in some respect.  Okay?
A.  Ask me -- ask me whatever you like.  I'll do my best
to answer.
Q.  All right.  I'm looking at your CV, and I note that
you have five board certifications; is that correct?
A.  I do.
Q.  Will you please tell me what the significance is of a
board certification?  In other words, what does it
mean to be board certified?
A.  Well, that's a pretty broad question.  Board
certification was a procedure that was instituted to
determine that doctors had learned what they're
supposed to learn in their residency.
        Now, board certification when I first
started practicing medicine, was more of an academic
issue.  And if -- it was only necessary if someone
wanted to pursue an academic career, or someone needed
to demonstrate that they had some special training to
take a particular job or work in a particular area.
        It's become more required for hospitals and
as a means of quality control, and again it
demonstrates that you've learned what you were
supposed to learn during your residency.  And we have
a process now called maintenance of certification,

Page 8

where the board will monitor your study and the kind
of materials you're studying to determine that you
continue to be up-to-date in your knowledge base.
        The board had an examination in general
psychiatry and child and adolescent psychiatry, and
then as psychiatry became more specialized, the board
began to offer certifications with added
qualifications in other areas, many of which that I've
tested and passed.
Q.  Has maintenance of certification replaced board
certification?
A.  Well, that's a fluid area.  Board certifi -- you have
to be board certified in order to maintain your
certification, and one method of doing so is to have a
doctor recertify every ten years.
        The boards are now studying whether
demonstrating to the board that you do continuing
education, participate in certain activities across a
broad range, not just reading articles or taking
courses, and that may serve in lieu of
recertification.  There are pilot programs.  Some
members of --
        (Off the record at 5:11 p.m.)
        (Whereupon Mr. Eads entered the
proceedings.)

2  (Pages 5 to 8)

Page 9

17:12  1        **(Back on the record at 5:12 p.m.)**
17:12  2             MR. EADS:  Please continue.
17:12  3             MR. IHRIE:  All right.  Thank you.
17:12  4    BY MR. IHRIE:
17:12  5    Q.  So I don't mean to misquote you, but did you say that
17:12  6        board certification is, in essence, a way for the
17:12  7        board to confirm that you actually learned what you
17:12  8        learned in law school -- I mean, in medical school?
17:12  9    A.  **No, not medical school.  Residency training.**
17:12 10    Q.  In your residency training.
17:12 11    A.  **And the board -- the board has an assurance that you**
17:12 12        **learned what you were supposed to learn, or that**
17:12 13        **you've met the requirements for training.**
17:12 14    Q.  Okay.  So if you went through residency and -- are you
17:12 15        able to decide not to become board certified?
17:13 16    A.  **Sure.  There's nothing -- there's nothing that says**
17:13 17        **that a doctor has to pursue board certification.**
17:13 18    Q.  Do you have to take an additional test?
17:13 19    A.  **For what?**
17:13 20    Q.  Board certification?
17:13 21    A.  **Yeah, board certification is an examination.  Yeah.**
17:13 22    Q.  And you are board certified in -- let's see if I can
17:13 23        locate the -- tell me the five areas that you're board
17:13 24        certified in.
17:13 25    A.  **Well, general psychiatry; addiction psychiatry;**

Page 10

17:13  1        **geriatric psychiatry; forensic psychiatry; what used**
17:13  2        **to be called psychosomatic medicine, and as of January**
17:13  3        **1 of this year it's called consultation liaison**
17:13  4        **psychiatry; and then I'm also certified in addiction**
17:13  5        **medicine.**
17:13  6    Q.  Do you consider yourself to be an expert in all of
17:13  7        those areas?
17:13  8    A.  **Well, I've demonstrated expertise, and I consider that**
17:14  9        **I have that expertise in those areas of psychiatric**
17:14 10        **practice.**
17:14 11    Q.  Tell me what the amount is that you have paid -- that
17:14 12        you have been paid, rather, by Mr. Chapman's firm or
17:14 13        any other person or firm in this case so far, not
17:14 14        including the thousand dollars that I just paid you.
17:14 15    A.  **$2,500.**
17:14 16    Q.  And are you owed any money other than --
17:14 17    A.  **No.  No.**
17:14 18    Q.  And how does the fact that you have been paid $2,500
17:14 19        square with your correspondence dated January 4, 2016,
17:14 20        which indicates that your retainer fee is $3,500?
17:14 21    A.  **Well, excuse me then.  My mistake.  It was $3,500.**
17:15 22        **I'm sorry.**
17:15 23    Q.  So you've been paid the initial retainer fee --
17:15 24    A.  **Yes.  Nothing --**
17:15 25    Q.  -- and have you used that up yet?

Page 11

17:15  1    A.  **Between preparing this document, my September 14,**
17:15  2        **2017, report, and preparing for the deposition, that**
17:15  3        **just -- that's just about covered by the 3,500.**
17:15  4    Q.  And what is your hourly rate for this deposition?
17:15  5    A.  **$900 for the first 90 minutes, and $500 an hour**
17:15  6        **thereafter.**
17:15  7    Q.  You wrote a report dated September 14, 2017; did you
17:15  8        not?
17:15  9    A.  **I did.**
17:15 10    Q.  And did you identify in that report all of the
17:15 11        materials that you've reviewed prior to writing that
17:15 12        report?
17:15 13    A.  **I did.**
17:15 14    Q.  Were there any other materials or items other than
17:16 15        what you listed that you used to prepare your report?
17:16 16    A.  **I don't believe so.**
17:16 17    Q.  Are we --
17:16 18    A.  **I had the videos.  I may have received the videos**
17:16 19        **after -- afterwards.**
17:16 20    Q.  I don't see where you have identified that you based
17:16 21        your report on any video.
17:16 22    A.  **No.  I must have received the videos afterwards.**
17:16 23    Q.  So your report does not contemplate your review of any
17:16 24        video; is that correct?
17:16 25    A.  **Oh, I don't know about contemplation.  I prepared my**

Page 12

17:16  1        **report before I received the videos.**
17:16  2    Q.  So no portion of your report was based upon your
17:16  3        review of the video; is that correct?
17:16  4    A.  **I believe that's correct.**
17:17  5    Q.  When did you receive a copy of what we have so far
17:17  6        called "the video"?
17:17  7    A.  **May 26, 2017.**
17:17  8    Q.  Is there a reason why you did not look at the video
17:17  9        prior to looking -- is there a reason why you didn't
17:18 10        look at the video prior to writing your report?
17:18 11    A.  **You know, I don't recall.  I don't recall.**
17:18 12    Q.  You don't recall what?
17:18 13    A.  **Why I didn't look at the videos, or why I didn't**
17:18 14        **include my review of the videos in the -- in the**
17:18 15        **September 14, 2017, report.**
17:18 16    Q.  How much of the video have you reviewed as of today?
17:18 17    A.  **I believe I watched -- I watched everything on this**
17:18 18        **disk.  I may have fast-forwarded through some periods.**
17:18 19    Q.  And how many hours did that take you?
17:18 20    A.  **I don't recall.**
17:18 21    Q.  There was 240 hours of video there.  Do you have any
17:18 22        recollection of how many hours --
17:18 23    A.  **I don't -- I don't believe I watched --**
17:18 24    Q.  Let me finish my sentence first.
17:18 25    A.  **I'm sorry.**

3 (Pages 9 to 12)

Gerald Shiener, M.D.
May 22, 2018

Page 13

17:18 1   Q.  Do you have any recollection of how many of those
17:18 2      hours you observed?
17:18 3   A.  No.
17:18 4   Q.  You -- did you keep any notes of how many of those
17:18 5      hours that you observed?
17:18 6   A.  No, I didn't.
17:18 7   Q.  Are you able to estimate how many hours of that video
17:18 8      you observed?
17:19 9   A.  No.
17:19 10   Q.  And just for clarification, no observation of the
17:19 11      video was used in writing your report, correct?
17:19 12   A.  I think I've already mentioned that a couple of times.
17:19 13   Q.  Did you not review the video because you felt it was
17:19 14      unimportant to review it?
17:19 15   A.  I don't recall why I didn't.  I know that I met with
17:19 16      Mr. Chapman, we discussed some things, I reviewed it
17:19 17      after.  I'm not sure why I didn't include in my review
17:19 18      of the video.
17:19 19   Q.  In a case like this, knowing that there is a video
17:19 20      that you could look at, would it have been -- is it
17:19 21      important for you to have seen the video prior to
17:19 22      writing your report?
17:19 23   A.  Oh, when you say "important," I'm not -- I'm not
17:19 24      really sure what you mean.
17:19 25          I didn't think it was -- I didn't think it

Page 14

17:19 1      was particularly pertinent to reach these opinions,
17:19 2      and I know that some of the other documentation
17:19 3      referred to videos.
17:20 4   Q.  So your testimony is that you don't feel it was
17:20 5      pertinent to give the opinion that you gave in your
17:20 6      report; is that correct?
17:20 7   A.  Well, I like the way I said it better.  And if I'm
17:20 8      going to be stuck with a version of what I said, I'd
17:20 9      rather it be my version.
17:20 10   Q.  Do you feel that your report may have been different
17:20 11      if you had viewed the video?
17:20 12   A.  I don't believe so.
17:20 13   Q.  And how would you know, if you haven't viewed the
17:20 14      video?
17:20 15   A.  I didn't say that I haven't viewed the video, I just
17:20 16      said that I didn't include the review of the video in
17:20 17      the report.
17:20 18   Q.  So the number of hours that you looked at the video,
17:20 19      which you don't know, your testimony is, that what you
17:20 20      did look at didn't change -- doesn't change what you
17:20 21      had previously written prior to reviewing the video;
17:20 22      is that right?
17:20 23   A.  Once again, I like the way I said it better.  I don't
17:20 24      need you to paraphrase that for me.
17:20 25   Q.  Well, I'm asking.

Page 15

17:20 1   A.  Well, I would agree with my version rather than your
17:20 2      paraphrase.
17:20 3   Q.  Did you look at any of the video prior to writing the
17:21 4      report?
17:21 5   A.  I don't recall when I viewed it.
17:21 6   Q.  So you may have looked at the video prior, or you may
17:21 7      have looked at the video after your report; is that
17:21 8      correct?
17:21 9   A.  What I said is:  I don't recall when I viewed it.
17:21 10   Q.  May we rely upon the accuracy and the truth of
17:21 11      everything that's in your written report?
17:21 12   A.  Well, I did everything I could to be accurate and
17:21 13      truthful in preparing my report.
17:21 14   Q.  Is that a yes?
17:21 15   A.  No, that's -- that's my answer.
17:21 16   Q.  Well, I under --
17:21 17   A.  I did my best to be accurate and truthful.
17:21 18   Q.  May we rely upon?
17:21 19   A.  Well, that's up to you.
17:21 20   Q.  Is your report a reliable report?
17:21 21   A.  Well, I did everything I could to reach my opinions
17:21 22      and conclusions with confidence or what you would call
17:21 23      a reasonable degree of medical certainty.  Whether you
17:21 24      rely upon it or not is up to you.
17:21 25   Q.  Do you believe that it's accurate?

Page 16

17:21 1   A.  I told you that I did everything that I could to
17:22 2      report my findings in an accurate and reliable manner.
17:22 3   Q.  Do you believe it's a truthful report?
17:22 4   A.  Well, because it -- it contains opinions, I'm not sure
17:22 5      how that squares with the issue of truth.  It's my
17:22 6      understanding that there's a finder of fact in this
17:22 7      matter.  I try to bring an understanding to what
17:22 8      happened, and this is my understanding.
17:22 9          I don't believe that -- I don't believe
17:22 10      that I made any misrepresentations in this report.
17:22 11      MR. IHRIE:  Excuse me one minute.
17:23 12      (Off the record at 5:23 p.m.)
17:23 13      (Back on the record at 5:23 p.m.)
17:23 13  BY MR. IHRIE:
17:23 15   Q.  Is there anything in your notes or your records, or
17:23 16      anything in your file in this case, that will remind
17:24 17      you -- or that you can look at that will remind you
17:24 18      whether or not you viewed any portion of the video
17:24 19      before you wrote the report or after the report?
17:24 20   A.  I can't think of what that would be.
17:24 21   Q.  Please look at page 2 of your report.
17:24 22      MR. CHAPMAN:  Do you want to make the
17:24 23      report an exhibit?
17:24 24      MR. IHRIE:  It's already been marked, so...
17:24 25      MR. CHAPMAN:  I don't think so.  Has it?

4  (Pages 13 to 16)

Gerald Shiener, M.D.
May 22, 2018

## Page 17

17:24  1            THE WITNESS:  It was marked and offered to
17:24  2    me, but they didn't say anything on the record.
17:24  3    BY MR. IHRIE:
17:24  4      Q.  All right.  So now I'm going to ask you to look at
17:24  5    what I've given you as Shiener Exhibit Number 1 and
17:24  6    ask if you can identify it.
17:24  7      **A.  It looks like it's a faxed copy of my report; it looks**
17:24  8    **like it's a copy of a curriculum vitae, and that goes**
17:25  9    **up to 2015; it looks likes it's a January 4, 2016, fee**
17:25 10    **schedule.**
17:25 11           MR. IHRIE:  All right.  I'm going to ask
17:25 12    you -- move for purposes of this deposition only to
17:25 13    introduce that as Exhibit Number 1 and indicate that
17:25 14    it is being introduced for deposition purposes only at
17:25 15    this time.
17:25 16    BY MR. IHRIE:
17:25 17      Q.  For the purposes of this case, Dr. Shiener, what areas
17:25 18    of expertise that you do have are you using?
17:25 19      **A.  I don't understand what you're really asking.**
17:25 20      Q.  Well, you indicated that you're an expert in
17:25 21    geriatrics, correct?  You're board certified in
17:25 22    geriatric psychiatry?
17:25 23      **A.  You asked me about my board certifications.  I'm**
17:25 24    **certified by the American Board of Psychiatry and**
17:25 25    **Neurology in geriatric psychiatry.**

## Page 18

17:26  1      Q.  Right.  And are you using that expertise in that
17:26  2    particular area of psychiatry in this case?
17:26  3      **A.  Oh, that doesn't seem particularly pertinent to the**
17:26  4    **issues in this case.**
17:26  5      Q.  Which areas of expertise in this case seem
17:26  6    particularly pertinent to you?
17:26  7      **A.  Psychiatry, consultation liaison psychiatry, addiction**
17:26  8    **psychiatry, addiction medicine --**
17:26  9      Q.  On page --
17:26 10      **A.  -- forensic psychiatry.**
17:26 11      Q.  Oh.  So all of the other four, basically; is that
17:26 12    correct?  Other than the geriatric psychiatry?
17:26 13      **A.  Well, I don't see how geriatric issues are pertinent**
17:26 14    **to this matter.**
17:26 15      Q.  Thank you.
17:26 16           Looking at page 2 of your report, you
17:26 17    indicate on number 4, it says, "CCS Medical & Mental
17:26 18    Health, Parts 1 and 2."
17:26 19      **A.  Yes.**
17:26 20      Q.  Can you tell me what that means, "parts 1 and 2,"
17:26 21    divide it in some sense?  I'm just trying to get a
17:27 22    clarification of what that means.
17:27 23      **A.  I think there were two PDFs.  The document was divided**
17:27 24    **into two PDFs.**
17:27 25      Q.  All right.  So you may be calling it one and two.  May

## Page 19

17:27  1    we conclude that you have reviewed all of CCS Medical
17:27  2    & Mental Health documents that exist in this case?
17:27  3      **A.  I don't know that.  Hold on.**
17:28  4      Q.  To try to help you along here -- unless you want more
17:28  5    time --
17:28  6      **A.  Wait.  Just -- you've asked me a question.  I'm going**
17:28  7    **to answer it.**
17:28  8      Q.  Okay.
17:29  9      **A.  Well, let's see.  Part 1 of that document is 54 pages,**
17:29 10    **and part 2 is 62 pages.  That would be 116 pages**
17:29 11    **total.**
17:29 12           MR. PERAKIS:  And part 2 was how many
17:29 13    pages?
17:29 14           THE WITNESS:  Sixty-two.  So that would be
17:29 15    116 pages.
17:29 16           Now, I don't know if that's exhaustive.
17:29 17    BY MR. IHRIE:
17:29 18      Q.  Yeah, you wouldn't know that, I suppose, because you
17:29 19    only have reviewed the materials that were given to
17:29 20    you, I presume by Mr. Chapman's office.  Correct?
17:29 21      **A.  Well, I was given some documents that were labeled**
17:30 22    **"CCS records."  I don't know if that's exhaustive --**
17:30 23      Q.  I understand.
17:30 24      **A.  -- for whatever reason.**
17:30 25      Q.  And where did you get those records?

## Page 20

17:30  1      **A.  From Mr. Chapman.**
17:30  2      Q.  Okay.  And looking at the first sentence of your
17:30  3    report, Dr. Shiener, you indicate that, and I quote --
17:30  4      **A.  The first sentence of my report.**
17:30  5      Q.  Right.  Well, the first sentence on -- the first
17:30  6    sentence after the materials that you looked at, right
17:30  7    after number 6.  The sentence that says, "I have been
17:30  8    asked to review these documents and other -- and
17:30  9    render opinions about the circumstances of
17:30 10    Mr. Stojcevski's death."
17:30 11           Do you see that?
17:30 12      **A.  I do.**
17:30 13      Q.  So you were asked to review the documents that you've
17:30 14    listed both on page 2, and the two sets of documents
17:30 15    on page 1, specifically deposition transcripts and
17:30 16    other expert reports, correct?
17:30 17      **A.  Well, there's a list that -- yeah, report's in**
17:30 18    **evidence.  It speaks for itself.**
17:30 19      Q.  You were asked by Mr. Chapman to review the three sets
17:31 20    of materials that are identified: number 1, the
17:31 21    deposition transcripts that you list, one through
17:31 22    nine, correct?
17:31 23      **A.  That's pretty much what my report says.**
17:31 24      Q.  And expert reports one through eight, correct?
17:31 25      **A.  That's pretty much what my report says as well.**

5  (Pages 17 to 20)

Gerald Shiener, M.D.
May 22, 2018

Page 21

17:31 1   Q. And other sets of records one through six, correct?
17:31 2   A. And that's also what my report says.
17:31 3   Q. Were you asked to review anything else that, in fact,
17:31 4      you did not review?
17:31 5   A. No. Or at least not to my recollection.
17:31 6   Q. So you were not asked to review the videotape then of
17:31 7      Mr. Stojcevski while he was in jail, correct?
17:31 8   A. Wait a minute.
17:31 9         THE WITNESS: Could you read that question
17:31 10     again, the one before that?
17:31 11        (The following portion of the record was
17:31 12     read by the reporter at 5:31 p.m.:
17:31 13     Question: "So you were not asked to review
17:31 14     the videotape then of Mr. Stojcevski while
17:31 15     he was in jail, correct?".)
17:31 16        THE WITNESS: That's not true. That's not
17:32 17     correct.
17:32 18  BY MR. IHRIE:
17:32 19  Q. All right. Well, then is it correct that you were
17:32 20     asked to review the videotape prior to writing your
17:32 21     report?
17:32 22  A. I was given the videotape, and I was asked not to
17:32 23     review it until speaking with Mr. Chapman. I spoke
17:32 24     with Mr. Chapman, and then I prepared the report.
17:32 25  Q. Did Mr. Chapman ever ask you to review the videotape?

Page 22

17:32 1   A. I don't know if he ever stated — he told me not to
17:32 2      review it until after I spoke with him.
17:32 3   Q. And when did you speak with him?
17:32 4   A. Wait, wait, wait, wait, wait.
17:32 5         Do you want to let me finish answering, or
17:32 6      do you want to interrupt me?
17:32 7   Q. Go ahead.
17:32 8   A. Thank you.
17:32 9         I was provided with the — with the videos.
17:32 10     I was told not to — not to view them until after I
17:32 11     spoke with him. So it was my understanding that after
17:32 12     I spoke with him, I was to review them.
17:32 13        And I met with him sometime over the summer
17:32 14     of 2017. I don't recall when.
17:32 15  Q. If it was your understanding that you were to review
17:32 16     the videotape after you spoke with him, and you spoke
17:33 17     with him in the summer of 2017, then why didn't you
17:33 18     thereafter review the videotape prior to writing your
17:33 19     report?
17:33 20  A. I think the last time you asked me that I told you I
17:33 21     didn't recall.
17:33 22  Q. Is there any portion of your report that addresses
17:33 23     anything that you saw in the videotapes?
17:33 24  A. You know, I — again, I — I don't recall. I know
17:33 25     that the video was referenced in a lot of other

Page 23

17:33 1   documents that I reviewed, and I can't tell you if I
17:33 2   drew my conclusions from viewing that firsthand or
17:33 3   from reading the accounts in the other aspects of the
17:33 4   documents that I've been provided.
17:33 5   Q. Have you testified in jail or prison cases before?
17:33 6   A. I have.
17:33 7   Q. Generally speaking -- not just jail or prison cases,
17:33 8      but generally speaking -- what percentage of your
17:34 9      cases -- in your cases, do you testify for the
17:34 10     plaintiff versus defendant?
17:34 11  A. I have never calculated that. Probably a
17:34 12     preponderance for -- testifying on behalf of
17:34 13     plaintiffs.
17:34 14  Q. Do you have any opinion or -- I hate to use the word
17:34 15     guess, but do you know how many jail cases or prison
17:34 16     cases you've been involved with?
17:34 17  A. No.
17:34 18  Q. More than ten?
17:34 19  A. Probably.
17:34 20  Q. Your first sentence under "Overview" on page 2 you
17:34 21     indicate, "David Stojcevski was detained."
17:34 22        Are you using that word "detained" as a
17:34 23     term of art in -- with respect to jails and prisons,
17:34 24     or do you just mean that that's where he was housed?
17:34 25  A. I don't understand what you're asking.

Page 24

17:34 1   Q. I think that probably answers my question, but --
17:35 2   A. Then I really don't understand what you're asking.
17:35 3   Q. Fair enough.
17:35 4         You indicate that he was detained in the
17:35 5      Macomb County Jail on June 11, 2014, at the direction
17:35 6      of the Roseville Police Department.
17:35 7         Upon what did you base that statement?
17:35 8   A. A police report or something that I read in those
17:35 9      documents.
17:35 10  Q. Is it your opinion that police departments are the
17:35 11     ones that direct for a defendant to be jailed?
17:35 12  A. Oh, I think a judge directs -- well, I mean, to the
17:35 13     extent that calls for a legal opinion, I don't
17:35 14     know that I can answer it.
17:35 15  Q. Do you know the answer?
17:35 16  A. I know that police departments have the power to
17:35 17     arrest people, put them in a lockup or put them in a
17:35 18     jail, and then a judge can send people to jail for a
17:35 19     certain -- for a certain period of time.
17:35 20  Q. In this case did the judge sentence him to jail, or
17:35 21     did the police department simply take him to jail?
17:36 22        MR. CHAPMAN: I'm going to objection: form
17:36 23     and foundation, and not at all relevant to anything
17:36 24     we're here for.
17:36 25        MR. IHRIE: It's relevant to the accuracy

Carroll Court Reporting and Video
586-468-2411

Page 25

17:36  1    and credibility of this report.
17:36  2    BY MR. IHRIE:
17:36  3    Q.  But you can go ahead and answer.
17:36  4            In this case did the police department make
17:36  5    the decision to put him in jail or did the judge?
17:36  6    A.  Well, since he was arrested on a warrant, I would
17:36  7        assume, not being -- not being a lawyer, not being
17:36  8        able to give you a legal opinion, I would have to
17:36  9        conclude that, if there was a warrant, I understand a
17:36  10       warrant is issued by a judge.
17:36  11   Q.  So what's your answer then?
17:36  12   A.  Well, why don't you repeat your question.
17:36  13   Q.  Was it the judge who placed him in jail or the
17:36  14       Roseville Police Department?
17:36  15   A.  Oh, that's my -- well, you mean who placed him in
17:36  16       the --
17:36  17   Q.  Yes.  Who ordered him to go to jail?
17:36  18   A.  Well, that's different between who placed him and who
17:36  19       ordered him.
17:36  20   Q.  Who ordered him?
17:36  21   A.  Well, why don't you make up your mind.  Ask me a
17:36  22       question that I can answer, and ask it consistently.
17:37  23       Because if you ask it one way and then ask it another
17:37  24       way, I don't know what you're talking about.
17:37  25   Q.  Well, let's use your word.

Page 26

17:37  1            Who directed him to go to jail?
17:37  2    A.  Well, directed him; my understanding is the police
17:37  3        department took him to the jail.
17:37  4            Is that what you mean by "directed"?
17:37  5    Q.  No, I'm using your word.  What did you mean by
17:37  6        "directed" in your report?  You said at the --
17:37  7            MR. CHAPMAN:  I'm going to object.  He
17:37  8        doesn't say "directed," he says, "At the direction of
17:37  9        Roseville Police."
17:37  10   BY MR. IHRIE:
17:37  11   Q.  That's what I'm about to read.
17:37  12            "At the direction of the Roseville Police
17:37  13       Department, he was detained in the Macomb County
17:37  14       Jail."
17:37  15   A.  No, they took him to jail.
17:37  16   Q.  So you mean they took him to jail.  They transported
17:37  17       him to jail; is that what you're saying?
17:37  18   A.  Well, which is it, took him or transported him?
17:37  19   Q.  Either.
17:37  20   A.  Well, that's my understanding.
17:37  21   Q.  Who ordered --
17:37  22   A.  This is all you got?  This is it?  This is what you
17:37  23       want to know?
17:37  24   Q.  Do you know who ordered him to go to jail?
17:37  25   A.  Well, ordered --

Page 27

17:37  1            MR. CHAPMAN:  Object to form and
17:37  2    foundation.
17:37  3            THE WITNESS:  Whoever issued the warrant.
17:37  4    But again, to the extent that it calls for a legal
17:37  5    conclusion, I don't know that I can answer that.
17:37  6    BY MR. IHRIE:
17:38  7    Q.  In terms of challenging me as to whether -- Is that
17:38  8        all you have, I would respectfully request that you
17:38  9        just answer my questions rather than challenge me.
17:38  10   A.  I'll do my best, but I want to understand them, and
17:38  11       many of these questions are cryptic to me, sometimes
17:38  12       because of the way that they're posed, and sometimes
17:38  13       because of the obscurity of what the issue really is
17:38  14       and what you're really asking me.
17:38  15            So I'm doing my best to try to understand.
17:38  16   Q.  Please do.
17:38  17   A.  I mean, when -- usually at the outset of a deposition
17:38  18       I'm instructed to let you know if I don't understand
17:38  19       what you're asking.  So when I ask that kind of
17:38  20       question, it arises out of my limited ability to
17:38  21       understand what you're really getting at or what you
17:38  22       mean when you pose these questions to me.
17:38  23            But I'll do my best to try and understand
17:38  24       and try and cooperate with you.
17:38  25   Q.  Looking at the second paragraph, you indicate --

Page 28

17:38  1    toward the end it says -- you reference Nurse Deluca,
17:39  2    noted on the intake form that he showed, quote,
17:39  3    obvious physical signs of drug use -- or drug abuse,
17:39  4    rather.
17:39  5            Why did you put that in your report, and
17:39  6    does it have any importance in this case?
17:39  7    A.  I put it in my report because I read it, and it showed
17:39  8        that -- it established the fact that a nurse did make
17:39  9        an assessment.
17:39  10   Q.  Well, she made a lot of assessments in her initial
17:39  11       document; did she not?  Why did you pick that one to
17:39  12       put in your report?
17:39  13   A.  That seemed to be the most pertinent.
17:39  14   Q.  Is it relevant to this case, in your opinion?
17:39  15   A.  Well, I'm not sure what you mean by "relevant."
17:39  16            The -- wait.  The medical record does have
17:39  17       some relevance.  I draw attention to certain parts of
17:39  18       the medical record, because they're exemplary of what
17:39  19       happened.  They form examples of what happened.
17:39  20   Q.  Well, you carved out and put in quotation marks that
17:40  21       the form showed -- the intake form showed that he --
17:40  22       that she wrote, "Obvious physical signs of drug
17:40  23       abuse."
17:40  24            My question is very simple.  Is that fact
17:40  25   relevant to this case?

Gerald Shiener, M.D.
May 22, 2018

Page 29

```
17:40  1   A.  Well, it seemed to be, or it could be.
17:40  2   Q.  And in what way could it be?
17:40  3   A.  Well, because there are some issues about his drug use
17:40  4       and about how his drug use manifested in his clinical
17:40  5       condition, who noticed it, and what they did about it.
17:40  6       So that was one reference to his drug use.
17:40  7   Q.  You then note that "She recommended he be placed in
17:40  8       the medical detox unit."  And then your next sentence
17:40  9       says, "He was placed in the general population on June
17:40 10       12, 2014."
17:40 11   A.  Yes.
17:40 12   Q.  Is the juxtaposition and the content of those two
17:40 13       sentences supposed to indicate that she recommended he
17:40 14       go to medical detox, but he was rather placed in the
17:40 15       general population?  Is that your point that you're
17:40 16       making there?
17:41 17   A.  No, I think it just -- it establishes the different
17:41 18       places in which he was housed.
17:41 19   Q.  Was -- after she recommended that he be placed in the
17:41 20       medical detox unit, do you know if he was?
17:41 21   A.  I don't think he was placed immediately.
17:41 22   Q.  Do you think he was rather placed in the general
17:41 23       population?
17:41 24   A.  On June 12, yes.
17:41 25   Q.  Your next paragraph indicates that on June 17 --
```

Page 30

```
17:41  1       strike that.  Let me ask it a little bit differently.
17:41  2           From June 11, which is when the intake form
17:41  3       from Deluca was taken, your next entry, your next
17:42  4       paragraph, talks about June 17.
17:42  5           Is it your opinion that nothing significant
17:42  6       with respect to this case happened between the 11th
17:42  7       and the 17th?
17:42  8   A.  Nothing that I felt necessary to include in my report
17:42  9       at this point.
17:42 10   Q.  You indicate that "Deputy Licavoli found Stojcevski
17:42 11       lying on the floor in his cell on his back, unable to
17:42 12       speak and blinking his eyes."
17:42 13           Of what relevance was the fact that
17:42 14       Licavoli found him unable to speak and blinking his
17:42 15       eyes on the floor of his cell?
17:42 16   A.  That's a description of his condition.
17:42 17   Q.  Is it relevant to this case?
17:43 18   A.  Well, I'm not sure what you're really asking when you
17:43 19       say, "Is it relevant to this case."
17:43 20           I mean, his medical condition, or his
17:43 21       condition at any given time, seems to be at issue
17:43 22       here.  So descriptions of his -- of his condition from
17:43 23       time to time would seem to be pertinent.
17:43 24   Q.  Is it relevant to you that on the 17th he was unable
17:43 25       to speak and blinking his eyes?
```

Page 31

```
17:43  1           What does "unable to speak" indicate to
17:43  2       you?
17:43  3   A.  Well, it can indicate any number of things.
17:43  4   Q.  What are the most significant things that it might
17:43  5       indicate?
17:43  6   A.  Most significant?
17:43  7           The inability to speak can be caused by a
17:43  8       number of issues, anything from severe pharyngitis or
17:43  9       oral pathology, to neurologic pathology, to
17:43 10       intoxication, to withdrawal, to somnolence, to other
17:43 11       psychiatric conditions: schizophrenia, depression.
17:44 12   Q.  You indicate then that he was taken to his -- to the
17:44 13       medical section and then returned to his cell.
17:44 14           Do you know what happened when he was taken
17:44 15       to what you call "the medical section"?
17:44 16   A.  I -- I don't have the -- I don't have the specific
17:44 17       document, or I haven't flagged it or referenced it,
17:44 18       but I understand that there was some assessment, and
17:44 19       then he was returned to his cell and referred to
17:44 20       mental health.
17:44 21   Q.  You then indicate that he was referred to mental
17:44 22       health because he was hallucinating.
17:44 23   A.  Yes.
17:44 24   Q.  So on the 17th -- did that all occur on the 17th, that
17:44 25       he was unable to speak -- or at least reported to be
```

Page 32

```
17:44  1       unable to speak -- reported to be blinking his eyes
17:44  2       and reported to be hallucinating?  Did that all occur
17:44  3       on the 17th?
17:44  4   A.  If not the 17th, then shortly thereafter.
17:45  5   Q.  At this point in your report is the combination of
17:45  6       those three things significant: being unable to speak,
17:45  7       blinking his eyes, and hallucinating?
17:45  8   A.  Well, once again, those do describe his condition, and
17:45  9       his condition is at issue in this matter.
17:45 10   Q.  What's the difference between -- what is
17:45 11       hallucinating?
17:45 12   A.  Hallucinating is reporting a sensory experience where
17:45 13       there is no objective stimuli.
17:45 14   Q.  And that's different than a delusion; is it not?
17:45 15   A.  A delusion is a conclusion based on faulty thinking.
17:45 16   Q.  And at this point he was hallucinating.
17:45 17           Do you recall what his hallucination was?
17:45 18   A.  No.
17:45 19   Q.  Would it refresh your memory if I indicated, generally
17:45 20       speaking, that he felt that he had -- half of his
17:45 21       heart had been eaten, and that -- well, let's just
17:45 22       start there.
17:45 23   A.  I think it was half of his body was eaten, or
17:45 24       something like that.
17:45 25   Q.  And that that all happened while he was at the jail?
```

Carroll Court Reporting and Video
586-468-2411

Gerald Shiener, M.D.
May 22, 2018

Page 33

A. Yes.

Q. Does that particular kind of hallucination fit into any particular psychiatric category?

A. It can fit into a number of different psychiatric conditions.

Q. The next sentence, which is at the top of page 3 indicates that "He was placed in a mental health cell, on suicide watch, under 24-hour video coverage."

Did you read anything in his medical report, or any of the medical notes, documents, or the mental health notes or documents of any kind, that indicated that he was suicidal?

A. Well, he was -- I think he was described as suicidal. I think your question may mean was there any objective basis for that, and I don't recall reading anything that described anything that he said that would lead to that inference, other than a general concern that his -- that his behavior might put him at risk for some self-harm. But I don't recall any verbalizations of suicidal intent.

Q. Do you know -- do you have an opinion, or do you know based upon your experience, as to what a suicide watch is?

A. Well, I have some understanding of what suicide watch is based on my experience, and that would be close

Page 34

observation; that would be environmental safety, so removing the means for self-harm, no sharps, paper clothing, finger foods, no utensils. Measures of that -- of that sort to reduce the risk of self-harm.

Q. Would it also include lack or reduced ability to go out and socialize with other members of the jail community?

A. Well, that's not necessarily part of suicide watch in itself, but in some instances it may be. And what you're talking about is increased degree of confinement. And that's not necessarily part of suicide watch. It may be in some instances or in some environments.

Q. Might there be any negative psychiatric consequences to placing somebody in a suicidal watch cell who is not suicidal?

A. Well, anything is possible, but if you're going to make an error, you want to err on the part of being conservative and overreact to the risk of self-harm rather than under react.

You know, isolation in a corrections pop -- correction setting might be instituted to reduce the risk of obtaining the means for self-harm from another inmate or obtaining the means for self-harm in an area of the -- of the lockup or of a prison or of a jail

Page 35

that's not as environmentally safe.

Q. You indicated -- you just used the phrase "the indications of self-harm." What were the indications of self-harm?

A. Well, I think when you asked me that previously, you asked me if I had heard anything or read anything that would lead to the mental health professional's inference that he was at risk for self-harm. And my answer was: Other than his disorganized behavior, I didn't see anything where there was anything he directly expressed that would lead to that inference. But certainly disorganized behavior increases the risk of self-harm for inadvertent reasons or for intentional reasons.

Q. What do you mean, "disorganized behavior"?

A. Well, if someone is confused, if someone is hallucinating, if someone is operating under a delusion, their behavior may be disorganized. They may have an impairment in their ability to take in information, process it, and act on it in a consensually validated way.

If someone is operating under a delusion of persecution, they may take some measure to protect themselves that puts them at greater risk. They may jump out of a window, because someone's trying to

Page 36

chase them; or they may run out into traffic, because they think they're being chased or persecuted; or they may do something unwise or something self-destructive in that instance.

Q. And is that justification, in your opinion, that something -- that somebody may do something like that, even though they have expressed zero intent to do something, they have not shared an idea to do something like that, they have not identified a plan to commit suicide, is it your testimony that somebody who hasn't done any of those things is appropriate for placement in a high-observation suicide that -- a suicide cell?

A. Well, surely you don't mean that everyone who intends to harm themselves is going to express that intent or is going to disclose that intent. Although many people do, many people who do complete suicide do not disclose their intent. So mental health professionals have to make inferences based on other aspects and other observations.

But suicide watch may be instituted when -- when an individual's behavior is disorganized, and that increases the risk of self-harm whether it's by intent or whether it's inadvertent.

Q. Your statement that not everybody who's going to

Carroll Court Reporting and Video
586-468-2411

Gerald Shiener, M.D.
May 22, 2018

Page 37

17:51 1 commit suicide expresses an intent to do so, I
17:51 2 certainly would agree with you.
17:51 3 A. Well, thank you.
17:51 4 Q. I'd the other side of that coin is that:  Just because
17:51 5 somebody acts in a -- what you phrase disorganized
17:51 6 fashion ought to be placed in a suicide cell; is that
17:51 7 true as well?
17:51 8 A. Well, no.  I think -- what do they call that?  A
17:51 9 hyperbole.  I say something, then you raise it to a
17:51 10 level of absurdity and ask if that's what I said, and
17:51 11 that's not what I said, or that's not what I meant.
17:51 12 But disorganized behavior may be one of the
17:51 13 reasons that you would place someone on a suicide
17:51 14 watch.  Because a suicide -- look, penicillin is used
17:51 15 to treat syphilis.  We don't call it an
17:51 16 antisyphilitic.
17:51 17 Suicide watch implies close observation and
17:51 18 environmental safety.  And there may be a number of
17:52 19 reasons that you want to put someone in that
17:52 20 environment; not only because they have suicidal
17:52 21 intent, but again, because there's something about
17:52 22 their behavior, or something about their expressions,
17:52 23 that the clinician feels raises the possibility of
17:52 24 self-harm, whether by intent or whether it's
17:52 25 inadvertent.

Page 38

17:52 1 Q. So other than what you've called disorganized
17:52 2 behavior, did you see any other indication of suicidal
17:52 3 intent or behavior?
17:52 4 A. Well, if someone says that their body has been
17:52 5 destroyed, they're talking about self-destructive
17:52 6 ideas; and in certain instances, that might be an
17:52 7 indication of intent to self-harm.
17:52 8 If someone talks about being persecuted --
17:52 9 and he didn't talk about being persecuted directly --
17:52 10 but that may be the projection of suicidal ideation
17:52 11 out on an environment.  So there are a number of
17:52 12 different reasons.
17:52 13 In this instance I -- by my recollection,
17:52 14 the disorganized behavior I believe led to the
17:52 15 inference that he needed to be in a -- in a suicide
17:53 16 watch environment.
17:53 17 Q. Didn't you already include the fact that -- of his
17:53 18 hallucinatory behavior in the disorganized behavior?
17:53 19 Isn't that part of a disorganized behavior?
17:53 20 A. Well, not everyone who's disorganized hallucinates,
17:53 21 and not --
17:53 22 Q. I didn't say that.
17:53 23 A. -- everyone who hallucinates is disorganized, so I
17:53 24 think that they're separate.  So I think I already
17:53 25 included that in what I said, and when I reiterate it,

Page 39

17:53 1 I wanted to make sure I was being thorough.
17:53 2 Q. Was his hallucinatory behavior part of his
17:53 3 disorganized behavior?
17:53 4 A. No, I'd say those are two different things.
17:53 5 Q. Two different things.
17:53 6 What was his disorganized behavior then?
17:53 7 What did that consist of?
17:53 8 A. I think I already answered that when you asked me to
17:53 9 define disorganized behavior, and I gave the example
17:53 10 that -- or I gave the definition --
17:53 11 Q. What was his?
17:53 12 A. Wait.  Can I finish?
17:53 13 Q. Yes.
17:53 14 A. Thank you.
17:53 15 -- that disorganized behavior can be an
17:53 16 impairment in the ability to take in information,
17:53 17 process it, and act on it in an appropriate manner or
17:53 18 consensually validated manner.  And hiding under the
17:54 19 bed, blinking his eyes, not speaking, and then stating
17:54 20 that his body had been damaged in the jail, those are
17:54 21 all manifestations of disorganized behavior.
17:54 22 Q. So then based upon what you just told me, thinking
17:54 23 that his body was half eaten, I just asked you if that
17:54 24 was part of his disorganized behavior, you said, "No,
17:54 25 that was separate."  Now you've listed it as part of

Page 40

17:54 1 his disorganized behavior.  Which one is it?
17:54 2 A. I said it was -- well, now, you can just argue with
17:54 3 me, if you like.  I'm trying not to be difficult, but
17:54 4 when -- you talked about hallucinations as being part
17:54 5 of disorganized behavior, and then I said, Not
17:54 6 everyone who hallucinates is disorganized, and not
17:54 7 everyone who is disorganized hallucinates, that those
17:54 8 are two different phenomena.
17:54 9 But certainly offering a recollection of
17:54 10 something and stating something had happened to him
17:54 11 that was, A, unlikely and not consistent with reality,
17:54 12 and B, something that was not likely to have happened
17:54 13 in the past or misremembering the past, that implies
17:54 14 a level of disorganization as well.
17:55 15 Now, I can talk about this a lot, and
17:55 16 psychiatrists do address these kinds of issues.  If
17:55 17 this is what we need to discuss, I'm happy to spend
17:55 18 the time doing it.
17:55 19 Q. Dr. Shiener, I'm going to ask you what we need to
17:55 20 discuss.  You don't need to worry about that.
17:55 21 So is --
17:55 22 A. I'm not worried in the least, Mr. Ihrie.
17:55 23 Q. All right.  So what was his disorganized behavior
17:55 24 absent the hallucinations?
17:55 25 A. Everything else I said about it a few moments ago, the

10  (Pages 37 to 40)

Gerald Shiener, M.D.
May 22, 2018

---

Page 41

17:55 1    first time you asked me.
17:55 2    Q.  You told me --
17:55 3    A.  We're not going to argue about what I told you.  You
17:55 4        can read from the record, if you want.
17:55 5    Q.  I understand that you told me what disorganized
17:55 6        behavior is, but I'm asking if it related to him, to
17:55 7        David.
17:55 8    A.  I believe I did --
17:55 9    Q.  You did not.
17:55 10       What was his disorganized behavior?
17:55 11   A.  I don't want to argue with you, but I did.  And I --
17:55 12   Q.  Forgive me then for not --
17:55 13   A.  I -- well --
17:55 14   Q.  -- for not hearing that.
17:55 15   A.  There's nothing to forgive you for.  I don't hold it
17:55 16       against you.
17:55 17   Q.  What was it?
17:55 18   A.  Hiding under the bed, not speaking, blinking his eyes.
17:55 19       And by that description there is some inference that
17:56 20       he was disturbed, because there was no reason for him
17:56 21       to hide under the bed.
17:56 22   Q.  I didn't see where he was hiding under the bed.  Where
17:56 23       did you see that?
17:56 24   A.  Oh, excuse me.  On the floor of his cell.  Excuse me.
17:56 25       On his back, unable to speak, and blinking his eyes.

---

Page 42

17:56 1    Q.  So lying on the floor, being unable to speak, and
17:56 2        blinking his eyes, those are the -- what you would
17:56 3        categorize as the disorganized behavior for David?
17:56 4    A.  Those are representations of disorganized behavior.
17:56 5    Q.  Were there any others with respect to David?
17:56 6    A.  Not in the descriptions that I have in my report.
17:56 7        There may have been more rich descriptions in the
17:56 8        record.
17:56 9    Q.  You next say, "He was seen by a physician."
17:56 10       I'm trying to understand the chronology of
17:56 11       your report.  Is your testimony that he was placed in
17:56 12       a suicide watch cell, and then he was seen by a
17:56 13       physician?
17:57 14       Strike that question.
17:57 15       Is there a chronology to your report?
17:57 16   A.  I tried to put things in chronological order as best
17:57 17       as I could reproduce them from the record.
17:57 18   Q.  And so if we see that you say, This happened, and then
17:57 19       this happened in the next sentence, may we presume
17:57 20       that it is your opinion that those happened in
17:57 21       chronological order?
17:57 22   A.  I tried my best to do so.
17:57 23   Q.  Thank you.
17:57 24       So after he was put in the 24-hour suicide
17:57 25       watch cell, you indicate that he was seen by a

---

Page 43

17:57 1    physician.
17:57 2    A.  Yes.
17:57 3    Q.  What physician was that, if you know?
17:57 4    A.  I believe it was Dr. Sherman.
17:57 5    Q.  And what did Dr. Sherman -- do you know when that was,
17:57 6        when he saw him?
17:57 7    A.  Not without looking at the record.  I referenced it; I
17:57 8        didn't put a date on it.  So I don't know how long
17:57 9        after his being placed on suicide watch the evaluation
17:57 10       took place or the assessment took place.
17:57 11   Q.  Do you know if he saw him on -- what day was he placed
17:58 12       in suicide watch; do you know?
17:58 13       Licavoli, you identified in your report,
17:58 14       indicated that on June 17, 2014, that's when Licavoli
17:58 15       found him.
17:58 16   A.  I think you already asked me that, and I think I said
17:58 17       it was either on the 17th or shortly thereafter.  I
17:58 18       don't know which day -- which day.
17:58 19   Q.  Well, I didn't ask you about the physician, because we
17:58 20       just got to that.  So do you know --
17:58 21   A.  You didn't -- the question you just asked me had
17:58 22       nothing to do with a physician, so...
17:58 23   Q.  I understand.  I went back to Licavoli.
17:58 24       When did Dr. Sherman see him?  Was it the
17:58 25       17th or the 18th?  Is that what you're saying?

---

Page 44

17:58 1    A.  No, that's not what I'm saying.
17:58 2    Q.  Well, my question is:  When did he see him?
17:58 3        THE WITNESS:  Would you go back to the
17:58 4        first time he asked me that and read my answer,
17:58 5        please?
17:58 6        COURT REPORTER:  The first time Dr. Sherman
17:58 7        saw him?
17:58 8        THE WITNESS:  No, the first time I was
17:58 9        asked about Dr. Sherman.  Go back to the very first
17:58 10       time.
17:58 11       (The following portion of the record was
     12       read by the reporter at 5:59 p.m.:
     13       Question:  "Thank you.
     14       "So after he was put in the 24-hour suicide
     15       watch cell, you indicate that he was seen
     16       by a physician.
     17       Answer:  "Yes.
     18       Question:  "What physician was that, if
     19       you know?
     20       Answer:  "I believe it was Dr. Sherman.")
     21       COURT REPORTER:  Is that what you wanted?
     22       THE WITNESS:  No, keep going.
     23       (The following portion of the record was
     24       read by the reporter at 5:59 p.m.:
     25       Question:  "And what did Dr. Sherman -- do

---

11  (Pages 41 to 44)

Gerald Shiener, M.D.
May 22, 2018

---

Page 45

1   you know when that was when he saw him?
2   Answer:  "Not without looking at the
3   record.  I referenced it; I didn't put a
4   date on it.  So I don't know how long after
5   his being placed on suicide watch the
6   evaluation took place or the assessment
7:59   7   took place.")
  BY MR. IHRIE:
17:59   9   Q.  So now my question is:  Will you look at your record
17:59   10   and tell me -- your materials and tell me when
17:59   11   Dr. Sherman saw him?
17:59   12   A.  Might take me a moment to find it.
17:59   13   Q.  I understand.
18:01   14       MR. CHAPMAN:  If it's helpful, Doctor, you
18:01   15   can look at Sherman's deposition through the index.
18:01   16       THE WITNESS:  I'm looking at the mental
18:01   17   health records on this.  Let's see.
18:02   18       What's the name of the app, the deposition
18:02   19   app?
18:02   20       MR. CHAPMAN:  What?
18:03   21       THE WITNESS:  What's the name of the
18:03   22   deposition app?  E-trans?  No.  What's the name of the
18:03   23   app to read the deposition files?  It's a PTX.
18:03   24       MR. CHAPMAN:  An E-trans?  I'm not sure.
18:03   25       THE WITNESS:  Okay.  Deposition Reader.  I

---

Page 46

18:03   1   don't have this on the new computer.
18:04   2       MR. IHRIE:  Bob Gazall, can you hear us?
18:04   3       MR. EADS:  Yes, I can.
18:04   4       MR. IHRIE:  All right.  Just so you know,
18:04   5   Dr. Shiener is just reviewing some materials right
18:04   6   now, so -- in case you're wondering if we all hung up
18:04   7   on you.
18:04   8       MR. GAZALL:  Yeah, no.  That's fine.
18:04   9       THE WITNESS:  You can only hope.
18:05   10       MR. IHRIE:  Said he's what?
18:05   11       MR. CHAPMAN:  Said he can only hope.
18:06   12       (Recess taken at 6:06 p.m.)
18:06   13       (Back on the record at 6:12 p.m.)
18:12   14       THE WITNESS:  Now, your question was?
18:12   15   BY MR. IHRIE:
18:12   16   Q.  You wanted her to read it back, I think.
18:12   17   A.  You can just tell me.
18:12   18   Q.  Okay.  When did Dr. Sherman see him?
18:12   19   A.  Looks like Dr. Sherman said that he saw him in medical
18:12   20   on the 17th, from his deposition, which would be page
18:12   21   119.
18:12   22   Q.  All right.  Is the chronology of what happened in this
18:12   23   case important?
18:12   24   A.  In some respects it is, yes.
18:12   25   Q.  In what respects --

---

Page 47

18:12   1   A.  Well --
18:12   2   Q.  -- is it?
18:12   3   A.  -- it's when there are changes in the patient's
18:12   4   clinical condition, and then when the assessments were
18:12   5   made based on the changes, and whether there were any
18:13   6   changes in the treatment program based on the changes
18:13   7   in his condition.
18:13   8   Q.  So your testimony is that Dr. Sherman saw David after
18:13   9   David was unable to speak, blinking his eyes, and
18:13   10   hallucinating, and after he had been put into the
18:13   11   suicide cell; is that correct?
18:13   12   A.  Well, let's see.  What does he say?  Excuse me.
18:13   13       Page 121, "All right.  Do you see under the
18:14   14   body of the note where it says, Late entry for
18:14   15   6-17-14, at 7:15 a.m., staff responded to a call in
18:14   16   mental health, patient was noted lying and twitching
18:14   17   his eyes."
18:14   18   Q.  What is it that you're reading, Doctor?
18:14   19   A.  This is Dr. Sherman's deposition.
18:14   20   Q.  Do you know what document Dr. Sherman is referring to
18:14   21   in that?
18:14   22   A.  (No verbal response.)
18:14   23   Q.  Well, let me just back up.
18:14   24   A.  He said -- this says:  "Well, he was brought over to
18:14   25   you in the morning; was he not?

---

Page 48

18:14   1       "No, this was afternoon.
18:14   2       And then you said -- you read from
18:14   3   Deposition Exhibit Number 3 marked for identification,
18:14   4   and it's called the Sherman 3 note.
18:15   5       "And do you see under the body of the note
18:15   6   where it says, Late entry for 6-17 at 7:15 a.m.?".
18:15   7   Q.  I think my question, Dr. Sherman, might be a little
18:15   8   simpler than that.
18:15   9   A.  I'm Dr. Shiener.
18:15   10   Q.  I'm sorry.  I apologize.
18:15   11   A.  That's even simpler, because I'm here, and he's not.
18:15   12   Q.  You indicated that he was seen by a physician in your
18:15   13   report.
18:15   14   A.  Yes.
18:15   15   Q.  On the 17th.
18:15   16   A.  Yes.
18:15   17   Q.  And you indicated previously that you do your best to
18:15   18   write things in chronological order.
18:15   19   A.  Yes.
18:15   20   Q.  So did he see -- did Dr. Sherman see him after the
18:15   21   patient was unable to speak, blinking his eyes, and
18:15   22   hallucinating, and after having been put into the
18:15   23   suicide cell?
18:15   24   A.  No, apparently not after being put into the suicide
18:16   25   cell.

12  (Pages 45 to 48)

Gerald Shiener, M.D.
May 22, 2018

Page 49

18:16  1    Q.  So --
18:16  2    A.  He saw him in the medical unit or in his cell near the
18:16  3        medical unit.
18:16  4    Q.  And you now know that.
18:16  5    A.  Well, that's what Dr. Sherman said.
18:16  6    Q.  So your chronology, at least to the extent that you've
18:16  7        gone to the second line on page 3, has -- is not
18:16  8        accurate, correct?  Is that what your testimony is?
18:16  9    A.  Well, it's accurate that he was seen by a physician.
18:16 10        It's just not accurate that he was placed under --
18:16 11        that's it's after where he was placed on a suicide
18:16 12        watch.  It should be:  He was seen by a physician, and
18:16 13        then he -- after he saw Dr. Sherman, he was put in a
18:16 14        mental health cell on a suicide watch.
18:16 15    Q.  All right.  So the chronology as you have it is not
18:16 16        correct, though, correct?
18:16 17    A.  Well, what I said was I did my best to put things in
18:16 18        chronological order.  And I would have been better --
18:16 19        I think we would have all been better served if I had
18:16 20        placed that second sentence before the first sentence.
18:16 21    Q.  Your next sentence says, "He was described as talking
18:16 22        to himself and eating very little."
18:16 23            And that's a period after the word little;
18:16 24        is that correct?
18:16 25    A.  Yes.  That's right.

Page 50

18:16  1    Q.  And he was described by whom?
18:17  2    A.  I don't recall.
18:17  3    Q.  And when was he so described?
18:17  4    A.  I believe that was while he was in the -- at some time
18:17  5        while he was in the mental health cell.
18:17  6    Q.  Some time -- well, he was in the mental health cell
18:17  7        for ten days.
18:17  8    A.  Yes.
18:17  9    Q.  So your testimony is that "Some time while he was in
18:17 10        the mental health cell."
18:17 11    A.  That's right.
18:17 12    Q.  Sometime during those ten days he was described as
18:17 13        talking to himself and eating very little.
18:17 14    A.  Well, I think not only is that in my report, but I
18:17 15        already answered "yes" when you asked me that before.
18:17 16    Q.  And is this chronologically accurate as well?
18:17 17    A.  I believe it's in the mental health -- while he was in
18:17 18        the mental health ward; I just don't know what day
18:17 19        that that note is from.
18:18 20            MR. CHAPMAN:  Without being pejorative, are
18:18 21        you going to sometime get to his opinions?  None of
18:18 22        this matters.  Get to his opinions.
18:18 23    BY MR. IHRIE:
18:18 24    Q.  Why did you put that in your report, that he was
18:18 25        described as talking to himself and eating very

Page 51

18:18  1        little?
18:18  2    A.  Oh, I felt it would help to understand what happened
18:18  3        to him, how he was acting.
18:18  4    Q.  Is that fact important or those facts important?
18:18  5    A.  Well, when you say "important," I'm not sure -- I'm
18:18  6        not sure what you mean.  If I wanted to put in
18:18  7        everything that I thought was important, I'd be
18:18  8        paraphrasing and dictating this whole set of papers
18:18  9        and the whole set of electronic records into a report,
18:18 10        and that would be redundant.  I didn't think that was
18:18 11        necessary.
18:18 12            I thought it was representative, and I'd
18:18 13        use the term "representative" rather than "important."
18:18 14    Q.  But you didn't dictate everything, and you chose
18:18 15        certain facts that you observed or read about, and you
18:18 16        put certain facts into your report and not others,
18:19 17        correct?
18:19 18    A.  Oh, I think I just said that, didn't I?
18:19 19    Q.  So my question is:  As background information to your
18:19 20        ultimate conclusions, is the fact that while he was in
18:19 21        the suicide cell he was described as talking to
18:19 22        himself and eating very little important to your
18:19 23        ultimate conclusion?
18:19 24    A.  I think I already answered that.
18:19 25    Q.  Well, if it is, I would like to know why it is.  If

Page 52

18:19  1        it's not, I'd like to know why you put it in there.
18:19  2        I'm not trying to lead you somewhere.  If it's
18:19  3        important, please tell me.
18:19  4    A.  I don't think I can answer it the way you've asked it.
18:19  5        I think that -- I think that what I tried to do was
18:19  6        put some things in this document that would be
18:19  7        representative.
18:19  8    Q.  Of what?
18:19  9    A.  Of the course of his stay in the jail, in different
18:19 10        parts of the jail, and descriptions of his condition,
18:19 11        and that if I wanted to put everything important, I
18:20 12        would have generated an unwield -- everything that I
18:20 13        thought was important, the document would be unwieldy.
18:20 14            So I just -- I put that sentence in,
18:20 15        because I thought it was representative.
18:20 16    Q.  And what was it representative of?
18:20 17    A.  Of some of the things that they said about him, when
18:20 18        he was in the mental health ward.
18:20 19    Q.  Then you go -- you jump from the 17th or the 18th to
18:20 20        June 25, where you indicate, "From June 25 until his
18:20 21        death June 27, he laid on the floor in his cell,
18:20 22        shaking and blinking his eyes."
18:20 23            Now, in the course of this paragraph you've
18:20 24        addressed that he was reported as talking to himself,
18:20 25        eating very little, blinking his eyes, and shaking.

13  (Pages 49 to 52)

Gerald Shiener, M.D.
May 22, 2018

---

Page 53

18:20 1    Why was it important to put those representative -- to
18:20 2    use your word -- observations into your report?
18:20 3    A. I didn't say it was important, I just thought that
18:20 4        those were representative of what had happened by way
18:21 5        of a summary.
18:21 6    Q. Did that have anything to do with what David was going
18:21 7        through, or any diagnosis, any conclusion?  Did it
18:21 8        have anything to do with your conclusion?
18:21 9    A. Well, they're representative of some of the behaviors
18:21 10       that led to my conclusions.  I didn't end my document
18:21 11       there; I include other information as well.
18:21 12   Q. I understand.
18:21 13   A. Well, if you do, then I don't understand your line of
18:21 14       questioning.  I'm not sure what you're really getting
18:21 15       at or what you're trying to ask of me.
18:21 16   Q. Why did you want the reader of your report to know
18:21 17       these four things: that he was observed talking to
18:21 18       himself, eating very little, shaking, and blinking his
18:21 19       eyes?
18:21 20   A. I don't think I have anything more to say about my
18:21 21       intent in preparing this document.
18:21 22   Q. Looking at the next paragraph, the second sentence,
18:21 23       you indicate -- well, let's look at the first sentence
18:21 24       first.
18:21 25               You understand that you were hired by the

---

Page 54

18:22 1    attorney for Correct Care Solutions, correct?
18:22 2    A. I do.
18:22 3    Q. And Correct Care Solutions, as you indicate, was to
18:22 4        provide psychiatric and medical care at the Macomb
18:22 5        County Jail as a contract provider.  Then you indicate
18:22 6        that there -- your next sentence reads: "There were
18:22 7        policies, procedures, and nursing policies describing
18:22 8        inmates' -- describing inmates' receipt of timely
18:22 9        health care for serious medical, dental, and mental
18:22 10       health needs."
18:22 11              I don't know what that sentence means.  Can
18:22 12       you please tell me what that means?
18:22 13   A. I don't know that I can help you understand it.  I
18:22 14       think that describes the role of Correct Care
18:22 15       Solutions and their agents.
18:22 16   Q. When you say that there were pol -- "the policies,
18:22 17       procedures, nursing policies describing inmates'
18:22 18       receipt of timely health care," that's -- it's the
18:22 19       word "describing" that I'm having a problem with.  I
18:22 20       don't understand what you mean when you say the
18:22 21       policies and procedures described inmates' receipt of
18:23 22       timely health care.
18:23 23   A. I don't get how you couldn't understand that.  It
18:23 24       seems fairly straightforward.
18:23 25   Q. Well, which inmate or inmates did the policies,

---

Page 55

18:23 1    procedures, and nursing policies describe their
18:23 2    receipt of timely health care?
18:23 3    A. People in need of services.
18:23 4    Q. So you want to stick with the word "describing"?
18:23 5    A. When you say, Stick with it, I don't know what you
18:23 6        mean.  It's already there.
18:23 7    Q. Okay.  What did you look at or review to determine
18:23 8        what corrections officers were trained in or not
18:23 9        trained in?  Which one of the list of documents that
18:23 10       you reviewed on pages -- your first and second page
18:24 11       did you look at to make that determination?
18:24 12           MR. CHAPMAN:  Object to form and
18:24 13   foundation.
18:24 14           THE WITNESS:  Oh, I don't know if it was in
18:24 15   the sheriff's re -- I don't know where it was.  I must
18:24 16   have read it somewhere in these documents.
18:24 17   BY MR. IHRIE:
18:24 18   Q. So you're really opining that somebody else said that
18:24 19       the corrections officers were trained?
18:24 20   A. Well, there were investigations.  I read a sheriff's
18:24 21       investigation.  Some of the corrections officers spoke
18:24 22       about their training or spoke about what they were
18:24 23       supposed to know how to do in their depositions.  I
18:24 24       don't recall where I gleaned that specifically.
18:25 25   Q. Well, you didn't look at any training materials, did

---

Page 56

18:25 1    you?
18:25 2    A. I don't think so.
18:25 3    Q. None are listed on your list of materials that you
18:25 4        reviewed for your report, are they?
18:26 5           MR. CHAPMAN:  What's the question?
18:26 6           MR. IHRIE:  He knows the question.  That's
18:26 7    why he's --
18:26 8           THE WITNESS:  Okay.  It doesn't look like I
18:26 9    had any manuals at the time that I prepared the
18:26 10   report.
18:26 11   BY MR. IHRIE:
18:26 12   Q. How is it then that you can state objectively and with
18:26 13       relative emphasis that "corrections officers were
18:26 14       trained in assessing inmates' needs for nutrition and
18:26 15       hydration"?
18:26 16           MR. EADS:  Form.  Object to form.
18:26 17           THE WITNESS:  Well, I don't -- I don't
18:26 18   recall where I read it.  I did read a number of
18:26 19   corrections officers' depositions.
18:26 20   BY MR. IHRIE:
18:26 21   Q. And --
18:26 22   A. They made reference to it in their depositions.
18:26 23   Q. So when you say "corrections officers were trained,"
18:26 24       are you really saying that somebody else said they
18:27 25       were trained, or a corrections officer said they

---

14  (Pages 53 to 56)

Gerald Shiener, M.D.
May 22, 2018

Page 57

18:27  1    individually were trained?  Is that what you --
18:27  2    A.  Well, that may have been the base -- that may have
18:27  3        been the basis for that statement.
18:27  4    Q.  You understand that saying that somebody said they
18:27  5        were trained, or told you that they were trained, is
18:27  6        different than your conclusion that they indeed were
18:27  7        trained.  Those are two separate things; are they not?
18:27  8    A.  Well, if they say so under oath, they say that they
18:27  9        were trained under oath, I'm not sure what the
18:27 10        difference would be.
18:27 11    Q.  Is it your testimony that every time somebody
18:27 12        testifies under oath, they're telling the accurate
18:27 13        truth?
18:27 14    A.  There you go, there's that hyperbole again.  When I
18:27 15        say something, you restate it in a way --
18:27 16    Q.  Just what's the answer to my question?
18:27 17    A.  Well, that's the answer to my question.  The answer to
18:27 18        my question is what I said, not the hyperbolic
18:27 19        rephrasing or paraphrase of what I said.  So -- and
18:27 20        I've already told you that I like the way I say things
18:27 21        better, and if you're going to paraphrase and ask me
18:27 22        if that's what I said, my answer is going to have to
18:28 23        be:  No.
18:28 24    Q.  I didn't ask you that.  My question is very simple.
18:28 25        Is it your testimony that everybody who testifies

Page 58

18:28  1        under oath is telling the accurate truth?
18:28  2    A.  I didn't recall saying that.
18:28  3    Q.  I ask -- I didn't say that you did say it, sir.  I'm
18:28  4        asking you if that is your opinion.
18:28  5    A.  No, that's not what you asked me.  You asked me if it
18:28  6        was my testimony.
18:28  7    Q.  No, I didn't.
18:28  8        MR. CHAPMAN:  You did.
18:28  9        THE WITNESS:  Read from the record.  Now --
18:28 10    BY MR. IHRIE:
18:28 11    Q.  All right, that's --
18:28 12    A.  You can -- I'm going to cooperate with you.
18:28 13    Q.  That's fine.
18:28 14    A.  But -- but I'm not going to engage in this.  And
18:28 15        you're not going to ask me the question three times
18:28 16        and then change it.
18:28 17    Q.  I'm asking you:  Is it your opinion --
18:28 18    A.  Well, which question do you want me to answer?
18:28 19    Q.  Is it your opinion that everybody who testifies under
18:28 20        oath is telling the accurate truth?
18:28 21    A.  Well, that seems pretty absolute.  It would be hard to
18:28 22        hold onto that kind of opinion.
18:28 23    Q.  So when you say that you read, and they were under
18:28 24        oath when they testified that they had been trained,
18:28 25        is that good enough for you to --

Page 59

18:28  1        MR. CHAPMAN:  Objection, that's --
18:28  2    BY MR. IHRIE:
18:28  3    Q.  -- make the statement --
18:28  4        MR. CHAPMAN:  That's not what he testified
18:29  5    to.
18:29  6    BY MR. IHRIE:
18:29  7    Q.  Let's just identify the fact that -- and agree with
18:29  8        me, if you will, that anything you know about whether
18:29  9        officers were trained came from either a deposition
18:29 10        where somebody else was saying they were trained, or
18:29 11        somebody else was making a statement about training --
18:29 12    A.  Or maybe something I read in some other case.
18:29 13    Q.  Let me finish my sentence.
18:29 14        You didn't investigate the training
18:29 15        yourself, did you?
18:29 16    A.  I didn't conduct my own police investigation of what
18:29 17        was said in any of these records.  I didn't go out and
18:29 18        ask these guys if they were telling the truth during
18:29 19        their deposition.  I didn't go out to the jail and
18:29 20        say, "Well, this is what's supposed to happen; is this
18:29 21        what really happens."  I don't think that's what my
18:29 22        job was here.
18:29 23    Q.  You put down in your report that you read Deputy
18:29 24        Harrison's deposition, correct?
18:29 25    A.  I did.

Page 60

18:29  1    Q.  Do you recall reading in his deposition where he
18:29  2        specifically indicated that he was not trained to
18:29  3        monitor food and water intake at the jail?
18:29  4    A.  I haven't committed his deposition to memory.
18:30  5    Q.  Well, if he did say that in his deposition, and for
18:30  6        the sake of this question I want you to presume that
18:30  7        he did, why would you say in your report that deputy
18:30  8        corrections officers were trained?
18:30  9    A.  Well, just because he --
18:30 10        MR. EADS:  Let me just object to form.
18:30 11        That's two completely different issues.  His report is
18:30 12        different from the question you just asked, so I'll
18:30 13        just object to the form and hypothetical.
18:30 14        MR. CHAPMAN:  I'll join.
18:30 15    BY MR. IHRIE:
18:30 16    Q.  Do you know what deputy -- what corrections officers
18:30 17        were trained to do with respect to assessing an
18:30 18        inmate's need for nutrition and hydration?
18:30 19    A.  I don't understand what you're asking.
18:30 20    Q.  Well, you said they were trained --
18:30 21    A.  They were trained to do.
18:30 22    Q.  To do what?
18:30 23    A.  To assess inmates' needs for nutrition and hydration.
18:30 24        MR. CHAPMAN:  The doctor is not here to
18:30 25        testify as to what corrections officers --

15  (Pages 57 to 60)

Gerald Shiener, M.D.
May 22, 2018

Page 61

18:30 1     MR. IHRIE: I know what he's here for.

18:31 2     MR. CHAPMAN: -- did or didn't do.

18:31 3     MR. IHRIE: I know what he's here for. If

18:31 4 there's an objection, make it.

18:31 5     MR. CHAPMAN: Well, there is. Why are we

18:31 6 going through this exercise of questioning him on

18:31 7 things that's not what he's retained for? He's not

18:31 8 giving any opinions on corrections officers, what they

18:31 9 did or didn't do.

18:31 10 BY MR. IHRIE:

18:31 11 Q. You indicated next that "A hunger strike policy was in

18:31 12 place."

18:31 13     Did you read the hunger strike policy?

18:31 14 **A. I don't recall if I did or not.**

18:31 15 Q. That being the case, you're not able to testify about

18:31 16 it today then, correct?

18:31 17 **A. About what's in it?**

18:31 18 Q. Yes.

18:31 19 **A. No.**

18:31 20 Q. When you see a patient that you haven't seen for a few

18:31 21 years, do you go back and look at his previous

18:32 22 records?

18:32 23 **A. If they're available.**

18:32 24 Q. If they're available? Why do you do that?

18:32 25 **A. To help me in my assessment.**

Page 62

18:32 1 Q. In the next paragraph you indicate, in the second

18:32 2 sentence, "Medical records -- 'medical record.'" I

18:32 3 don't know if you mean that plural, but medical --

18:32 4 I'll read it the way it is. "Medical record generated

18:32 5 in 2006 would have reflected that he was taking both

18:32 6 Xanax and Klonopin, benzodiazepine tranquilizers."

18:32 7     Why did you put that in your report?

18:32 8 **A. Same reason.**

18:32 9 Q. Well, the reason you gave me before was that it was

18:32 10 representative of something. That doesn't seem to be

18:32 11 logical to put that in there because it's

18:32 12 representative of something, so my question is: Why

18:32 13 did you put it in there?

18:32 14 **A. Well, your opinion's noted, but that's why I put it**

18:32 15 **in.**

18:32 16 Q. Well, tell me what the answer is as to why you put it

18:32 17 in?

18:33 18 **A. It's representative.**

18:33 19 Q. It's representative. Of what?

18:33 20 **A. His medical history.**

18:33 21 Q. Are you saying that the 2006, 2008, and 2009 records

18:33 22 were representative of his medical history?

18:33 23 **A. Yeah. Prior medical records would have been**

18:33 24 **representative of his medical history.**

18:33 25 Q. Well, they would have been more than representative;

Page 63

18:33 1 they would have been his medical history at the jail,

18:33 2 correct?

18:33 3 **A. Well, I mean, if they were accurate, and depending on**

18:33 4 **the quality of the record and their completeness.**

18:33 5 Q. So is there a reason why you put that in the report?

18:33 6 **A. Yeah, because it was representative of his history.**

18:33 7 Q. And it is your statement that those records, at least

18:33 8 in 2006, would have reflected, had they been looked

18:34 9 at, that he was taking both Xanax and Klonopin back

18:34 10 well before he was housed in 2014, correct?

18:34 11 **A. Say that again?**

18:34 12     THE WITNESS: Or read it. Why don't you

18:34 13 read it.

18:34 14     (The following portion of the record was

18:34 15 read by the reporter at 6:34 p.m.:

16 Question: "And it is your statement that

17 those records, at least in 2006, would have

18 reflected, had they been looked at, that he

19 was taking both Xanax and Klonopin back

20 well before he was housed in 2014,

18:34 21 correct?".)

18:34 22     MR. CHAPMAN: Object to form and

18:34 23 foundation.

18:34 24     THE WITNESS: Well, I think that's what

18:34 25 that says. I think that's what that sentence says,

Page 64

18:34 1 yeah.

18:34 2 BY MR. IHRIE:

18:34 3 Q. So I'm right when I said that, correct?

18:34 4 **A. I'm not here to say whether you're right or wrong.**

18:34 5 **That's just what it says there.**

18:34 6     **You don't want to get into my opinions on**

18:34 7 **that, do you?**

18:34 8 Q. Your last sentence of that paragraph indicates,

18:35 9 "Michigan Automated Prescription System revealed that

18:35 10 Mr. Stojcevski had regularly filled prescriptions for

18:35 11 methadone, oxycodone, clonazepam, and alprazolam

18:35 12 between February and June 2014."

18:35 13     Do you have any familiarity with the

18:35 14 Michigan Automated Prescription System?

18:35 15 **A. I do.**

18:35 16 Q. And tell me what that is.

18:35 17 **A. It's a system that keeps track of controlled substance**

18:35 18 **prescriptions that are filled in the state of Michigan**

18:35 19 **and in some other states, and if you're a mental -- if**

18:35 20 **you're a health practitioner caring for a patient, you**

18:35 21 **want to know his history of opiates and sedative use,**

18:35 22 **analgesic use, and some other drugs that are under**

18:35 23 **those schedule, you can go to a website, enter the**

18:35 24 **patient's name and birth date, and attest to the**

18:35 25 **reasons for which you're reviewing the record, and**

16 (Pages 61 to 64)

Gerald Shiener, M.D.
May 22, 2018

Page 65

18:35   1      you'll get a record of prescriptions filled.
18:35   2   Q.   Are you a subscriber to that service?
18:36   3   A.   I don't think you have to be a subscriber. I think
18:36   4      any practitioner can access it.
18:36   5   Q.   Is there a fee, if you know?
18:36   6   A.   There's no fee.
18:36   7   Q.   Do you ever access it?
18:36   8   A.   I do.
18:36   9   Q.   Why?
18:36  10   A.   Well, now it's required. Before --
18:36  11   Q.   "Now" starting when?
18:36  12   A.   Starting on June 1, actually. But it --
18:36  13   Q.   This year.
18:36  14   A.   This year.
18:36  15          But in the hospital we often see patients
18:36  16      who are incapable of providing a history to us, they
18:36  17      appear to be intoxicated or withdrawing, and so we'll
18:36  18      look at their history, to see if there's any record of
18:36  19      their use.
18:36  20   Q.   Do you recall when in your practice you began to use
18:36  21      that service?
18:36  22   A.   Long time ago. When it was first offered.
18:36  23   Q.   What do you have to do? Plug in your -- do you have a
18:36  24      -- like lawyers have P numbers, you have a physician
18:36  25      number, correct?

Page 66

18:36   1   A.   You know, it's been so long since I registered, I
18:36   2      don't know what you had to prove. I think it's
18:36   3      just -- you just have to have a license number. I
18:36   4      don't think you need a DEA or anything. But if you
18:36   5      have a license number, and you're a registered
18:36   6      practitioner, and you're in good standing with the
18:36   7      state, then you can access the database.
18:37   8   Q.   Have you ever had patients that you thought were drug
18:37   9      seeking from you?
18:37  10   A.   Well, I mean, any --
18:37  11   Q.   Inappropriately drug seeking?
18:37  12   A.   Sure.
18:37  13   Q.   How long does it take to -- for you to log into the
18:37  14      MAPS system and learn what you wish to learn?
18:37  15   A.   Now it's quite quick. Before maybe the last -- I
18:37  16      think within the last 12 to 18 months, the system's
18:37  17      been changed. Before it was changed it was a little
18:37  18      more lengthy, you know, to -- it could be about a 20-,
18:37  19      25-minute endeavor.
18:37  20   Q.   And if you do log in, you can learn what prescriptions
18:37  21      have been prescribed to a certain patient, correct?
18:37  22   A.   No.
18:37  23   Q.   What can you learn?
18:37  24   A.   What prescriptions have been filled.
18:37  25   Q.   Have been filled.

Page 67

18:37   1   A.   And reported.
18:37   2   Q.   All right.
18:37   3   A.   And --
18:37   4   Q.   And how often --
18:37   5   A.   Yeah.
18:37   6   Q.   -- they've been filled, correct?
18:37   7   A.   I think under the old system you could choose how -- I
18:37   8      don't know if you could chose how far back you went or
18:38   9      if there was a limit of -- but now the limit is about
18:38  10      18 months, and you get a list of prescriptions that
18:38  11      have been filled. You know, the accuracy is sometimes
18:38  12      questionable, but it's better than not having any
18:38  13      information.
18:38  14   Q.   If the accuracy is sometimes questionable, why have
18:38  15      you used it? You said you've used it for years.
18:38  16   A.   Well, I've -- because some information is better than
18:38  17      none. And it doesn't tell you about diversion, it
18:38  18      doesn't tell you -- first of all, if a patient has a
18:38  19      lot of prescriptions, it doesn't tell you if they're
18:38  20      using the drug or selling it. And if a patient is
18:38  21      buying it from someone who's diverting it, it's not on
18:38  22      the MAPS. But it's informative.
18:38  23   Q.   And you indicated that -- on your third paragraph on
18:38  24      page 3, that "Michigan Automated Prescription System
18:38  25      revealed."

Page 68

18:38   1          How was it that you saw the Michigan
18:38   2      Automated Prescription System with respect to
18:38   3      Mr. Stojcevski?
18:38   4   A.   If I didn't see the report -- I think number 5 on page
18:39   5      2, Michigan Automated Prescription System. So I did
18:39   6      have a report.
18:39   7   Q.   I understand that; but where did you -- did you --
18:39   8      where did you get that? Did you look it up yourself?
18:39   9   A.   No. No, it was provided to me.
18:39  10   Q.   That was provided to you.
18:39  11          MR. CHAPMAN: I got it from you.
18:39  12          MR. IHRIE: And we got it from the medical
18:39  13      examiner.
18:39  14          MR. PERAKIS: He got it from them.
18:39  15          THE WITNESS: I wouldn't have been able to
18:39  16      get it, because it only goes back a certain time
18:39  17      period. This would have been prior to the time period
18:39  18      that was recorded.
18:39  19   BY MR. IHRIE:
18:39  20   Q.   Yeah, okay.
18:40  21          When Dr. Sherman saw David Stojcevski, did
18:40  22      you see anything in the medical records that indicated
18:40  23      that he did any kind of a physical exam on him?
18:40  24   A.   I don't. I don't recall, but I don't believe so.
18:40  25   Q.   Did you see anything in the records that would

17  (Pages 65 to 68)

Page 69

18:40 1    indicate that he did a neurological exam on him?
18:40 2    **A.  I don't recall.**
18:40 3    Q.  If he did, it's not in your report, correct?
18:40 4    **A.  I didn't quote his -- his notes.  I believe there were**
18:40 5    **only those two notes.**
18:40 6    Q.  And as you sit here today, you have no recollection of
18:40 7    seeing anything in the records that he did, correct?
18:40 8    **A.  Nothing about a neurologic exam.**
18:40 9    Q.  Do you remember what his diagnosis -- strike that.
18:41 10    Do you remember what he concluded?
18:41 11    **A.  When he said he was feigning a seizure and returned**
18:41 12    **him to his unit?  Is that what you're referring to?**
18:41 13    Q.  Yes.
18:41 14    **A.  Yeah.**
18:41 15    Q.  Did you ever see anything in the records that
18:41 16    indicated that Dr. Sherman after that ever did
18:41 17    anything to rule in or rule out his opinion of
18:41 18    feigning seizures?
18:41 19    **A.  I'm not sure what that would be, but I don't recall**
18:41 20    **seeing anything to that effect, other than waiting and**
18:41 21    **seeing if the condition progressed.**
18:41 22    Q.  Do you recall seeing in Dr. Sherman's deposition where
18:41 23    he indicated that he was going to follow up with David
18:41 24    Stojcevski?
18:41 25    **A.  I haven't memorized that document.  If you want to**

Page 70

18:41 1    **refer me to a page, I'll take a look at it.**
18:41 2    Q.  Blood pressure of 150 over 98, how would you
18:42 3    characterize that?
18:42 4    **A.  Elevated.**
18:42 5    Q.  You indicate in your next paragraph that "by June 20,
18:42 6    '14, his behavior was described as bizarre."
18:42 7    Do you recall who described his behavior as
18:42 8    bizarre?
18:42 9    **A.  No.**
18:42 10    Q.  When you say "By June 20, 2014," do you mean on June
18:42 11    20, 2014?
18:42 12    **A.  Yes.**
18:42 13    Q.  You next indicate that "Dr. Sherman described that he
18:42 14    was feigning a seizure, and he was returned to his
18:42 15    unit."
18:42 16    **A.  Yes.**
18:42 17    Q.  Is that also out of chronological order?
18:43 18    **A.  I don't -- I think the only day that could have been**
18:43 19    **would have been the -- I believe Dr. Sherman said that**
18:43 20    **his only notes were on the 17th.  And on the -- 6-17**
18:43 21    **there was a late entry, and then the next note was**
18:44 22    **6-24.**
18:44 23    Q.  The next note of whom?
18:44 24    **A.  Dr. Sherman.**
18:44 25    Q.  And what does that June 24 note say?

Page 71

18:45 1    MR. CHAPMAN:  When you get to a point, can
18:45 2    we take a break for a second?
18:45 3    MR. IHRIE:  Sure.  Any time you want.
18:45 4    MR. CHAPMAN:  Well, I don't want to
18:45 5    interrupt your flow.  If you want to go now, that's
18:45 6    fine.
18:45 7    MR. IHRIE:  Well, just -- the doctor is
18:45 8    obviously looking for something, and the question on
18:45 9    the floor is --
18:45 10    COURT REPORTER:  Do you want me to read?
18:45 11    MR. CHAPMAN:  Yes.
18:45 12    MR. IHRIE:  -- is:  What did he say on the
18:45 13    24th.
18:45 14    (The following portion of the record was
18:45 15    read by the reporter at 6:45 p.m.:
18:45 16    Question:  "And what does that June 24 note
18:45 17    say?".)
18:45 18    MR. IHRIE:  Yeah, what did the June 24 note
18:45 19    say.
18:45 20    We'll wait until we finish the June 24
18:45 21    note.
18:47 22    MR. IHRIE:  Will you mark this as Shiener
18:48 23    Deposition Exhibit 2?
24    MARKED BY THE REPORTER:
25    DEPOSITION EXHIBIT 2

Page 72

1    6:48 p.m.
2    MR. EADS:  What's that, Bob?
3    MR. IHRIE:  Shiener Deposition Exhibit 2.
18:48 4    MR. EADS:  What is it, though?  Sorry.
18:48 5    MR. IHRIE:  Oh, it's Sherman's progress
6    note.
7    MR. EADS:  Is that the 6-24 note?
8    MR. CHAPMAN:  No, this is the delayed entry
9    note.
10    MR. EADS:  Seventeen?
11    MR. CHAPMAN:  It's dated 6-24-14.
12    MR. IHRIE:  We'll let him decide what it
13    is.  All right?
18:48 14    MR. CHAPMAN:  Well, that's what it is.  He
18:48 15    asked me what it is.
18:48 16    MR. IHRIE:  Well, I'm not asking you what
18:48 17    it is; I'm asking him what it is.
18:48 18    MR. CHAPMAN:  I was just responding --
18:48 19    BY MR. IHRIE:
18:48 20    Q.  Is this the note you're talking about?
18:48 21    MR. CHAPMAN:  -- to John's question.
18:48 22    MR. EADS:  He's looking at Exhibit 2?
18:48 23    MR. IHRIE:  Yes, he is.
18:48 24    MR. EADS:  Okay.
18:48 25    THE WITNESS:  This note is late entry

18  (Pages 69 to 72)

Gerald Shiener, M.D.
May 22, 2018

## Page 73

18:48  1        6-23-2014.  But the deposition references a 6-24 note.
18:49  2   BY MR. IHRIE:
18:49  3   Q.  Is your opinion -- what is your opinion as to when
18:49  4        Dr. Sherman saw David?
18:49  5            MR. CHAPMAN:  Asked and answered.  He told
18:49  6        you the 17th a long time ago.
18:49  7   BY MR. IHRIE:
18:49  8   Q.  That's one of them.
18:49  9   **A.  Seventeenth, and then there's this late entry entered**
18:49 10   **on 6-24 at 7:29 p.m. that's a late entry for 6-23.**
18:49 11   Q.  Do you have an opinion as to how many times
18:49 12        Dr. Sherman saw David?
18:49 13   **A.  No, I haven't committed the whole record to memory.**
18:49 14   Q.  Well, you read his -- you read all of the notes, and
18:49 15        you read his deposition, correct?
18:49 16   **A.  Like I said, I didn't commit it to memory.**
18:49 17   Q.  I didn't ask you if you committed it to memory.
18:49 18   **A.  I read them.**
18:49 19   Q.  Let me ask this:  Is it important how many times
18:49 20        Dr. Sherman saw David?
18:50 21   **A.  It's more important what he said.**
18:50 22   Q.  What who said?
18:50 23   **A.  Dr. Sherman.**
18:50 24   Q.  What he said when?
18:50 25   **A.  In the later stages of Mr. Stojcevski's confinement.**

## Page 74

18:50  1   Q.  Tell me what he said then.
18:50  2   **A.  Well, here he said that it was his assessment that**
18:50  3   **this was a feigned seizure behavior, and returned him**
18:50  4   **to the general population without seizure precautions.**
18:50  5   Q.  And is that -- did he return him to the general
18:50  6        population after concluding that he was feigning
18:50  7        seizures on the 24th?
18:50  8            MR. CHAPMAN:  Objection.  It's not a memory
18:50  9        test.
18:50 10            MR. IHRIE:  Hold.  No, it's not a memory
18:50 11        test.  He's an expert witness.  He's reviewed all the
18:50 12        documents.  I'm asking his opinion and what it's based
18:50 13        upon, so --
18:50 14            THE WITNESS:  Well, what's the question?
18:50 15            MR. IHRIE:  The question is -- I just asked
18:50 16        it to you.
18:50 17        Go ahead, read it back.
18:50 18            THE WITNESS:  I know you just asked it.
18:50 19        That's why I wanted you to repeat it.
18:50 20            MR. IHRIE:  Go ahead, read it back.
18:50 21            THE WITNESS:  But you can read it back.
18:51 22        (The following portion of the record was
18:51 23        read by the reporter at 6:51 p.m.:
18:51 24        Question:  "And is that -- did he return
18:51 25        him to the general population after

## Page 75

18:51  1        concluding that he was feigning seizures on
18:51  2        the 24th?".)
18:51  3            THE WITNESS:  Well, this conclusion appears
18:51  4        to be on the 23rd.
18:51  5   BY MR. IHRIE:
18:51  6   Q.  Then did he return him to the general population after
18:51  7        concluding on the 23rd that he was feigning seizures?
18:51  8   **A.  That was his recommendation.**
18:51  9   Q.  Now please answer my question.  Was his -- I'll ask
18:51 10        it --
18:51 11   **A.  To be accurate, I'll have to find the record.**
18:51 12   Q.  What record is it that you're looking for?
18:51 13   **A.  (No verbal response.)**
18:51 14   Q.  Dr. Shiener?
18:51 15   **A.  I'm looking for the chronology of what happened on the**
18:51 16   **24th.**
18:51 17   Q.  We can't look -- all right.  Okay.  Go ahead.
18:52 18   **A.  Okay.  There is a note on jail command, then the**
18:52 19   **location MHOI, "Patient is appropriate for placement**
18:52 20   **on high-observation status."**
18:52 21        So looks like he was maintained on the 24th
18:52 22        in the high-observation status, as he was on the 25th.
18:52 23        So he wasn't returned to the general population.
18:52 24   Q.  Is it your opinion that Dr. Sherman on the 24th wrote
18:52 25        a note that he had seen David on the 23rd, and made a

## Page 76

18:52  1        recommendation that he be returned to the general
18:52  2        population?
18:52  3   **A.  That's not an opinion; that's a description of what's**
18:52  4   **listed on the Shiener Exhibit 2.**
18:53  5   Q.  So that's not an opinion, that's just the fact; is
18:53  6        that your testimony?
18:53  7   **A.  Well, it's what the document says.**
18:53  8   Q.  And did you review that document --
18:53  9   **A.  I did.**
18:53 10   Q.  -- prior to writing your report?
18:53 11   **A.  I did.**
18:53 12   Q.  Did you factor it in?
18:53 13   **A.  Well, I considered it after I read it.**
18:53 14   Q.  So how many times, in your opinion, did Dr. Sherman
18:53 15        see David, as far as you know?
18:53 16   **A.  I know as we're discussing this, I know of two**
18:53 17   **encounters, the 23rd and the 17th.**
18:53 18   Q.  Do you feel it was appropriate for Dr. Sherman to see
18:53 19        David on the 23rd?
18:53 20            MR. CHAPMAN:  Object to form and
18:53 21        foundation.
18:53 22            THE WITNESS:  Appropriate?
18:53 23   BY MR. IHRIE:
18:54 24   Q.  That it was --
18:54 25   **A.  Well, it's appropriate for a doctor to examine the**

19  (Pages 73 to 76)

Page 77

18:53 1   patient. And he made -- and he apparently made an
18:53 2   assessment.
18:54 3       MR. CHAPMAN: Can we take that break?
18:54 4       MR. IHRIE: Sure.
18:54 5       (Off the record at 6:54 p.m.)
18:54 6       (Whereupon Mr. Perakis left the room.)
18:54 7       (Back on the record at 7:00 p.m.)
18:54 8   BY MR. IHRIE:
19:00 9   Q. Are you ready, Doctor?
19:00 10  A. I'm ready.
19:00 11  Q. And do you remember the last question?
19:00 12  A. No.
19:00 13      MR. IHRIE: Go ahead and read it again.
14        THE WITNESS: Do you?
15        (The following portion of the record was
16        read by the reporter at 7:00 p.m.:
17        Question: "That it was --
18        Answer: "Well, it's appropriate for a
19        doctor to examine the patient. And he
20        made -- and he apparently made an
21        assessment.")
22        COURT REPORTER: Do you want more than
23        that?
24        MR. IHRIE: No, that's fine.
19:01 25  BY MR. IHRIE:

Page 78

19:01 1   Q. Do you have an opinion as to why Dr. Sherman
19:01 2   recommended returning him back to the general
19:01 3   population, and he was put back into medical -- I
19:01 4   mean, to the mental health cell?
19:01 5   A. I believe Dr. Sherman's assessment was confined to the
19:01 6   likelihood that he was having a seizure or paroxysmal
19:01 7   event and the need for close observation. It looks
19:01 8   like it was appropriate for placement on
19:01 9   high-observation for suicidal behavior or
19:02 10  verbalizations, and I think that would refer back to
19:02 11  some of the other reasons, for risk of self-harm that
19:02 12  we discussed about an hour and a half ago.
19:02 13      So it may not have been -- it may have been
19:02 14  more for psychiatric reasons than medical reasons.
19:02 15  Q. Did you read Dr. Sherman's deposition?
19:02 16  A. I did.
19:02 17  Q. Do you recall all those pages that talked about
19:02 18  Dr. Sherman -- when he professed embarrassment that he
19:02 19  hadn't written a note on the 17th, instead wrote it on
19:02 20  the 24th, and then mistakenly put that he had seen the
19:02 21  patient on the 23rd, when in fact he had not seen the
19:02 22  patient on the 23rd --
19:02 23  A. On review --
19:02 24  Q. -- and in fact, had only seen him on the 17th?
19:02 25  A. On review during the break, I did notice that in his

Page 79

19:02 1   deposition.
19:02 2   Q. But you didn't notice that before you wrote your
19:02 3   report, correct?
19:02 4   A. I didn't recall it.
19:03 5   Q. Is this another part of your report where the
19:03 6   chronology is inaccurate?
19:03 7   A. Well, the notations were placed based on the dates of
19:03 8   the -- of the papers. The depositions revealed
19:03 9   something a little bit different. And I note that
19:03 10  there was some -- apparently there's some confusion in
19:03 11  how the computer posts the note, or when the notes are
19:03 12  posted and when they're written and the actual
19:03 13  encounter to which they refer.
19:03 14  Q. Why, if you read that in the -- Dr. Sherman's report,
19:03 15  did you nevertheless put in your report -- strike
19:03 16  that.
19:03 17      Why, if you read that in Dr. Sherman's
19:03 18  deposition, did you nevertheless still put in your
19:03 19  report that he saw him on the 23rd?
19:03 20  A. Well, I was -- as I was preparing my report, I was
19:03 21  reviewing those documents, so I must have -- I must
19:03 22  have seen that in Dr. Sherman's deposition sometime
19:03 23  after the report was prepared. I must have recalled
19:03 24  that after the report was prepared.
19:04 25      And I only reviewed it during the -- during

Page 80

19:04 1   the break and when I was looking at that portion of
19:04 2   the discussion starting on page 121 or 122.
19:04 3   Q. So is that portion of your report factually
19:04 4   inaccurate?
19:04 5   A. It's accurate in the way it refers to the
19:04 6   documentation. The documentation is mis -- is
19:04 7   misleading and --
19:04 8   Q. The documentation is misleading?
19:04 9   A. Well, yeah. There's a note on the 24th that says,
19:04 10  "Backdated to the late entry on the 23rd."
19:04 11  Q. But doesn't his deposition explain that?
19:04 12  A. But his deposition does.
19:04 13  Q. And if his deposition explained that, why did you
19:04 14  nevertheless put it in your report that he saw him on
19:04 15  the 23rd?
19:04 16  A. I must have reviewed the deposition afterwards or
19:04 17  later.
19:04 18  Q. So your testimony now is that: Some of the matters
19:04 19  that you said in your report that you reviewed prior
19:04 20  to writing your report, actually you didn't review
19:04 21  them prior to writing your report; at least this one
19:04 22  you are testifying that you reviewed after you wrote
19:04 23  the report, correct?
19:05 24      MR. CHAPMAN: Objection: argumentative.
19:05 25      THE WITNESS: No, that's not what I said.

Gerald Shiener, M.D.
May 22, 2018

Page 81

19:05  1      What I said was that I report -- I recorded the
19:05  2   documentation in my report, and the documentation was
19:05  3   misleading.  The documentation was inaccurate, and it
19:05  4   was only after I later reviewed Dr. Sherman's
19:05  5   deposition about his embarrassment and the reasons for
19:05  6   late entry that I realized that that was a -- the date
19:05  7   on that, the June 24/June 23 entry, was inaccurate.
19:05  8   BY MR. IHRIE:
19:05  9   Q.   Why didn't you amend your report then?
19:05 10   A.   I neglected to do so.  I don't recall as to why.
19:05 11             I did understand that I'd have an
19:05 12   opportunity to discuss it in person.
19:05 13   Q.   Pardon me?
19:05 14   A.   I did understand that I'd have an opportunity to
19:05 15   discuss it in person.
19:05 16   Q.   What is decompensation?
19:06 17   A.   Well, decompensation is a term that's commonly used in
19:06 18   psychiatry to refer to the emergence of symptoms of a
19:06 19   psychiatric illness that has an intermittent or
19:06 20   episodic presentation, or of the failure of an
19:06 21   individual's coping abilities to deal with a stressor
19:06 22   which -- with which they're presented.
19:06 23   Q.   So how would you interpret -- I'm looking at the last
19:06 24   the last full paragraph, Doctor, on page 3.
19:06 25             So how would you interpret Nurse Brock's

Page 82

19:06  1   note that you reference, where it says, "He was
19:06  2   described as being" -- I'm sorry.
19:06  3             "A self-harm watch initial assessment was
19:06  4   undertaken by Mental Health Provider Brock on June 18,
19:07  5   24 (sic).  He was described as being in need of
19:07  6   assessment for decompensation?"
19:07  7             How would you interpret that statement?
19:07  8   A.   The -- well, that is an example of a mental health
19:07  9   professional using the term -- a jargon term, in maybe
19:07 10   not the most precise manner.  But what I infer from
19:07 11   that entry, decompensation meant the emergence of
19:07 12   disorganized behavior or behavior that was not
19:07 13   understandable to her that needed to be assessed.
19:07 14   Q.   Your next line says, "Nurse Cueny noted on June 24,
19:07 15   2014, that Mr. Stojcevski did take Klonopin, two to
19:07 16   three tabs at morning, and the last time it was taken
19:07 17   two weeks ago."
19:07 18             Do you see that sentence?
19:07 19   A.   Yes.
19:07 20   Q.   So when did Ms. Cueny see -- Nurse Cueny see David?
19:07 21   A.   Once again that was an inaccurate note, because after
19:07 22   that I say, "Dr. Sherman described that he knew on
19:08 23   June 18, or the next day, that Mr. Stojcevski had used
19:08 24   benzodiazepines."
19:08 25             So Nurse Cueny, the date on the note

Page 83

19:08  1   appears to be the 24th, but I believe it referred to
19:08  2   an earlier assessment that she made.
19:08  3   Q.   Do you remember the date of the earlier assessment?
19:08  4   A.   I can only infer that it was a week prior, that there
19:08  5   was some calendar issue of punching the wrong date.
19:08  6   Q.   So a week prior would have been the 17th or the 18th?
19:08  7   A.   I believe so.
19:08  8   Q.   Right around the day, or within hours, of David having
19:08  9   hallucinations?
19:08 10   A.   Well, if saying that half of his body was eaten up is
19:08 11   a hallucination or a delusion.  There's some
19:08 12   discussion as to what that was.
19:08 13             But when that behavior was described, the
19:08 14   knowledge of his use of benzodiazepines was either
19:08 15   disclosed to Nurse Cueny, or Nurse Cueny disclosed it
19:08 16   to Dr. Sherman.
19:09 17   Q.   What did she disclose?
19:09 18   A.   That he had been taking Klonopin before that.
19:09 19             (Whereupon Mr. Perakis returned to the
19:09 20   room.)
19:09 21   BY MR. IHRIE:
19:09 22   Q.   Do you know if the nurse he had told that he was
19:09 23   taking Xanax ever disclosed that to Dr. Sherman?
19:09 24   A.   I don't know.  I don't recall.  Dr. Sherman just said
19:09 25   he used benzodiazepines, so I don't know if he knew

Page 84

19:09  1   which specific benzodiazepine.
19:09  2   Q.   Did you read in Dr. Sherman's -- well, strike that.
19:09  3             Some benzodiazepines are short-acting, and
19:09  4   some are long-acting, correct?
19:09  5   A.   Yeah.  I've had that discussion.
19:09  6   Q.   Is that something, in your opinion that a doctor who
19:09  7   is dealing with -- in a jail setting, by definition
19:09  8   dealing with people who are abusing drugs, should
19:10 10   know?
19:10 11             MR. CHAPMAN:  Object to form and
19:10 12   foundation.
19:10 13             THE WITNESS:  What is it that they should
19:10 14   know?  To what are you referring?
19:10 15   BY MR. IHRIE:
19:10 16   Q.   Which benzodiazepines are -- the difference between
19:10 17   long-acting and short-acting benzos?
19:10 18   A.   Well, I want to be careful in answering that.  That is
19:10 19   a complicated issue, and there are -- for example, the
19:10 20   medication Xanax is considered to be shorter acting,
19:10 21   but it has active metabolites, so it may have a
19:10 22   slightly longer duration of action than its half life
19:10 23   would indicate.  Klonopin has a slightly longer
19:10 24   duration of action and a slightly longer half life.
19:10 25             I mean, those are things that a physician
           who's dealing with patients who take these medicines

Page 85

19:10 1    should know, but 77 million prescriptions for
19:10 2    benzodiazepine tranquilizers are written in the United
19:10 3    States every year, and --
19:10 4    Q. So they're quite common.
19:10 5    A. Pardon?
19:10 6    Q. So they're quite common?
19:10 7    A. They are quite common.
19:11 8    Q. I don't know if you're aware of it, but tell me if you
19:11 9    are. Are you aware when Sheriff -- Macomb County
19:11 10   Executive Hackel indicated that the county jail, the
19:11 11   Macomb County Jail -- and I may be paraphrasing here
19:11 12   -- essentially had become repositories for those who
19:11 13   are abusing drugs and for the mentally ill?
19:11 14       MR. CHAPMAN: Object to form and
19:11 15   foundation.
19:11 16       THE WITNESS: Well, I know that the Wayne
19:11 17   County Jail is the largest psychiatric facility in the
19:11 18   state of Michigan, and I know that a significant
19:11 19   portion of inmates in jails and prisons are mentally
19:11 20   ill, were intoxicated at the time of their
19:11 21   confinement, or were -- or had abused drugs, or had
19:11 22   used prescription drugs or nonprescription drugs in
19:11 23   the -- in the days prior to their incarceration or
19:11 24   confinement.
19:11 25   BY MR. IHRIE:

Page 86

19:11 1    Q. Did you read in your --
19:11 2    A. I don't know exactly what Sheriff Hackel said, but I
19:12 3    know that Judge Kenny in Wayne County talked about the
19:12 4    needs of the jail and the function that the jail has
19:12 5    come to serve in this era versus the era where asylums
19:12 6    were more available.
19:12 7    Q. I believe it was Nurse Bertram that was advised by
19:12 8    David --
19:12 9       MR. IHRIE: Tell me if I'm wrong on this,
19:12 10   Harold.
19:12 11   BY MR. IHRIE:
19:12 12   Q. But I believe it was Nurse Bertram that was advised by
19:12 13   David on the 17th that he had been taking Xanax?
19:12 14       As a mental health worker, do you think she
19:12 15   should have told the -- either the director of nursing
19:12 16   or the director of -- medical director, Dr. Sherman?
19:12 17       MR. CHAPMAN: Object to form and
19:12 18   foundation. He's not here and an expert as to what a
19:12 19   nurse should or shouldn't do.
19:12 20       MR. IHRIE: Well, you may not have him here
19:12 21   as an expert for that, but he's already told me he's
19:12 22   an expert on things that I feel fall under the
19:12 23   umbrella.
19:13 24       I think it was Bertram.
19:13 25       MR. CHAPMAN: I have no idea what you just

Page 87

19:13 1    said, but he's not here as a nursing expert, so he's
19:13 2    not giving testimony as a nursing expert.
19:13 3       THE WITNESS: Well, that's really not
19:13 4    particularly pertinent to my opinion, but history --
19:13 5    it's traditional for history to be recorded somewhere
19:13 6    in the medical record.
19:13 7    BY MR. IHRIE:
19:13 8    Q. And if I told you -- well, tell me why it's
19:13 9    recorded -- why history is recorded in a medical
19:13 10   record.
19:13 11   A. Because a medical record communicates the patient's
19:13 12   condition among the multiple professionals caring for
19:13 13   a patient.
19:13 14   Q. So if I have contact with a patient, should I put
19:13 15   what -- you know, the essential elements of my contact
19:13 16   with that patient in a medical note?
19:13 17   A. With all due respect, no. I don't think a lawyer's
19:13 18   contact with a patient has any place in a medical
19:13 19   record.
19:14 20       But if your question is if you were a nurse
19:14 21   or a doctor --?
19:14 22   Q. Yes.
19:14 23   A. I think it would -- tradition suggests that you should
19:14 24   communicate your findings in some way.
19:14 25   Q. And is that tradition -- does that tradition exist to

Page 88

19:14 1    communicate findings for a medical -- a valid medical
19:14 2    reason that will be of help to a patient?
19:14 3       MR. CHAPMAN: Object to form and
19:14 4    foundation.
19:14 5       THE WITNESS: Well, again, in any setting.
19:14 6    Communication between you and Mr. Perakis would be
19:14 7    important, because you're both working on this matter,
19:14 8    and you should keep each other aware of what you're
19:14 9    doing, so your efforts can be coordinated, so your
19:14 10   efforts are not duplicated, or so you're not working
19:14 11   at cross-purposes. And in general people taking care
19:14 12   of a patient should communicate their -- their
19:14 13   concerns or their impressions or their observations,
19:14 14   in general.
19:14 15       MR. IHRIE: Okay. It was Bertram, right?
19:15 16   Yeah, Bertram.
19:15 17   BY MR. IHRIE:
19:15 18   Q. You put in your last note -- in your last line on that
19:15 19   last full paragraph on page 3, starting about halfway
19:15 20   down, "Nurse Cueny noted June 24, 2014, that
19:15 21   Mr. Stojcevski, quote, did take Klonopin, two to three
19:15 22   tabs at home, and the last time it was taken was two
19:15 23   weeks ago. Dr. Sherman described that he knew on June
19:15 24   18, 2014, or the next date -- the next day, that
19:16 25   Mr. Stojcevski had used benzodiazepines. He described

Gerald Shiener, M.D.
May 22, 2018

---

Page 89

that he discussed the matter with Nurse Cueny and
considered the prospect of benzodiazepine withdrawal."
        Did you read Nurse Cueny's dep?
A. I did.
Q. Do you recall when she said she couldn't remember
whether she told Dr. Sherman about the hallucinations?
Do you remember that?
A. I don't -- I haven't memorized her dep. If you
want -- I mean, I have it here. If you want to direct
me to a page --
Q. Well, I'm not --
A. -- I'll see what she says.
Q. My question is just: Do you remember.
        If you don't --
A. I haven't memorized the document. I remember some
discussion, but I don't recall the details.
Q. Looking at your last paragraph on page 3, it
indicates, "Progress notes from Nelson, Mann, and
Brock repeatedly describe Mr. Stojcevski as "refusing"
to respond."
        Why did you put the word "refusing" in
quotation marks?
A. You know, I think that was the language that they
used, or that was the language that I read, whatever
document I'm referring to.

---

Page 90

Q. "And the assessment was that he was feigning for
secondary gain."
A. That's right.
Q. I will show them to you, if you wish, but all --
virtually all of the mental health reports from the
mental health personnel indicated -- in the vast
majority of categories that they were asked to assess
him for indicate "unable to assess, unable to assess,
unable to assess, unable to assess, unable to assess."
        Do you recall seeing that?
A. I do.
Q. In your conclusion, though, that the assessment of
Nelson, Mann, Brock -- and Brock, their assessment was
that he was feigning for secondary gain?
A. I believe that's -- I believe that's what I read.
Unless it was Dr. Sherman's characterization of what
they said or...
Q. Do you know if there was a -- if the Macomb County
Jail had a psychiatrist?
A. They had a psychiatrist.
Q. If I said his name was Dr. Haq --
A. Dr. Haq.
Q. -- Haq, do you know him?
A. There are a lot of Dr. Haqs. It's a common Pakistani
name.

---

Page 91

When you say, "had a psychiatrist," I know
that someone consulted. I don't know what the nature
of the relationship was or how freq -- what the
availability of that doctor was.
Q. Is there an appropriate protocol -- do you have an
opinion as to whether or not there's an appropriate
protocol when a mental health professional is unable
to assess a patient on a high suicide -- in a high
suicide cell?
A. Well, that they should articulate the reason for their
inability to assess.
Q. Is there any --
A. And, for example, if a patient's nonverbal, they
should say they can't assess because a patient's not
speaking, and then --
Q. I'm sorry; I didn't catch that.
A. If a patient is nonverbal, then they say "unable to
assess," and then the reason for the inability to
assess.
Q. And I didn't see the reason for the inability to
assess in any of those reports, did you?
A. I haven't --
        MR. CHAPMAN: I'm going to object to form
and foundation. Mischaracterizes the testimony and
the record.

---

Page 92

BY MR. IHRIE:
Q. Would it be appropriate to call a psychiatrist as a
mental health professional, "Every day I go and see
this person, and he's nonresponsive or unable to --
either refusing to talk"?
A. Well, now look, if he's nonresponsive, that might
indicate a need for an assessment by someone with
greater expertise, someone's nonresponsive. But if
someone is just not verbalizing, that may not
necessarily be a reason to call a psychiatrist.
Q. And how does one know the difference?
A. Well, if you're talking about a mental health
professional, they have to make a clinical judgment.
Q. So at the top of page four you indicate that "His
nutritional intake was poor"?
A. Yes.
Q. And what do you base that on?
A. I think that's what the records describe. There was
an episode -- well, they describe that he was eating
and drinking intermittently.
Q. And who described that?
A. I don't recall the specific observers.
Q. Do you recall if it was medical personnel or mental
health personnel or jail personnel?
A. I believe it was mental health personnel. It may have

---

23  (Pages 89 to 92)

Gerald Shiener, M.D.
May 22, 2018

Page 93

19:21 1   been jail personnel.
19:21 2   Q.   Then you indicate that "He was incontinent of stool"?
19:21 3   A.   Yes.
19:21 4   Q.   Then we have a corrections officer, you indicate
19:21 5        Officer Perry, on the 22nd indicating he was
19:21 6        incoherent?
19:21 7   A.   Yes.
19:21 8   Q.   And then you indicate that Dr. Sherman evaluated
19:21 9        Mr. Stojcevski on the 23rd, concluding that he was
19:21 10       feigning seizure behavior, and returned him to the
19:21 11       general population.
19:21 12            That's the sentence I believe that you
19:21 13       previously indicated was not accurate, correct?
19:21 14  A.   It was -- it references a note that's not accurate.
19:21 15  Q.   But when you wrote your report, Dr. Shiener, you
19:22 16       believed that Dr. Sherman evaluated him on the 23rd,
19:22 17       correct?
19:22 18  A.   I think we discussed this matter already, and my
19:22 19       answer is no different than it was the last time we
19:22 20       discussed it.
19:22 21  Q.   Well, you're giving a little different answer, so I
19:22 22       want to clarify.
19:22 23            When you wrote your report, you believed
19:22 24       that Dr. Sherman had evaluated him on the 23rd,
19:22 25       correct?

Page 94

19:22 1   A.   When I dictated this, I considered the document to be
19:22 2        accurate.
19:22 3            When I reconsidered a reiteration of
19:22 4        Dr. Sherman's deposition, I came to understand that
19:22 5        the June 23 note was actually reference to the 17th of
19:22 6        June and not the 23rd of June.
19:22 7   Q.   You then indicate in the next paragraph, that "On June
19:23 8        27 his weight was reported at 150 pounds, which would
19:23 9        indicate a 45-pound weight loss over the course of 12
19:23 10       days."  Correct?
19:23 11  A.   That's what it says, yes.
19:23 12  Q.   And why do you say "12 days"?
19:23 13  A.   I think from the intake at the jail.  Maybe it would
19:23 14       have been 11 days on the 16th.
19:23 15  Q.   What day did he get into the jail; do you know?
19:23 16  A.   June 11.  I'm sorry.
19:23 17  Q.   And what day did he die?
19:23 18  A.   He died on June 27.
19:23 19  Q.   So how many days was he in the jail?
19:23 20  A.   How many days was he in the jail?  Sixteen days.
19:23 21  Q.   Is this another inaccuracy, factual inaccuracy in your
19:23 22       report?
19:23 23  A.   No, I don't know the -- I don't know when his weight
19:23 24       was reported or --
19:24 25  Q.   Well, you had all the records.

Page 95

19:24 1   A.   I did.
19:24 2   Q.   So it's not a factual inaccuracy, it is your opinion
19:24 3        that the weight loss, however it was reported,
19:24 4        occurred over a 12-day period?
19:24 5   A.   It was reported to have occurred over a 12-day period.
19:24 6        And there was a weight that was -- that was reported
19:24 7        on June 27.  I'm not sure where the -- where the
19:24 8        admitting weight was obtained or where the earlier
19:24 9        reference was obtained or what day it was obtained.
19:24 10  Q.   Did you look at the intake documents?
19:24 11  A.   I did.
19:24 12  Q.   Did you find his weight there?
19:24 13  A.   I believe the intake document reported 195 pounds.
19:24 14  Q.   Did you see -- other than the 27th and the intake
19:24 15       document, did you see any other time, in any of the
19:24 16       medical records or any records of any kind, where he
19:24 17       was weighed or his weight was written down at all?
19:24 18  A.   No.  He wasn't weighed until the 27th, by my
19:24 19       understanding.
19:24 20  Q.   Did you see any other time, in any of the records,
19:25 21       whether -- where his weight was written down, other
19:25 22       than the day he came into the jail and the day he left
19:25 23       the jail dead?
19:25 24  A.   His weight was reported the day he came in the jail,
19:25 25       and his day -- weight was recorded when he was

Page 96

19:25 1        weighed on the 27th.
19:25 2   Q.   Then why do you write "12 days"?
19:25 3   A.   I don't know.  I don't recall why I reached that
19:25 4        conclusion.
19:25 5   Q.   Does it appear that that's another factual inaccuracy
19:25 6        in your report?
19:25 7   A.   It may -- it could be, depending on the reliability of
19:25 8        the initial report of 195 pounds.
19:25 9   Q.   I'm not talking about the weight; I'm talking about
19:25 10       the number of days.
19:25 11  A.   You just asked --
19:25 12  Q.   I'm talking about --
19:25 13  A.   You didn't ask it that way.  Whatever you're talking
19:25 14       about or whatever you meant to ask, that's not what
19:25 15       you asked.
19:25 16  Q.   Does it appear that your notation that his weight loss
19:25 17       occurred over a 12-day period appeared to be another
19:25 18       factual inaccuracy in your report?
19:25 19  A.   No, it's just not consistent with the fact that his
19:26 20       weight was reported on intake on the day that he
19:26 21       entered.  I'm not sure -- I'm not sure if there were
19:26 22       any other references to his weight.
19:26 23  Q.   I'm looking at your conclusions in the second
19:26 24       paragraph, where you indicate "Cessation" after
19:26 25       talking about benzodiazepines, "Cessation of these

Gerald Shiener, M.D.
May 22, 2018

Page 97

19:27  1   medications causes a, quote, "rebound," unquote, of
19:27  2   arousal symptoms of increased anxiety, restlessness,
19:27  3   motor tension, hyperactivity, and in extreme cases,
19:27  4   seizures."
19:27  5           Did I accurately read that?
19:27  6   **A.  You did.**
19:27  7   Q.  It also, in extreme cases, may cause death as well,
19:27  8   correct?
19:27  9   **A.  I think that's exceedingly rare, and I think that**
19:27 10   **would be exceedingly extreme.  The literature does not**
19:27 11   **really reflect -- the literature is more reflective of**
19:27 12   **how rare death is in benzodiazepine withdrawal as an**
19:27 13   **isolated cause of death or an isolated incident.**
19:28 14           MR. IHRIE:  Mark this as Shiener Deposition
19:28 15   Exhibit Number 3.
19:28 16           MARKED BY THE REPORTER:
19:28 17           DEPOSITION EXHIBIT 3
19:28 18           7:28 p.m.
19:28 19           MR. IHRIE:  Do you want one?
19:28 20           MR. CHAPMAN:  I think I have it.  Well,
19:28 21   yeah, let me have it.
19:28 22   BY MR. IHRIE:
19:28 23   Q.  I'm going to show you what has been previously
19:28 24   identified as Correct Care Solutions' materials with
19:28 25   respect to benzodiazepine withdrawal, and I'm going to

Page 98

19:29  1   ask you to go --
19:29  2   **A.  Give me a Bates number.**
19:29  3   Q.  I don't think they're --
19:29  4   **A.  Yeah, they're numbered, lower left-hand corner.**
19:29  5   Q.  Oh, yeah, there are Bates numbers on them.
19:29  6           I'm going to ask you to look at -- first of
19:29  7   all, look at 9690.
19:29  8           THE WITNESS:  9690?
19:29  9           MR. CHAPMAN:  You mean -- it starts out at
19:29 10   692, 693.
19:29 11           MR. IHRIE:  692 -- 696.  I'm sorry.
19:29 12           MR. CHAPMAN:  Look at 696?
19:29 13           MR. IHRIE:  Yeah, 696.  I'm looking at them
19:29 14   upside down.
19:29 15           MR. PERAKIS:  Fourth or fifth page, Doctor.
19:29 16   BY MR. IHRIE:
19:29 17   Q.  It says "696."  Do you see the picture of what I'm
19:29 18   going to, for lack of a better phrase, call grim
19:29 19   death?
19:29 20   **A.  You mean the Grim Reaper.**
19:29 21   Q.  The Grim Reaper?
19:29 22   **A.  That's a scythe he's --**
19:29 23   Q.  And that's a scythe, yes.  So we're on the same page
19:30 24   then?
19:30 25           Will you please read that --

Page 99

19:30  1   **A.  Well, wait.  I want to be careful in answering.  We're**
19:30  2   **on page --**
19:30  3   Q.  This one, Doctor.
19:30  4   **A.  0696.**
19:30  5   Q.  Yeah, this one.
19:30  6   **A.  I don't think we're on the same page, because I don't**
19:30  7   **think we're --**
19:30  8   Q.  Okay.
19:30  9   **A.  -- thinking along the same lines.  But we are looking**
19:30 10   **at the --**
19:30 11   Q.  We may not be.
19:30 12   **A.  -- same page of the exhibit.**
19:30 13   Q.  So please read the words that are on that page.
19:30 14   **A.  Which words?  All the words or the ones that are**
19:30 15   **bulleted?**
19:30 16   Q.  The ones that are bulleted.
19:30 17   **A.  Okay.  I've read them.**
19:30 18   Q.  Out loud.
19:30 19   **A.  Oh, out loud.  I'm sorry.**
19:30 20           **"Why do we care about benzodiazepine**
19:30 21   **withdrawal?  It is potentially life-threatening."**
19:30 22   Q.  Then there's a picture of the Grim Reaper.
19:30 23   **A.  There is.**
19:30 24   Q.  So apparently CCS, in their materials, felt that
19:30 25   benzodiazepine withdrawal is potentially

Page 100

19:30  1   life-threatening, correct?
19:30  2   **A.  Well, I --**
19:30  3   Q.  Would you agree?  Yes?
19:30  4   **A.  Wait.**
19:30  5           **I can't tell you what their feelings are.**
19:30  6   **They put this in, and they said this.  This isn't peer**
19:30  7   **reviewed, and this isn't scientific, and my opinion is**
19:30  8   **it's not -- to say that it's potentially**
19:30  9   **life-threatening -- I would say that the potential is**
19:31 10   **quite low --**
19:31 11   Q.  Okay.
19:31 12   **A.  -- and that there may be many reasons for them to --**
19:31 13   **for them to represent this.**
19:31 14           **Doesn't even say who prepared this or what**
19:31 15   **the source of that information or the source of that**
19:31 16   **conclusion is.**
19:31 17   Q.  Well, the only source we know is that it says, "CCS
19:31 18   Correct Care Solutions" on the top left.
19:31 19   **A.  But we don't know who prepared it or...**
19:31 20   Q.  No, we don't know who prepared it.
19:31 21           Looking at your -- under conclusions, the
19:32 22   third paragraph down, you indicate that "Short-acting
19:32 23   drugs are excreted rapidly, leading to sudden
19:32 24   decreases in serum level and intense withdrawal
19:32 25   symptoms early in the course of abstinence."

25  (Pages 97 to 100)

Gerald Shiener, M.D.
May 22, 2018

---

Page 101

19:32 1  A. Yes.
19:32 2  Q. What intense withdrawal symptoms, if you know?
19:32 3  A. Well, all the symptoms are present more intensively,
19:32 4     because they occur suddenly, over a shorter time
19:32 5     period.
19:32 6  Q. What symptoms?
19:32 7  A. All the symptoms that I measure; arousal symptoms:
19:32 8     increased anxiety, restlessness, motor tension,
19:32 9     hyperactivity. And -- and with sudden, rapid falling
19:32 10    serum levels, the risk of all of these symptoms,
19:33 11    including seizures, is heightened.
19:33 12 Q. What does "early in the course of abstinence" mean?
19:33 13 A. Well, the period of abstinence -- the length of
19:33 14    abstinence determines the likelihood of the symptoms
19:33 15    of an abstinence syndrome. And the symptoms generally
19:33 16    peak with alcohol, say, within 72 hours. With
19:33 17    benzodiazepines, with the shorter-acting drugs it may
19:33 18    occur -- the abstinence syndrome may begin to emerge
19:33 19    in as short as 12 or 24 hours; whereas with
19:33 20    longer-acting drugs, the onset of symptomatology might
19:33 21    occur later, 24 or 48 hours.
19:33 22 Q. Are there different stages of benzodiazepine
19:34 23    withdrawal?
19:34 24 A. Well, sure. The -- the withdrawal and the development
19:34 25    of abstinence syndrome is a function of how long

---

Page 102

19:34 1     someone has taken a drug and how much they've taken.
19:34 2     So in general, someone who takes a lot for a shorter
19:34 3     period can experience withdrawal symptoms, someone who
19:34 4     takes a little bit for a longer period can experience
19:34 5     withdrawal symptoms, if they stop taking the drug
19:34 6     suddenly.
19:34 7         And then the other factor of how soon the
19:34 8     symptoms emerge has to do with the excretion curve of
19:34 9     the drug. So a drug -- and the examples I give,
19:34 10    oxazepam, temazepam, and lorazepam, those are drugs
19:34 11    that have no active metabolites, they have a
19:34 12    relatively short duration of action, so the symptoms
19:34 13    may occur within 12 or 24 hours of cessation; whereas
19:34 14    with drugs like alprazolam, clonazepam, or
19:35 15    chlordiazepoxide or chlorazepate, which have a longer
19:35 16    duration of action, the symptoms may not emerge for 24
19:35 17    to 48 hours or even 72 hours.
19:35 18 Q. So without knowing how much somebody was taking, the
19:35 19    frequency of their dose, the size of the dose, how
19:35 20    long they had been taking a drug, and when the last
19:35 21    time they used it, all of those may be variables with
19:35 22    respect to the onset of symptoms. And this -- let's
19:35 23    just do those -- with the onset of symptoms, correct?
19:35 24 A. Well, I think the onset of symptoms has more to do
19:35 25    with the duration of action of the drug.

---

Page 103

19:35 1  Q. All right. So onset has more to do with duration,
19:35 2     correct?
19:35 3  A. Duration of action has more to do with onset.
19:35 4  Q. All right. Duration of action means how long
19:35 5     somebody's been taking the drug?
19:35 6  A. No. Duration of action is how long the drug's action
19:36 7     is present. So if you take a dose of Ativan,
19:36 8     lorazepam, that's relatively short acting. So -- and
19:36 9     if you take that on a regular basis and stop taking
19:36 10    it, abstinence syndromes will emerge sooner after
19:36 11    abstinence is induced. Okay.
19:36 12        So whereas if you take a longer -- a drug
19:36 13    with a longer duration of action, and you stop taking
19:36 14    it suddenly, abstinence syndromes may appear later in
19:36 15    the abstinence.
19:36 16 Q. What if you're taking both?
19:36 17 A. If you're taking two drugs, the way they interact,
19:36 18    what you've taken most recently, how much you have on
19:36 19    board determines how soon the abstinence syndrome
19:36 20    emerges.
19:36 21 Q. And when they peak also; would derm -- would be
19:36 22    important to determine also when they peak?
19:36 23 A. Yeah, I mean the difference would be 12 hours versus
19:36 24    48 to 72 hours.
19:36 25 Q. And would it also be a factor in determining how long

---

Page 104

19:36 1     the peak symptoms last?
19:36 2  A. No, no, that's -- once the syndrome is established,
19:37 3     the -- you know, the syndrome lasts for as long as it
19:37 4     took to develop. So if it peaks at 12 or 24 hours,
19:37 5     then the second 12 or 24 hours are the duration of the
19:37 6     abstinence syndrome. If it peaks at 72 hours, it may
19:37 7     be another 72 hours.
19:37 8  Q. Have you ever written any articles on benzodiazepine
19:37 9     withdrawal?
19:37 10 A. I wrote an article in a journal called Patient Care,
19:37 11    and I talked about hospital delirium, and that
19:37 12    addressed benzodiazepine withdrawal. I wrote a --
19:37 13 Q. Can we get a copy of that article?
19:37 14 A. Oh, I don't -- it's old, and I don't have a copy, so I
19:37 15    don't know where you'd get it.
19:37 16        And then I wrote a chapter in a textbook
19:37 17    called The Clinical Practice of Emergency Medicine
19:37 18    that talked about acute psychosis and altered mental
19:37 19    status that may have mentioned abstinence syn --
19:37 20    nothing of the depth to which we're discussing at this
19:38 21    point.
19:38 22 Q. Your next paragraph says, "Based upon the length of
19:38 23    time that Mr. Stojcevski was in the hospital."
19:38 24        What hospital was he in?
19:38 25 A. Not in the hospital; in the jail. That must be a

---

26  (Pages 101 to 104)

Gerald Shiener, M.D.
May 22, 2018

Page 105

19:38 1     **typo.**

19:38 2   Q.  Well, it's not really a typo; it's a different word.

19:38 3     Is that another factual inaccuracy in your report?

19:38 4   **A.  I'd say it was more like a typographical error or**

19:38 5     **dictation error.  He wasn't in the hospital; he was**

19:38 6     **confined.**

19:38 7   Q.  Then you say, "Based upon the time that he was in the

19:38 8     hospital and the" -- and this is what I'm going to ask

19:38 9     you about -- "the development of his symptoms."

19:38 10       Describe the development of his systems --

19:38 11     symptoms for me, please.

19:38 12   **A.  I'm not sure what you're asking.**

19:39 13   Q.  Well, you used the phrase, "the development of his

19:39 14     symptoms."

19:39 15   **A.  Well --**

19:39 16   Q.  I presume that means that his symptoms developed,

19:39 17     correct?

19:39 18   **A.  His behavior became disorganized early on in the**

19:39 19     **hospitalization.**

19:39 20   Q.  I want you to describe the development of his

19:39 21     symptoms.

19:39 22   **A.  Yes.  Well, what I would say is that his behavior**

19:39 23     **became disorganized early in the stages of his**

19:39 24     **confinement and were intermittent but persistent**

19:39 25     **throughout the 16 days.**

Page 106

19:39 1   Q.  What symptoms developed?

19:39 2   **A.  Disorganized behavior.**

19:39 3   Q.  Well, that's a term of art.  I want you to talk to a

19:39 4     layperson.

19:39 5   **A.  We've talked -- we talked about disorganized behavior**

19:39 6     **for about 30 minutes earlier in this proceeding.**

19:39 7   Q.  Well --

19:39 8   **A.  And I gave examples, and I talked about the things**

19:39 9     **that were represented in the record, or the**

19:39 10     **descriptions: staring, not responding, engaging in**

19:40 11     **behavior that Dr. Sherman said was not consistent with**

19:40 12     **a -- with a seizure.**

19:40 13   Q.  The hallucinations, too?

19:40 14   **A.  Well, the report that half of his -- half of his body**

19:40 15     **had been devoured or half of his heart had been**

19:40 16     **devoured.**

19:40 17   Q.  When you say, almost sarcastically, Well, the report

19:40 18     that he did that, I mean, are you somehow suggesting

19:40 19     that what he said somehow is not a hallucination?

19:40 20       MR. CHAPMAN:  Wait.  I'm going to object to

19:40 21     the use of the term "sarcastic."  There's nothing

19:40 22     about Dr. Shiener's testimony that --

19:40 23       MR. IHRIE:  It appeared to me to be.

19:40 24       MR. CHAPMAN:  -- was sarcastic.  Well, then

19:40 25     you appeared wrong.

Page 107

19:40 1     THE WITNESS:  If I'm being sarcastic,

19:40 2     you'll know it, and it won't just appear that way.

19:40 3       I don't mean to be sarcastic.  I'm trying

19:40 4     to be precise when people use jargon or terms of art

19:40 5     that might not be appropriately used.  And someone

19:40 6     said -- someone said in the record "hallucination,"

19:41 7     and then the behavior to which they seemed to be

19:41 8     referring was that the patient said that half of his

19:41 9     body had been devoured or half of his heart had been

19:41 10     devoured.  That would be more -- and you raised the

19:41 11     question of a delusion.  That would be more consistent

19:41 12     with the description of a delusion than a

19:41 13     hallucination.

19:41 14       But it's a representation of disorganized

19:41 15     behavior.

19:41 16   BY MR. IHRIE:

19:41 17   Q.  So there are no other symptoms, other than the ones

19:41 18     you have mentioned in this deposition, that fall under

19:41 19     the umbrella of your phrase "development of his

19:41 20     symptoms;" is that true?

19:41 21   **A.  Well, now we're debating this to quite an extensive**

19:41 22     **degree, but what I would say is:  The things that I**

19:41 23     **have described.**

19:41 24     **Now, there is some mention of an elevation**

19:41 25     **of blood pressure with a diastolic of 95.  And**

Page 108

19:41 1     **depending on what his baseline blood pressure was,**

19:42 2     **elements of hypertension can be determined by a number**

19:42 3     **of things, but blood pressure, especially diastolic**

19:42 4     **blood pressure, but often pulse pressure as well or**

19:42 5     **the width between diastolic and systolic, can be**

19:42 6     **elevated in the abstinence states from sedatives or**

19:42 7     **hypnotics or alcohol.  So the development of that**

19:42 8     **symptom.**

19:42 9     **His intermittent intake of food, his being**

19:42 10     **incontinent of stool, the time at which those things**

19:42 11     **occurred, and the duration for which they presented on**

19:42 12     **an intermittent basis are what I'm referring to as the**

19:42 13     **development of symptoms.**

19:42 14   Q.  Would your development of symptoms also include

19:42 15     observations by personnel of rapid-eye movement?

19:42 16   **A.  Well, first of all, it's not my development or not my**

19:42 17     **description, it's just -- it's a term that I use,**

19:42 18     **something that --**

19:42 19   Q.  Yes.

19:42 20   **A.  -- something that --**

19:42 21   Q.  Would the term that you used, "development of his

19:43 22     symptoms," also include observations by others of --

19:43 23     that he had rapid-eye movement?

19:43 24   **A.  Well, rapid-eye movement refers specifically to a**

19:43 25     **phenomenon that occurs in a certain stage of sleep.**

Carroll Court Reporting and Video
586-468-2411

Gerald Shiener, M.D.
May 22, 2018

Page 109

And then rapid-eye movement can be -- can mean nystagmus, it can mean glances that are darting around the room. That might be the indication of hallucinations. So if I'm talking to you, and I keep looking over here, and you were a psychiatrist, you might infer that I was seeing something or looking at something or sensing movement, and then the prudent thing for a psychiatrist to do would be to ask a patient, "Is there something that you see, or is there something distracting you."

But -- so rapid-eye movement is very nonspecific. And typically rapid-eye movement is more of a symptom of intoxication with certain drugs of abuse rather than something that's seen in withdrawal state. But when patients have visual hallucinations, their eyes may be described as darting. I don't know that I would necessarily consider that to be rapid-eye movements.

Q. What about eye fluttering?

A. Eye fluttering is something that's seen when someone is falling asleep, or when someone is just inducing sleep, and it's another phenomenon that some individuals who are described as histrionic often do when they're thinking or when they're under stress, where their eyelids flutter.

Page 110

Q. How about incoherency?

A. Incoherency is very nonspecific.

Q. Is that part of the development of his symptoms that you --

A. Well, he was described as incoherent. It's not really -- and what they mean was he was making verbalizations that didn't seem to make sense. That might be some -- that might be one of the symptoms, and that could emerge in a number of conditions, benzodiazepine withdrawal being only one of them.

Q. I appreciate that comment, but my question is: Is incoherency one of the symptoms that you're talking about when you talk about "and the development of his symptoms"?

A. Well, the description of him as being incoherent may refer to one of those symptoms. Again, I don't mean to be sarcastic, but these are mental health professionals who are using conclusory terms or jargon rather than descriptive terms. So when you say someone's incoherent -- you've taken a lot of depositions, and you've gotten answers you don't understand. You might use the term incoherent.

When I describe someone as incoherent, what I would do is in a report I would describe what they said, and then I would refer to them in the summary as

Page 111

being incoherent, meaning that they make verbalizations that don't make sense or that are difficult to understand, or it's difficult to understand the relevance or the context of what they're saying. That's what I would mean.

I don't know what these people mean.

Q. Well, when I asked you about these symptoms, you seemed to preface your answers with, Well, you know, somebody's saying that they observed.

All of these symptoms are what somebody say they observe; are they not?

A. They're -- they're not describing their observations; they're making conclusory statements.

Q. You mean I can't walk out here and listen to somebody walk up to me on the street and have them talk gibberish, and I'm not qualified to say that they're incoherent?

A. Yeah, because they might be talking to you in another language. And you might describe it as gibberish, and it might be an eloquent dissertation in some language that you don't understand.

Q. So the answer to my question is: Yes, that I'm not qualified to know if somebody is speaking in an incoherent fashion. Is that your testimony?

A. No, my testimony is that: If you described someone

Page 112

speaking what you refer to as gibberish as being incoherent, that may not be accurate, and that would be a conclusory statement.

If you said that someone came and spoke to you in words that you didn't understand, and it could be gibberish or it could be another language, that would be more accurate. That would be an observation.

Gibberish is a conclusion. Incoherence is a conclusion.

Q. Trust me, I know if somebody is speaking incoherently.

A. It's not a question of my trust or distrust.

Q. So what about tremors; I haven't heard you use the word tremors. Are tremors one of his symptoms in your "development of symptoms" phrase?

A. Tremors could -- tremors could be one of the symptoms that could be caused by benzo --

Q. I'm not asking --

A. If he developed tremors, that would be one of the things to which he was referring.

Q. What -- I didn't hear the end of that.

A. I said, "If he developed tremors, that would be one of the things to which I'm referring."

I just don't want to end a sentence with a preposition.

Q. Thank you.

Gerald Shiener, M.D.
May 22, 2018

---

Page 113

19:47 1    A. I don't want to say referring to.
19:47 2    Q. I'm sorry to say that you're old school. Me too.
19:47 3    A. Well, I'm also old, so...
19:47 4    Q. You know, that's hard to hear "Where are you at," but
19:47 5       we hear it.
19:48 6    A. Try working with medical students every day who can't
19:48 7       speak proper English --
19:48 8    Q. Try hiring a lawyer --
19:48 9    A. -- let alone use jargon, so...
19:48 10      Takes two of them to do this.
19:48 11   Q. We talked about decompensation before. You understand
19:48 12      because you reviewed the document, that the word
19:48 13      decompensation is one of the categories that is on the
19:48 14      self-harm watch mental health observation initial
19:48 15      assessment as -- it's one of the categories under the
19:48 16      heading "Reason to Watch." So -- did you know that?
19:48 17   A. Yeah. I got the form right here.
19:48 18   Q. All right.
19:48 19   A. I have the form on my screen.
19:48 20   Q. Well, you implied when I asked about decompensation,
19:48 21      Well, it's -- you know, people say things, and
19:48 22      decompensation really isn't --
19:48 23   A. Look, that's an issue that I have with using jargon
19:49 24      terms and not being descriptive. And I think that
19:49 25      that makes the -- that makes what -- the terms are

---

Page 114

19:49 1       nonspecific, they're used in an imprecise manner; and
19:49 2       it's better to describe what you're seeing.
19:49 3          Now, I know what decompensation means, but
19:49 4       it's commonly used even by many mental health
19:49 5       professionals, in a cavalier way or an imprecise way.
19:49 6    Q. Was it being used in a cavalier way when the mental
19:49 7       health professionals checked decompensation in this
19:49 8       case?
19:49 9    A. Well, I would describe the disorganized behavior as
19:49 10      evidence of a decompensation, meaning the definition
19:49 11      that I gave you about a year course. But I just --
19:49 12      whenever these jargon terms or terms of art are used,
19:49 13      I feel I have to give a caveat. And I don't mean to
19:49 14      be difficult.
19:49 15   Q. You then indicate under -- "and the development of his
19:50 16      symptoms, a time course is not suggestive of
19:50 17      withdrawal from benzodiazepines, and the more severe
19:50 18      aspects of Mr. Stojcevski's condition in the latter
19:50 19      stages of his" -- there's that typo,
19:50 20      hospitalization -- "hospitalization, a period of 16
19:50 21      days, is not consistent with -- is not consistent
19:50 22      withdrawal from benzodiazepines."
19:50 23          I'm going to suggest that probably is a
19:50 24      typo. You missed a word, correct?
19:50 25   A. With should be in there. With withdrawal. It's not

---

Page 115

19:50 1       -- that's not an uncommon thing for a typist to miss.
19:50 2    Q. I agree.
19:50 3          So tell me what the, quote-unquote, "more
19:50 4       severe aspects of Mr. Stojcevski's condition in the
19:50 5       latter stages of his confinement" were.
19:50 6    A. Well, his behavior seemed to be -- seemed to be
19:50 7       described as being more disorganized, he was eating
19:51 8       intermittently, his verbalizations were not making
19:51 9       sense, he's -- there was incontinence of stool.
19:51 10         So there's -- the behavior seemed to be
19:51 11      becoming more disorganized towards the end of his
19:51 12      confinement.
19:51 13   Q. Meaning that his condition was deteriorating?
19:51 14   A. Well, manifestations of some process were becoming
19:51 15      more obvious and presenting more --
19:51 16   Q. "The manifestations of some process" --
19:51 17   A. That's right.
19:51 18   Q. -- "were becoming more obvious."
19:51 19   A. That's right.
19:51 20   Q. What manifestations?
19:51 21   A. The things we've been talking about.
19:51 22   Q. All of them?
19:51 23   A. The progression of symptoms.
19:51 24         All of them in varying sequences, in
19:51 25      varying degrees at different times.

---

Page 116

19:51 1    Q. So all of the things that we were talking about were
19:51 2       becoming more obvious --
19:51 3    A. More manifest and more obvious, which is --
19:51 4    Q. -- the longer he was in the jail.
19:51 5    A. That's right. That was the trend.
19:52 6    Q. I'm not going to spend much time on it for my friend
19:52 7       Ron, but why did you go into much detail about opiate
19:52 8       withdrawal? Why is that important in your conclusion
19:52 9       here?
19:52 10   A. Well, because he was taking -- he was reported to be
19:52 11      taking methadone as well.
19:52 12   Q. Well, you indicate that "Once again" -- and I'm
19:52 13      looking at the first full paragraph on five. "Once
19:52 14      again the course of Stojcevski's symptoms would
19:52 15      suggest that the more severe symptoms that he
19:52 16      experienced were unlikely to be caused by opiate
19:52 17      withdrawal, as opiate withdrawal symptoms usually peak
19:52 18      within 72 to 96 hours and remit shortly after that."
19:53 19   A. That's right.
19:53 20   Q. Okay. Then you indicate "Based" -- in the next
19:53 21      paragraph, "Based on my review of the medical records
19:53 22      and the course of Mr. Stojcevski's illness, an
19:53 23      alternative consideration is strongly suggested."
19:53 24         I want to talk about your phrase "strongly
19:53 25      suggested" for a minute. "Strongly suggested" is a --

---

29 (Pages 113 to 116)

Gerald Shiener, M.D.
May 22, 2018

---

**Page 117**

19:53 1     is a categorization that would be compared to what?
19:53 2  A.  A categorization compared to what.
19:53 3  Q.  Yeah.  Let me tell you --
19:53 4  A.  I don't understand what that means.
19:53 5  Q.  Fair question.
19:53 6     What came to mind when I was thinking about
19:53 7     this, when I saw your phrase "strongly suggested,"
19:53 8     was: not suggested, moderately suggested or somewhat
19:54 9     suggested, suggested, strongly suggested, true.
19:54 10     Do those make sense in terms of the
19:54 11     categories?  Because you're using a phrase that I
19:54 12     don't have anything to weigh it against, "strongly
19:54 13     suggested."
19:54 14  A.  Well, it sounds like you do.  Because it sounds like
19:54 15     your response was that whole hierarchy.
19:54 16  Q.  Does that make sense to you, those categories?
19:54 17  A.  Well, I want to be careful in answering this.
19:54 18     It seems consistent with what I know about
19:54 19     how lawyers think.
19:54 20  Q.  How about how you think?
19:54 21  A.  No.  No.
19:54 22  Q.  How --
19:54 23  A.  Strongly -- look --
19:54 24  Q.  I'm not trying to trick you.
19:54 25  A.  No, I --

---

**Page 118**

19:54 1  Q.  I'm just trying to get some bearing on what you mean.
19:54 2  A.  I didn't say you were trying to trick me.  I was about
19:54 3     to explain.
19:54 4     A doctor's job is to look at a bunch of
19:54 5     phenomena and to find a pathophysiologic process that
19:54 6     explains all the phenomena.  And the suggestion -- at
19:55 7     least the suggestion or the inference throughout my
19:55 8     analysis of the -- of the course, the correspondence
19:55 9     between the lawyers, and the considerations or the
19:55 10     suggestions or the inferences to be made from the
19:55 11     course of Mr. Stojcevski's confinement in the jail was
19:55 12     that his use of opiates and his use of benzodiazepines
19:55 13     had something to do with his demise, and that this had
19:55 14     something to do with an abstinence syndrome.  And when
19:55 15     I discussed that on page 4, I thought I discussed
19:55 16     those issues in some detail, to suggest that: What
19:55 17     happened to Mr. Stojcevski was not consistent with
19:55 18     what we know about opiate withdrawal because of the
19:55 19     time frame, and because of the -- the bottom line with
19:55 20     opiate withdrawal, that it's more physically
19:55 21     uncomfortable than life-threatening.
19:56 22     And the morbidity of -- the morbidity from
19:56 23     opiate withdrawal is -- is very limited.  People are
19:56 24     uncomfortable for --
19:56 25  Q.  Well --

---

**Page 119**

19:56 1  A.  Wait, wait.  Let me finish.
19:56 2     -- for a brief period.
19:56 3     Looking at benzodiazepine withdrawal, that
19:56 4     occurs early on in the course of abstinence, hours or
19:56 5     days, and it's unlikely that an abstinence syndrome
19:56 6     could persist for more than several days.  Certainly
19:56 7     not for 16 days.
19:56 8  Q.  So this first -- second full paragraph on page 5,
19:56 9     getting back to that, you say that, "Mr. Stojcevski's
19:56 10     illness" -- I'm sorry, let me start, "Based on my
19:56 11     review of the medical records, and the course of
19:56 12     Mr. Stojcevski's illness, an alternative
19:56 13     consideration"...
19:56 14     Now, your word "an," does that mean that
19:56 15     there are other alternative considerations, or you're
19:56 16     just sort of picking out one, "an alternative
19:56 17     consideration"?
19:56 18  A.  No, I'm describing what my thinking is.
19:56 19  Q.  Is it the alternative consideration, or is it one of
19:57 20     many?
19:57 21  A.  Well, in medicine, a doctor considers a differential
19:57 22     diagnosis.  So there are many things that a doctor
19:57 23     considers.
19:57 24     What I mean to express here -- and you can
19:57 25     diagram my sentences, if you like, but what I mean to

---

**Page 120**

19:57 1     express is that a -- a more compelling conclusion than
19:57 2     the influence of opiate withdrawal or benzodiazepine
19:57 3     withdrawal or some combination of the abstinence
19:57 4     syndromes from those two substances --
19:57 5  Q.  Um-hum.
19:57 6  A.  -- was responsible for what happened to
19:57 7     Mr. Stojcevski.
19:57 8  Q.  Um-hum.  So what is a neuroleptic?
19:57 9  A.  A neuroleptic is a drug that -- a neuroleptic is a
19:57 10     drug that causes what -- the Swiss chemist who
19:57 11     described it used the term la affect neuroleptic
19:58 12     (phonetic).  Emotional quieting, less interest in the
19:58 13     environment, subdued reactions separate from sedation.
19:58 14  Q.  And --
19:58 15  A.  And neuroleptic drugs are typically drugs that have
19:58 16     some effect on the dopamine system in the mind and
19:58 17     cause that syndrome of emotional quieting.
19:58 18  Q.  Does Xanax have any effect on the dopamine system of
19:58 19     the brain?
19:58 20  A.  Not any direct effect.
19:58 21  Q.  How about --
19:58 22  A.  All these systems interact with each other.  But Xanax
19:58 23     affects GABA, the chloride channel, and glutamate.
19:58 24  Q.  And can you tell me the difference, if there is a
19:58 25     difference, between a neuroleptic and a psychotropic

---

30  (Pages 117 to 120)

Gerald Shiener, M.D.
May 22, 2018

---

Page 121

19:58  1     medication?
19:58  2     A.  Well, psychotropic is a class of medicine that have an
19:58  3         effect on the psyche or the mind, and a neuroleptic is
19:58  4         one of those drugs.
19:58  5     Q.  So a neuroleptic would fall under the umbrella of
19:58  6         psychotropic?
19:58  7     A.  Neuroleptic drugs are psychotropic drugs.
19:59  8     Q.  But a psychotropic --
19:59  9     A.  Wait, wait, wait.
19:59 10     Q.  I'm sorry.
19:59 11     A.  You have to be very careful, because neuroleptic drugs
19:59 12         are used for a number of different things.
19:59 13         Neuroleptic drugs all have an antiemetic quality.
19:59 14     Q.  Anti what?
19:59 15     A.  Antiemetic.  They block vomiting or nausea.
19:59 16             Neuroleptic drugs, many of them are
19:59 17         antihistaminic, so they're used for itching, used to
19:59 18         stop itching.  So -- but neuroleptic drugs are
19:59 19         psychotropic drugs.  They do have an effect on the
19:59 20         psyche, and their indication is some aspect of mental
19:59 21         illness, either mood stabilization or treatment of
19:59 22         psychosis.
19:59 23             (Recess taken at 7:59 p.m.)
20:05 24             (Back on the record at 8:05 p.m.)
20:05 25     BY MR. IHRIE:

---

Page 122

20:06  1     Q.  So looking at the same paragraph, you indicate --
20:06  2         well, is Xanax a psychotropic medication?
20:06  3     A.  Any drug that affects the mind.  And Xanax is a
20:06  4         psychotropic medicine, because it's used as an
20:06  5         anxiolytic.
20:06  6     Q.  And Klonopin?
20:06  7     A.  Well, Klonopin is, but Klonopin's FDA indication is
20:06  8         for -- as an adjunct anticonvulsant.  It really
20:06  9         doesn't have FDA approval as an anxiolytic.
20:06 10     Q.  Alcohol?
20:06 11     A.  Alcohol is a psychoactive drug; it's not a
20:06 12         psychotropic drug.  The term psychotropic is typically
20:06 13         reserved for drugs that have a therapeutic effect.
20:06 14             And they serve alcohol in nursing homes,
20:06 15         and, you know, there are some nursing home residents
20:06 16         that take a shot of whiskey or a shot of -- a glass of
20:06 17         wine at bedtime, but it's considered a psychoactive
20:06 18         drug; not a psychotropic.
20:06 19     Q.  So you indicate in this paragraph, "Individuals who
20:07 20         use psychotropic medications often experience more
20:07 21         life-threatening conditions, neuroleptic malignant
20:07 22         syndrome."
20:07 23     A.  Yes.
20:07 24     Q.  Is that -- when you say, "neuroleptic malignant
20:07 25         syndrome," are you talking about -- when you say "more

---

Page 123

20:07  1         life-threatening conditions," such as neuroleptic --
20:07  2     A.  That's right.
20:07  3     Q.  That's what you basically are saying?
20:07  4     A.  Yes.  Um-hum.
20:07  5     Q.  Okay.  Now, describe for me what neuroleptic malignant
20:07  6         syndrome is.
20:07  7     A.  Well, neuroleptic malignant syndrome is a syndrome
20:07  8         that occurs when patients receive neuroleptic drugs,
20:07  9         and they develop delirium, lead-pipe rigidity, or
20:07 10         what's called a whole-body dystonic reaction:
20:07 11         elevated fever, elevated white blood cell count.  And
20:07 12         that has a certain degree of mortality as well as
20:07 13         morbidity.
20:07 14     Q.  Then you say, "Although there's no indication that
20:07 15         Mr. Stojcevski received neuroleptic medication."
20:08 16     A.  That's right.  Well, that's one of the things to
20:08 17         consider in the differential diagnosis, is the only
20:08 18         reason I'm putting it here.
20:08 19     Q.  So if he never -- I want to call it NMS.  If NMS is
20:08 20         for people who have been taking a neuroleptic --
20:08 21     A.  That's right.
20:08 22     Q.  -- and you have no evidence that he was taking any
20:08 23         neuroleptics, and he was never described as having
20:08 24         what you call "lead-pipe rigidity," why do you
20:08 25         identify it as a -- why do you even talk about it?

---

Page 124

20:08  1     A.  It's part of the differential diagnosis of a condition
20:08  2         that presented with the course of Mr. Stojcevski's
20:08  3         confinement.
20:08  4     Q.  I'm not sure that I understand that.  And maybe it's
20:08  5         because I'm not medically smart.  But when you say "it
20:08  6         presented itself," how did it present itself?
20:08  7     A.  No, I didn't say -- no, that's not what I said.
20:08  8     Q.  All right.
20:08  9     A.  What I said was:  That's part of the differential for
20:08 10         someone who presents as Mr. Stojcevski did.
20:09 11             But it's ruled out for the reasons that you
20:09 12         just discussed or the reasons that I state.  There's
20:09 13         no -- there's no indication that he ever received
20:09 14         neuroleptic medication, and he was never described as
20:09 15         having any of the symptoms -- any of the symptoms that
20:09 16         are specific to that syndrome, other than delirium.
20:09 17     Q.  Well, is that -- are you finished?
20:09 18     A.  Yes.
20:09 19     Q.  Okay.  Is that -- is NMS one of the alternative
20:09 20         considerations that you're strongly suggesting?
20:09 21     A.  It's part of the differential diagnosis, but it's not
20:09 22         suggested by the symptoms.
20:09 23     Q.  What was suggested by the symptoms?
20:09 24     A.  Malignant catatonia or catatonia.
20:09 25     Q.  And that's in your next paragraph.

---

31  (Pages 121 to 124)

Gerald Shiener, M.D.
May 22, 2018

Page 125

20:09 1   A.  That's right.
20:09 2   Q.  And you indicate in the next paragraph, "Another
20:09 3       syndrome would be."
20:09 4           When you say "would be," you mean is an
20:09 5       alternative that is strongly suggested?
20:09 6   A.  That's right.
20:09 7   Q.  What's the difference between malignant catatonia and
20:10 8       catatonia?
20:10 9   A.  Well, catatonia can be self-limiting, and some
20:10 10      patients develop some of the symptoms, or a milder
20:10 11      form of the illness, and then either remit or respond
20:10 12      to treatment.  But other patients have a steadily
20:10 13      deteriorating condition that leads to some morbidity
20:11 14      or death.
20:11 15  Q.  And which one are you saying it strongly suggested?
20:11 16  A.  Malignant catatonia.
20:11 17  Q.  And what are the -- when it says -- your last
20:11 18      paragraph says, "Catatonia is the delirium and altered
20:11 19      level of consciousness."
20:11 20          How are the last two paragraphs on this
20:11 21      page related to one another?
20:11 22  A.  (No verbal response.)
20:11 23  Q.  You talk about malignant catatonia in the
20:11 24      second-from-last paragraph, and catatonia in the last
20:11 25      one.  Or are they -- should I read them connected

Page 126

20:11 1       together in some way?
20:11 2   A.  I don't really know what you're asking.  I talk about
20:11 3       the condition of catatonia in two paragraphs.
20:11 4   Q.  Well --
20:11 5   A.  How are they -- how are they different?
20:11 6   Q.  All right.  Well, let me ask you --
20:11 7   A.  Wait, wait, wait, wait, wait.
20:12 8           I think the first paragraph is more
20:12 9       descriptive of catatonia, the second paragraph talks
20:12 10      about some of the consequences or the possible
20:12 11      outcomes of catatonia.
20:12 12  Q.  I guess the reason that I ask you that is because
20:12 13      under the last paragraph, where you say "Catatonia
20:12 14      is," you have a whole bunch of symptoms.  The one when
20:12 15      you talk about "malignant catatonia," you don't
20:12 16      identify any symptoms in that.  So that's what I'm
20:12 17      trying to figure out.
20:12 18          Let me just ask you differently.
20:12 19          What are the symptoms of malignant
20:12 20      catatonia?
20:12 21  A.  They're the same symptoms of catatonia.
20:12 22  Q.  Okay.
20:12 23  A.  It just becomes more persistent, the symptoms may be
20:12 24      more severe, and it progresses to a poorer outcome.
20:12 25  Q.  I see.

Page 127

20:12 1           So the symptoms of catatonia on DSM-5 --
20:12 2       I'm going to list them.  There are 12.  Stupor -- did
20:13 3       you see stupor?
20:13 4   A.  Well, delirium, the altered level of consciousness.
20:13 5   Q.  So you would say that delirium falls under a category
20:13 6       of stupor?
20:13 7   A.  Well, he was described as incoherent, or he had
20:13 8       problems -- you know, we've talked about this all
20:13 9       evening.  He had problems taking in information,
20:13 10      processing it, and acting on it.  Being stuporous or
20:13 11      being less active or staying in one place and --
20:13 12      and/or having movements that are -- movements or
20:13 13      actions that are purposeless, would be one way to --
20:13 14      could be described as stuporous.
20:13 15  Q.  Catalepsy?  Did he have catalepsy?
20:13 16  A.  I think on the videos there were some times where he
20:13 17      was active, and then he would suddenly become
20:13 18      inactive.
20:13 19          Catalepsy refers to a very specific
20:13 20      phenomenon that is common to a number of neurologic
20:13 21      syndromes, where someone -- where someone becomes
20:14 22      suddenly inactive, or someone suddenly -- somebody is
20:14 23      doing something, and they suddenly stop, or they
20:14 24      suddenly drop.
20:14 25  Q.  Well, the DSM-5 describes catalepsy as passive

Page 128

20:14 1       induction of a posture held against gravity.  Do you
20:14 2       agree with that?
20:14 3   A.  That's waxy flexibility.
20:14 4   Q.  Well, that's not what the DSM-5 says.  Do you disagree
20:14 5       with that DSM-5 description?
20:14 6   A.  No, that's -- staying in one posture, that's a rare
20:14 7       symptom of catatonia.
20:14 8   Q.  But it wasn't what you described, was it?
20:14 9   A.  No.  It's sudden cessation of a movement.  So in the
20:14 10      middle of doing something, someone just stands still,
20:14 11      and they stop.  That's what I said.
20:14 12  Q.  Did that ever happen with David?
20:14 13  A.  Well, there were -- his activities were described as
20:14 14      purposeless.  I don't know that anyone described that
20:14 15      specifically.
20:14 16          I fast-forwarded through much of the
20:15 17      videos.  There might have been some instances where he
20:15 18      was doing something, and then he -- and then he
20:15 19      suddenly ceased.  I -- I don't know that I would
20:15 20      necessarily interpret it and use that -- that term or
20:15 21      that --
20:15 22  Q.  Did he have waxy flexibility?
20:15 23  A.  Nobody ever put him in a position and determined --
20:15 24      you have to test for that.  So if you see someone, you
20:15 25      raise their hand.  If they're catatonic schizophrenic,

Carroll Court Reporting and Video
586-468-2411

Gerald Shiener, M.D.
May 22, 2018

Page 129

20:15  1    they're often negative, and they resist you.  If
20:15  2    they're just stuporous or delirious, they won't resist
20:15  3    you; but if you let go of their arm, it will fall.  If
20:15  4    they're catatonic, they'll keep it in the same
20:15  5    position.  No one ever tested him in that way.
20:15  6    Q.  Did he have mutism?
20:15  7    A.  There were times where he wouldn't speak.  They said
20:15  8        that he refused to speak or was incapable of speech.
20:15  9    Q.  Who said that?
20:15 10    A.  I don't recall, but there are notations in the medical
20:15 11        record.
20:15 12            And we talked about refusing to speak
20:15 13        versus being incapable of speech.
20:15 14    Q.  Did he have negativism?
20:16 15    A.  Negativism is different than cataplexy.  Negativism is
20:16 16        when you go to move -- someone is in a resting
20:16 17        position, they seem to be inattentive, you go to move
20:16 18        their arm, and they resist.  And then their eyes
20:16 19        are closed, you try to open their eyes, and then they
20:16 20        scrunch down, keep their eyes closed.
20:16 21            Nobody ever tested him for that, either.
20:16 22    Q.  Was there any posturing?
20:16 23    A.  There were times where he -- where he was described as
20:16 24        not moving.
20:16 25    Q.  Posturing -- what is posturing?

Page 130

20:16  1    A.  Well, posturing is more what they describe in
20:16  2        cataplexy.  Someone stays in an awkward posture, or is
20:16  3        doing something, they suddenly stop, but they stay in
20:16  4        the position that they were in when they stopped.
20:16  5    Q.  DSM-5 says, "Posturing is spontaneous and active
20:17  6        maintenance of a posture against gravity."
20:17  7            Did you see any of that?
20:17  8    A.  I didn't see any of that on the video.
20:17  9            When they say "against gravity," that might
20:17 10        mean holding one's arms out or holding one's arms in
20:17 11        the position that they were in the last time they did
20:17 12        something, or standing as opposed to laying flat on
20:17 13        the bed or laying flat on the ground.
20:17 14    Q.  I hope I pronounce this right.  Stereotypy?
20:17 15    A.  Stereotypy means doing the same thing over and over
20:17 16        again.  I think I saw some things on the video where
20:17 17        he would -- where he would do that.  That's more
20:17 18        purposeless.  And stereotypy might be moving your
20:17 19        hands around in a circle or touching the same thing or
20:17 20        rubbing the same thing.  I thought I saw some things
20:18 21        that were consistent with that on the video.  No one
20:18 22        ever described that or used that term.
20:18 23    Q.  Agitation?
20:18 24    A.  Agitation is pretty nonspecific.
20:18 25    Q.  Grimacing?

Page 131

20:18  1    A.  Nobody described him as grimacing.
20:18  2    Q.  Echolalia?
20:18  3    A.  Nobody used that term to describe him, either.
20:18  4    Q.  I know they wouldn't use that term, but did they
20:18  5        describe that condition?
20:18  6    A.  Echolalia is quite rare.  No, nobody said that he just
20:18  7        repeated what was said to him.
20:18  8    Q.  And the same goes with echopraxia, correct?
20:18  9    A.  That means doing the same thing that someone does.
20:18 10        And no.  That's the opposite of mutism.
20:18 11    Q.  So --
20:18 12    A.  So there's a whole range of behaviors, some being the
20:18 13        opposite of other behaviors that you see.
20:18 14    Q.  So for catatonia DSM-5 says, "The clinical picture is
20:18 15        dominated by three or more of the following symptoms."
20:18 16            Did he have three or more?
20:18 17    A.  Well, first of all, that's only a guideline.  I don't
20:19 18        want to endorse that.  That's authoritative, and I
20:19 19        don't want to endorse that the DSM is like a book of
20:19 20        statutes, where you have to have something to make the
20:19 21        diagnosis.  If you read the book properly, and you
20:19 22        read the disclaimers about the use of the book and
20:19 23        about clinical judgment and clinical experience -- I
20:19 24        believe if you read through them, I believe he had --
20:19 25        he had stupor, he had some evidences, by my

Page 132

20:19  1    recollection, of stereotypy, he had some -- he had
20:19  2    elective mutism, so that's three right there.
20:19  3    Q.  Do you have access to the video right there?
20:19  4    A.  No, I don't.  This is a new computer that does not
20:19  5        play videos.  We won't play DVDs.
20:19  6    Q.  Okay.  Where do convulsions fit into --
20:19  7    A.  Convul -- you mean seizures?
20:20  8    Q.  No, convulsions.  Where somebody is lying on the
20:20  9        ground, and then they -- I know that this won't be
20:20 10        picked up by the -- they just begin to just --
20:20 11    A.  That's a --
20:20 12    Q.  -- go -- just act like this.
20:20 13        My arms and legs are flying all over, for
20:20 14    the record.
20:20 15    A.  I wouldn't call -- that would be flailing arms and
20:20 16    legs.
20:20 17    Q.  All right.
20:20 18    A.  That's not necessarily typical in catatonia.
20:20 19    Q.  Where does apparent --
20:20 20        MR. PERAKIS:  Did you hear what he said?
20:20 21    "That's not necessarily typical in catatonia."
20:20 22    BY MR. IHRIE:
20:20 23    Q.  And where -- presuming that such physical behavior was
20:20 24    not intentional, what would that seem to indicate to
20:20 25    you?

33  (Pages 129 to 132)

Page 133

20:20 1   A.  It was not intentional?
20:20 2   Q.  Yes.
20:20 3   A.  It could be an indication of physical discomfort; it
20:20 4       could be an indication in sleep/wake
20:20 5       cycle, someone might be thrashing about while they're
20:20 6       dreaming; it could be manifestations of a seizure;
20:20 7       could be feigning a seizure, as Dr. -- as Dr. Sherman
20:21 8       concluded, based on the fact that he made
20:21 9       verbalizations after the behavior was observed.
20:21 10  Q.  What kind of verbalizations?
20:21 11  A.  (No verbal response.)
20:21 12  Q.  When you say "he made," you mean David made, David
20:21 13      Stojcevski?
20:21 14  A.  Well, let me...
20:21 15      Okay.  This late entry that's referenced to
20:22 16      6-23 --
20:22 17  Q.  Um-hum.
20:22 18  A.  -- that in fact is 6-17, "I went to see the patient
20:22 19      who was being observed in the medical unit for
20:22 20      questionable seizures.  I observed him fluttering his
20:22 21      eyes in what was certainly not a seizure but what was
20:22 22      most likely his poor attempt to feign one.  I shook
20:22 23      his shoulder and told him to sit up, at which point he
20:22 24      suddenly stopped the eye fluttering behavior and
20:22 25      exclaimed, 'What's happening,' as if he was unaware."

Page 134

20:22 1       So that verbalization would be inconsistent
20:22 2       with a seizure or paroxysmal event.
20:22 3       Now, if someone were flailing their arms --
20:22 4       what you demonstrated is not consistent with a
20:22 5       neurological symptom of a seizure.
20:22 6   Q.  I never said it was.  I just asked you what it would
20:22 7       be an indication of.
20:22 8       I think you've answered the question to the
20:22 9       best of your ability.
20:22 10  A.  I think a lawyer trying to demonstrate something and
20:22 11      not really knowing what he was trying to demonstrate.
20:22 12  Q.  Oh, I knew exactly what I was trying to demonstrate.
20:22 13  A.  What was that?
20:22 14  Q.  It was exactly what he does on the tape.  If you pull
20:22 15      it up, I'll show it to you.
20:23 16  A.  Well again, that flailing -- flailing is not
20:23 17      consistent with a paroxysmal event or a seizure.
20:23 18  Q.  I didn't say it was.  I just asked you what was it an
20:23 19      indication of, and I think you answered the question.
20:23 20  A.  But you referred to it as a convulsion.
20:23 21  Q.  Yes, I did.
20:23 22  A.  And convulsion is generally synonymous with seizure.
20:23 23  Q.  Okay.  You read Dr. Sherman's deposition, correct?
20:23 24  A.  I read Dr. Sherman's deposition.
20:23 25  Q.  And you must have read, when you read his deposition,

Page 135

20:23 1       that Dr. Sherman testified under oath that David never
20:23 2       said he was having a seizure.
20:23 3       Do you recall reading that?
20:23 4   A.  I haven't committed it to memory.  If you want to
20:23 5       direct me to a page, I'll --
20:23 6   Q.  That he -- do you remember reading that he testified
20:23 7       that he never even used -- that David never even used
20:23 8       the word seizure?  Do you recall reading that?
20:23 9       MR. CHAPMAN:  I'm going to object to the
20:23 10      form and foundation.  It's not a memory test.  If you
20:23 11      want to direct him to a page, you can do that.
20:23 12      THE WITNESS:  I haven't committed it to
20:23 13      memory.  In the interest of accuracy, if you want to
20:23 14      direct me to a page, I'll review that.
20:23 15  BY MR. IHRIE:
20:23 16  Q.  Um-hum.
20:23 17  A.  What page?
20:24 18  Q.  Well, let's ask it as a hypothetical question.
20:24 19      I want you to assume hypothetically that a
20:24 20      patient comes down to a medical doctor in a jail
20:24 21      setting, and the medical doctor concludes that it was
20:24 22      -- that the patient was feigning a seizure, and that
20:24 23      the patient never used the word seizure.  I want you
20:24 24      to assume that the patient never said he was having a
20:24 25      seizure, I want you to assume that the doctor says

Page 136

20:24 1       that none of the physical movements that he was
20:24 2       exhibiting even indicated a seizure.  I would like you
20:24 3       to tell me, given those circumstances, do you have an
20:24 4       opinion as to why a doctor would conclude that he was
20:24 5       feigning a seizure?
20:24 6       MR. CHAPMAN:  Object to form and
20:24 7       foundation.  Calls for a conclusion, calls for
20:24 8       speculation, and you're not informing him of the
20:25 9       entire record, only the selective parts you want to
20:25 10      inform him of.
20:25 11      MR. PERAKIS:  That's the nature of a
20:25 12      hypothetical.
20:25 13      MR. CHAPMAN:  No, a hypothetical must
20:25 14      include all the relevant facts.  You can't --
20:25 15      MR. IHRIE:  Those are all the relevant
20:25 16      facts.
20:25 17      MR. PERAKIS:  Those are the relevant facts.
20:25 18      MR. CHAPMAN:  No, it's not.
20:25 19      MR. IHRIE:  Well, that's your opinion.
20:25 20      Make your objection.
20:25 21      THE WITNESS:  If I'm to reach an opinion
20:25 22      based on what you've told me, what I would say is that
20:25 23      a medical doctor working in a correction setting would
20:25 24      have to have a high index of suspicion for
20:25 25      malingering, especially someone who's in a mental

Carroll Court Reporting and Video
586-468-2411

Gerald Shiener, M.D.
May 22, 2018

Page 137

```
20:25  1    health unit and someone who's newly admitted.  And if
20:25  2    someone is seen flailing their arms in the manner in
20:25  3    which you demonstrated --
20:25  4    BY MR. IHRIE:
20:25  5    Q.  Yeah?  Well, no, I'm not -- Doctor, don't --
20:25  6           MR. CHAPMAN:  Wait.  Let him finish his
20:25  7    answer.
20:25  8           MR. IHRIE:  I don't want him to
20:25  9    misunderstand something.
20:25 10    BY MR. IHRIE:
20:25 11    Q.  My flailing was in no way intended to indicate that
20:25 12    that was in any way related to the time when he saw
20:25 13    Dr. Sherman.
20:25 14    A.  Well, but you said that was exactly what happened on
20:25 15    the tape.
20:26 16    Q.  It was, but -- it is, but not when he saw Dr. Sherman
20:26 17    or before he saw Dr. Sherman.  That occurred well
20:26 18    after he saw Dr. Sherman.  So I don't want you to
20:26 19    misunderstand.
20:26 20           MR. CHAPMAN:  Did you have a question for
20:26 21    the doctor?
20:26 22           MR. IHRIE:  Yeah.  He was in the process of
20:26 23    answering my question.
20:26 24           MR. CHAPMAN:  Well, you interrupted him.
20:26 25           THE WITNESS:  What I said was:  In a
```

Page 138

```
20:26  1    correction setting, a doctor has to have a high index
20:26  2    of suspicion for malingering or the intentional
20:26  3    production of the symptoms of a physical or
20:26  4    psychiatric illness for the sole purpose of secondary
20:26  5    gain or external consequences, which might be
20:26  6    medication, transfer to a better unit, attention, or
20:26  7    avoidance of an unpleasant aspect of his confinement.
20:26  8    And so that index of suspicion must be there.
20:26  9           And if the behavior that the doctor was
20:26 10    asked to observe involved involuntary movements in a
20:27 11    patient that he knew or suspected had been using drugs
20:27 12    or taking -- taking sedatives, it's not an
20:27 13    unreasonable inference to conclude that this would be
20:27 14    a naive attempt to feign a seizure.  And I believe
20:27 15    that -- I believe that in some of the things that I
20:27 16    read, there's some -- there may have been some
20:27 17    inference that the doctor was called to see the
20:27 18    patient because of the possibility that the patient
20:27 19    may have been having a seizure.
20:27 20           And I don't want anyone to infer that just
20:27 21    because a doctor concludes that a patient is feigning
20:27 22    a seizure, that the patient would have to mention
20:27 23    seizure or use the word seizure or overspecify his
20:27 24    symptom in some way.
20:27 25           And "overspecify" means drawing attention
```

Page 139

```
20:27  1    to a symptom, which is a common finding in
20:27  2    malingerers.
20:27  3    BY MR. IHRIE:
20:27  4    Q.  You would agree though, wouldn't you, that if a doctor
20:27  5    is to conclude that a patient is feigning a seizure,
20:28  6    that there has to be something that was presented by
20:28  7    the patient that somehow relates to seizure activity
20:28  8    or seizure-like activity; would you not?
20:28  9    A.  Well, when you say "something," that's imprecise.
20:28 10    What do you mean?  What do you mean when you say
20:28 11    "something"?
20:28 12    Q.  Well --
20:28 13    A.  Well, wait.
20:28 14           If the patient was acting in a way that
20:28 15    made another health care professional concerned, and
20:28 16    called the doctor and say, "Doctor, this patient's
20:28 17    behaving in a certain way, is he having a seizure,"
20:28 18    then that would be the first thing on the doctor's
20:28 19    differential.
20:28 20    Q.  Is malingering a diagnosis?
20:28 21    A.  No, but it's called a V-code.  It's -- malingering
20:28 22    is --
20:28 23    Q.  It's not a diagnosis, is it?
20:28 24    A.  No, it's not a diagnosis.
20:28 25    Q.  Would you agree with this statement?  "Even advanced
```

Page 140

```
20:28  1    providers need to be very cautious about deciding that
20:28  2    a patient is malingering.  One correctional
20:28  3    physician," and it cites the name, "asserted that
20:28  4    malingering must always be considered a diagnosis of
20:28  5    exclusion.  Literally every other possible cause of
20:28  6    the patient's symptoms must be ruled out before
20:29  7    deciding that the patient is malingering."
20:29  8           Would you agree with that statement?
20:29  9    A.  Well, if --
20:29 10    Q.  I'll let you explain yourself, but give me a yes or a
20:29 11    no, if you agree with it.
20:29 12    A.  Well, that's a lengthy and very conclusive statement,
20:29 13    and there are parts of it which I -- with which I
20:29 14    don't agree.
20:29 15    Q.  With which what?
20:29 16    A.  With which I do not agree.
20:29 17    Q.  Okay.  Well, just so you're aware, you didn't agree
20:29 18    with language from the people who are paying you in
20:29 19    their patient malingering nursing perspective from
20:29 20    Correct Care Solutions' cover article.
20:29 21           MR. CHAPMAN:  Is there a question in that?
20:29 22    BY MR. IHRIE:
20:29 23    Q.  Did you know that?
20:29 24    A.  Did I know from what you were reading?  No, I didn't
20:29 25    know what you were reading.
```

35  (Pages 137 to 140)

Gerald Shiener, M.D.
May 22, 2018

---

Page 141

20:30  1          MR. CHAPMAN:  It's not an authoritative
20:30  2   document.  Come on.
20:30  3          MR. IHRIE:  Well, hold on.
20:30  4      All right.  Do you want to take a break?
20:30  5          MR. PERAKIS:  Yeah.
20:30  6          MR. IHRIE:  Okay.  Last break, I think.
20:30  7          THE WITNESS:  How much longer do you think
20:30  8   you have?  Another hour?
20:30  9          MR. CHAPMAN:  How much time do you think
20:30 10   you have?
20:30 11          MR. IHRIE:  Ten minutes.
20:30 12          (Recess taken at 8:30 p.m.)
20:34 13          (Back on the record at 8:35 p.m.)
20:35 14          MR. IHRIE:  Back on the record.
20:35 15   BY MR. IHRIE:
20:35 16   Q.  I will read that paragraph again to you, but I'd like
20:35 17      you to tell me which portions of it you don't agree
20:35 18      with.
20:35 19   A.  Oh, you don't have to read it.  I'll tell you.
20:35 20   Q.  Okay.  Go ahead.
20:35 21   A.  The idea that malingering is a diagnosis of exclusion,
20:35 22      you need positive findings to make the diagnosis as
20:35 23      well as having ruled out -- ruled out other conditions
20:35 24      or other possible physical explanations.  But the
20:35 25      sentence -- but the paragraph that you read to me made

---

Page 142

20:35  1   it sound so absolute.  And in medicine -- this may get
20:35  2   a little conceptual, and this may be a little
20:35  3   long-winded, but first of all, it's impossible to
20:35  4   prove a negative, and you cannot prove that somebody's
20:35  5   not sick.  And with all of our investigations, imaging
20:36  6   studies, blood tests, physical examination, you still
20:36  7   cannot prove a negative, that someone is not sick.
20:36  8          Medical problem-solving means that a doctor
20:36  9   listens to a symptom, thinks of the most severe
20:36 10   illness that could be causing the symptom, undertakes
20:36 11   a history and an examination to make the patient prove
20:36 12   by his signs, symptoms, and history that he has that
20:36 13   condition.  And then if a patient can't prove that,
20:36 14   then you go to another condition.
20:36 15          So if you come to me with chest pain, my
20:36 16   first thought is myocardial infarction or acute
20:36 17   coronary syndrome.  So I'll ask you a question that
20:36 18   will rule that out.  And that question would -- that
20:36 19   question would be, in a rational approach:  "Where is
20:36 20   the pain?"
20:36 21          You must point to your left side.  If you
20:36 22   point to your right side, then I have to come up with
20:36 23   another diagnosis.  But I can't prove that you're not
20:36 24   having a heart attack; I can only prove your symptoms
20:36 25   aren't consistent with that.  And if I keep on going

---

Page 143

20:36  1   down a differential diagnosis, I might find some
20:37  2   condition that's most consistent.
20:37  3          So if your pain is right-sided, then it may
20:37  4   be pleuritic, a problem between the lungs and the
20:37  5   lining of the chest cavity; it may be referred from
20:37  6   your gallbladder; it may be a subdiaphragmatic
20:37  7   abscess; it may be cervical pain radiating down; it
20:37  8   may be an abscess in your axilla.  So I'll ask you a
20:37  9   series of questions to rule out those things.
20:37 10   Q.  You mean you'd follow up on things.
20:37 11   A.  Oh, yeah.  I'd investigate that.
20:37 12   Q.  Why would you investigate and follow up?
20:37 13   A.  I would investigate.
20:37 14   Q.  Why?
20:37 15   A.  To reach -- to reach a compelling conclusion.
20:37 16   Q.  Why would that be important?
20:37 17   A.  Because a diagnosis explains the symptoms and
20:37 18      prescribes a course of treatment.  If the diagnosis is
20:37 19      malingering, not only do your symptoms have to not
20:37 20      conform to known patterns of illness, but you have to
20:37 21      have other signs and symptoms of malingered illness.
20:37 22      And that would be multiplicity of symptoms that don't
20:37 23      conform to known patterns of illness, spontaneous
20:37 24      concerns about the authenticity of your
20:38 25      symptomatology, a relationship with one clinician who

---

Page 144

20:38  1   understands you and disparaging other clinicians who
20:38  2   can't find out what's wrong with you, a use of
20:38  3   superlatives and hyperbole in describing your
20:38  4   symptomatology.
20:38  5          So there are things that you look for that
20:38  6   malingerers have in common.  A guardedness and an
20:38  7   unwillingness to provide collateral history; "Who is
20:38  8   the last doctor that saw you?"
20:38  9          "I don't remember, but my doctor told me
20:38 10   this."  Patients who use jargon in describing their
20:38 11   symptoms rather than describing their discomfort and
20:38 12   using laymans terms.
20:38 13          So those are more important than diagnosing
20:38 14   malingering.
20:38 15          And to say that absolutely it's a diagnosis
20:38 16   of exclusion, and you must do everything within your
20:38 17   power to prove that the patient is not ill, that's not
20:38 18   consistent with standard in medical diagnosis of
20:38 19   history, physical information, and differential
20:38 20   diagnosis.
20:38 21   Q.  Most certainly your opinion disagreed with that
20:38 22      person, doesn't it?
20:38 23   A.  Well, I don't know who that person is or --
20:38 24   Q.  I didn't ask who it was.  I said --
20:38 25   A.  Well, wait, wait, wait.

---

36  (Pages 141 to 144)

Page 145

```
20:38  1   Q.  -- "certainly your" --
20:38  2   A.  Wait, wait.
20:39  3          MR. CHAPMAN:  Whoa, whoa.
20:39  4          MR. EADS:  Don't argue with him.
20:39  5          MR. IHRIE:  I'm not arguing with him.
20:39  6          MR. EADS:  You are.
20:39  7   BY MR. IHRIE:
20:39  8   Q.  I didn't ask who the person was.
20:39  9          I said:  Certainly your opinion differs
20:39 10   from that person's opinion, correct?
20:39 11   A.  Whoever they may be, and whatever their credentials
20:39 12       are, and whatever the quality of that publication --
20:39 13       which is not a peer-reviewed journal, it's not a
20:39 14       medical textbook, it's not a tome; it's a magazine.
20:39 15   Q.  And this is a conversation where you're giving us your
20:39 16       opinion, right?
20:39 17   A.  Well, no.
20:39 18          MR. CHAPMAN:  Calm down.
20:39 19          THE WITNESS:  Wait, wait.  It's more than
20:39 20   my opinion.  It's what's taught in medical schools,
20:39 21   it's what I teach in medical schools as an associate
20:39 22   professor at Wayne State and as an assistant professor
20:39 23   at Michigan State.  That's how doctors learn how to
20:39 24   diagnose.
20:39 25          Now, that's a journal for nurses.  Their
```

Page 146

```
20:39  1   expertise may be different, their mandate may be more
20:39  2   absolute.  But I -- I disagree with that for the
20:39  3   reasons that I gave you.
20:39  4   BY MR. IHRIE:
20:39  5   Q.  So now tell me -- I appreciate that -- your right --
20:39  6       rather lengthy colloquy, but now tell me:  What types
20:39  7       of things do you ask a patient, and what type of tests
20:39  8       do you give a patient when you suspect malingering?
20:40  9   A.  Well, the questions I ask the patient would be the
20:40 10       same questions I ask in taking the history.  It
20:40 11       depends on what the patient's presenting symptoms are
20:40 12       and how they interact with me.  And I wouldn't
20:40 13       necessarily use laboratory tests, unless there were
20:40 14       evidence to -- unless there were an indication to do
20:40 15       so.  So...
20:40 16   Q.  Are seizures identifiable with laboratory tests?
20:40 17   A.  Well, if a patient, for example --
20:40 18   Q.  It's a real simple question, Doctor.  Are they?
20:40 19   A.  No.  No.
20:40 20          MR. CHAPMAN:  Don't argue with the doctor.
20:40 21          MR. IHRIE:  I'm not arguing.
20:40 22          MR. CHAPMAN:  Ask a question, let him
20:40 23   answer.
20:40 24          MR. IHRIE:  We don't have to move on if he
20:40 25   says no.
```

Page 147

```
20:40  1          THE WITNESS:  You are arguing with me,
20:40  2   because a seizure is a diagnosis.
20:40  3          If someone has behavior that leads a doctor
20:40  4   to suspect a seizure, the doctor can do a number of
20:40  5   things.  The first thing a doctor would do if he
20:40  6   observes the phenomenon is to do a postictal
20:40  7   neurologic exam or neurologic exam when the movements
20:40  8   or the behavior stops.  And there should be areflexia
20:40  9   and an absence of certain reflexes.
20:40 10          If the reflexes are present, then it's
20:41 11   likely that that was not a paroxysmal event or a true
20:41 12   neurological event.
20:41 13   Q.  Did he do that?
20:41 14   A.  Wait, wait, wait.  I'm not done.
20:41 15   Q.  All right.
20:41 16   A.  If the doctor is not certain, or the results are
20:41 17       equivocal, in the immediate period after the behavior
20:41 18       a blood test can be undertaken for prolactin.  With
20:41 19       paroxysmal events the brain chemical prolactin is
20:41 20       released and peaks within minutes and is sustained for
20:41 21       a period of 10 to 15 minutes.
20:41 22          So those are the kinds of things that a
20:41 23   doctor can do.  Obtaining electroencephalogram might
20:41 24   be of some benefit, might be of some benefit if
20:41 25   seizures are suspected.
```

Page 148

```
20:41  1   Q.  Is there any indication in all the records that you
20:41  2       read that Dr. Sherman did any of those things?
20:41  3   A.  He did some examination in the period immediately --
20:41  4   Q.  Any of the three things that you listed?
20:41  5          MR. EADS:  I don't think he's finished.
20:41  6          MR. CHAPMAN:  I don't think he's finished.
20:41  7          THE WITNESS:  I think you got to let me
20:41  8   finish.  If you just want to argue with me, I'm going
20:41  9   to keep asking you to let me finish until you do.
20:42 10   BY MR. IHRIE:
20:42 11   Q.  I'm trying to get --
20:42 12   A.  You say you will.  You say you will.  Whatever the
20:42 13       goal of your endeavors is is of little interest to me.
20:42 14       You asked me a question, I'm going to answer it, if
20:42 15       you let me.
20:42 16   Q.  I will let you.
20:42 17   A.  That's what you keep telling me, but then you keep
20:42 18       interrupting me.
20:42 19   Q.  I'm waiting.
20:42 20   A.  Well, let's see if you mean it.
20:42 21          And -- he did an examination.  He did a
20:42 22   postictal examination.
20:42 23   Q.  I'm sorry?
20:42 24   A.  He did a postictal examination, because he said he
20:42 25       told the patient to do something, the patient
```

37  (Pages 145 to 148)

Gerald Shiener, M.D.
May 22, 2018

---

Page 149

20:42 1    responded.  That's inconsistent with a seizure and
20:42 2    that ruled it out.
20:42 3    Q.  Anything else?
20:42 4    A.  That's all he wrote.  I don't know what else --
20:42 5    Q.  What did the postictal examination consist of
20:42 6    according to the records?
20:42 7    A.  He gave the patient a command, the patient followed
20:42 8    it.
20:42 9    Q.  So he asked him -- what was the command?
20:42 10         MR. EADS:  Just for the record, Doctor,
20:42 11   which note are you reviewing?
20:42 12         MR. IHRIE:  I'm sorry?
20:42 13         THE WITNESS:  I'll tell you in a minute.
20:42 14   The same note to which I referred before, the note
20:42 15   that's listed as a late entry to June 23, 2014, which
20:42 16   is actually a June 17.
20:43 17        "I went to see this patient, who was being
20:43 18   observed in the medical unit for questionable
20:43 19   seizures.  I observed him fluttering his eyes in what
20:43 20   was certainly not a seizure, but was most likely a
20:43 21   poor attempt to feign one."
20:43 22        So he considered that the eyelid fluttering
20:43 23   was not consistent with a paroxysmal event.
20:43 24        "I shook his shoulder and told him to sit
20:43 25   up, at which point he suddenly stopped the eye

---

Page 150

20:43 1    fluttering behavior and exclaimed, 'What's happened'."
20:43 2         So giving the patient a command, and
20:43 3    distracting him by touch, and having the patient
20:43 4    respond, is inconsistent with a seizure.
20:43 5    Q.  And it's your testimony that is a sufficient -- that
20:43 6    is a sufficient test, whether it be neurological test
20:43 7    or whatever test you want to call it, that is
20:43 8    sufficient to rule in or rule out a seizure?
20:43 9    A.  In that instance it wasn't the test, the sufficiency
20:43 10   of the test, it was the sufficiency of the response.
20:43 11        Now, I could do that test.  If the patient
20:43 12   didn't respond, and I did nothing else, that might not
20:44 13   be sufficient.  But if the patient did respond --
20:44 14        I don't think you should put it up there
20:44 15   anymore.  I think -- you keep dropping it.
20:44 16        MR. EADS:  I know.
20:44 17   BY MR. IHRIE:
20:44 18   Q.  I thought it was your testimony that eye fluttering
20:44 19   can be from all sorts of causes, correct?
20:44 20   A.  It can.  I just said that that was Dr. Sherman's
20:44 21   inference.  I didn't say that that was consistent with
20:44 22   my understanding, but that's what he wrote.
20:44 23        And wait, wait.  You got to let me finish.
20:44 24   You said you would.  Okay.
20:44 25        But certainly touching the patient, and

---

Page 151

20:44 1    giving him the command, and having the patient stop
20:44 2    the behavior and follow the command, would be
20:44 3    inconsistent with a seizure.  And if the patient acted
20:44 4    in that way, that would be sufficient to demonstrate
20:44 5    that what was being observed was not the product of a
20:44 6    seizure.
20:44 7    Q.  I guess my question is:  David never said or acted
20:44 8    like he was having a seizure, so why would the doctor
20:44 9    presume that he's trying to feign a seizure?
20:44 10   A.  I think you asked me that a number of times.  I think
20:44 11   I answered it a number of times.  And I don't want to
20:45 12   respond to your guesses when you say you guess that
20:45 13   that's what's on your mind.  But I'll try to satisfy
20:45 14   your mind by telling you that this note says, "I went
20:45 15   to see the patient, who was being observed in the
20:45 16   medical unit for questionable seizures."
20:45 17        So when the doctor was called, someone -- I
20:45 18   don't know who -- was questioning whether the behavior
20:45 19   that they were observing could have been due to a
20:45 20   seizure, and that patients who malinger, or patients
20:45 21   who have seizures, don't necessarily use the word
20:45 22   seizure, or don't say, "I'm having a seizure," whether
20:45 23   they are or not.
20:45 24        So I'm not sure -- I'm not sure why you
20:45 25   have a hard time reconciling the fact that David

---

Page 152

20:45 1    Stojcevski did not refer to a seizure, but the doctor
20:45 2    was concerned that he might have been having one given
20:45 3    the behavior, and conducted a test that effectively
20:45 4    ruled it out.  What's the big deal?  Why are you
20:45 5    spending so -- I mean, you can spend as much time as
20:45 6    you want on anything, but why you're spending so much
20:45 7    time on it -- I'm sorry, Harold.  I didn't mean to
20:46 8    interrupt you.
20:46 9         MR. PERAKIS:  No.
20:46 10        THE WITNESS:  No, go ahead.
20:46 11        MR. PERAKIS:  No, quite frankly, you
20:46 12   interrupted me, but nevertheless...
20:46 13        THE WITNESS:  I never said I wouldn't.  I
20:46 14   never said I wouldn't interrupt you.
20:46 15        MR. PERAKIS:  Fair point, I guess.
20:46 16        THE WITNESS:  Don't guess.
20:46 17   BY MR. IHRIE:
20:46 18   Q.  Do you see anywhere in the records where Dr. Sherman
20:46 19   ever asked who identified, quote-unquote, seizure-like
20:46 20   activity, or inquired as to the basis of why he was
20:46 21   brought down?
20:46 22   A.  I don't recall.
20:46 23   Q.  Did you see anywhere in the medical records where,
20:46 24   even though the director of nursing knew that he had
20:46 25   been taking benzodiazepines and that he had been

---

38  (Pages 149 to 152)

Gerald Shiener, M.D.
May 22, 2018

Page 153

20:46  1    engaging in either hallucinatory or delirium behavior,
20:46  2    depending upon how you define these two --
20:46  3  A.  You mean delusional behavior.
20:47  4  Q.  -- delusional behavior, and with the other symptoms
20:47  5    that you shared, did you see anywhere in the records
20:47  6    where Dr. Sherman ever saw David again?
20:47  7  A.  I don't think so, no.
20:47  8  Q.  Did you see anywhere in the records where David was
20:47  9    ever diagnosed with anything?
20:47 10  A.  No, I don't recall seeing a diagnosis.
20:47 11  Q.  Did you see anywhere -- anywhere in the medical
20:47 12    records where the psychiatrist on call ever saw David?
20:47 13  A.  No.
20:47 14  Q.  Did you see anywhere in the medical records where
20:47 15    David was ever -- we know he wasn't diagnosed, at
20:47 16    least that's your opinion -- where he was ever treated
20:47 17    for any diagnosed problem?
20:47 18  A.  No, I don't recall.  I don't recall any treatment
20:47 19    being administered.
20:48 20  Q.  What --
20:48 21  A.  Other than observing him.
20:48 22  Q.  What -- you would agree, would you not, that the
20:48 23    symptoms of malignant catatonia may overlap with
20:48 24    symptoms of other illnesses, other physical or mental
20:48 25    problems?

Page 154

20:48  1  A.  They may.
20:48  2  Q.  And you would agree that your opinion -- well, strike
20:48  3    that.
20:48  4        Why is it that David died, in your opinion?
20:48  5    Strike that.
20:48  6        What did David die from, in your opinion?
20:48  7  A.  "What did David die from?"  I thought you weren't
20:48  8    going to end a sentence with a preposition.
20:48  9  Q.  I apologize.  Don't tell my wife.
20:48 10  A.  Or your Latin teacher.
20:48 11        David died of --
20:48 12  Q.  Sounds a little stilted to say, from what did David
20:48 13    die, but I will say that.
20:48 14  A.  That's how Winston Churchill spoke.
20:48 15        Died from irregular heartbeat due to
20:48 16    electrolyte imbalance.
20:48 17  Q.  He died from irregular heartbeat, you say?
20:48 18  A.  Or cardiac arrhythmia, the two.
20:48 19  Q.  Is that a heart attack?
20:48 20  A.  No.  Heart attack is a coronary artery occlusion.
20:49 21  Q.  So tell me the physiology of what he died from.
20:49 22  A.  Well, the balance of sodium, potassium, and calcium in
20:49 23    the blood supports an environment where nervous tissue
20:49 24    that goes throughout heart muscle can stimulate the
20:49 25    heart to beat in a manner that is regular and

Page 155

20:49  1    coordinated, so the ventricles contract and the atria
20:49  2    contract, and the ventricles contract and the atria
20:49  3    contract.  And if the balance between sodium,
20:49  4    potassium, and calcium in the blood is disrupted, the
20:49  5    conductive tissue that monitors that process
20:49  6    malfunctions, and either the heart beats in a
20:49  7    dysfunctional way, or in an irregular manner, where it
20:49  8    will beat and stop and beat and stop.  And it may
20:49  9    stop, or it may beat so rapidly that it loses
20:49 10    efficiency.
20:49 11  Q.  And what test was it that you looked at that caused
20:50 12    you to conclude that?  Any one test?
20:50 13  A.  No, just -- just the way -- the way what happened to
20:50 14    him was described, and the way his behavior was
20:50 15    described.
20:50 16  Q.  Well, who described what way that happened to him?
20:50 17  A.  The documentation in the medical record.
20:50 18  Q.  The documentation in the medical record?
20:50 19        Did the documentation in the medical record
20:50 20    indicate any type of dehydration?
20:50 21  A.  Well, they talked about a weight loss.
20:50 22  Q.  Who's "they"?
20:50 23  A.  The medical record described a weight loss.
20:50 24  Q.  So what's the answer to my question?
20:50 25  A.  "Who's they?"  The medical record.

Page 156

20:50  1  Q.  No, is the --
20:50  2  A.  Well, that was your question.
20:50  3  Q.  Okay.
20:50  4  A.  You interrupted me, and you asked me that question.
20:50  5    So anyway, if you want to ask me a question, I'll
20:50  6    answer.  You want to interrupt me and ask another
20:50  7    question, then I don't know what question --
20:50  8  Q.  Go ahead.
20:50  9  A.  -- to ask (sic).  So what do you want me to do?
20:50 10  Q.  Go ahead.
20:50 11        MR. CHAPMAN:  Come on, guys, let's --
20:50 12        THE WITNESS:  Why don't you just whisper to
20:51 13    him.
20:51 14  BY MR. IHRIE:
20:51 15  Q.  Is there anything in the medical record that indicates
20:51 16    that he had -- that he was dehydrated?
20:51 17  A.  There was some suggestion that he had lost a huge
20:51 18    amount of weight over a relatively brief period that
20:51 19    was un -- that was unlikely, and -- but there were
20:51 20    descriptions in the record that he ate or drank
20:51 21    intermittently.  So it's not clear that there's any
20:51 22    basis to conclude that he was dehydrated.
20:51 23  Q.  Did you read the autopsy report?
20:51 24  A.  Yeah.  Yes.
20:53 25        MR. CHAPMAN:  He answered, "Yes."

Carroll Court Reporting and Video
586-468-2411

Gerald Shiener, M.D.
May 22, 2018

---

Page 157

20:53 1      THE WITNESS: Yeah, I did, yes.
20:53 2   BY MR. IHRIE:
20:53 3   Q. Oh, okay. So you say you did read -- was that my
20:53 4      question?
20:53 5   A. Yes. Yes.
20:53 6   Q. All right. And did you read the portion of the
20:53 7      autopsy report that talked about the test that caused
20:53 8      the medical examiner to conclude hypertremia
20:53 9      (phonetic)?
20:53 10  A. Hypertremia? What's that?
20:53 11  Q. Dehydration.
20:53 12     MR. CHAPMAN: I'm going to object to form
20:53 13  and foundation. I don't know what you mean by "test."
20:53 14  BY MR. CHAPMAN:
20:53 15  Q. Test of one of David's fluids.
20:53 16     MR. EADS: I'll just object to the -- I'll
20:53 17  make the same objection, thinking back on the
20:53 18  testimony.
20:54 19     THE WITNESS: Do you have a copy? Remember
20:54 20  we discussed that the copy that I have --
20:54 21     MR. CHAPMAN: Isn't good.
20:54 22     THE WITNESS: -- the labs are half off the
20:54 23  page. And I remember where you and I talked about
20:54 24  this.
20:54 25     MR. CHAPMAN: I should have a copy for you.

---

Page 158

20:54 1      THE WITNESS: You gave me another copy. I
20:54 2   don't know where it is. I don't know if you gave me
20:54 3   -- I don't know if you scanned it or if you copied it,
20:54 4   but I remember you printed it out.
20:54 5      MR. CHAPMAN: I have a copy here.
20:54 6      THE WITNESS: Yeah.
20:54 7      MR. CHAPMAN: I have a copy here. It has
20:54 8   just my writing on it. Could I give it to him?
20:54 9      There you go, that's the lab values. The
20:54 10  writing is my writing.
20:54 11     THE WITNESS: Yeah, because we had this.
20:54 12     MR. CHAPMAN: Yeah.
20:54 13     THE WITNESS: And I remember we printed out
20:54 14  another copy of this --
20:54 15     MR. CHAPMAN: Yeah.
20:54 16     THE WITNESS: -- but I don't know where it
20:54 17  is.
20:54 18     MR. CHAPMAN: The pencil/pen writing is
20:54 19  mine, so...
20:54 20     THE WITNESS: Yeah. Okay. So -- so yeah,
20:55 21  there was an elevation of sodium with a reference
20:55 22  range of 135 to 145. This was 162. So 17. -- 17 --
20:55 23  nano milliliters.
20:55 24  BY MR. IHRIE:
20:55 25  Q. And do you know the significance of that reading?

---

Page 159

20:55 1      MR. EADS: Just object to form and
20:55 2   foundation. Significance relating to what? Just a
20:55 3   high sodium; is that what you want to know?
20:55 4      THE WITNESS: Yeah, that's an elevated
20:55 5   value for sodium.
20:55 6   BY MR. IHRIE:
20:55 7   Q. And what is the significance of that? What does that
20:55 8      indicate?
20:55 9      MR. EADS: Same objection.
20:55 10     THE WITNESS: Well, that indicates that
20:55 11  there's more sodium than should be present in the
20:55 12  blood; likewise, there's more potassium than should be
20:55 13  present in the blood.
20:55 14  BY MR. IHRIE:
20:55 15  Q. And does that come from --
20:55 16  A. And actually, this is vitreous?
20:55 17     MR. CHAPMAN: That's vitreous fluid.
20:55 18     THE WITNESS: Yeah, this is vitreous.
20:55 19  BY MR. IHRIE:
20:55 20  Q. Yes.
20:55 21  A. And potassium is elevated.
20:55 22     These reference ranges might not be
20:55 23  accurate for vitreous. Chloride, and the glucose was
20:55 24  26, so his blood sugar was low. His BUN was elevated.
20:56 25  And his creatinine was not necessarily elevated, so

---

Page 160

20:56 1   there may have been some kidney abnormality.
20:56 2   Q. So -- and I'm not trying to -- I'm not sure I
20:56 3      understood the -- your testimony with respect to what
20:56 4      the cause of death was.
20:56 5      MR. CHAPMAN: Objection: asked and
20:56 6   answered. He said an arrhythmia due to an elevated
20:56 7   sodium.
20:56 8      MR. EADS: Join.
20:56 9      THE WITNESS: Elevated potassium.
20:56 10  BY MR. IHRIE:
20:56 11  Q. Okay, all right. So, all right, he wrote it down.
20:56 12     So due to electrolyte --
20:56 13  A. Good thing he's here.
20:56 14  Q. Yes. Due to electrolyte imbalance.
20:56 15     What causes electrolyte imbalance?
20:56 16  A. Kidney problems, too much water intake, not enough
20:56 17  water intake. This is, I mean...
20:56 18  Q. And so do you have an opinion as to what caused
20:56 19  David's electrolyte imbalance?
20:57 20     MR. EADS: Just object to foundation.
20:57 21     MR. CHAPMAN: I would join as well and
20:57 22  indicate that the doctor is not here as a pathology
20:57 23  expert; he's here as a psychiatric expert.
20:57 24     MR. IHRIE: He's testifying on why David
20:57 25  died.

---

40 (Pages 157 to 160)

Gerald Shiener, M.D.
May 22, 2018

---

Page 161

20:57 1          MR. CHAPMAN: You asked him the question.
20:57 2     He's not offered as an expert in pathology.
20:57 3          MR. PERAKIS: He's still testified to it.
20:57 4          MR. IHRIE: I'm sorry; is there a
20:57 5     question on the table?
20:57 6     BY MR. IHRIE:
20:57 7     Q.  I think the question was: Do you have an opinion as
20:57 8     to why he had an electrolyte imbalance.
20:57 9     **A.  Let me -- you know, it's not clear, given the unusual**
20:58 10    **pattern of the imbalance and the laboratory values.**
20:58 11    **If this was simple dehydration, his blood urea**
20:58 12    **nitrogen is elevated, his creatinine is not as**
20:58 13    **elevated. So that suggests that it's other than**
20:58 14    **dehydration that caused this -- this imbalance.**
20:58 15    Q.  Well, what did you mean then when you said, "Catatonia
20:58 16    can become malignant and life-threatening due to poor
20:59 17    nutritional intake, dehydration, hyperactivity, and
20:59 18    symptoms may progress to severe dehydration and death.
20:59 19    This would be more consistent with the course of
20:59 20    Mr. Stojcevski's illness"?
20:59 21    **A.  Those are some of the possible outcomes in malignant**
20:59 22    **catatonia, and those are the possible risks of**
20:59 23    **morbidity. In this case, given the odd pattern of**
20:59 24    **elevation of sodium, but extreme elevation of**
20:59 25    **potassium, and elevation of BUN without a -- without a**

---

Page 162

20:59 1     **proportional elevation in creatinine, raises some**
20:59 2     **questions that make it difficult for me to**
20:59 3     **determine --**
20:59 4     Q.  Well, why did you say "This" --
20:59 5          MR. EADS: Whoa, whoa, whoa. He didn't
20:59 6     finish.
20:59 7     BY MR. IHRIE:
20:59 8     Q.  Were you finished?
20:59 9     **A.  -- make it difficult for me to determine why this**
20:59 10    **pattern of electrolyte abnormality appears. It**
20:59 11    **doesn't seem to be consistent with dehydration.**
20:59 12         MR. CHAPMAN: And I will again raise my
20:59 13    objection. He's not here as a pathologist, and these
20:59 14    questions are inappropriate. We're not offering him
20:59 15    here as a pathologist.
20:59 16         MR. IHRIE: I'm just reading his report.
20:59 17         MR. CHAPMAN: No, his report says nothing
21:00 18    about creatinine, says nothing about potassium, says
21:00 19    nothing about...
21:00 20    BY MR. IHRIE:
21:00 21    Q.  Your -- so what I would like to understand then, when
21:00 22    you said -- when you were just testifying a moment
21:00 23    ago, you said, "Well, in this case."
21:00 24         Well, when you use the phrase in the last
21:00 25    paragraph of your report, you say, "This would be more

---

Page 163

21:00 1     consistent with the cause of Mr. Stojcevski's
21:00 2     illness."
21:00 3     **A.  Yeah. Malignant catatonia.**
21:00 4     Q.  And you indicated, "It can become malignant and
21:00 5     life-threatening due to poor nutritional intake."
21:00 6          Did he have poor nutritional intake?
21:00 7     **A.  Wait. It can be.**
21:00 8     Q.  I understand it can be.
21:00 9          So my question to you is: Did he have poor
21:00 10    nutritional intake?
21:00 11         MR. CHAPMAN: It's already been testified
21:00 12    to.
21:00 13         THE WITNESS: We talked about that. We
21:00 14    talked about that two hours ago.
21:00 15    BY MR. IHRIE:
21:00 16    Q.  Did all of these symptoms: "poor nutritional intake,
21:00 17    dehydration, hyperactivity, and symptoms may progress
21:00 18    to severe dehydration and death," is your opinion
21:00 19    that that's what happened?
21:00 20         MR. EADS: Objection.
21:01 21         THE WITNESS: No, it's not. Because that
21:01 22    electrolyte pattern is not consistent with
21:01 23    dehydration.
21:01 24    BY MR. IHRIE:
21:01 25    Q.  So is your opinion changing now, because of what you

---

Page 164

21:01 1     just read two minutes ago --
21:01 2     **A.  No.**
21:01 3     Q.  -- from what you wrote in your report?
21:01 4     **A.  No, no. No, what I wrote in my report are common**
21:01 5     **symptoms of that illness, and stating that that**
21:01 6     **illness is a more compelling conclusion. But not**
21:01 7     **every illness encompasses every symptom of that**
21:01 8     **illness.**
21:01 9     Q.  Do you have an opinion as to why he died?
21:01 10         MR. EADS: Same objection.
21:01 11         MR. CHAPMAN: Objection: asked and
21:01 12    answered. He said "an arrhythmia."
21:01 13    BY MR. IHRIE:
21:01 14    Q.  Oh, I'm sorry. All right.
21:01 15    **A.  I'll accept it.**
21:01 16    Q.  Did you read the expert report of Dr. Baden, also one
21:01 17    of Mr. Chapman's experts?
21:01 18    **A.  Are we done with the autopsy?**
21:01 19    Q.  Yes.
21:01 20    **A.  No, I don't think I received Dr. Baden's report.**
21:01 21    Q.  Well, he concludes -- I'll just read you -- it's one
21:02 22    sentence. He concludes after reviewing all of the
21:02 23    medical records, ostensibly the same ones that you
21:02 24    looked at, he says, "It is my opinion based on the
21:02 25    autopsy materials that I have reviewed, that the

---

41 (Pages 161 to 164)

Gerald Shiener, M.D.
May 22, 2018

Page 165

21:02 1    immediate cause of Mr. Stojcevski's death was
21:02 2    dehydration contributed to by starvation."
21:02 3         So we have one expert saying "dehydration
21:02 4    contributed to by starvation," you indicated it was a
21:02 5    heart problem caused by an electrolyte imbalance, and
21:02 6    we have a medical examiner who concluded that it was
21:02 7    benzodiazepine withdrawal syndrome, and we have one or
21:02 8    two other opinions that are out there, too.
21:02 9         Do you have an opinion as to why so many
21:02 10   people that look at the same thing come up with
21:02 11   different opinions?
21:02 12   A.  Well, first --
21:02 13        MR. EADS:  Hang on.
21:02 14        MR. CHAPMAN:  Wait, wait.  I'm going to
21:02 15   object as to form and foundation.  You mischaracterize
21:02 16   all of those, and I don't even know where to begin.
21:03 17   It's such an absurd question.
21:03 18        MR. IHRIE:  Note your objection.  State
21:03 19   your objection.
21:03 20        MR. EADS:  Hang on.
21:03 21        Join the objection first on behalf of my
21:03 22   clients.
21:03 23        Now we can take an answer.
21:03 24        THE WITNESS:  My answer is that the exact
21:03 25   mode of death was not part of what I was asked to

Page 166

21:03 1    consider or what I was asked to opine -- on which I
21:03 2    was asked to opine.
21:03 3         Now, you asked me a series of questions; I
21:03 4    answered as best I could based on my understanding of
21:03 5    what -- of what the autopsy said, and based on my
21:03 6    understanding of what those -- and you asked me about
21:03 7    the laboratory.  That's really not why I undertook
21:03 8    this analysis.  I undertook this analysis to reach a
21:03 9    diagnosis of his condition towards the end of his
21:03 10   life.
21:03 11   BY MR. IHRIE:
21:03 12   Q.  Okay.  Is your opinion -- is it your testimony that
21:04 13   you don't have an expert opinion as to what caused his
21:04 14   death?
21:04 15   A.  To the degree that we've been discussing about cardiac
21:04 16   arrhythmias and electrolyte or pathologic findings,
21:04 17   no.  That wasn't the focus of my opinion.
21:04 18        The focus of my opinion was the diagnosis
21:04 19   of his condition and what was responsible for the
21:04 20   behavioral changes that he manifested while he was in
21:04 21   the jail.
21:04 22   Q.  Do you agree that benzodiazepine withdrawal, the
21:04 23   symptoms of it and the duration of it, depends on a
21:04 24   number of factors that include the following:  the
21:04 25   length of time that a person took benzodiazepines?

Page 167

21:04 1    A.  We talked about this an hour ago.
21:04 2    Q.  We're going over something slightly different.
21:04 3    A.  Well, that's not any different.
21:04 4    Q.  I'm going to go through a list.
21:04 5    A.  Well, that's not any different than anything I've
21:05 6    already answered.
21:05 7    Q.  All right.
21:05 8    A.  So I'll refer you back to my earlier discussion.  Just
21:05 9    so -- at the late hour I want to make sure that
21:05 10   everything I say is consistent.
21:05 11        So you can look up the last time you asked
21:05 12   me that, and I'll give you the same answer.
21:05 13   Q.  No, I want you to answer now.
21:05 14   A.  I'm not going to do that.
21:05 15   Q.  Well --
21:05 16   A.  Because I already --
21:05 17   Q.  -- you're refusing to answer my question?
21:05 18   A.  I already answered.
21:05 19        MR. CHAPMAN:  He answered the question
21:05 20   several times.
21:05 21        THE WITNESS:  I have --
21:05 22   BY MR. IHRIE:
21:05 23   Q.  Then your attorney can make an objection, and the
21:05 24   objection will be dealt with.
21:05 25   A.  He's not my attorney.

Page 168

21:05 1    Q.  The attorney who hired you --
21:05 2    A.  You know better.
21:05 3         But you referred to him as my attorney.
21:05 4    He's not my attorney.
21:05 5    Q.  The attorney who hired you can make his objection.
21:05 6    You have an obligation to answer the question.
21:05 7    A.  I answered the question.
21:05 8    Q.  You have an obligation to answer it now.  If it's
21:05 9    asked and answered, that's a --
21:05 10   A.  Are you giving me legal advice?
21:05 11   Q.  Yes, I am giving you --
21:05 12   A.  You are.
21:05 13        MR. CHAPMAN:  The doctor has the right to
21:05 14   stand by his prior answers.  That's what he wants to
21:05 15   do.  That's what he's doing.
21:05 16   BY MR. IHRIE:
21:05 17   Q.  All right.  Let me ask a different question then.
21:05 18   Does it depend upon the method used to take -- that a
21:05 19   person has taken benzodiazepines?
21:05 20   A.  The method?
21:05 21   Q.  The method: injected, oral?
21:06 22   A.  I would say that that would have a lesser effect on
21:06 23   the timetable and manifestation of the symptoms of an
21:06 24   abstinence syndrome.
21:06 25   Q.  Does it depend on any underlying medical or mental

Carroll Court Reporting and Video
586-468-2411

Gerald Shiener, M.D.
May 22, 2018

---

Page 169

21:06 1    health issues?
21:06 2    A.  I would say that there would be some very unique
21:06 3        situations where a mental health issue might affect
21:06 4        the manifestations of benzodiazepine withdrawal
21:06 5        physical condition, if someone had some underlying
21:06 6        cardiac illness or neurologic illness, then that may
21:07 7        be some part of the determinant of how the abstinence
21:06 8        syndrome manifest themselves.
21:06 9    Q.  Does it depend at all on whether or not the patient
21:06 10       was abusing other drugs or alcohol concurrently with
21:06 11       benzodiazepines?
21:06 12   A.  Well, "other drugs" is kind of nonspecific.
21:07 13            Alcohol, alcohol acts in a manner that is
21:07 14       similar to benzodiazepines, and the profile and nature
21:07 15       of an alcohol abstinence syndrome is somewhat
21:07 16       different.  So the alcohol use would have to be
21:07 17       significant and severe.
21:07 18            But again, the symptoms of -- we've already
21:07 19       discussed this some time ago.  The symptoms of an
21:07 20       alcohol abstinence syndrome occur -- occur earlier
21:07 21       rather than later.
21:07 22   Q.  Explain this to me, if you can:  Almost every article,
21:07 23       including those from the National Institute of Health
21:07 24       that I have read, indicate that -- including this one
21:08 25       I'm looking at -- indicate that the benzodiazepine

---

Page 170

21:08 1    withdrawal timeline indicates that the first symptoms
21:08 2    occur somewhere in the area of one to four days after
21:08 3    cessation of use; then the acute, or what is generally
21:08 4    speaking in the literature that I have read called
21:08 5    full-blown withdrawal, occur -- it peaks around week
21:08 6    two and then begins to subside; and then post is a
21:08 7    third category which could go on for weeks, months, or
21:08 8    years, but typically the symptoms, to some degree,
21:08 9    subside.
21:08 10           My question is:  Why is it that almost
21:08 11   every single article that I read says that the
21:08 12   symptoms peak somewhere in the area of a week to two
21:08 13   weeks --
21:08 14           MR. CHAPMAN:  I would object to form and
21:08 15   foundation.  Mischaracterizes the evidence in the
21:08 16   literature.
21:08 17   BY MR. IHRIE:
21:08 18   Q.  -- and your testimony is that it peaks within just a
21:08 19       matter of a day or two.
21:09 20   A.  Well, again, I think you're mischaracterizing what I
21:09 21       said.  And I -- and we've discussed this extensively.
21:09 22       I've repeated myself more than once.  And what I said
21:09 23       was that:  With short-acting drugs, the abstinence
21:09 24       syndrome occurs sooner; and with longer-acting drugs,
21:09 25       the abstinence syndrome may emerge somewhat later.

---

Page 171

21:09 1            And that period of one to four days, I
21:09 2    believe I used the term 12 to 24 hours at the short
21:09 3    end, and I believe 72 to 96 hours at the long end.
21:09 4    And if you take the time to go back in this record,
21:09 5    you'll find that that's what I've said consistently.
21:09 6            Now, the fact that the abstinence syndrome
21:09 7    can last for a week, that's not been consistent with
21:09 8    my 40 years of clinical experience in dealing with
21:09 9    benzodiazepine dependence and withdrawal as an
21:09 10   addiction specialist.  And if the literature -- if
21:09 11   you're characterizing the literature as saying that, I
21:09 12   think that they may be discussing some of the
21:09 13   long-term effects of benzodiazepine withdrawal, that
21:10 14   is lower seizure threshold, increased anxiety, lower
21:10 15   tolerance for anxiety, lower tolerance for change,
21:10 16   disturbances in sleep and other functions.  And those
21:10 17   things -- the first patient I ever detoxed from
21:10 18   benzodiazepine told me that it took her six months to
21:10 19   a year before she felt like herself after stopping
21:10 20   these medicines.
21:10 21           So I wouldn't necessarily disagree that
21:10 22   there's a prolonged secondary abstinence syndrome, but
21:10 23   in terms of a delirium, a risk of spontaneous
21:10 24   seizures, I believe that that risk diminishes after
21:10 25   the first -- after the first week.

---

Page 172

21:10 1    Q.  After the first week?
21:10 2    A.  That's been my clinical experience.
21:10 3            And, I mean, I'd be willing to examine the
21:10 4        great body of literature to which you're referring.
21:10 5        They -- I don't think you're accurately characterizing
21:10 6        what the literature says or implies.
21:11 7            MR. IHRIE:  I don't believe I have any more
21:11 8    questions.
21:11 9            THE WITNESS:  He was done an hour ago.
21:11 10           MR. CHAPMAN:  John, do you have any
21:11 11   questions?
21:11 12           MR. EADS:  Yeah, I've got a couple.
21:11 13           EXAMINATION
21:11 14   BY MR. EADS:
21:11 15   Q.  Can malignant catatonia-afflicted patients die without
21:11 16       dehydration?
21:11 17   A.  They can.
21:11 18   Q.  And do people who suffer from malignant catatonia, do
21:11 19       they experience pain?
21:11 20   A.  From the behaviors that they manifest, it's our
21:11 21       inference that they do not.  Maintaining postures
21:11 22       against gravity for prolonged periods of time, anyone
21:11 23       would find that uncomfortable.  These patients don't
21:11 24       appear to experience that discomfort.
21:11 25           Furthermore, a delirium by definition is an

---

43  (Pages 169 to 172)

Gerald Shiener, M.D.
May 22, 2018

---

Page 173

21:11 1     **inability to take in information, process it, and act**
21:11 2     **on it.  That doesn't mean external sensory**
21:12 3     **information, it also means internal information.  And**
21:12 4     **older reports of catatonia that were imprecise in many**
21:12 5     **ways but were richly descriptive, describe catatonic**
21:12 6     **patients maintaining postures even though they**
21:12 7     **experience pressure sores or bleeding or other**
21:12 8     **sequelae that we would consider to be physically**
21:12 9     **uncomfortable.  They don't seem to experience it or**
21:12 10     **complain of it or alter their behavior because of it.**
21:12 11         MR. EADS:  All right.  That's all I have.
21:12 12         MR. CHAPMAN:  I have no questions.
21:12 13         MR. IHRIE:  Okay.
21:12 14         MR. PERAKIS:  I have nothing.  Thank you.
21:12 15         MR. CHAPMAN:  We're done.
21:12 16         MR. PERAKIS:  We're done.
21:12 17         Thank you, Doctor.
21:12 18         MR. EADS:  All right, Bob, we're all
21:12 19     finished.
21:12 20         MR. GAZALL:  Thank you, gentlemen.  Have a
21:12 21     good evening.
21:12 22         MR. CHAPMAN:  For the record, I guess we
21:12 23     should indicate it's 9:15.  Do you guys owe the good
21:12 24     doctor some money?
21:12 25         MR. IHRIE:  Yeah, we do.

---

Page 174

1         (The deposition was concluded at 9:12 p.m.
2     Signature of the witness was not requested by counsel
3     for the respective parties hereto.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

Page 175

1   STATE OF MICHIGAN )
2   COUNTY OF OAKLAND ) ss.
3     I, Mary Jo Power, CSR 1404, in and for the State
4   of Michigan, do hereby certify:
5     That, prior to being examined, the witness named in
6   the foregoing deposition was by me duly sworn to testify the
7   truth, the whole truth and nothing but the truth;
8     That said deposition was taken down by me
9   stenographically at the time and place therein named, and
10   thereafter transcribed via computer-aided transcription
11   under my direction, and the same is a true, correct and
12   complete transcript of said proceedings;
13     Before completion of the deposition, review of the
14   transcript was not requested.  If requested, any changes
15   made by the deponent (and provided to the reporter) during
16   the period allowed are appended hereto.
17     I further certify that I am not interested in the
18   event of the action.
19     Witness my hand this 1st day of June, 2018.
20
21
22         MARY JO POWER, CSR-1404
23         Certified Shorthand Reporter
24         State of Michigan
25         My commission expires:  December 12, 2018

---

44  (Pages 173 to 175)