**EXHIBIT 8**
**Dr. Stoltz Deposition Transcript**

## Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAFINKA STOJCEVSKI, a/k/a   )
STEPHANIE STOJCEVSKI,        )
Individually, and as          )
Personal Representative of   )
the Estate of DAVID          )  Case No.
STOJCEVSKI, Deceased,        )  15-cv-11019

    Plaintiffs,   )  Hon. Linda V. Parker
                  )  Mag. David R. Grand
    -v-          )

COUNTY OF MACOMB, SHERIFF    )
ANTHONY M. WICKERSHAM,       )
MICHELLE M. SANBORN,         )
CORRECT CARE SOLUTIONS       )
(CCS), LAWRENCE M.           )
SHERMAN, M.D., DAVID ARFT,   )
NATALIE PACITTO, MONICA      )
CUENY, R.N., TIFFANY         )
DELUCA, LPN, VICKI           )
BERTRAM, LPN, SARA BREEN,    )
LPN, MICAL BEY-SHELLEY,      )
LPN, DIXIE DEBENE, LPN,      )
THRESSA WILLIAMS, LPN,       )
LINDA PARTON, LPN, AMBER     )
BARBER, LPN, DEANN PAVEY,    )
LPN, CHANTALLE BROCK, LPN,   )
KELLY MANN, DANYELLE         )
NELSON, MHP, OXLEY,          )
COONEY, HARRISON, TALOS,     )
PINGILLEY, AVERY, VANEENOO   )
AND HELHOWSKI,               )
    Defendants.   )

## Page 2

1    The telephonic deposition upon oral
2  examination of RANDALL STOLTZ, M.D., a witness
3  produced and sworn before me, Sherry D. Lenn, RPR, and
4  Notary Public in and for the County of Warrick, State
5  of Indiana, taken on behalf of the Plaintiffs at the
6  offices of Stewart Richardson Deposition Services, 915
7  Main Street, Suite 304, Evansville, Indiana, on
8  April 30, 2018 at 9:06 a.m., pursuant to the Federal
9  Rules of Civil Procedure.
10
11
12
13
14
15
16
17
18
19
20
21
22
    STEWART RICHARDSON & ASSOCIATES
23  Registered Professional Reporters
    915 Main Street, Suite 304
24  Evansville, IN  47708
    (812) 477-4449
25

## Page 3

1                    APPEARANCES
2  FOR THE PLAINTIFFS:
3    Harold A. Perakis, Esq. (Via Polycom)
    Robert D. Ihrie, Esq. (Via Polycom)
4    IHRIE O'BRIEN
    24055 Jefferson Avenue
5    Suite 2000
    St. Clair Shores, MI  48080
6
7  FOR THE CORRECT CARE
    SOLUTIONS DEFENDANTS AND
8  DEFENDANTS COUNTY:
9    Ronald W. Chapman, Esq. (Via Polycom)
    Kevin A. McQuillan
10   CHAPMAN LAW GROUP
    1441 West Long Lake Road
11   Suite 310
    Troy, MI  48098-4476
12
13
14  FOR THE MACOMB COUNTY DEFENDANTS:
15   Robert S. Gazall, Esq. (Via Polycom)
    MACOMB COUNTY CORPORATION COUNSEL
    One South Main Street
16   8th Floor
    Mount Clemens, MI  48043
17
18
19  FOR COUNTY OF MACOMB,
    SHERIFF WICKERSHAM AND
    MICHELLE SANBORN DEFENDANTS:
20
    Cara M. Swindlehurst, Esq. (Via Polycom)
21   WILSON ELSLER MOSKOWITZ
    EDELMAN & DICKER, LLP
22   LAUREL OFFICE PARK III
    17197 North Laurel Park Drive
23   Suite 201
    Livonia, MI  48152
24
25

## Page 4

1              INDEX OF EXAMINATION
                                  PAGE
2
3  EXAMINATION
4  QUESTIONS BY MR. PERAKIS          5
    QUESTIONS BY MR. IHRIE          150
5
6
       INDEX OF DR. STOLTZ DEPOSITION EXHIBITS
7
8  NUM.   DESCRIPTION              PAGE
9  Exhibit 1   Dr. Stoltz's Report          150
10 Exhibit 2   Dr. Stoltz's Curriculum Vitae   6
                and Estimated Expert Fee
11
12 Exhibit 3   Progress Notes          51
13 Exhibit 4   Progress Notes          5
    
14 Exhibit 5   Progress Notes          47
15 Exhibit 6   Progress Notes          72
16 Exhibit 7   Policy: Inmates with Alcohol   5
                and Other Drug Problems
17 Exhibit 8   Policy: Intoxication and   5
                Withdrawal
18
19 Exhibit 9   Policy: Receiving Screening   5
20 Exhibit 10  Subject: Alcohol and Sedative   5
                Hypnotic Withdrawal (Substance
                Abuse)
21
22 Exhibit 11  Benzodiazepine Withdrawal   5
23 Exhibit 12  Order Record History          5
24
25

Page 5

1      (Dr. Stoltz Deposition Exhibits 1, 2, 3, 4, 5,
2      6, 7, 8, 9, 10, 11 and 12 were premarked for
3      identification.)
4           RANDALL STOLTZ, M.D.,
5      called as a witness by the Plaintiffs, having been first
6      duly sworn, was examined and testified as follows:
7      EXAMINATION
8      QUESTIONS BY MR. PERAKIS
9           MR. PERAKIS: Let me state for the record this is a
10          deposition -- an expert deposition taken pursuant
11          to Notice and used for all purposes under Federal
12          Court Rules.
13     Q Dr. Stoltz, my name is Harold Perakis. I represent
14          the Estate of David Stojcevski in this matter. It
15          looks like you've had some opportunity to
16          understand what the case is about.
17               Have you ever been deposed before?
18     A Yes.
19     Q How many times?
20     A Once in the past four years.
21     Q Once in the past four years?
22     A Correct.
23     Q Okay. Do you remember the rules about speaking
24          clearly, no nods of the shoulder or shrugs of the
25          shoulder and so forth?

Page 6

1      A Yes.
2      Q And because this is a phone deposition, I'll do my
3          best not to interrupt you. I'll make sure that I
4          take a few seconds. Let me take a few seconds of
5          stopping my question before you answer. Okay?
6      A Okay.
7      Q All right. Now, I see that you have in front of
8          you a couple of exhibits, right?
9      A Yes.
10     Q I assume you have a total of 12 exhibits in front
11          of you?
12     A Yes.
13     Q Is that right?
14     A That's correct.
15     Q And the second exhibit -- yeah, the second
16          exhibit is your CV, right?
17     A Yes.
18     Q Okay. And I know it's labeled differently than
19          that, but it's a CV. So I'd like to go through
20          that with you so I understand what your background
21          is. Okay?
22     A Sure.
23     Q And what I'd like to do is start, really, at the
24          back of your -- in the appendix, publication 1.
25          All right?

Page 7

1      A Sure.
2      Q I mean, Appendix 1, publications.
3      A Okay.
4      Q Are you there?
5      A Yes.
6      Q Okay. So I've looked at all these, and I guess I
7          just wanted to get a sense of which of those
8          publications -- I'll try to make this simple.
9          Which of those publications have anything to do
10          with benzodiazepine withdrawal?
11     A Well, technically, none of them have to do directly
12          with that. I mean, the next to the last one,
13          inhaled loxapine, is a benzodiazepine-type drug
14          that -- as well as lorazepam that we actually
15          looked at how long the drug stayed in your system
16          and followed through a pharmacokinetic research
17          trial -- drug trial, but...
18     Q Okay. So may I assume, if you're looking at the
19          first -- Appendix 1, page one, if that's page five
20          of six of your CV, may I safely assume then that
21          nothing in those -- that those publications on the
22          first page, are directly related to benzodiazepine
23          withdrawal?
24     A No. You're -- you're correct.
25     Q Okay. So you won't be relying on that first page

Page 8

1          of your -- of your appendix in any way, will you,
2          in answering these questions today?
3      A No.
4           MR. CHAPMAN: Object to form and foundation.
5      Q So the answer is you will not be depending on those
6          particular publications; is that right?
7      A That's right.
8      Q Okay. So let's go to the second page of your
9          appendix. And I believe the one that you did
10          mention and I noticed when I was looking at it, was
11          -- it sounds like an interesting study that
12          basically you were involved and three other
13          doctors, possibly, and the quote is inhaled
14          loxapine and intramuscular lorazepam in healthy
15          volunteers: a randomized placebo-based -- or
16          placebo-controlled drug-drug interaction study; is
17          that right?
18     A Yes.
19     Q Okay. Now, first of all, you were talking about
20          healthy individuals in that particular study,
21          right?
22     A That's right.
23     Q You were not talking about people who were addicted
24          to any medication, right?
25     A Correct.

Page 9

```
 1    Q  And you weren't talking about anybody who was
 2        possibly starving to death or had problems with
 3        being hydrated, right?
 4    A  That's right.
 5    Q  Okay.  So do you believe that -- you know the facts
 6        of this case to a certain extent.  Do you believe
 7        that David Stojcevski in any way reflects the
 8        patients that were in that study?
 9    A  No.
10    Q  Okay.  So may I now assume then that your entire
11        Appendix 1 publications are not directly related to
12        this case and you are not using -- well, number
13        one, are not -- are not directly related to this
14        case, right?
15    A  That's right.
16    Q  And also, you will not be using any of those
17        publications in making determinations pertaining to
18        this case, right?
19    A  That's correct.
20    Q  Okay.  So now we can go back to the first page of
21        your CV.  Now, explain, Dr. Stoltz -- not that this
22        is particularly relevant, but I was curious -- why
23        is this on a Covance.  Solutions Made Real
24        document?
25    A  Well, actually at the time of this CV, I worked for
```

Page 10

```
 1        Covance.  And actually they produced the CV with
 2        all my of background information, and then the CV
 3        was sent out to different pharmaceutical companies.
 4        We actually -- it went out for business.  It was
 5        used for business development.
 6    Q  Okay.  So -- and now, it's -- your first part of
 7        your employment history suggests that you worked --
 8        you work with Cov- -- you're with Covance.  Is it
 9        Covance?  Is that right?
10    A  Correct.
11    Q  Okay.  And you worked from 2005 to the present as
12        medical director?
13    A  Yeah.  Actually my CV's changed as of the first of
14        this year, but no, as medical director until --
15        they closed the business in Evansville last fall.
16        So they're no long- -- I'm no longer with Covance.
17    Q  Okay.  So January 1st of 2018 you no longer worked
18        for Covance; is that right?
19    A  I believe that it was actually in October of '17 is
20        when they closed the business here.
21    Q  Okay.  Well, let's just talk for a minute.  Since
22        October of 2017, without that employment, what have
23        you been doing?
24    A  I work for the Vanderburgh County Detention Center.
25        And actually there's an additional one on -- not on
```

Page 11

```
 1        this list is the Warrick County Detention Center.
 2    Q  You said the Warrick County Detention Center?
 3    A  Yeah, W-a-r-r-i-c-k, Warrick County Detention
 4        Center, as medical director of both of the jails.
 5    Q  Okay.  So from October of 2017 until the present,
 6        you've been the medical director of two different
 7        correctional facilities?
 8    A  Well, I've been medical director for a long time in
 9        Vanderburgh County, since 1998, but actually in --
10        starting in January of '17 to the present I've been
11        also the one at the Warrick County Detention
12        Center.
13    Q  Okay.  So since January 2017 you've held two roles
14        as medical director in two separate facilities; is
15        that right?
16    A  Correct.
17    Q  And that would be Vanderburgh and Warrick County;
18        is that right?
19    A  That's right.
20    Q  And because I noticed that Warrick County is not
21        part of your CV here, may I assume that the bullet
22        point under Vanderburgh County Detention Center
23        would be a similar bullet point under a Warrick
24        County Detention Center that describes your
25        employment?
```

Page 12

```
 1    A  Yes.
 2    Q  Okay.  And now, let's -- so we know what Covance --
 3        we know that you worked for Covance for it looks
 4        like about 12 or 13 years, right?
 5    A  Right.
 6    Q  And during those 12 or 13 years at Covance, did you
 7        have any hands-on medical treatment with patients?
 8    A  Yes.
 9    Q  You did?
10    A  Yes.
11    Q  And can you give me an estimate of percentages?  If
12        you -- if you look at those whole 12 or 13 years,
13        how -- what's the percentage of your clinical
14        practice versus your administrative duties at that
15        -- at that employment?
16    A  Probably 80 to 90 percent clinical and 10 percent
17        -- 10 to 20 percent administrative.
18    Q  Okay.  Can you define what you mean by the
19        90 percent clinical?  What would you be doing --
20        what would you have been doing during that time?
21    A  Well, I saw patients every day.  We actually
22        evaluate them to be in clinical trials and make
23        sure they're healthy volunteers, look at laboratory
24        tests, look at ECGs, whatever testing was involved
25        to make sure they qualify for a clinical trial.
```

Page 13

1    And once they were in a trial, we would follow them
2    from a safety standpoint to make sure things were
3    safe.
4    Q  I see.  So what you're talking about then is during
5       those 12 or 13 years you were actually doing
6       clinical trials with patients?
7    A  Correct.
8    Q  And did any of those clinical trials involve any
9       type of drug withdrawal?
10   A  Yes.
11   Q  And how many of those percentage of the patients
12      that you saw or you were -- you were doing clinical
13      trials with involved drug withdrawal?
14   A  I don't recall the exact number or percent.  It's a
15      low number, though.
16   Q  More than 10 percent, do you think, or more than
17      20 percent?
18   A  Oh, no.  I'd say probably 5 percent or less.
19      Probably less than 5 percent.
20   Q  So what would the other 95 percent be?
21   A  It would be new drugs and development for things
22      such as diabetes, high blood pressure, hepatitis A,
23      HIV, et cetera, et cetera, et cetera.
24   Q  Okay.  So if we sort of narrow this down,
25      Dr. Stoltz, then what we're talking about is from

Page 14

1    2005 until October of 2017 -- during the time that
2    you worked at Covance, number one, you would have
3    dealt with at most 5 percent of the patients had
4    something to do with drug withdrawal; is that
5    right?
6    A  Correct.
7    Q  And of that 5 percent of patients who were involved
8       with drug withdrawal, what percentage of that had
9       to do with benzodiazepine withdrawal?
10   A  I'm thinking.  Probably in the neighborhood of
11      10 percent.
12   Q  Okay.  So 10 percent of the 5 percent; is that
13      right?
14   A  Right.
15   Q  Okay.  And I guess I -- because I'm not real
16      familiar with clinical trials, Doctor; I'm more
17      involved in -- you know, in cases involving
18      specific treatment of patients, can you explain to
19      me whether the patients that you did see that
20      involved benzodiazepine withdrawal, were those --
21      were those patients who were actively withdrawing
22      from the medication, or had they been off of that
23      medication for some time?
24   A  In trial, if they were on a benzodiazepine or a
25      similar-type product, they may be on it for seven,

Page 15

1    ten days, and then they would be stopped.
2    Sometimes they'd be tapered off; sometimes they'd
3    just be stopped and then watched to make sure no
4    signs of withdrawal occurred.
5    Q  So these -- and I'm -- excuse me, I don't want to
6       use the word, but I'm going to use it anyway.  So
7       were these people sort of guinea pigs for
8       determining what was to happen to them once they
9       were tapered off of the -- of the benzodiazepine;
10      is that right?
11   A  That's a term some people --
12         MR. CHAPMAN:  I'm going to object to the use
13      of the pejorative term guinea pig.  That's really
14      insensitive and way out of line, sir.
15         MR. PERAKIS:  Well, it's a word that I've
16      chosen to use, so...
17   Q  And if you disagree with me, Dr. Stoltz, or you
18      think it's pejorative, you can let me know that,
19      okay, and I'll -- I'll use another one.
20   A  I guess that's a word --
21   Q  Okay?
22   A  -- that Time Magazine used at one point on their --
23      on a cover page.  But these are healthy volunteers
24      that volunteered to be in clinical trials to test
25      new products.  And they were monitored very closely

Page 16

1    in the trials for safety.
2    Q  Okay.  So once again, every patient that you've
3       discussed that were involved in benzodiazepine
4       withdrawal were healthy patients; is that right?
5    A  That is true.
6    Q  In other words, they were eating every day, right?
7    A  Yes.
8    Q  And did you pay attention to their nutrition during
9       the trials?
10   A  It depended on the trial.  Some trials, there has
11      to be strict monitoring of nutritional intake and
12      calorie intake; other trials there's not.
13   Q  Okay.  But needless to say that when you were
14      examining these -- and I guess I'll use them -- is
15      it clinical subjects; is that better, or study
16      subjects --
17   A  Sure.
18   Q  -- is that all right with you?
19   A  Sure.
20   Q  Okay.  So in dealing with these study subjects, the
21      thing that I'm having a little hard time
22      understanding is, were you -- would you put them on
23      benzodiazepines to determine what their -- what the
24      impact of withdrawal was going to be?
25   A  I would say there was a variety of reasons we would

Page 17

1  study. And usually there's new chemical entities,
2  new -- either new benzodiazepines or something like
3  the study referred to, the loxapine or the --
4  similar products. It would be looking if there's
5  drug interactions between the different products,
6  look to see if -- that one study in particular was
7  inhaled versus taking it orally. There's a
8  difference in how it's absorbed in the body, how
9  long it will stay in the body. And also you would
10 look for, you know, side effects, drowsiness,
11 et cetera. And you'd also make sure there's not
12 withdrawal phenomenon.
13 Q And the reason that you would taper these
14 individuals off of the benzodiazepines is because
15 abrupt stoppage of benzodiazepine being prescribed
16 would cause trouble -- would cause various problems
17 with that particular study patient, right?
18 A Well, usually we did not taper them off; we stopped
19 them abruptly.
20 Q Okay. So you would -- so what you -- go ahead.
21 A I said we -- we stopped them abruptly, but we would
22 watch them for any signs of withdrawal.
23 Q Oh, I see. Okay. And were you able to determine
24 what signs of withdrawal were common in these
25 healthy patients?

Page 18

1  A Well, you could see the same -- I mean,
2  theoretically you could see the same thing in
3  healthy people versus other people. It just
4  depends on -- these people were on --
5  Q Well --
6  A New people to taking the drug, not people that have
7  taken it chronically and then you suddenly stop
8  them.
9  Q Oh, okay. So these people had not been taking
10 benzodiazepines on a chronic basis, right?
11 A Correct.
12 Q Okay. So they were -- they were actually
13 introduced to benzodiazepines through your studies,
14 right?
15 A That's right.
16 Q Okay. And did any of these people have drug
17 addictions?
18 A Not that they -- not that they admitted to.
19 Q Okay. Do you know if any of these people had ever
20 been incarcerated?
21 A That's a question we ask when they come in for
22 screening. And they -- they did not qualify for
23 the trial if they had been incarcerated or had drug
24 addiction problems.
25 Q Okay. So -- so, in other words, these were people

Page 19

1  that were going through whatever they were going to
2  go through outside of a correctional facility,
3  right?
4  A That's right.
5  Q Okay, Doctor, I'm going to -- this question is not
6  in any way meant to be derogatory of your -- of
7  your studies. But do you feel comfortable in
8  comparing those study people -- study patients with
9  someone such as David Stojcevski?
10    MR. CHAPMAN: Object to form and foundation.
11 I don't know what you mean by "comfortable."
12    MR. PERAKIS: Well, let's see if he knows.
13    MS. SWINDLEHURST: I'll join.
14    COURT REPORTER: Cara, was that an objection?
15 I'm sorry, you cut out.
16    MS. SWINDLEHURST: Yeah. I'll join in the
17 objection.
18    COURT REPORTER: Thank you.
19 Q Dr. Stoltz, would you like me to restate the
20 question or have it reread back?
21 A Yeah, please.
22 Q What's that?
23 A Yes.
24 Q Yes?
25 A Yes.

Page 20

1  Q All right. Dr. Stoltz, do you feel comfortable in
2  utilizing any findings in those studies and using
3  those studies in making decisions about David
4  Stojcevski?
5  A Well, I -- I mean, I guess my comment would be I
6  don't feel like there's a lot of relevance directly
7  with his case.
8  Q Okay. And --
9  A Obviously, if we were using benzodiazepines,
10 there's some information you obtain from when you
11 do the -- we call them pharmacokinetic studies with
12 benzodiazepines. It gives you some information on
13 the half-life of the drug, how long it stays in
14 your system. So I mean, there is some correlation
15 but not direct correlation with David's case.
16 Q Okay. So then tell me why you believe there's not
17 much relevance to David's case.
18 A Well, David --
19    MR. CHAPMAN: Wait. I'm going to object to
20 form and foundation. I don't think those were the
21 words he used. He said there's some correlation.
22 Q Doctor, do you want to answer the question?
23 A Yeah. Repeat that again.
24 Q You previously testified just a moment ago that
25 there wasn't much relevance to your study findings

Page 21

1    to David's case.  Do you agree with that?
2    A  Yes.
3    Q  Okay.  And tell me why you believe there's not much
4    relevance.
5    A  We tend to use the benzodiazepines in a different
6    way than someone on the streets would use them in
7    our research trial.
8    Q  Well, when you say "someone on the streets," are
9    you talking about people who were prescribed the
10   medication by a doctor?
11   A  Correct.
12   Q  Is that yes?
13   A  Yes.
14   Q  Okay.  So you're not -- that's -- you're not in any
15   way being pejorative of David by using the term "on
16   the streets," are you?
17   A  No.  Outside of our clinical research site.
18   Q  Outside of your clinical research what?
19   A  Outside of what we do in our clinical research.
20   People outside of our research site tend to be --
21   it's a different situation.
22   Q  Okay.  Fair enough.
23       Now, when you -- when you have been studying
24   these people, did you pay attention to the amount
25   of dosage being used by these patients?

Page 22

1    A  Yes.
2    Q  Did you also pay attention to how long the
3    medication was being prescribed before they were
4    abruptly stopped?
5    A  Yes.
6    Q  And did you also pay attention to the last time
7    that those study patients used those medications?
8    A  I'm not sure what you mean by that.
9    Q  Oh, in other words -- yeah.  In other words, you
10   knew exactly when that particular patient began and
11   ended the usage of the benzodiazepine, right?
12   A  That is correct.
13   Q  And Doctor, were those factors that I just
14   mentioned important in determining the impact of
15   the stoppage of the medication?
16   A  They could be.
17   Q  Why could they be?
18   A  Benzodiazepines, depending on the dosage, depending
19   on the half-life of the drug itself, can all be
20   factors in if you're going to have any withdrawal
21   phenomenon or side effect problems with the drug.
22   Q  Okay.  And so -- so the dosage matters then, right?
23   A  Yes.
24   Q  And so does the type of benzodiazepine, right?
25   A  Correct.

Page 23

1    Q  Now, what if you add into that -- that mix of
2    medications oxycodone, to prescribe oxycodone for
3    pain at the same time a person is taking
4    benzodiazepines?
5    A  Potentially a dangerous combination.
6    Q  It's a dangerous combination?
7    A  Potentially a dangerous --
8    Q  Is that what you said?
9    A  I said, "Potentially a dangerous combination."
10   Q  And would it be more dangerous if the patient was
11   being prescribed two benzodiazepines along with an
12   oxycodone?
13   A  It sure could be.
14   Q  And why is that?
15   A  Well, there's warning labels on the drugs for using
16   those combinations, especially two benzodiazepines
17   together.  In addition, you know, if you drink
18   alcohol with it or other things you're mixing with
19   those drugs, there's a chance for death.
20   Q  Okay.  So is it common knowledge, as far as you
21   know, that -- that that triumvirate of medications
22   is, in medical circles, deemed to be extremely
23   dangerous?
24   A  It's deemed to be dangerous -- potentially
25   dangerous.

Page 24

1    Q  All right.  And that includes the danger of death,
2    right?
3    A  Yes.
4    Q  Okay.  So you never had to deal with anybody in
5    these studies, did you, that were taking oxycodone
6    at the same time they were taking benzodiazepines,
7    right?
8    A  I don't believe so.
9        MR. MCQUILLAN:  Guys, I think we're going to
10   take a quick break for just a second.
11       MR. PERAKIS:  Okay.
12       (A brief recess was taken.)
13   Q  Continuing to look at what has been marked -- or
14   that should be marked Exhibit 2 --
15       MR. PERAKIS:  And I just want to make sure
16   nobody had any objection to admitting that as
17   Exhibit 2?
18       MR. CHAPMAN:  I have no objection.
19       MS. SWINDLEHURST:  No objection.
20       MR. PERAKIS:  No objections?  Okay.
21   Q  So --
22       MR. CHAPMAN:  Well, wait, wait.  Let me think.
23   I reserve any objections for trial.  You can use
24   any exhibits you want during the deposition.  And I
25   have no objection to you using them during the dep.

Page 25

1    I reserve any objections that I might have at
2    trial.
3         MR. PERAKIS:  I think we all agree to that.  I
4    understand that, Ron.
5         MR. CHAPMAN:  Okay.
6         MR. PERAKIS:  No problem.
7         MR. CHAPMAN:  Okay.
8    Q  So the next part of your CV is you worked for West
9       Pharmaceutical Services from '99 to 2005, right?
10   A  Correct.  And I can clarify that.  Actually Covance
11      bought West.  So actually I've been with the same
12      company for -- since two thousand- -- or since
13      1999.
14   Q  I'm sorry.  Oh, so Covance was the same as West
15      Pharmaceutical?
16   A  Covance purchased West in 2015.
17   Q  Okay.  Thank you.  I didn't hear that.  I'm sorry.
18      To try to cut this short, does any -- did any
19      of that employment relate in any way to your
20      opinions regarding David?
21   A  It was the same information we discussed with
22      Covance.
23   Q  Oh, okay.  So they were the same kind of studies,
24      is what you're saying?
25   A  Correct.

Page 26

1    Q  Okay.  So the next one is Vanderburgh County
2       Detention Center in Evansville, Indiana.  And it
3       looks like you've been the medical director since
4       1998; is that right?
5    A  Yes.
6    Q  And can you tell me what percentage of your
7       involvement as medical director at that particular
8       detention center involves clinical treatment and
9       care of patients/inmates?
10   A  Probably 99 percent is patient care.  1 percent's
11      probably administrative.
12   Q  1 percent is administrative?
13   A  Yes.
14   Q  Okay.  Now, I know that you had a chance to review
15      some of the facts in this case.  And do you believe
16      that Dr. Sherman's employment was similar to your
17      employment at Vanderburgh?
18   A  From my understanding.
19         MR. CHAPMAN:  I'm going to object to form and
20      foundation.
21   A  You know, honestly, I don't know exactly what his
22      role was there.  I would assume it would be
23      similar.  I think the jail is --
24   Q  Okay.  Well --
25   A  -- a fair amount bigger there than it is here.

Page 27

1    Q  I'm sorry.  Say that again.
2    A  I think the jail where he was at was a fair amount
3       bigger than the one I'm at.
4    Q  Okay.  And how big is the Vanderburgh County
5       Detention Center?
6    A  It's around 600 to 700 inmates.
7    Q  Okay.  Which is -- which is a little more than half
8       of the capacity for the McComb County Jail, I
9       believe.
10      So tell me what your duties were on a daily
11      basis at Vanderburgh County Detention Center.
12   A  Well, I respond to the nursing phone calls or texts
13      on different issues; new inmates coming in, what
14      medications they were on, treatment of diabetes,
15      hypertension, different diseases and then seeing
16      people on sick call, the ones that need to be seen
17      weekly, similar to what other physicians probably
18      do in other jails.
19   Q  Okay.  And during your time at Vanderburgh County,
20      were you involved in the medical treatment of
21      individuals with drug withdrawals?
22   A  Many times.
23   Q  Many times?
24   A  Yes.
25   Q  And of those many times, how often would it relate

Page 28

1       to benzodiazepine withdrawal?
2    A  I don't know the number offhand but quite a
3       significant number.
4    Q  Doctor, in terms of your Vanderburgh County
5       Detention Center, is Evansville, Indiana, a small
6       city or a large city?
7    A  I would say a medium-size city.
8    Q  All right.  And would that mean there would be a
9       couple hundred thousand citizens there?
10   A  In the county, there's probably, I'm guessing, two
11      hundred to 250,000 in the county.
12   Q  Okay.  Would you call Evansville, Indiana, an urban
13      community where the detention center is?
14   A  Yes.
15   Q  Yes?
16   A  Yes.
17   Q  Okay.  And do you agree that benzodiazepine
18      withdrawal is a fairly common occurrence in the
19      inmates that you see at Vanderburgh County
20      Detention Center?
21   A  I'm not sure I'd use the word withdrawal as common.
22      I would say it's common people come in on
23      benzodiazepines and we take them off.
24   Q  And when -- and when they do come in on
25      benzodiazepine withdrawals, the patients or

Page 29

```
 1    inmates, what is your -- what do you -- what do you
 2    do for them?
 3  A If I know they're on benzodiazepine, if they tell
 4    us and we confirm it, depending on what the
 5    benzodiazepine is, how much the dosage is, we may
 6    start them on a taper -- tapering dose.  We might
 7    put them on a monitoring protocol for withdrawal,
 8    that type thing.
 9  Q Okay.  So you're -- I can assume then you're
10    familiar with the factors involved in determining
11    whether inmates that come in on benzodiazepine --
12    what factors are involved in continuing them to
13    taper off of that medication, right?
14  A Yes.
15  Q All right.  And could you tell me what are the
16    considerations in making that determination about
17    whether to place somebody in a benzodiazepine
18    withdrawal protocol?
19  A If I know they're taking benzodiazepines when they
20    come in and they tell us at receiving the
21    screening, whether they take it off-the-street
22    drugs or they actually get it from a pharmacy under
23    a doctor's prescription, we look at the -- which
24    one it is, what dosage they're taking, how long
25    they've been taking it and determine, based on
```

Page 30

```
 1    that, whether they are put on a tapering dose of
 2    benzodiazepines from day one or we put them on a
 3    protocol to monitor them.
 4  Q Doctor, I know you mentioned that -- you talked
 5    about inmates who tell you during the screening
 6    process, right?
 7  A Yes.
 8  Q Well, what if some -- what if an inmate tells you,
 9    as David did, six or seven days after he -- after
10    he is incarcerated that he's been on benzodiazepine
11    withdrawal?  What do you do then?
12  A Typically, if they've already been in, such as
13    David, for a week, and then they finally tell us,
14    they've already been on a monitoring protocol
15    already.  And if they're doing fine, there's no
16    significant issues at that point.  They're already
17    weaned off their benzodiazepine.
18  Q Well, let's talk about that for a minute.
19       Do you have any evidence at all that David was
20    put on a monitoring program for benzodiazepine
21    before he told the staff about his use of those --
22    of that medication?
23  A He was put on a COWS protocol because he told them
24    he was on opiates.  But that's a similar -- similar
25    kind of protocol where you're monitoring vital
```

Page 31

```
 1    signs and monitoring condition.
 2  Q Well, but it's not the same, is it?
 3  A Not exactly, no.
 4  Q Okay.  What is the difference?
 5  A Well, there's different monitoring parameters.  I
 6    don't have the protocol right in front of me.  I
 7    think it's -- it might be one of the exhibits.  But
 8    they're a little bit different parameters.  But
 9    typically you would pick up issues on either one of
10    the protocols.
11  Q How do you confirm -- once an inmate has told you
12    that he's on certain medication, how do you confirm
13    that he, indeed, is telling you the truth?
14  A That can be difficult to do.
15  Q Okay.  Now -- yeah.  Just, I guess -- I understand
16    that, but can you tell me how you do it?
17  A Well, we ask them where do they get the medication,
18    what pharmacy they go to so we can confirm, who's
19    their physician.  And if they tell us, we call and
20    confirm.
21  Q Is that it?
22  A Well, if we confirm, say, from a pharmacy, we'll
23    see when they last had the prescription filled; if
24    they come in with a bottle, see how many pills are
25    left.  It just depends on the situation.  Each
```

Page 32

```
 1    person's kind of individualized.
 2  Q Yeah.  And you do agree, don't you, that in making
 3    assessments about a particular inmate's risk of
 4    withdrawal is a very individualized decision, isn't
 5    it?
 6  A Yes.
 7  Q So if a doctor or a nurse utilizes a general --
 8    general decision-making without considering the
 9    specifics of a particular inmate's medical care,
10    that would be inappropriate, wouldn't it?
11       MR. CHAPMAN:  Object to form and foundation.
12  A Well, I would say in general you use a general
13    thought process and reasonable medical judgment for
14    all the opiates and all the benzodiazepines.  But
15    if, in particular, you know which ones they've been
16    taking, which ones are short acting versus long
17    acting, which ones have higher withdrawal issues,
18    you may individualize in that manner.  But I mean,
19    your COWS and your CIWA protocols, they're the same
20    for everybody.  They're not different protocols for
21    different people.
22  Q Fair enough.  But once again so we -- back to
23    confirming the medication.  Why is it important to
24    confirm the medication dosage and duration of usage
25    and the last time that it was used?
```

Page 33

1    A  Yeah.  Unfortunately, that's not always -- it's
2        very difficult to do many times.  But ideally -- in
3        an ideal word, if they come in and we know exactly
4        what they're taking, the dose and when they took
5        the last dose, then you -- like you said, we could
6        individualize the treatment based on that.
7    Q  Yeah, but I -- no, I understand, but I -- the
8        question I asked was, why is it important to know
9        the dosage, when it was last taken, the -- the
10       duration of the -- of the use of that medication?
11   A  To de- -- well, to decide if you need to put them
12       on a withdrawal protocol or a withdrawal medication
13       or you may not need anything at all.  I mean, many
14       people come into our jail and say they've been
15       taking this, and we can't find any record of it,
16       because they want drugs when they come into jail or
17       alcohol, the same way.  They'll say they drink a
18       fifth of vodka a day and -- every time they come to
19       jail.  They've never withdrawn in the past.  So it
20       all depends --
21   Q  Well, I guess -- well, here's what I'm going to --
22       I guess it's important that I ask you this
23       question.  Okay?
24           In simple terms, Doctor, other than knowing
25       the pharmacy or knowing the doctor who prescribed

Page 34

1        the medication, what other ways do you have to
2        confirm whether the patient is telling you the
3        truth about his medications?
4    A  Well, depending on your state, I guess.  Indiana
5        has the INSPECT program.  You can contact them to
6        see if the person has been doctor shopping or
7        pharmacy shopping.
8    Q  You said it depends on your state?
9    A  Correct.
10   Q  Explain what you mean by that.
11   A  Well, different states have different programs
12       where you can contact -- Indiana has one called
13       INSPECT.  And you can contact them and it tells you
14       individual patients that have been doctor shopping
15       or patient -- or pharmacy shopping.  If they filled
16       OxyContin at ten different pharmacies in the past
17       week, you could look that up.
18   Q  All right.  So how easy is it to look that up in
19       Pennsylvania --
20   A  I have no --
21   Q  -- or excuse me, in Indiana?  I'm sorry.
22   A  It's time --
23           MR. CHAPMAN:  Object to form and foundation.
24   Q  How easy is it, as a medical director of a facility
25       -- detention facility, to look up that information

Page 35

1        in Indiana?
2    A  It's time consuming.
3    Q  What's that?
4    A  It -- it can be time consuming.
5    Q  Explain why it's time consuming in Indiana.
6    A  You have to go online, put passwords in, get
7        through the system.  It takes --
8    Q  Doctor, can you speak up?  I'm having a hard time
9        understanding what you're saying.
10   A  Yeah.  You have to go into a computer sys- -- be at
11       a computer.  You have to put in passwords.  You
12       have to go into the system.  And it takes awhile to
13       bring all the information up.
14   Q  How long?
15   A  I haven't done it for a while.  It can take 10, 15
16       minutes.
17   Q  Okay.  So it takes 10 or 15 minutes to know how to
18       handle an inmate, right?
19           MR. CHAPMAN:  Object to form and foundation.
20       That's not what he testified to.
21   A  Yeah, that's a very broad question there.
22   Q  Well, I know your -- I know your testimony said 10
23       to 15 minutes.  Do you believe that's a long time
24       to provide proper medical care?
25           MR. CHAPMAN:  Object to form and foundation.

Page 36

1    A  I think it all depends on how -- how much you need
2        that information.  We don't do -- we don't -- do
3        not do that on every inmate that comes into the
4        jail.
5    Q  I understand that.  And -- but in a situation where
6        you don't know specific facts that are important in
7        determining whether a benzodiazepine withdrawal
8        protocol should be implemented, don't -- doesn't a
9        doctor have an obligation to find that information
10       before he makes decisions about putting someone on
11       a protocol or not?
12           MR. CHAPMAN:  Object to form and foundation.
13   A  What's more typically done is if you have a
14       suspicion the patient is on a benzodiazepine, you
15       put them on a benzodiazepine taper when they walk
16       in the door, that way you basically protect the
17       patient.
18   Q  And that's because it's better to be safe than
19       sorry, right?
20           MR. CHAPMAN:  Object to form and foundation.
21           MS. SWINDLEHURST:  I'll join.
22   Q  Is that right?
23   A  In some circumstances, yes.
24   Q  Okay.  So in some circumstances, it's better to be
25       safe than sorry?  Are you telling me not in all

Page 37

1   circumstances it's better to be safe than sorry?
2   A  I never --
3           MR. CHAPMAN:  Same objection, form and
4   foundation.
5   A  I never say all.
6   Q  Go ahead, Doctor.
7   A  I never say all.
8   Q  What's that?
9   A  I never say all.
10  Q  You never say all?
11  A  No.
12  Q  So -- okay.  So let's assume for a minute that in
13  Michigan there's a system called MAPS.  Are you
14  aware of the MAPS system?
15  A  No.
16  Q  It's called the Michigan Automated Prescription
17  System.  You've never heard of that?
18  A  No.
19  Q  Does Indiana have something similar in terms of the
20  monitor that's used that you're talking about takes
21  10 to 15 minutes to find information?
22  A  I presume it's similar to the --
23          MR. CHAPMAN:  Objection to form and
24  foundation.  He said he doesn't know.
25  A  I don't know.

Page 38

1   Q  What's that?
2   A  I presume it may be similar to our INSPECT program,
3   but I don't know.
4   Q  To your I inspect [as said] program?
5   A  I-N-S-P-E-C-T.
6   Q  I-M as in Mary --
7   A  I as in Indiana.  I-N- -- N as in Nancy --
8   -S-P-E-C-T.
9   Q  And what does that stand for?
10  A  Indiana -- I don't -- honestly, I don't know what
11  it stands for.
12  Q  But you use it?
13  A  Periodically.  Our jail does.
14  Q  Okay.  Under what circumstances does your jail use
15  INSPECT?
16  A  That all depends.  If we have someone we suspect is
17  -- keeps coming in and out of jail and abusing
18  drugs and shopping everywhere, we -- we may look
19  them up to see what all physicians they're going
20  to, what all pharmacies they're going to to confirm
21  what they've been taking.
22  Q  So is it -- is it your testimony that the only time
23  you use the system called INSPECT is if you suspect
24  that somebody's drug shopping?
25  A  It's if we have questions about someone in

Page 39

1   particular about what's going on with them and
2   their background and drug use.
3   Q  Okay.  Doctor, is there another way to confirm
4   medication usage, to talk to family members?
5   A  Well, generally, if they're over 18, we can't do
6   that due to HIPPA violations.
7   Q  Can you ask the patient to sign a release to talk
8   to family members?
9   A  You could.
10  Q  Is there anything that would stop you from doing
11  that?
12  A  I don't know.
13  Q  Could you ask the patient if he remembers the next
14  day after he didn't remember?
15  A  You could.
16  Q  Could you ask the day after that?
17  A  You could.
18  Q  Doctor, based upon your review of all the records,
19  is there any indication whatsoever that anybody in
20  the jail asked Mr. David Stojcevski if he recalls
21  where the pharmacy was or the doctor that was
22  involved at any time after June 18th of 2014?
23  Excuse me.
24  A  Yeah.  I believe someone did on either June 17th or
25  18th.  Mrs. Cueny --

Page 40

1   Q  Right.  Well, let's -- okay.  But other than that
2   particular time that you're discussing, because
3   we'll get into the date of that, but other than
4   that time, is there any indication that anyone in
5   the jail; medical staff, mental health staff,
6   corrections officers did anything to try to confirm
7   or verify that what David was telling you was the
8   truth?
9   A  Not that I recall.
10  Q  Okay.  Do you believe that a jail that does not
11  follow up in making a continual attempt to talk to
12  the patient about where he was getting the
13  medication, do you believe that that falls below
14  the standard of the medical staff?
15  A  No.
16          MR. CHAPMAN:  Object to form and foundation.
17  A  No.
18          MR. CHAPMAN:  I'm sorry.  Was there an answer?
19          MR. PERAKIS:  Yep.
20  A  No.
21  Q  You do not believe it is?
22  A  No.
23  Q  And tell me why.
24  A  Once again, things are individualized for patients
25  that come into your jail.  If a person tells you,

Page 41

1 such as David, a week later he's taken these drugs,
2 you've already tapered him off. You've done the
3 appropriate thing potentially anyway. You've not
4 noticed any symptoms, any vital sign changes, any
5 problems, it doesn't matter what he -- where he
6 took it at; it's after the fact.
7   Now, it could have been important on day two
8 or day three to know that, if you would have known
9 that, but he didn't -- luckily he did not have any
10 withdrawal symptoms the first six days after he
11 came in. So we would not be -- in my jail, I would
12 not be calling his doctor, calling the pharmacies.
13 At day seven when he told, I think, Monica Cueny
14 about the drugs, we would not be calling to find
15 out. It wouldn't matter at that point. He's
16 already been tapered off.
17 Q Well, Doctor, can you tell me what symptoms exist
18 for benzodiazepine withdrawal?
19 A Well, generally early on within the first few days
20 you're going to have vital sign changes. You may
21 have sensory changes. You may have, you know --
22 some kind of hallucinations are possible early on,
23 but you'll not be totally right. And there's a
24 list, you know, the CIWA scoring of the other
25 different symptoms that they look for. But like I

Page 42

1 said, David had already been monitored for a week
2 before he admitted taking these other drugs.
3 Q What about tremors, Doctor?
4 A That's possible.
5 Q What about delusions?
6 A That's possible.
7 Q What about confusion?
8 A That's possible.
9 Q What about -- what about being nonresponsive in
10 interpersonal relationships?
11 A That could occur.
12 Q What about loss of appetite?
13 A Many times, if they're going through the different
14 symptoms such as what you mentioned, they may not
15 think about eating as much as they would before.
16 And so you may, you know, see that as appetite
17 changes.
18 Q What about hallucinations? Did we talk about that
19 already?
20 A That's a possibility, yes.
21 Q Okay. And you -- I think you mentioned -- what
22 about -- you said a moment ago that it's possible
23 that hallucinations could occur.
24   MR. PERAKIS: Is there a reason we're getting
25 an echo now?

Page 43

1   COURT REPORTER: Not that I know of.
2   THE WITNESS: Not on our end.
3   MR. CHAPMAN: This is Ron Chapman. I haven't
4 done anything different.
5   MR. PERAKIS: Okay.
6   MS. SWINDLEHURST: Same.
7   MR. PERAKIS: Yeah. I'm just telling you
8 there's a big echo going on.
9   (A discussion was held off the record.)
10 Q So what about seizures or seizure-like activity?
11 A That's a possibility.
12 Q Okay. Now, a few moments ago you testified to
13 hallucinations and how they possibly could occur
14 the first few days of withdrawal, right?
15 A Yes.
16 Q Can they also occur a week after withdrawal?
17 A That's a possibility. That's less likely, but I
18 mean, it's a possibility.
19 Q It's a possibility? You've actually seen it,
20 haven't you, Doctor?
21 A I'm not sure I've seen it in my jail.
22 Q Okay. But you agree that the medical literature
23 suggests that benzodiazepine withdrawal can take --
24 symptoms can be for weeks or even months or years?
25 You agree with that, don't you?

Page 44

1 A Well, not symptoms of seizures and that type of
2 thing, but I mean symptoms of increased anxiety,
3 increased -- probably some of their symptoms coming
4 back before they started on the benzodiazepines.
5 But yes, the -- in the literature it does state
6 that.
7 Q Okay. So you agree that each individual's reaction
8 to an immediate cessation of benzodiazepine
9 medication that has been prescribed, that each
10 individual's responses are, in fact, individualized
11 and have to be carefully monitored?
12 A Each -- yeah, each person responds differently to
13 many medications.
14 Q Right. And what impact does the medication
15 triumvirate of oxycodone, Xanax and Klonopin have
16 on the possibility or likelihood that some of the
17 early onset symptoms could last -- could occur much
18 later in the week or in several weeks?
19 A Well, the oxycodone -- the narcotics get out of
20 your system relatively quickly. And Xanax --
21 Q Right, I understand that.
22 A -- gets out of your system quickly.
23 Q But once again the question is there. Does that
24 complicate the analysis of whether to put somebody
25 on benzodiazepine protocol -- withdrawal protocol?

Page 45

1    A  I don't think so.  You'd follow the same protocol
2       either way.
3    Q  Okay.  So is it your testimony that if David were
4       to have symptoms, they would have all occurred
5       within a week of him -- of cessation of the
6       medication?
7    A  Obviously, no one has a crystal ball, but in
8       general speaking terms, most people that come in on
9       medications such as he mentioned will have most of
10      their -- the worst symptoms within the first few
11      days of the first week if they're going to have
12      symptoms.
13   Q  Okay.  So most people most of the time, right?
14   A  Yes.
15   Q  All right.  And the symptoms would have occurred
16      within the first week of cessation; is that right?
17   A  Yes.
18   Q  Now, taking into consideration something that is
19      part of the record in this case, in situations
20      where there's a possibility or potential for
21      benzodiazepine withdrawal, do you agree that it's
22      better to be safe than sorry?
23         MR. CHAPMAN:  Object to form, foundation, too
24      general of a question.
25         MS. SWINDLEHURST:  I'll join.

Page 46

1    A  So say that again.
2    Q  Yeah.  In a situation where there's even a
3       potential of benzodiazepine withdrawal, do you
4       agree that it's better to be safe and put the
5       person on protocol, benzodiazepine withdrawal, than
6       it is to allow him to die 10 or 17 days after he
7       gets incarcerated?
8          MR. CHAPMAN:  Same objection.
9    A  Well, once again --
10         MS. SWINDLEHURST:  Join.
11   A  -- I would say it needs to be individualized from
12      the history and the information you receive.
13         I mean, when David came in, there was no
14      mention of benzodiazepines.  And if there would
15      have been and he had just taken the last pill
16      before he came in that day, I would put him on a
17      benzodiazepine protocol and probably withdrawal.
18         The way it worked out, he didn't tell them
19      until a week later that he hadn't taken it for two
20      weeks.  And he would have been obviously
21      withdrawing at home before he came in but even
22      until -- even withdrawing more --
23   Q  Well --
24         MR. CHAPMAN:  Let him finish.  Let the doctor
25      finish.

Page 47

1    A  -- by the time they found out he was taking it.  So
2       I would not have put him on benzodiazepines at that
3       point, no.
4    Q  Dr. Stoltz, is there any indication in the record
5       that you can show to me that indicates what the
6       last dosage of Xanax was?
7    A  Only in the record, I believe, with Monica Cueny on
8       the -- I believe the 17th or 18th -- 18th, I
9       believe, said he told her he hadn't taken the --
10      something for two weeks.
11   Q  And what was it that that note says, if you
12      could --
13   A  I'm sorry.  I can't remember --
14   Q  And that -- and that would be --
15   A  -- which Exhibit 2 that was.
16   Q  -- in Exhibit 5 that's been marked.  Are you
17      looking at it?
18   A  Yeah.  It states the last dose of Klonopin two to
19      three tabs at home last -- taken two weeks ago for
20      anxiety.
21   Q  I'm sorry.  Could you --
22   A  The middle of that exhibit it states that he does take Klonopin,
23      it states that he does take Klonopin, two to three
24      times at home, last taken two weeks ago for
25      anxiety, and patient unable to provide name or

Page 48

1       location of the pharmacy.
2    Q  Okay.  So what was taken two weeks prior?
3    A  It says Klonopin.
4    Q  All right.  So Doctor, you agree, don't you, that
5       that same note only talks about Klonopin, right?
6    A  Correct.
7    Q  And that that was last taken two weeks ago?
8    A  Correct.
9    Q  For anxiety, right?  Right?
10   A  That's what it says.
11   Q  Is that right?
12   A  That's what he --
13   Q  And doesn't -- does that note also confirm that
14      Mr. Stojcevski, in fact, confirmed that he had had
15      psychiatric hospitalization for that anxiety?
16   A  In the past, yes.
17   Q  Okay.  What impact does that information have in
18      relationship to knowing the seriousness of his
19      condition and the seriousness of him needing that
20      medication?
21   A  Well, typically in jails and prisons we --
22         MR. CHAPMAN:  Object to form.
23   A  -- don't use benzodiazepines on people that have
24      anxiety.  But someone like David, he would be
25      referred to mental health and have mental health

Page 49

1      evaluations done in my jail -- in most jails.
2    Q  Okay.  So there would be a mental health evaluation
3      is what you're saying?
4    A  Yes.
5    Q  Okay.  Now, going back to the question I asked you,
6      is there any proof in the record whatsoever that
7      suggests that anyone in the jail knew what the last
8      time was that David was taking Xanax?
9    A  No, but the good thing is Xanax -- I mean, from
10     David's standpoint, Xanax tapers out of your body
11     real quick, and usually you have withdrawals pretty
12     quickly if you've been on Xanax.
13        And so even if he stopped it the day before he
14     came to jail, he was on a protocol -- at least the
15     COWS protocol where he's being monitored for five
16     or six days, and he showed no withdrawal symptoms
17     at that point.
18   Q  Okay.  And Doctor, I'm sure you've looked at the
19     records pretty thoroughly.  And is there anything
20     in the record that David was experiencing the
21     following symptoms during his incarceration:
22     Sensory deprivation, hallucination -- well, let's
23     just start with sensory problems.
24   A  Well, it was noted when he -- in the mental health
25     unit, he had withdrawal -- you know, social

Page 50

1      withdrawal, would not speak to folks.  He was kept
2      on observation.  He was doing bizarre things such
3      as hallucinations potentially.
4    Q  Okay.
5        MR. PERAKIS:  Folks, can you hold on just one
6      second?
7        MS. SWINDLEHURST:  Sure.
8        (A discussion was held off the record.)
9    Q  So when you're defining sensory problems, you're
10     including social withdrawal, right?
11   A  Yes.
12   Q  Is that right?
13   A  Yes.
14   Q  What about noncommunicative behavior?
15   A  Yes.
16   Q  What about unresponsiveness?
17   A  It was mentioned in the record.
18   Q  Okay.  So next let's go to hallucinations.  Is
19     there anywhere in the record that suggests that
20     David experienced hallucinations and/or delirious
21     statements or behavior?
22   A  Yes.
23   Q  Is that yes?
24   A  Yes.
25   Q  Do you know how many -- do you know when that

Page 51

1      happened?
2    A  I'd have to look at the actual date.
3    Q  Yeah.  I think if you look at Exhibit -- let's see.
4      If you look at Exhibit 3 --
5    A  Yes.  Okay.
6    Q  Do you see that note?
7    A  Yes.
8    Q  So I know that you're reading what I think you're
9      reading, could you read it to me?
10   A  On 6-17 from Vicky Bertram it says called to
11     patient's housing unit at 1925 with complaints of
12     being vaguely responsive, observed patient sitting
13     on the floor, states that all his organs but
14     10 percent of his heart was removed and his arms
15     shredded a couple days ago.
16   Q  Continue.
17   A  Oh.  Patient states that it happened while he was
18     here.  Patient stated that he was taking drug --
19     taking four milligrams of Xanax daily for anxiety
20     and oxycodones for pain.
21   Q  Okay.  So we know that that was placed in the
22     record at 8:12 p.m. on June 17th, right?
23   A  Correct.
24   Q  Okay.  And you agree, don't you, that that
25     particular note would indicate delirium or

Page 52

1      hallucinations -- and/or hallucinations, right?
2    A  Correct.
3    Q  Okay.  Is there anywhere in the record that
4      confirms that David was suffering tremors or
5      constant shaking?
6        MR. CHAPMAN:  Object to form and foundation.
7        MS. SWINDLEHURST:  I'll join.
8    A  I'd have to look at the record more closely to see
9      if -- I don't recall that being -- except for --
10   Q  Have you had a chance to look at the video?
11   A  No, I've not seen the video.
12   Q  You've not seen the video?
13   A  No.
14   Q  So I can assume then that -- well, have you seen
15     portions of it?
16   A  No.
17   Q  So you wouldn't know about the extent to which
18     David was suffering tremors or seizures or any type
19     of abnormal behavior, would you?
20   A  Only what was in the medical record, and I did
21     not --
22        MR. CHAPMAN:  Object to form and foundation.
23   A  I did not receive the video.
24   Q  What's that?
25   A  Only what was documented in the record.  I did not

Page 53

1   receive the video.
2       MR. PERAKIS:  Hang on one second.  Yeah.  You
3   know, let's -- I do need to take five minutes,
4   guys.
5       MR. CHAPMAN:  Okay.  Let's take a break.
6       MR. PERAKIS:  Thank you.
7       (A brief recess was taken.)
8   Q  Doctor, is sleep pattern disruption an indication
9   of benzodiazepine withdrawal?
10  A  It could be.  You know, interestingly, I'll just
11  comment at this point, you know, many of the things
12  you mentioned of all of the different
13  symptomatology is not just withdrawal symptoms.
14  Those can all go along with mental health disorders
15  as well, which, you know, in my opinion, is
16  probably what's going on with this individual.
17  Q  I gotcha.  Now, what about -- is there any
18  indication in the record that David Stojcevski was
19  confused during his incarceration at McComb County
20  Jail?
21  A  I believe most of his symptoms --
22      MR. CHAPMAN:  Object to form and foundation.
23  A  Yeah.  Some of those --
24  Q  Go ahead.
25  A  -- symptoms occurred on the 16th -- or 17th and

Page 54

1   18th.  And he was even brought down to the medical
2   unit.  He was evaluated.  And, you know, at some --
3   one or two points thought he was faking things.
4   Q  Right.  And Doctor, do you also agree that in the
5   medical record that the -- that it was confirmed
6   that David was suffering from decompensation on
7   June 18th?
8   A  Well, there was a question about that.  And he was,
9   I guess --
10  Q  Well, it was noted in the mental health records.
11      MR. CHAPMAN:  You need to let him finish his
12  answers, please.
13      MR. PERAKIS:  Oh, sure.
14  A  Ask that question again.
15  Q  Yeah.  Give me one second.
16      On June 18th in the mental health observation
17  initial assessment, the reason for watching David
18  24 hours a day, seven days a week was listed as
19  decompensation.  Do you -- could you please explain
20  decompensation?
21  A  Well, if mental health felt he was decompensating,
22  that could be from a mental health disorder.
23  Q  Could it also be from acute benzodiazepine
24  withdrawal?
25  A  Less likely since he had been off benzodiazepines

Page 55

1   for at least a week at that point and maybe even
2   two weeks.
3   Q  Well, I'm not asking you that.  I'm asking you is
4   it possible that it could also be a result of acute
5   benzodiazepine withdrawal?
6   A  (No response.)
7       MR. CHAPMAN:  Object to form and foundation to
8   the word "possible."
9       MS. SWINDLEHURST:  I'll join.
10  Q  Can you explain what decompensation means?
11  A  Decompensation means mentally you actually become
12  somewhat incapacitated mentally, which could be a
13  variety of things when they use that terminology.
14  Q  Well, okay.  So tell me what those variety of
15  things are for a moment.
16  A  You could have hallucinations, auditory, visual.
17  You could be -- have delirium.  You could not be
18  with it, so to speak.
19  Q  So that means that all the things that you
20  testified were symptoms of benzodiazepine
21  withdrawal are the same things that -- what
22  decompensation means?
23  A  Could be -- yeah.  It could be a mental health
24  disorder underlying -- he could have underlying
25  health -- mental health disorder that's

Page 56

1   exacerbating or getting worse.
2   Q  Exacerbating what?
3   A  Exacerbation of an underlying mental health
4   disorder.
5   Q  I don't -- I'm a little confused.  I understand the
6   concept of exacerbation, but --
7   A  Worsening -- worsening of an underlying -- I mean,
8   potentially his anxiety could be coming forth.
9   Q  So in other words, he could be having an anxiety
10  attack when they labeled him as decompensated?
11  A  True.
12  Q  And anxiety is one of the symptoms that
13  benzodiazepine improves; isn't that right?
14  A  Yes.
15  Q  Is that yes?
16  A  Yes.
17  Q  Okay.  So now back to other symptoms of
18  benzodiazepine withdrawal.  Do you recall anywhere
19  in the record that confirms that -- and I think
20  we've talked about this, but I'll say it anyway --
21  that David was nonresponsive to various stimuli in
22  his little world in MHO1?
23      MR. CHAPMAN:  Object to form and foundation
24  and pejorative statements.
25      MS. SWINDLEHURST:  I'll join.

Page 57

1  Q  Is that right, Doctor?
2  A  I'm sorry. Read that back again. Everybody
3     interrupted me.
4  Q  Yeah. Is there -- is there evidence in the record
5     -- medical record that confirmed that David was
6     nonresponsive for many days during his stay in
7     MHO1?
8  A  Well, on 6-17 when --
9        MR. CHAPMAN: Object to form and foundation,
10    mischaracterizes the record.
11 A  Vicky Bertram saw him on 6-17. She said he
12    complained of being vaguely responsive, observed
13    him sitting on the floor, which we already read
14    earlier.
15 Q  Right. No, but what about the 18th?
16 A  He was brought down to medical and evaluated after
17    he would not -- he would lay in the floor twitching
18    and brought down in a wheelchair. And after being
19    evaluated, he walked back without -- with a steady
20    gait.
21 Q  And Doctor, you agree, don't you, that one of the
22    significant symptoms of benzodiazepine withdrawal
23    is that the symptoms actually wax and wane, right?
24 A  Well, the times I've seen them in the past, they
25    tend to progressively get worse many times if you

Page 58

1     don't treat them.
2  Q  They get progressively worse if you don't treat
3     them; is that what you said?
4  A  They can. They don't tend to just come and
5     disappear.
6  Q  Yeah. Did you look at the video --
7  A  I did not.
8  Q  -- to determine -- or wait. Let me ask you this.
9     Did you look at the medical -- the mental health
10    records pertaining to what they deemed was David's
11    nonresponsiveness?
12 A  Yes.
13 Q  And you saw that almost every day from the 18th
14    till the 27th, the date of his death, in fact an
15    hour and a half before he died, mental health staff
16    was claiming that he was refusing or non- --
17    refusing to speak to them or nonresponsive, right?
18 A  Well, I saw in the -- initially at some point they
19    came by, and he asked about getting his
20    medications. When they did not give him
21    medications, he refused to talk to them and stayed
22    away from them and kind of avoided them ever since,
23    it appeared to me.
24 Q  Well, do you know what day that happened, Doctor?
25 A  I'd have to look exactly on the record to see for

Page 59

1     sure what date that was.
2  Q  Well, if I tell you it was the 21st and it was the
3     only time he did that, do you agree with that?
4  A  That sounds about right, yes.
5  Q  Okay. So is there anywhere in the medical records
6     that demonstrated or showed evidence that David had
7     a loss of appetite?
8  A  I believe that somewhere I saw he was not eating.
9     I'd have to look in the record and see exactly
10    dates and times for that.
11 Q  Yeah. I believe, in fact, there is no monitoring
12    of what he was eating, was there, Doctor?
13 A  I don't think directly.
14       MS. SWINDLEHURST: Object to form and
15    foundation.
16       MR. CHAPMAN: Join.
17 Q  Okay. So your answer is, is you don't see anything
18    in the medical records to suggest that he had a
19    loss of appetite, right?
20 A  Not that I recall.
21 Q  Okay. Now, what about -- do you recall in the
22    records whether David was suffering from any
23    seizure or seizure-like activity?
24 A  I do recall -- I've got it here in front of me.
25    One second. Well, Dr. Sherman ended up seeing him

Page 60

1     because he was called -- or he was observed in the
2     medical unit for questionable seizures.
3  Q  Yeah. And do you know what Dr. Sherman testified
4     to or is in the record said about those seizures?
5  A  Well, he says in the record I observed him
6     fluttering his eyes and what was certainly not a
7     seizure, but it was mostly a poor attempt to fake
8     one.
9  Q  So Dr. Sherman felt that he was faking the
10    seizures?
11 A  According to his note on --
12       MR. CHAPMAN: Object to form and foundation,
13    mischaracterizes the record.
14 Q  Let me use the word then. Did Dr. Sherman believe
15    that he was feigning seizures or that his seizures
16    were being feigned?
17 A  The one he observed that he wrote in his progress
18    note on 6-24, I think it occurred on 6-17 when he
19    saw him.
20 Q  Well, Doctor, I just want to point you to your --
21    page four of your record -- of your report. I'm
22    sorry. You, in fact, used the term that
23    Dr. Sherman believed that he was -- that David was
24    trying to fake a seizure, right?
25 A  Yes.

Page 61

1   Q Are you looking at your report?
2   A Yes.
3       MR. CHAPMAN: Where are you pointing to on
4   page four?
5       MR. PERAKIS: It's page four of the second
6   paragraph. Do you see that, where he starts with
7   he evaluated him for possible seizures?
8       MR. CHAPMAN: The second paragraph that starts
9   out Dr. Sherman added a late entry?
10      MR. PERAKIS: That's right.
11  Q Do you see that, Doctor?
12  A Yes.
13  Q Is that yes?
14  A Yes.
15  Q Okay. Yeah, you need to speak up, Doctor. I can't
16  hear you.
17  A Yeah, I'm right next to the phone. I'm not sure
18  why, but okay.
19  Q Do you see where it was your word -- the word fake
20  that was used in your report, right?
21  A Yes.
22  Q So is it your testimony that Dr. Sherman suspected
23  seizures -- suspected faking seizures?
24  A That appears from the note.
25  Q Dr. Stoltz, is there anything in the medical record

Page 62

1   to confirm that Dr. Sherman ruled in or ruled out
2   his suspicion that David was faking a seizure?
3   A Well, I'm -- from reading his record, in his, you
4   know, best medical judgment at the time and
5   observing David and then when he shook his
6   shoulders, things stopped, with a seizure, that's
7   not going to happen.
8   Q I under-- I understand that, but I -- that's not
9   the question I asked you.
10      Is there anything in the medical record
11  written by anyone that suggests or evidences that
12  Dr. Sherman attempted to rule in or rule out his
13  suspicion that the seizures were fake?
14      MR. CHAPMAN: Object to form and foundation.
15      MS. SWINDLEHURST: I'll join.
16  A My only comment would be on Dr. Sherman's note that
17  his impression was a feigned seizure behavior and
18  return to general population without seizure
19  precautions. He did not feel that he had seizures.
20  Q I understand that. But you do agree, don't you,
21  that an important obligation of a doctor in the
22  correctional care -- in a facility, it's important
23  and a clear obligation of the doctor to confirm
24  whether the faking was occurring or not, right?
25  A And that's why --

Page 63

1       MR. CHAPMAN: Object to form and foundation.
2       MS. SWINDLEHURST: I'll join.
3   A And that's why he had a medical evaluation of David
4   that day; he felt that it was not a seizure.
5   Q What's that?
6   A That's why he did a medical evaluation that day,
7   for questionable seizures. He did -- that's what
8   he did. In his best medical judgment, he felt he
9   was not having seizures.
10  Q Do you know whether he did a medical examination on
11  the 17th?
12  A Well, from his entry note and then from his
13  testimony in his deposition he said he did. That's
14  all I can go by.
15  Q But Doctor, is there anything in the record that
16  says that he did an examination?
17  A Only his note on 6-24 he entered.
18  Q What's that?
19  A Only in his note that he entered --
20  Q What's that?
21  A Only in his note that he entered in the --
22      MR. CHAPMAN: You've got to let him answer.
23  You can't keep interrupting him.
24      MR. PERAKIS: I'm not -- I can't hear him,
25  Ron, that's all. I'm not trying to interrupt him.

Page 64

1       MR. CHAPMAN: Well, okay.
2       MR. PERAKIS: I really am not. I just can't
3   hear what he's saying. Okay? I'm sorry about
4   that.
5       MR. CHAPMAN: Okay.
6   Q So would you -- do you want to restate your answer?
7   A Only in the record that he documented on 6-24-14
8   and in his deposition that he evaluated him.
9   Q I understand that. So what you're telling me is
10  that -- that the only thing in the record is his
11  note that he supposedly wrote on the 24th, right?
12  A Right.
13      MR. CHAPMAN: Object to form and foundation,
14  mischaracterizes known evidence.
15  Q Now, we know that Dr. Sherman said certain things
16  in his deposition, right?
17  A Yes.
18  Q And do you agree with everything he said in his
19  deposition?
20      MR. CHAPMAN: Objection. It's a memory test
21  -- not a memory test.
22      MR. PERAKIS: Oh, you don't -- if he can't
23  answer it, that's okay.
24  A I don't -- actually, I don't recall everything in
25  the deposition offhand right now.

Page 65

1  Q  Okay.  Well, Doctor, I'm a little bit concerned
2     about your failure to answer a very simple
3     question.  Did we know that his -- that
4     Dr. Sherman's examination resulted in a conclusion
5     -- resulted in a conclusion from Dr. Sherman that
6     he suspected that David was faking a seizure,
7     right?  We know that from his examination, right?
8  A  I can only look at the record on -- that he entered
9     on 6-24-14 where he says impression: Feigned
10    seizure behavior, return to GP without seizure
11    precautions.
12 Q  Right.  So that was his conclusion?  In other
13    words, he suspected feigned seizures or faked
14    seizures, right?
15 A  Correct.
16 Q  Now, at the moment he told him to go back to
17    general population, going forward during the next
18    ten days of his life, did Dr. Sherman in any way
19    rule in or rule out that those seizures were fake?
20 A  I don't believe --
21    MR. CHAPMAN:  Object to form and foundation,
22    asked and answered.
23 A  Yeah, I already answered that.
24 Q  Okay.  So your answer is exactly what you said
25    before, right?  And in other words, what you're

Page 66

1     telling me is the only thing that he did to
2     determine whether the seizures were fake is his
3     examination?  Is that what you're telling me?
4  A  Yes.
5  Q  Is that yes?
6  A  Yes.
7  Q  Can you say that a little louder for me?
8  A  Yes.
9  Q  Thank you.  And I think you need to speak like that
10    because I'm real serious?  I'm having a hard time
11    hearing you.  All right?  You might be talking into
12    your papers; I'm not sure.
13    MR. CHAPMAN:  I'm sorry.  If I could intervene
14    for a second, I think Counsel's correct, Doctor.
15    Maybe -- I don't know.  I note the phone's volume
16    -- sometimes you're very loud, and sometimes you're
17    not.  If you could maybe -- I don't know what we
18    can do, a better effort or something, but -- but I
19    understand what Counsel's saying.  You're a little
20    difficult to hear sometimes.
21    THE WITNESS:  I'll move it right in front of
22    me.  Is that any better?
23    MR. PERAKIS:  Yeah.  I think that's the best
24    thing we can do, Doctor.  I appreciate that.
25    THE WITNESS:  Okay.

Page 67

1     MR. PERAKIS:  Give me one second.
2  Q  Doctor, going back to the issue of Xanax, isn't it
3     true that Dr. Sherman did nothing to confirm the
4     dosage of Xanax, the last dosage that was taken or
5     the duration of the Xanax that was being taken?
6  A  Well, at the time Dr. Sherman was made aware of
7     that, the inmate was already off of the Xanax for a
8     week, at least that we know of.  So I mean, he
9     would have already been going through withdrawals,
10    most likely, from Xanax before that point.  So
11    there would be no reason to necessarily have to
12    find that out.  Who cares?
13 Q  So what you're telling me then is that Dr. Sherman
14    had no reason whatsoever to address the issue of
15    Xanax?
16 A  At that point there's --
17 Q  Is that what you're saying?
18 A  At that point you can put in the record he may have
19    taken Xanax; you don't know, but it would not have
20    changed the outcome or how he would have treated
21    him at that point.
22 Q  The question I'm simply asking is, did he do
23    anything to determine dosage, duration of dosage or
24    last usage of Xanax?
25 A  And my comment is no, he did not, but there's not a

Page 68

1     reason to do that.  At that point it would not make
2     any difference in how you would have treated him or
3     managed him, other than refer him to mental health
4     for mental health evaluation, which I would have
5     done the same thing.
6  Q  Okay.  And once it's determined by a doctor or his
7     staff or the mental health staff that David is, in
8     fact, decompensating after he was allegedly
9     feigning seizures, what's a doctor to do in that
10    situation?
11 A  Get a mental health referral.
12 Q  Are you telling me that the doctor has no other
13    obligation than to let mental health take over?
14 A  Well, I would get a mental health referral for an
15    evaluation.  And if they say I don't think it's
16    anything mental health going on here, I think it's
17    more medical, then the medical folks would get more
18    involved at that point.
19 Q  Well, I understand that.  But we know that he was
20    decompensating, right, as of the 18th?
21 A  Well, interestingly, on the -- I think it was the
22    17th and 18th he had these weird symptoms of heart
23    coming out, this and this and this, but that never
24    recurred days after that.
25 Q  So are you telling me that delusions or

Page 69

1    hallucinations have to keep recurring before
2    anybody's put on benzodiazepine withdrawal
3    protocol?
4    A  Well, I think if he was having true benzodiazepine
5       withdrawal, things would have got progressively
6       worse, and he would have had a lot more symptoms
7       progressing on days later.  And he actually became
8       coherent.  He would talk to the nurses, in the
9       record, talk to mental health until he didn't get
10      what he wanted.  So I mean, in my --
11   Q  Do you know whether his physical and/or mental
12      condition deteriorated after June 18th, 2014?
13   A  Well, he had vital signs done, I believe, on three
14      separate occasions after that, and they were all
15      stable.  The nurse came by and saw him and talked
16      to him at times.  But, obviously, he did go
17      downhill the last two or three days before he
18      passed away.  But once again --
19   Q  Was anything -- did medical get involved at all
20      during those last two or three days?
21   A  I believe the last -- he had a set of vital signs
22      on the 25th that were normal.  But I believe they
23      felt he had an underlying mental health problem.
24      And, unfortunately, he would not speak to mental
25      health.  But I'd probably refer more of that

Page 70

1    evaluation to a -- maybe a psychiatrist expert
2    rather than myself.
3    Q  Doctor, if I tell you that the only involvement
4       that medical had with Mr. Stojcevski during the
5       last four days of his life was a 30-second nurse
6       visit, would you agree with that?
7          MR. CHAPMAN:  Object to form and foundation.
8       It mischaracterizes the record.
9          MS. SWINDLEHURST:  I'll join.
10   A  I don't know how long the visit was.  I just saw
11      vital signs recorded on the 25th.
12   Q  Okay.  And so vital signs answers the whole
13      question; is that what you're telling me?
14   A  I just said that was recorded.
15   Q  I understand that.  But do vital signs tell the
16      whole story about whether somebody is going through
17      benzodiazepine withdrawal?
18   A  Not necessarily.
19   Q  Okay.  Then tell me why it's "not necessarily."
20   A  I mean, there can be a lot of things involved.
21      Obviously, if someone was decompensating from
22      opiates, benzodiazepines, you typically see changes
23      in vital signs as part of the process.
24   Q  Well, I understand at least you say you typically
25      see it.  They didn't see it this time, did they?

Page 71

1    A  No.
2    Q  Do you know how many times the nurses have claimed
3       to have done -- have taken vital signs but they
4       were never recorded?
5    A  I did see a note that the nurses said they -- when
6       they made rounds, they did record them.  If they
7       were normal, they may not necessarily write them
8       down.
9    Q  So how are we to know whether the nurses are
10      telling us the truth about his vital signs?
11   A  Well, I look at the ones that were recorded.
12   Q  Okay.  So you're not depending on any of the
13      unrecorded vital signs, right?
14   A  No.
15   Q  Can you tell me what date or dates Dr. Sherman saw
16      David?
17   A  I believe just 6-17.
18   Q  What document are you looking at that tells you
19      that?
20   A  It is the provider progress note on 6-24-14.  And
21      through the deposition it said it was actually
22      information recalled from his visit on 6-17.
23   Q  Oh, so you have to supplement the notes with the
24      deposition testimony in order for you to determine
25      that he saw him on the 17th; is that right?

Page 72

1    A  Well, that and the nurse's note that they refer him
2       to the doctor on the 17th as well as --
3    Q  Right.  Are you aware that Mr. Stojcevski was taken
4       down to the medical unit on June 23rd because he
5       had pooped and urinated on himself in his jail
6       cell?
7          MR. CHAPMAN:  Object to form and foundation.
8       That's not specified.
9          MS. SWINDLEHURST:  I'll join.
10   Q  Are you aware of that?
11   A  I don't recall that exactly, no.
12   Q  Well --
13   A  Is that one of the exhibits?
14   Q  -- I want you to -- I want you to take a careful
15      look, if you will, at what you're looking at, which
16      is Dr. Sherman's note.  Do you see that?  It's
17      Exhibit 6.
18   A  Right.
19   Q  Do you see that?
20   A  Yes.
21   Q  So the date of service is June 24th, 2014.  You
22      agree with that, right?
23   A  That's what the progress note says at the top.
24      However, it says an added, by Dr. Sherman, late
25      entry for 6-23.  And I read in one of the

Page 73

1    depositions of how this computer system, if you
2    don't close out a note, it will date different
3    dates. So I couldn't tell you for sure what date
4    that was.
5    Q  Okay. So -- so really -- I just want to make sure
6    you agree with me at least, that this particular
7    note doesn't really confirm -- does not confirm
8    that Dr. Sherman saw him only on June twenty- --
9    June 17th, right?
10   A  You can't tell from his note.
11   Q  You can't tell from this note? And whose fault is
12   that?
13   A  It could be the computer system or just
14   documentation.
15   Q  Or it could be Dr. Sherman's fault, right?
16   A  It could be just the way he documented things,
17   correct.
18   Q  Is there anywhere in that note that confirms that
19   he did a medical exam on David?
20   A  Only on the entry from Bey-Shelley on 6-17 that he
21   was being sent back to the unit after the physician
22   completed the assessment.
23   Q  I understand that, but that's -- even Bey-Shelley
24   only says completed the assessment, right? It
25   doesn't say he did an exam?

Page 74

1    A  Well, I presume when you say completed assessment,
2    it includes a full assessment, an examination and
3    plan of attack.
4    Q  Well, I understand that's what you want to presume,
5    but is it a fact?
6    A  I can only say what's in --
7         MR. CHAPMAN: I'm going to object. What's the
8    question? What's the question? Is what a fact?
9    Doctor, hold on. What's the question?
10   Q  The question is this: Is there anywhere in the
11   note that you're looking at, which is Exhibit 6,
12   that suggests that there was a medical examination
13   of David Stojcevski on June 17th --
14        MR. CHAPMAN: It's been asked and answered.
15   Q  -- by Dr. Sherman?
16        MR. CHAPMAN: It's been asked and answered.
17   Objection.
18   Q  And what's your answer?
19   A  I said from the progress note on that page alone,
20   Exhibit 6, I could not say for sure.
21   Q  All right. Is there anywhere in that note that
22   confirms that he performed a neurological exam?
23   A  Not from looking at the note itself.
24   Q  Okay. Could you please tell me what it means to be
25   oriented times three in a neurological exam?

Page 75

1    A  It means you're oriented to person, place, and
2    time.
3    Q  So if we look at this note, there's no proof that
4    David was oriented to place, time, and person, is
5    there?
6    A  No.
7    Q  Is that no?
8    A  Not from that note alone, no.
9    Q  Not from that note alone. So the question I have
10   for you is, if we don't know by this note that he
11   was oriented to time, why would a doctor depend on
12   his assessment of time in terms of when the last
13   medication was taken or not taken?
14   A  Well, you know, it could not have been taken
15   anytime after the 11th because he was in jail.
16   Q  That's -- I agree with you there. Okay?
17   A  So the doctor would know he's not been on
18   medication at least for six, seven days no matter
19   what.
20   Q  I understand that. But we still don't know when
21   his last dosage of Xanax was done, right? In fact,
22   Dr. Sherman didn't know that, did he?
23   A  No. But once again, like I said earlier, it would
24   not matter. You've already basically had him on
25   withdrawal protocol and observation for six days

Page 76

1    without significant symptomatology feeling there
2    was any withdrawal issues going on.
3    Q  Did you notice in the records that Monica Cueny
4    actually believed and stated in her note that he
5    should continue on the protocol, and that was on
6    the 18th?
7         MR. CHAPMAN: Object to form and foundation.
8    Q  And I'm going to direct you to Exhibit 5.
9    A  That's what -- I was looking at that.
10        She noted that. I'm not sure -- I -- I was
11   recalling her deposition -- I think she thought
12   he was still on that protocol, but he had finished
13   that protocol at that point.
14   Q  Well, actually you agree, don't you, that he had
15   finished that protocol three days earlier, right?
16   A  Right.
17   Q  And if Nurse Cueny had made any attempt in looking
18   at medical records, she would have noticed that
19   there was a jail memo that confirmed that he had
20   finished protocol, right?
21        MR. CHAPMAN: Object to form and foundation.
22   It's an intentional mischaracterization of the
23   record.
24        MS. SWINDLEHURST: I'll join.
25   Q  Well, Doctor, are the COWS assessments in the

Page 77

1   medical record?
2   A  Earlier, yes.
3   Q  Is that yes?
4   A  Earlier.
5   Q  Earlier, yes?
6   A  Yes.
7   Q  So if Nurse Cueny had taken the time to look at the
8      records, the fact that she -- that the COWS
9      protocol were there would have been easily
10     identifiable, right?
11         MS. SWINDLEHURST:  Object to form and
12     foundation.
13         MR. CHAPMAN:  Object to form and foundation.
14     Again, it's a mischaracterization.  You know they
15     weren't there then.  Don't mischaracterize things
16     in order to gain an advantage.  It's not pretty.
17         MR. PERAKIS:  Well, they sure -- they sure
18     better have been since they --
19         MR. CHAPMAN:  No, they shouldn't have.  And
20     you know the explanation for that and the fact that
21     they weren't there.  You just can't mischaracterize
22     things and trying to trip up the doctor.
23         MR. PERAKIS:  Ron -- Ron, it's a vague --
24         MR. CHAPMAN:  It's not fair.
25         MR. PERAKIS:  It's a vague explanation, I

Page 78

1      understand.  Okay?
2   Q  But what I'm asking you is very simply, Doctor, do
3      you have any proof that the COWS protocol
4      assessments were not in the medical records on
5      June 18th?
6   A  I don't know.
7   Q  All right, Doctor.  Have you found any evidence
8      whatsoever that Dr. Sherman reviewed medical
9      records involving David prior to making a decision
10     on not to institute a benzodiazepine withdrawal?
11  A  I don't know that from looking at the record.
12  Q  Well, Doctor, can you explain, as a doctor, why
13     it's important to have accurate and timely
14     recordation of a patient's care or treatment?
15  A  Well, to accurately evaluate and manage a patient,
16     you like to have all the information about that
17     patient; medical history, medical allergies,
18     medications, diagnoses, past hospitalizations,
19     surgeries, et cetera, et cetera.  And
20     unfortunately, when folks come into jail situations
21     that information can be very difficult to get ahold
22     of.  Patients will tell you things that -- they'll
23     hide things from you.  They'll lie about things
24     many times, and you may have inaccurate
25     information.  So you have to go on your best

Page 79

1      judgment on how a patient feels, how he looks when
2      you do your receiving screening and your
3      evaluations.
4          You know, unfortunately Dr. Sherman did not
5      have the information about benzodiazepines when Mr.
6      -- or when David came into the jail.  And it wasn't
7      until a week later that he got some information
8      about that.  At that point, he'd already been
9      tapered off, so to speak, and did not feel anything
10     further needed to be done.  And that was actually
11     in the -- the note from Monica Cueny after she'd
12     contacted Dr. Sherman.
13  Q  Okay.  So once again, let's get back to the
14     importance of medical records.  Do you agree that
15     medical providers, nurses and doctor, should look
16     at the medical record of an inmate whenever he is
17     -- he is being -- whenever that particular medical
18     provider is treating him?
19  A  Ideally, if it's available, yes.
20  Q  What's that?
21  A  In an ideal world, yes.
22  Q  Well, you know, that's the second time you've used
23     the term "ideal world."  What does that mean,
24     Doctor?
25  A  Well, if you're in a jail -- I mean, I've been out

Page 80

1      when you get called into booking to see someone.  I
2      don't have a medical record with me when I go into
3      booking to see someone, or I may see someone down
4      the hall or here and there.  I don't have their
5      medical, and I don't have a chart with them.  It's
6      all an electronic system.  So it depends on if
7      that's readily available at the time you're
8      evaluating someone.
9   Q  So if it's not readily available when you're
10     evaluating somebody, you just don't look at it?  Is
11     that it?
12  A  You may go back and look at it later, but at the
13     time -- it's like if you go to your doctor's
14     office, my guess would be your doctor sits in front
15     of the computer while you're seeing your doctor.
16     And he's looking at your record and talking to you
17     at the same time.  It would be nice if that would
18     happen all the time in a jail, but it doesn't.
19  Q  Okay.  So let's say you don't have time to do it on
20     the moment you're examining them but you have time
21     later.  Is it important to go ahead and look at the
22     records after -- after that examination?
23  A  If there's information you need to know to treat
24     that person, yes.
25  Q  How would you know if there's information necessary

20  (Pages 77 to 80)

Page 81

1    to treat the patient unless you've looked at the
2    record?
3    A  By what's going on at the time with the patient.
4    Q  So what you're telling me is that your treatment
5    only involved the moment that you're examining the
6    patient?  Is that it?
7    A  It's so -- my comment would be it's very
8    individualized on each individual situation.  And
9    it's in your best medical judgment what you need at
10   that time.  A physician or even a nurse would say I
11   need to look at the medical records -- before I
12   give penicillin, I better look at the record to
13   make sure there's no allergies.  You know, before I
14   give this drug, I better see what other drug this
15   person is currently on so I don't have a drug
16   interaction.  If I need this, I need to see the
17   record.  If you feel at the time I don't need the
18   medical record to treat what's going on, I don't go
19   back and look at the record, I treat the condition
20   or I evaluate the condition.
21   Q  So does that mean that a doctor's medical judgment
22   takes precedence over protocols pertaining to
23   benzodiazepine withdrawal?
24       MR. CHAPMAN:  Object to form and foundation.
25   A  A doctor has to use his best medical judgment to

Page 82

1    determine does this person need benzodiazepine
2    withdrawal or a protocol or whatever.  That's their
3    judgment.
4    Q  All right.  Do you know whether Dr. Sherman ever
5    looked at any medical records at the time that he
6    -- either before or after he examined David on the
7    17th?
8    A  I don't know.
9    Q  Do you know whether Dr. Sherman ever looked at
10   medical records before or after Monica Cueny
11   consulted with him pertaining to Mr. Stojcevski --
12   A  I don't know.
13   Q  -- on the 18th?  On the 18th?  You don't know, do
14   you?
15   A  No.
16   Q  Should he have?
17   A  He's getting the history from the nurse, and I
18   don't see where -- how it would change how he would
19   treat the patient at that point.  He may have asked
20   the nurse -- or the questions on the phone, I'm
21   sure they did, but I don't see why he would
22   necessarily have to go look at the medical record.
23   I get these phone calls at home all the time.  I
24   don't have the medical records in front of me and
25   no access to them from home.

Page 83

1    Q  And I understand.  I understand that, but you know,
2    I'm going to ask you to take a look at Exhibit 3.
3    A  Okay.
4    Q  Do you have it in front of you?
5    A  Yes.
6    Q  You agree that that was -- the date of service of
7    Ms. Bertram, the LPN, was June 17, 2014?
8    A  That's what it states.
9    Q  Right?  That's what it states.  You also agree that
10   she wrote this note in her -- in the medical record
11   on June 17th at 8:12 p.m., right?
12   A  Correct.
13   Q  You also agree then that that note was in the
14   medical records at least 16 hours before his
15   conversation had ended with Ms. Cueny?
16       MR. CHAPMAN:  Object to form and foundation.
17   You haven't established that he knows the process
18   yet.
19   Q  Okay.  Go ahead and answer the question.
20   A  I don't know the exact timing before or after, but
21   it was in the record, apparently.
22   Q  Well, we -- it was in the record on the 17th,
23   right?
24   A  That's what it appears to be, yes.
25   Q  And that was before Dr. Sherman consulted with

Page 84

1    Nurse Cueny, right?
2        MR. CHAPMAN:  Object to form and foundation.
3    You haven't established knowledge yet.
4    Q  And I'll direct you to Exhibit 5.
5    A  Okay.
6    Q  Do you see that?
7    A  Yes.
8    Q  Now, do you know that Nurse Cueny testified that
9    when she put it in -- when she put the note in on
10   the 18th, even though it was appended, that note
11   was available to everybody who wanted to look at
12   it?
13   A  Okay.
14   Q  Are you aware of that?
15   A  I didn't look back at her deposition to verify
16   that, but that sounds reasonable.
17   Q  Okay.  And that's because you understand medical
18   records -- electronic medical records, right?
19   A  Right.
20   Q  And you see that that conversation that Dr. Sherman
21   and Ms. Cueny -- and Nurse Cueny had was on the
22   18th, right?
23   A  Correct.
24   Q  And you agree with me then, don't you, that
25   Nurse Bertram's note was on the 17th, the day

Page 85

1  before the conversation had between Dr. Sherman and
2  Nurse Cueny?
3  A Yes.
4  Q So Doctor, do you also agree with me that within a
5  24 hour time frame, Dr. Sherman learned about
6  Xanax, Klonopin and seizures and hallucinations and
7  did nothing, right?
8     MR. CHAPMAN: Object to form and foundation.
9  This is -- wait. Object to form and foundation,
10  mischaracterizes the evidence regarding seizures.
11     MR. PERAKIS: Okay. Then I'll restate it. So
12  I'll restate it.
13  Q So isn't it true that Dr. Sherman, within a 24 hour
14  time period, was aware of David taking Xanax,
15  Klonopin and having hallucinations?
16  A Yes, and Dr. Sherman evaluated him as well during
17  that time period.
18  Q Well, Dr. Sherman saw him on the 17th, right?
19  A Right.
20  Q Okay. Hold on a second.
21     Well, you agree, don't you, that on the 17th,
22  when Dr. Sherman saw David, that he had no
23  information about Xanax, Klonopin or
24  hallucinations?
25  A True.

Page 86

1  Q So do you believe any of that information should
2  have, at a minimum, caused him to reconsider the
3  conclusions he reached on the 17th?
4  A Well, his evaluation on the -- I mean, from a
5  physician's standpoint, his medical evaluation on
6  the 17th was based on an earlier note that day by
7  Bey-Shelley, after she was called to the mental
8  health unit, to refer the physician to see him for
9  an evaluation.
10  Q So once again, I'm going to ask that question, that
11  on the 17th when he examined David Stojcevski, he
12  was unaware of David's prescriptions for Xanax,
13  Klonopin and the fact that he had had
14  hallucinations? Is that correct?
15  A Well, according to the notes --
16  Q Is that correct?
17  A -- he found that out from Cueny on the 18th.
18  Q You said -- your answer was that he found it out
19  from Cueny on the 18th?
20  A That he had been taking Klonopin.
21  Q Right. And that -- what about seizures? What
22  about hallucinations?
23  A I don't know from the record if he saw Bertram's
24  note or not. I don't know.
25     MR. CHAPMAN: Excuse me. Objection. What's

Page 87

1  your question? What about hallucinations? What
2  about what?
3  Q Doctor, if Dr. Sherman had looked at the note from
4  Ms. Bertram, he would have known about Xanax and he
5  would have known about the hallucinations, right?
6  A He could have seen her note, yes.
7  Q Do you know if Dr. Sherman looked at her note?
8  A No, I don't.
9  Q -- looked at Ms. Bertram's note? What's that?
10  A I don't know. And I would say from a physician's
11  standpoint, it would not have made any difference
12  if he knew she was -- he was on that or not. Now,
13  if he would have actually thought he had true
14  seizures, that might have been a different story.
15  Q Well, you just talked about seizures; you didn't
16  talk about hallucinations, right?
17  A No.
18  Q So if the hallucinations had been there, along with
19  the information about taking Xanax and Klonopin,
20  don't you agree that Dr. Sherman should have
21  reevaluated his prior decision that David was
22  faking something?
23  A That's hard to say retrospectively. I mean, I
24  would hope Dr. Sherman evaluated him on the -- the
25  day he did and looked at all options. And,

Page 88

1  obviously, he was in the mental health unit being
2  evaluated mentally.
3  Q Doctor, so you would agree, wouldn't you, that the
4  Vicky Bertram note was readily available to
5  Dr. Sherman if he had looked at the note, right?
6  A I don't know for sure of that, no.
7  Q Why do you say that?
8  A I'm not a hundred percent sure how the CCS, Correct
9  Care Solutions, computer system works and what's
10  available and what timing and where Dr. Sherman was
11  at the time, if he was in front of the computer,
12  had access to it. I don't know all the
13  circumstances of that moment in time.
14  Q Okay. So your answer is you don't know?
15  A I don't know.
16     MR. PERAKIS: Okay. Give me just a minute.
17     MR. CHAPMAN: Can we take a bathroom break for
18  a second? Thank you. Going off for a bathroom
19  break.
20     COURT REPORTER: All right.
21     (A brief recess was taken.)
22  Q You know, just so I have a better understanding of
23  what's going on during the break, are you and
24  Mr. Chapman talking about the testimony at all
25  during your breaks?

Page 89

1  A  I've been going to the bathroom, but I talked to
2  Kevin for a minute.
3  Q  What did you say?  You talked to Kevin for a
4  minute?
5  A  Yeah.
6  Q  What did you talk about?
7     MR. MCQUILLAN:  I think we're going to object
8  to attorney/client privilege.
9     MR. CHAPMAN:  Wait a second.  Doctor, wait,
10  wait, wait, wait.  Unless you ask a more specific
11  question, Federal Rules of Evidence 26 prohibits
12  his communication with you.  There's only two very
13  specific questions you can ask, and that's it.
14  Unless you ask them, I direct the witness not to
15  talk to you.
16  Q  Did you talk about the case?
17     MR. CHAPMAN:  Objection.  Don't answer the
18  question, Doctor.  You have to ask very specific
19  questions to obtain information.
20     MR. PERAKIS:  Well, I'm going to ask the
21  questions, and if you don't believe that it's
22  appropriate, that's okay.
23  Q  Are you taking any direction from defense attorneys
24  in relationship to your testimony?
25  A  I use my own testimony.

Page 90

1  Q  What's that?
2  A  I use my own testimony.
3  Q  Do you take -- are you taking direction from
4  Mr. Chapman not to answer questions?
5     MR. CHAPMAN:  I'm not sure I understand your
6  question.  I just gave two on the record for him
7  not-to-answer questions.  What are you referring
8  to?
9     MR. PERAKIS:  Well, okay.  So I presume, Ron,
10  that the answer is yes, he was taking direction
11  from you to not answer questions.  Is that right or
12  not right?
13     MR. CHAPMAN:  Well, I don't know if that's
14  right or not.  I told him not to answer two
15  questions, and he didn't answer them.
16     MR. PERAKIS:  All right.  So I think he can
17  answer the question.  He can answer the question.
18  Q  Did you take direction from Mr. Chapman to not
19  answer the question?
20     MR. CHAPMAN:  What question are you talking
21  about?
22     MR. PERAKIS:  The one that he wouldn't answer.
23     MR. CHAPMAN:  Look, we're going around in a
24  ridiculous circle.  On the record I directed him
25  not to answer the question.  So if you're asking

Page 91

1  him is he listening to Mr. Chapman, he did because
2  he didn't answer the question.
3     MR. PERAKIS:  Well, let him say that.
4     MR. CHAPMAN:  I don't understand what you're
5  doing here.
6     MR. PERAKIS:  Well, let him say that.
7     MR. CHAPMAN:  Why does he have to say that?
8  He didn't answer the question.
9     MR. PERAKIS:  Because it's his testimony, not
10  yours, Ron.
11     MR. CHAPMAN:  No.  When I direct him not to
12  answer, it's my statement, not his.  He's my
13  witness.  I told him not to answer those two
14  questions, end of story.  That's not his testimony;
15  that's my statement.  And I'll suffer the
16  consequences if the Court disagrees with me, but
17  you didn't ask the right questions under Rule 26.
18  So he doesn't have to answer those questions.
19     MR. PERAKIS:  Okay.
20  Q  Okay.  All right.  So Dr. Stoltz, if the Bertram
21  note that we talked about from the 17th was
22  available to Dr. Sherman, do you believe the
23  information in that note would have been valuable
24  to Dr. Sherman to know?
25  A  Well, from my understanding, when Monica Cueny saw

Page 92

1  him, she actually reviewed that as well as reviewed
2  all the information and did a thorough evaluation
3  of David and gave all that information to
4  Dr. Sherman, which he actually included in the use
5  of the Xanax, Klonopin, et cetera.  But he used
6  that information to determine that no new orders
7  needed to be done and to keep him in medical health
8  evaluation, high observation.
9  Q  So it's your understanding that that's the case?
10  A  From their depositions, yes.
11  Q  Are you telling me that it's your understanding
12  that Nurse Cueny said that she had told Dr. Sherman
13  about Xanax?
14  A  She related information in her thorough -- she did
15  a pretty thorough evaluation -- in her note to
16  Dr. Sherman.
17  Q  Well, where does -- where in the record do you see
18  anything that suggests that Dr. Sherman was aware
19  of Xanax and hallucinations from the Bertram note?
20  A  I don't see it from the Bertram note.
21  Q  Oh, so you believe that somehow Ms. Cueny
22  communicated the facts of Xanax and hallucination
23  to Dr. Sherman on the 18th?
24  A  I believe from her depo- -- information in her
25  deposition, yes.

Page 93

1  Q  Are you aware that in her deposition she had
2     testified that she could not recall whether he
3     discussed -- she discussed Xanax or hallucinations
4     with Dr. Sherman?
5        MR. CHAPMAN: Object to form and foundation,
6     mischaracterizes her total record.
7  Q  Are you aware of that?
8  A  I'd have to look at all of the deposition --
9  Q  What's that?
10 A  -- to determine for sure.
11 Q  I can't hear you, Doctor. I'm sorry. That low
12    voice hit me again now.
13 A  Yeah. I think at some point in the record she felt
14    she did notify Dr. Sherman of that information.
15 Q  So you think in her testimony she did say that?
16 A  I'd have to look back at the record to verify at
17    what point she mentioned that and as well as what
18    Dr. Sherman -- his --
19 Q  Well, assume for a minute that there's nothing in
20    her testimony that says that. All right?
21       MR. CHAPMAN: Well, I would object as
22    continually misleading. It's -- I would object as
23    continually misleading and inappropriate
24    hypothetical because there certainly is.
25       MR. PERAKIS: Okay. Well, we'll get her

Page 94

1     deposition, and we'll demonstrate to you that she
2     doesn't recall.
3  Q  So is it your testimony then that you believe that
4     Dr. Sherman had, indeed, taken that into
5     consideration in deciding not to institute
6     benzodiazepine withdrawal?
7        MR. CHAPMAN: Objection. Take what into
8     consideration?
9  Q  Do you -- is it your testimony that Dr. Sherman
10    took into consideration the information that
11    existed in the Bertram deposition in making a
12    decision to not institute a benzodiazepine
13    withdrawal?
14       MR. CHAPMAN: I'm going to object to form and
15    foundation. Again, what information? You have to
16    be specific.
17 Q  Okay. So looking at Exhibit 3, is it your
18    testimony that the evidence of delusions was
19    somehow transmitted to Dr. Sherman by Ms. Cueny?
20 A  (No response.)
21 Q  Can you answer the question, Doctor?
22 A  I was looking at her note to verify.
23 Q  Okay. Are you talking about -- you're looking at
24    Monica Cueny's note?
25 A  Correct. From the note alone, I can't tell you

Page 95

1     everything she discussed with Dr. Sherman.
2  Q  That's -- I'm glad you're saying that because it's
3     clear that the note doesn't identify anything that
4     Ms. Bertram put in her note, right?
5  A  From the note, that's true.
6  Q  Okay. So the only possibility that Dr. Sherman
7     could have been aware of that fact would have been
8     through his discussions with Monica Cueny, right?
9  A  Yes.
10 Q  Because -- or he looked at -- or Dr. Sherman looked
11    at the notes, right?
12 A  He may have looked at the note. True. I don't
13    know.
14 Q  Right. Okay. So that's one of the two options.
15    But it is either/or, right?
16 A  It could be both.
17 Q  Is that right? Well, I understand that, but we
18    know from this note that this note doesn't indicate
19    that Cueny ever said anything to him about what
20    Bertram had found the day before, right?
21 A  It's not in the note.
22 Q  What's that? Not in the note. Thank you.
23       By the way, going to Exhibit 5 -- and you're
24    looking at Ms. Cueny's notes, how important is the
25    fact that he had -- that -- how important is the

Page 96

1     fact that Ms. Cueny confirmed that he had actually
2     had hospitalization for anxiety?
3  A  I'm sorry. I missed the question.
4  Q  What's that?
5  A  What was the question?
6  Q  Oh. Is it an important fact that David had been
7     hospitalized for anxiety --
8  A  It could be.
9  Q  -- in terms of determining whether he needed the
10    benzodiazepine withdrawal protocol?
11 A  Well, no, that's not -- I do not feel that it's
12    important for that. It's important for mental
13    health referral, because obviously he had
14    underlying mental health issues.
15 Q  Okay. Dr. Stoltz, do you have Monica Cueny's
16    deposition there?
17 A  No. I actually have it on a disc -- on a flash
18    drive. I don't have it in front of me.
19 Q  Okay. Well, can you look at it?
20       MR. CHAPMAN: I don't believe there's a --
21    there's a computer there for him to plug it into.
22 Q  Are you guys trying to pull it up?
23 A  We're going to try.
24 Q  Are you there?
25 A  We're going to try.

Page 97

1     MR. MCQUILLAN:  I can get the condensed.  We
2  have the condensed version that will -- that's
3  loaded.
4     MR. PERAKIS:  Okay.
5  Q May I direct you to a page?
6  A Yes.
7  Q Page 108.  Are you there?
8  A Yes.
9  Q Okay.  So it would be lines 3 through 7.  And if
10  you could just read the question in line 3 and then
11  answer what her answer was.  Out loud.  I'm sorry.
12  A It says, Question, so regardless, that's not
13  accurate.  But regardless, you never discussed with
14  Dr. Sherman your testimony, and that is that you
15  did not discuss with Dr. Sherman anything about
16  Xanax or anything about hallucinations, correct?
17  And she says I -- I can't recall my exact words to
18  Dr. Sherman.
19  Q Okay.  That ---
20     MR. CHAPMAN:  Under the rules -- wait a
21  second.  Under the rule of completeness, I request,
22  that the entire page be read all the way up to 109
23  line 2, the complete understanding for the witness
24  before you cross examine him on the statement.
25     MR. PERAKIS:  Okay.  We'll go -- we'll go all

Page 98

1  the way through 110, in fact.  Okay?  So go to --
2  if you'd go to look at page 110 for me.
3     MR. CHAPMAN:  You want him to just read it so
4  he understands it be-- that's my question.  If
5  you want him to read it into the record, then do it
6  now.  I want him to read, for rule of completeness,
7  so he has understanding of the context of this
8  statement, at least to be able to read it to
9  himself before you ask any questions.
10  Q Okay.  Well, here's what we'll have you do, Doctor.
11  Go ahead and read pages 109, 110, 111, and 112.
12  Okay?
13  A Okay.
14  Q Take your time.
15     MR. CHAPMAN:  So Doc, take your time to read
16  pages 108 through 112, is what they're asking you
17  to do.
18     MR. PERAKIS:  Yes, that's exactly right.
19     MR. CHAPMAN:  Do you have any idea how long
20  we're going to be?  If we're going to be another
21  seven hours, I need to take a lunch break.
22     MR. PERAKIS:  Oh, no, I don't think so.  I
23  think probably another hour, hour and a half.
24     MR. CHAPMAN:  Okay.  That would be good.
25  Thanks.

Page 99

1     MR. PERAKIS:  Okay.  I'm going to try.  I
2  don't think that it's going to be another five
3  hours or four hours, so...
4  Q Let me know when you're done, Doc.
5  A I think I'm done enough.
6  Q So I'll just -- we'll go back to page 108, right?
7  A Yep.
8  Q And the question that -- that you asked -- that was
9  asked by Mr. Ihrie, and her answer was I can't
10  recall my exact words to Dr. Sherman, right?
11  A Correct.
12  Q Is that true?
13  A Yes.
14  Q Okay.  Are you getting it?  Do you see that?
15  A Yes.
16  Q Okay.  So then we go to page 109, and at 109 when
17  asked at the bottom of 108, did you discuss with
18  Dr. Sherman -- well, you've already testified that
19  what you told Dr. Sherman -- that none of what you
20  testified that you told Dr. Sherman included the
21  word hallucination or Xanax or anything that is in
22  Vicky Bertram's note, correct?  That you say you
23  looked at.  Answer, I did talk about Xanax use and
24  Klonopin use.  Question, Now your testimony is that
25  you are now recalling that you did talk to

Page 100

1  Dr. Sherman about David's Xanax use; is that
2  correct?"
3  A Yes.
4  Q Her answer was, though, "From what the chart says,
5  two days ago he said that" -- and then there was a
6  long interruption and lawyer stuff.  And at page
7  110 Mr. Ihrie asks "Xanax is not mentioned in your
8  note, is it?"  Answer, "No."  "And you testified
9  that you told Dr. Sherman everything that he told
10  you, correct?"  Answer, "Yes."  "And then I asked
11  you did you tell them anything else, and you said
12  just what he told me."  And then the next question,
13  at the bottom of 110, "Is now your testimony that
14  you did discuss Xanax and hallucinations with
15  Dr. Sherman?"  And her answer is, "I can't recall.
16  I can't recall that.  I can remember talking to him
17  about Xanax and Klonopin, how he was on -- he
18  reported Xanax one day and Klonopin another day."
19  "So you did tell Dr. Sherman that he had reported
20  taking Xanax on the 17th."  "Um-hum."  "Yes?"
21  "Yes."  "And Klonopin on the 18th?"  "Yes."  "So to
22  the best of your knowledge, Dr. Sherman was fully
23  aware on the 18th, after talking to you, that David
24  had been taking Xanax and Klonopin."  Answer, "That
25  David had reported."  "Yes."  "Yes."

Page 101

1  All right. Now, down to page 112. "Since you
2  told Dr. Sherman" -- this is line 3 -- "according
3  to your testimony, about the Xanax, which only
4  could have learned from Bertram's note of the day
5  before --" "Um-Hum." "Yes?" "Yes." "-- did you
6  also tell him about the hallucinations?" "I can't
7  recall."
8      So the question becomes is there any evidence
9  that Cueny talked to Dr. Sherman about
10  hallucinations?
11     MR. CHAPMAN: Other than what you just read in
12  the record?
13     MR. PERAKIS: Yeah, including what's in the
14  record.
15  A According to her information --
16     MR. CHAPMAN: Well, I object --
17  A -- she can't recall.
18     MR. CHAPMAN: -- to form. In the record she
19  said she talked to him and she doesn't recall, so I
20  don't understand what your question is.
21  Q Well, Dr. Stoltz, you agree that she doesn't know
22  whether --
23     MR. CHAPMAN: Let him answer the question.
24  You can't ask another question -- you can't confuse
25  him. Come on.

Page 102

1      MR. IHRIE: Ron, if you have an objection,
2  make it. No talking objections.
3      MR. CHAPMAN: There's no -- this isn't an
4  objection. Because you read something and then you
5  ask a question, I don't know what you're referring
6  to.
7  Q Okay. Here, a simple question, Dr. Stoltz.
8      MR. CHAPMAN: Even the doctor --
9  Q Dr. Stoltz, where in the testimony did Monica
10  testify that she told -- that she recalled telling
11  Dr. Sherman about Xanax and Klonopin -- or Xanax
12  and hallucinations?
13     MR. CHAPMAN: Objection. Ms. Cueny's
14  testimony stands for itself. It doesn't need
15  interpretation by the doctor.
16  Q Well, Doctor, you -- Doctor, you've testified that
17  you believed that she did tell him, right?
18  A In her note, she states that when she evaluated
19  him, there were no auditory hallucinations or
20  visual hallucinations observed at this time.
21  Q Say that again?
22  A In her note she states there was no auditory
23  hallucinations or visual hallucinations observed at
24  this time.
25  Q What -- what --

Page 103

1  A On 6-18.
2  Q But you don't know whether Nurse Cueny told
3  Dr. Sherman about Bertram's note, do you?
4  A I can't be for sure what all she explained to him.
5  Q Is there anything in her deposition that confirms
6  that she talked to Dr. Sherman about hallucinations
7  other than the fact that she can't recall?
8  A (No response.)
9      MR. CHAPMAN: I'm going to object to form and
10  foundation.
11     MR. PERAKIS: Okay.
12  Q Just please answer the question, Dr. Stoltz.
13     MR. CHAPMAN: I think he just answered.
14  A I did just answer it.
15  Q What's that?
16  A I did answer it.
17  Q You did answer it? And what was the answer?
18  A Could you read it back?
19     MR. CHAPMAN: Objection, asked and answered.
20  Q What was the answer?
21  A I said something to the effect I could not tell
22  from her note or from her deposition a hundred
23  percent all -- all of what occurred during the
24  conversation other than the fact --
25  Q Okay.

Page 104

1  A -- she was told --
2  Q That's --
3      MR. CHAPMAN: Let him finish. Let him finish.
4  You can't cut him off because you don't like what
5  he says. Let him finish. You can finish, Doctor.
6  A Yeah. Other than the fact that he was on
7  benzodiazepine, he noted, as well as taking
8  oxycodone and at the time she evaluated when she
9  did a quite thorough evaluation, he had no
10  hallucinations going on at the time.
11  Q Right. But that doesn't -- that doesn't address
12  what Bertram stated in her note, right? Right?
13  A I can't tell from -- like I said, all what was --
14  during the conversation.
15  Q Right. Okay.
16  A You know, I would add that she did mention, you
17  know, case discussed with Dr. Sherman. Generally,
18  when nurses put that in their note, I mean, that
19  the full case was discussed with the physician over
20  the phone, they don't go into the extreme details
21  of every word that was discussed. They go over,
22  you know, I discussed the case with the doctor, so
23  the doctor knows what's going on, till he -- so he
24  makes his opinion on what he's going to do.
25  Q So I just want to make this clear. We don't know

Page 105

1    whether Nurse Cueny told Dr. Sherman about
2    hallucinations, right?
3    A We don't know for sure.
4    Q Okay.  And Dr. Stoltz, is it true that the
5    information that was in Ms. Bertram's note was
6    available for Dr. Sherman if he had looked at it?
7       MR. CHAPMAN: Object to form and foundation.
8    Q Correct?
9    A It's possible.  On the other hand, I would also add
10   that when it says case discussed with Dr. Sherman
11   by Monica Cueny the next day, that most likely that
12   was all discussed.
13   Q Well, I -- and I understand your -- that's a
14   presumption, and it's not based on any facts in the
15   record, right?
16   A You could -- a lot of things you could presume in
17   any case, I guess.
18      MR. CHAPMAN: Is that a question?
19   Q So, Doctor, is it your testimony that Dr. Sherman
20   finding out within 24 hours that David was taking
21   Klonopin, taking Xanax and experiencing
22   hallucinations and delirium, that it's your
23   testimony that that should not have triggered a
24   benzo withdrawal protocol or at least another
25   evaluation with Dr. Sherman?

Page 106

1    A Well, in my opinion, he was just seen by
2    Dr. Sherman just the evening or afternoon before
3    with an evaluation done.  And at that point he did
4    not feel that there was anything significant
5    medically going on and put him back in general
6    population, and the next day -- the next morning a
7    full thorough evaluation was done again by Monica
8    Cueny, which, in her documentation and her notes,
9    much better than what Dr. Sherman's was.  There was
10   not really a reason why he would need to go back
11   and do another examination if she just did one.  He
12   -- she was -- he was stable at that time.  She
13   reported all the information to him, and they kept
14   him in mental health, high observation, which
15   sounds appropriate.
16   Q So what you're telling me then is it was -- that
17   information was not important enough to trigger a
18   reconsideration of his prior June 17th opinion or
19   at least another examination?
20   A He had just evaluated him the evening before -- the
21   evening before --
22   Q What's that?
23   A -- or the same day he had that hallucination thing
24   you're referring to.
25   Q Say that again.

Page 107

1    A I said he'd just evaluated him on the 17th.  And
2    you're referring to the note -- let me see here.
3    Q I'll direct you to Exhibit --
4    A Yeah.  Go back to Exhibit --
5    Q -- 3, I believe.
6    A Yeah.  He was -- he was seen the 17th by
7    Dr. Sherman in the afternoon.  In the evening,
8    that's when Bertram evaluated him.  And then Cueny
9    did a thorough evaluation the next morning and
10   referred all the information back to Dr. Sherman.
11   I think that's appropriate.  That's what we would
12   do in my jail, and I would make decisions based on
13   that information.
14   Q Well, but -- but you're talking about based on that
15   -- that information.  We don't even know if he knew
16   about hallucinations, do we?
17   A Well, he's getting -- he's in the mental health
18   unit and getting mental health evaluations, so
19   that's the right place to be.
20   Q So let's talk about in your report -- I believe
21   it's your conclusion that the medical staff of CCS
22   was not deliberately indifferent; is that right?
23   A Oh, I -- I believe they actually --
24      MR. CHAPMAN: You're asking him for a legal
25   conclusion when you ask him that

Page 108

1    question.  (Indecipherable.)
2       COURT REPORTER:  Could you please repeat that
3    objection?
4       MR. CHAPMAN:  That's a legal conclusion,
5    deliberate indifference.
6       MR. PERAKIS:  Well, I'm going to --
7    Q I mean, it's in your report, right, Doctor?  And
8    let me just start off by saying something so I get
9    this correct.
10      Looking at your report on page two and going
11   to page three, you agree, don't you, that your
12   opinions today and in your report are based upon
13   the records that you reviewed, right?
14   A Correct.
15   Q Is that right?
16   A Yes.
17   Q Okay.  So -- so I just wanted to make sure because
18   on your opinion on page five in two different
19   locations you basically state the same thing.
20   First paragraph page five, "In my opinion, based on
21   my education, training, and experience (especially
22   in Correctional Medicine), I do not feel that the
23   medical staff acted with deliberate indifference to
24   David Stojcevski's care."  Do you see that?
25   A Yes.

27 (Pages 105 to 108)

Page 109

1  Q And then at the bottom I believe you say something
2    very similar where it says "In my professional
3    opinion, and based on my education, training, and
4    experience, I do not believe that the Correct Care
5    Solutions medical staff acted with deliberate
6    indifference or reckless disregard for the health
7    or safety needs of Mr. Stojcevski."
8      Can you please define the term "medical staff"
9    for me in those two opinions?
10 A The -- the nursing staff and the physicians,
11   Dr. Sherman.
12 Q And so what you're talking about then is the --
13   once again, as you've testified, it would be
14   Dr. Sherman and the nursing staff, right?
15     MR. CHAPMAN: Objection, asked and answered.
16 Q Is that right?
17 A Them as well as the mental health staff that was
18   seeing him as well.
19 Q As well as the mental health staff, okay. So now
20   that we have, in your opinion, you've defined
21   medical staff as the -- Dr. Sherman, the nursing
22   staff and the mental health staff, right?
23 A Correct.
24 Q Okay. Right off the start here, Doctor, are you
25   familiar with what the mental health staff was

Page 110

1    doing after June 18th in their -- what they were
2    writing in their notes?
3  A Yes.
4  Q And do you agree that in about eight days in a row
5    their notes are almost identical, the basic message
6    being we can't assess this guy, right?
7      MR. CHAPMAN: Object to form and foundation,
8    mischaracterization.
9  Q Do you agree?
10 A Well, in other words, he would not --
11 Q What's that?
12 A -- he would not -- after he was not given the
13   medications he wanted, he withdrew from wanting to
14   speak with the medical staff -- I mean, the mental
15   health staff.
16 Q Okay. Well, for whatever reason, they could not
17   assess him, correct?
18 A Not thoroughly, no.
19 Q Well, what -- well, please define the term
20   "thoroughly."
21 A Well, to give him a full mental health evaluation,
22   it's hard -- other than looking at someone, it's
23   hard to get much in the evaluation if he won't
24   speak to you when you say how are you doing, what's
25   going on, that type of thing.

Page 111

1  Q So how many days did that go on?
2  A I'd have to look at the exact number of days in the
3    record. But I believe it got to where they had a
4    care conference, I believe it was on the 26th,
5    and --
6  Q Oh, so are -- so you are aware of the care
7    conference?
8      MR. CHAPMAN: You can't interrupt him when
9    he's answering questions. Come on, gentlemen. Let
10   him fully answer.
11 Q So you are aware of the care conference, eh?
12 A I was aware a care conference came about on the
13   twenty- -- I believe the 26th and then to get a
14   psychiatrist involved, which an appointment was
15   made, but he passed away prior to that evaluation.
16 Q Okay. So how long did it take before -- how many
17   days was it between the first date that he was not
18   able to be assessed and June 26th?
19 A I wouldn't say completely unassessed because
20   medical saw him, I believe, two or three different
21   -- I actually think three different times during
22   that time period, as well as mental health --
23 Q I'm talking about days. How many days, Doctor?
24 A Well, mental health was seeing him, I believe, on
25   the 18th till the care conference on the 26th.

Page 112

1  Q So that would be the 18th, 19th, the 20th, the
2    21st, the 22nd, the 23rd, the 24th, the 25th, and
3    the 26th. So you agree with me, don't you, that it
4    took nine days before anybody in the mental health
5    department decided for him to see a psychiatrist?
6    Is that what your testimony is?
7  A I was looking here.
8      MR. CHAPMAN: Are you asking him to confirm
9    your math?
10     MR. PERAKIS: I just want him to answer the
11   question.
12     MR. CHAPMAN: Well, but it's not his
13   testimony. If you want him to count the days, he
14   can tell you that. But the way your question is
15   asked, it doesn't make sense.
16     MR. IHRIE: Make an objection, Ron.
17 Q So Doctor, can you answer the question?
18 A If that's the math, that's the answer.
19 Q Okay. So is it your testimony that mental health
20   did assess him from June 18th till June 27th?
21 A They observed him in the mental health unit on
22   suicide watch.
23 Q Well, right. I'm not asking you that question.
24   I'm not asking you that question. We know they
25   observed him through the door of the jail, right?

Page 113

1  You know that, right?
2  A  Right.
3  Q  But the question I asked you is, did they assess
4     him --
5  A  They.
6  Q  -- from a medical -- a mental health perspective,
7     because it's your testimony that they did
8     everything right.
9  A  They assessed him to the best of their ability.  If
10    he's not going to communicate and cooperate, you
11    can't do much.
12 Q  Well, wait a minute.  You just testified that to
13    the best of her ability, she waited till June 26th,
14    after not being able to assess him for nine days,
15    to refer him to a psychiatrist, right?
16    MR. CHAPMAN:  Is there a question?
17 A  That's when the care conference was set up.
18 Q  What's that?
19 A  That's when the care conference came about to
20    discuss what we were going to do with this
21    gentleman.
22 Q  Well, I understand that.  I understand there was a
23    care conference on the 26th.  Okay?  And we'll talk
24    about that.  Well, what about all the prior days?
25    Are you telling me that they were not deliberately

Page 114

1     indifferent for nine days even though they failed
2     to have any assessment of this man from a mental
3     health perspective?  Is that your testimony?
4  A  They have in the record --
5     MR. CHAPMAN:  I object to use of the term --
6     wait, wait, Doctor.  I object to the use of the
7     term deliberate indifference.  If you want to say
8     standard of care, reasonable, but you're just
9     setting up to make an argument in front of the
10    Court.  He can't testify to that fact.  Ask him
11    something more specific.  Come on.
12 Q  Well, Doctor --
13    MR. PERAKIS:  Wait a minute.  Let me just say
14    this for the record.  It's in his report.
15    Everything is open to examination because it's in
16    his report.  So that's what we're doing.
17    MR. CHAPMAN:  It is, but if you asked the
18    question and move later to have the question
19    stricken because he's given a legal conclusion,
20    you're asking him to do that.  And I'm asking you
21    not to ask him to do that.
22    MR. PERAKIS:  I'm not asking --
23    MR. CHAPMAN:  Ask him to standard of care,
24    reasonableness.  You are.
25 Q  I'm asking you the same question, and I think I'm

Page 115

1     going to have to --
2     MR. CHAPMAN:  That's my objection.  Do what
3     you want to do.  That's my objection.  Go ahead.
4     MR. PERAKIS:  Okay then.  Bye, Ron.  Fair
5     enough.
6     So Court Reporter, could you reread that back
7     to me?
8     COURT REPORTER:  Yes, sir.
9     MR. PERAKIS:  Do you know what I'm talking
10    about, Court Reporter?
11    COURT REPORTER:  I think I do.  Let me search
12    back here.  Just a second, please.
13    (A discussion was held off the record, and the
14    requested material was read back by the court
15    reporter.)
16 Q  Now, please answer, Doctor.
17 A  Well, from the record, they did daily assessments.
18    They had daily notes put in that they went by and
19    saw the individual.  Medical went by on multiple
20    days and did vital signs and encouraged fluids.
21 Q  Well --
22 A  So I mean, he was not left --
23    MR. CHAPMAN:  Let him finish.  You have to let
24    him finish.  Come on.
25    MR. PERAKIS:  Okay.  I'm sorry.

Page 116

1  A  Well, I was going to say --
2     MR. CHAPMAN:  Well, you keep doing it.  Let
3     him finish.
4  A  So I mean, there was some evaluation done the best
5     that they could do.  And it got to a point they
6     finally, obviously, you know, decided to have a
7     case conference on what to do next, but he was not
8     left there with nothing done to him.
9  Q  So once again, Doctor, are you telling me that they
10    were not deliberately indifferent during the nine
11    days that they -- their own forms say they could
12    not assess him and they waited nine days to
13    determine that a psychiatrist needed to be
14    involved?
15 A  Well, what I'm -- I'm not making --
16 Q  Is that your testimony?
17 A  I'm not making up a legal conclusion, but I'm
18    saying that he was evaluated or looked at daily by
19    mental health.  And actually medical went in and
20    did vital signs on him several days during that
21    time period and evaluated him as well, and his
22    vital signs were stable.  He just refused to
23    communicate and interact with the mental health
24    people.  Not much you can do --
25 Q  So the question is -- so the question is, how many

Page 117

1  days were they going to wait before they needed a
2  full psychiatric assessment of this man?
3  A  Well, I'm not a psychiatrist to be able to tell you
4  how long you should wait with somebody with this
5  state of mind, whether he had catatonia or had
6  something else going on.  At what point do you do
7  further action?  I'm not a psychiatrist to tell you
8  what length of time that is.
9  Q  I know you're not a psychiatrist, but you have
10  testified and you have confirmed in your report
11  that the mental health staff were not deliberately
12  indifferent.
13  A  They -- and my opinion is they went by and saw the
14  individual.  Now, whether an individual would
15  interact with them or not, that's -- that's one
16  thing, but they did not avoid the individual.  They
17  went by and saw David on a daily basis.  They have
18  notes in their mental health notes they did.  He
19  would not interact.
20  Q  And we're going to --
21      MR. CHAPMAN:  You've got to let him finish,
22  sir.
23      MR. PERAKIS:  Okay.
24  Q  Doctor --
25      MR. CHAPMAN:  Finish, please, Doctor.

Page 118

1  Q  Okay.  Go ahead.
2      MR. CHAPMAN:  Let the doctor finish.  You
3  can't interrupt him while he's giving an answer
4  because you don't like the answer he's giving.
5  Let's stop this stuff or I'm going to call an end
6  to the dep.  You do it regularly, and you can't do
7  it when you don't like the answer.
8      MR. PERAKIS:  Ron, Ron, half of the time I
9  can't understand what he's saying, and I -- and I
10  tried to make that clear, okay, so --
11      MR. CHAPMAN:  That could -- that could be
12  true, but then wait till he's done and say you
13  don't understand, and the court reporter can read
14  back the answer because she's getting it.
15      MR. PERAKIS:  Fair enough.  Okay.  That's a
16  deal.  All right.
17  Q  So do you want to answer the question, Doctor?
18  A  I thought I just did.
19  Q  Okay.  Well, do you have the self-harm watch/mental
20  health observation initial assessment?
21  A  Is that one of the exhibits?
22  Q  It's dated June 18th.
23  A  Just a moment.
24  Q  Let me know when you -- if you have it or if you
25  don't.

Page 119

1  A  We're looking.
2      MR. MCQUILLAN:  Oh, you know what, hold on.
3  You said the 18th?
4      MR. PERAKIS:  What's that?  The 18th.  That's
5  the -- the statement is -- it's called self-harm
6  watch/mental health observation initial assessment.
7  A  Yes.
8      MR. MCQUILLAN:  We have it.
9  Q  Do you have it?
10  A  Yes.
11  Q  Do you see the -- at the top the type of watch is
12  self-harm watch.  Do you see that?
13  A  Yes.
14  Q  Frequency every 15 minutes, right?
15  A  Right.
16  Q  And then on this particular document it says the
17  reason for watch has been -- is decompensation.  Do
18  you see that?
19  A  Yes.
20  Q  All right.  Now, in assessing somebody's mental
21  status, is it important to know whether that
22  patient is oriented times three?
23  A  That can be part of your assessment, yes.
24  Q  Is it also important -- now, I'm asking if it's
25  important, and I know it can be part of the

Page 120

1  assessment, but is it important?
2  A  Yes.
3  Q  Is it important that -- when you know whether the
4  person is alert -- the patient is alert?
5  A  Yes.
6  Q  Is it important that you know whether the person is
7  distractible?
8  A  Well, could be.
9  Q  And what about poor concentration?  Is that an
10  important aspect of doing a mental status?
11  A  It could be.
12  Q  So you see -- under the mental status you see that
13  Mrs. Brock writes other -- checks "other," right?
14  Do you see that?
15  A  Sensorium, other.
16  Q  What's that?
17  A  Where it says sensorium?
18  Q  Yeah, for sensorium.
19  A  Yes.
20  Q  Do you see that she does that and underneath she
21  explains, unable to assess, right?
22  A  Right.
23  Q  And you see all the way down, except for
24  appearance, Ms. Brock says unable to assess?  Do
25  you see that?

Page 121

1  A Yes.
2  Q Okay. And when it comes to his appearance, she
3    says patient was observed lying on lower bunk with
4    rapid eye movement. Do you see that?
5  A Yes.
6  Q So here's what we have on this particular document,
7    Doctor, and tell me if you -- if this is accurate.
8    In this particular document, on June 18th we know
9    he's decompensating and as a consequence he's being
10   watched every 15 minutes? You agree with that,
11   right?
12 A That's what it says.
13 Q Okay. But you agree with it too, right? That's
14   what -- that's what the document reflects, right?
15 A Yes.
16 Q And it also reflects that the patient was on the
17   floor lying on the lower bunk with rapid eye
18   movement. Do you see that?
19 A Yes.
20 Q What's the significance of rapid eye movement;
21   Doctor, in relationship to somebody who's
22   decompensated?
23 A It's hard to say.
24 Q All right. Could it be that it relates to
25   sensorium difficulties?

Page 122

1  A It could be.
2  Q Okay. Could it be that it relates to agitation?
3  A It's possible.
4  Q Could it be that it relates to delusions?
5  A Well, it could be a whole lot of things. It could
6    be the guy's going into some, you know, mental
7    health other issue, you know. And I believe
8    actually that the mental health had medical come
9    see him that same day. That's when Monica Cueny
10   evaluated him.
11 Q Right. And what did -- and let's go back to Monica
12   Cueny for a minute before I continue on. Okay?
13 A Okay.
14 Q If we go back to Monica Cueny's note, which is the
15   same day -- and we've determined that she was in
16   his bunk about 2:45 p.m. based on the video -- we
17   note that she goes through everything that we've
18   talked about, right?
19 A Right.
20 Q And then she concludes -- and then she concludes
21   continue with COW protocol as ordered. Do you see
22   that?
23 A Yes.
24 Q Did she do that?
25 A We talked about this earlier.

Page 123

1  Q No, I understand. But was COW protocol instituted
2    as she -- as she believed was necessary?
3  A Well, I -- I would have to go back and look at her
4    deposition again, but I believe she thought it was
5    still ongoing at that time.
6  Q I understand that.
7    Was COW protocol initiated --
8  A He had put the --
9  Q -- regardless of whether it had been completed or
10   not?
11 A It was not reinitiated, no, although he had vital
12   signs done multiple times after that point. And
13   interestingly, even from her note after mental
14   health had this same note, she notes, you know, the
15   guy does not have -- when she approached him, he
16   began to flutter eyes open and closed. But then
17   things obviously changed, and then he started, you
18   know --
19 Q Yeah, yeah. I don't -- I don't know what medical
20   records you're looking at, Doctor, to confirm that
21   vital signs were taken. You agree, don't you, that
22   body weight is a vital sign in CCS records, right?
23 A They generally do that on intake.
24 Q What's that?
25 A Most places do that on intake when they first come

Page 124

1    into the jail, either verbal or off their driver's
2    license, or they wait depending on if they have a
3    scale.
4  Q That's not what I asked you.
5    MR. CHAPMAN: You can't interrupt him. Come
6    on, gentlemen. He's in the middle of the answer.
7    You don't like it, so you interrupt him. I'm
8    getting really irritated here because you're
9    attempting to disrupt his thinking and it's wrong.
10   Stop it.
11   MR. PERAKIS: It's hard to do it -- it's hard
12   to do it, and I'm not trying to disrupt his
13   thinking. This is not --
14   MR. CHAPMAN: Well, you are, and it's
15   interesting. You always do it when he's giving you
16   answers you don't like.
17   MR. PERAKIS: Okay. All right. So --
18   MR. CHAPMAN: Let him go back and finish,
19   regain his thought process. Come on.
20 Q Okay. Finish.
21 A Well, my comment was, yeah, weight is usually
22   checked on admission and either by verbal or off
23   the driver's license or off a scale, if there's one
24   in the receiving and screening area, but usually
25   not repeated unless there's a reason to repeat

Page 125

1   that.
2   Q  Okay.  But I just want to -- I want to make sure
3     you've noted something in these notes -- in these
4     records.
5       Do you agree that weight is a vital sign
6     throughout CCS's records?
7   A  Well, it's placed on their progress note in their
8     electronic medical record as well as pulse
9     oximetry.  You don't do those every time you see
10    somebody.
11  Q  I understand that.  But you agree, don't you, that
12    weight is a vital sign -- a patient's vital sign in
13    CCS records, right?
14  A  Well, if you're saying is it listed on the vital
15    signs -- patient vitals on their progress note,
16    it's built into their progress note --
17  Q  Yeah.
18  A  -- on the electronic record, yes.  Just in case you
19    check it, you can enter it.
20  Q  Okay, okay.  All right.  So now we have Ms. Cueny
21    who doesn't check, apparently, whether COWS
22    protocol had ended, so she goes ahead and says
23    continue COWS protocol, right?
24  A  That's what it says in her note.
25  Q  What's that?

Page 126

1   A  It says that in the note.
2   Q  It says that in the note.  Okay.  Now, I want you
3     to read to me the last sentence of -- in
4     Ms. Cueny's notes.
5   A  Continue with low bunk status.  Medical staff to
6     continue to monitor for changes.
7   Q  Okay.  The last sentence says medical staff to
8     continue to monitor for changes, right?
9   A  Right.
10  Q  What does it mean from your perspective -- since
11    you have opined that the medical staff has done
12    everything -- has done things that were not
13    deliberately indifferent, tell me after June 18th
14    what the medical staff did to monitor for changes
15    that David was going through?
16  A  I'd have to look at dates, but I believe on three
17    separate dates they went in to check on him, do
18    vital signs on him, which were stable, and --
19  Q  Okay.  Show me where those are in the record.
20  A  They're actually, I believe, in the jail record
21    notes.
22  Q  Okay.  Can you find them for me?
23  A  If you hang on just a moment here.
24  Q  Thank you.
25  A  I know one's on 6-25, and I believe there's one on

Page 127

1   6-20 and 6-21 or 2.
2   Q  And what documents are you looking at?
3   A  The jail -- jail log.
4   Q  The jail log?
5   A  In the jail log, there's one on -- let's see here.
6   Q  Well, that's not the medical records, is it?
7   A  No, but I mean -- I guess all of it is part of the
8     medical record.  If there's information listed,
9     that's medical.
10  Q  Well, Doctor, testimony has revealed through one of
11    the nurses -- expert nurses that what you're
12    looking at is the nurse timeline, right?
13  A  I don't know.  Is that the --
14      MR. CHAPMAN:  I'm going to object.  I'm not
15    sure the -- I don't believe that's what he's
16    looking at.  I believe he's looking at another
17    document.
18      MR. PERAKIS:  I don't know either.  I --
19    exactly right.  I don't know.
20  Q  If you can tell me what you're looking at, that
21    would be great.
22      MR. MCQUILLAN:  These pages are Bates numbered
23    if you'd like them.
24      MR. PERAKIS:  Okay.  Well, what do you have?
25      MR. CHAPMAN:  He's looking at Exhibit 19 from

Page 128

1   Follmann's (phonetic) dep, which is the training
2     log, I believe.  He's got mental health logbook
3     8-17 to 27, 2014.
4   Q  Oh, you're looking at the mental health log; is
5     that right?
6       MR. CHAPMAN:  I believe that's what he's
7     looking at.
8   Q  Is it handwritten, Doctor?
9   A  Yes.
10  Q  Okay.  Well, are you aware that that mental health
11    log is not available to the nurses?
12  A  I don't know.
13  Q  Okay.  Are you aware that -- so that's the one.
14    Let's say that's the 19th, is what you're looking
15    at; is that right?
16  A  (No response.)
17  Q  Is that yes, Doctor?
18  A  Well, the one on 6-23-14.  It says Nurse Dixie in
19    mental health to check David.  Inmate up and aware,
20    drinking water.
21  Q  That's on the 23rd.  Okay.
22  A  23rd at 15 --
23  Q  Okay.  What other one are you looking at?
24  A  And then on the -- no.  Let's see here.  On the
25    25th it says at 2145 hours nurse checked vital

Page 129

1    signs on mental health 1, vital signs checked,
2    good.
3    Q Okay.  So I know what you're talking about.  And I
4    know that that examination took exactly 30 seconds
5    on June 25th.  All right.
6    A Okay.
7    Q Now -- so what you're telling me is from June 24th
8    to the day he died, before he died there was a
9    total of one nurse visit that totaled 30 seconds,
10   right?
11   A I -- I don't know the timing of them.  There was a
12   nurse visit office, obviously, on the 23rd and the
13   25th.
14   Q Right.  But -- well, the 23rd would have been five
15   days before he died.
16   A And it says he's up and aware and drinking water.
17   Q On the 23rd?
18   A Right.
19   Q Is that right?
20   A Yes.
21   Q Okay.  And then we -- and then the one you -- the
22   one you mentioned is the 25th?
23   A Yes.
24   Q And that's -- as I tell you, it's 30 seconds long.
25   Okay.  So is it your -- is it your opinion that

Page 130

1    those -- that those -- that process of monitoring
2    was sufficient so as to not be deliberately
3    indifferent?
4    A Well --
5       MR. CHAPMAN:  I object to the use of the term
6    again.
7       MR. PERAKIS:  I understand.  I'm just using
8    his term.  I don't know what to tell you, Ron.
9       MR. CHAPMAN:  You're using it intentionally so
10   you can argue to have it excluded later, and that's
11   what bothers me here.
12      MR. PERAKIS:  Well, Ron, Ron, it's his term.
13   I'm not using it for anything other than going
14   through this report.  I don't know what to tell
15   you.
16      MR. CHAPMAN:  You're not looking at the report
17   right now.  This question has nothing to do with
18   it.
19      (Attorneys talking over each other.)
20      MR. PERAKIS:  (Indecipherable.)
21      MR. CHAPMAN:  My objection is stated.  My
22   objection is stated.  We'll make the argument to
23   the Court.  You can't set it up and then try to
24   take it away later when he testifies there's no
25   deliberate indifference.

Page 131

1       MR. PERAKIS:  Fair enough, fair enough.
2    Q So let me just summarize this part of it at least.
3    So we know that you are giving an opinion on
4    deliberate indifference regarding the medical
5    staff, right?  Dr. Stoltz?
6    A Well, I don't want to make a legal determination
7    here, but I'm saying I do not -- I felt the medical
8    staff did see David.  They, you know, documented
9    vital signs, document he's drinking water on the
10   23rd.  Mental health was making rounds on David.
11   You know, it's an unfortunate event David went
12   downhill and passed away.
13   Q Well, you're right.  He went downhill, didn't he?
14   You agree with that, right?
15   A Well, I think there was men- -- obviously there was
16   mental health issues going on, and I believe the
17   psychiatrist has mentioned catatonia, which it all
18   fits in that category.  He basically became
19   socially withdrawn and refused to eat, apparently,
20   and eventually expired probably from electrolyte
21   imbalance.  But --
22   Q Okay.
23   A -- the medical staff didn't intentionally avoid
24   seeing David.  They went by and saw him.  Mental
25   health went by and saw him every day.  And it -- it

Page 132

1    finally got to the point in the end, unfortunately
2    before he died, they felt it's time to get a
3    psychiatrist involved and do other things, but
4    unfortunately he passed away before then.
5    Q You agree, don't you, Dr. Stoltz, that the symptoms
6    that he was suffering that was causing him to go
7    downhill were consistent with withdrawal from
8    benzodiazepine, right?
9    A Actually, no, in my opinion, probably not.  He had
10   been off benzodiazepines for a considerable amount
11   of time before he came into jail, which we've
12   discussed many times.  And my true opinion is
13   Dr. Sherman appropriately, in his best medical
14   judgment, felt he did not need to be on withdrawal
15   protocol for benzodiazepines.  He'd already been
16   withdrawn from benzodiazepines.
17   Q That's not the question I --
18   A There was no symptoms.  His vital signs remained
19   stable throughout, including in the very end.  So I
20   don't know how much more I can say.  I've told you
21   this three times.
22   Q Dr. Stoltz, Dr. Stoltz, I didn't ask you that
23   question.  I asked you whether the symptoms that
24   David suffered from during what you deemed to be a
25   downhill process were consistent with symptoms

Page 133

1    suffered by someone who's going through
2    benzodiazepine withdrawal?
3        MR. CHAPMAN:  Objection, asked and answered.
4    He already testified to that.
5    A  That's exactly what I --
6    Q  What's the answer?
7    A  I just answered that last statement.
8    Q  You -- well, wait a minute.  You -- how did you
9    answer the question?  Not what you want to say, how
10   did you answer the question -- I'll make it real
11   simple for you, Dr. Stoltz.
12       The symptoms that he was suffering from, were
13   those symptoms consistent with benzodiazepine
14   withdrawal?
15       MR. CHAPMAN:  Objection, asked and answered.
16   Q  What's the answer?
17   A  I already answered that.
18   Q  Okay.  Then we'll try it a different way, Doctor.
19       What symptoms was David suffering from during
20   the downhill process that you described?
21   A  Most likely from a mental health disorder that came
22   out because he was off his medications that he
23   first came into jail with.  And I would refer that
24   to a psychiatrist or neurologist, you know, for
25   their opinion, but most probably to a psychiatrist

Page 134

1    to explain that more in detail.
2        MR. PERAKIS:  Okay.  Well, Madam Court
3    Reporter, could you please reread that?  I didn't
4    hear the answer.
5        COURT REPORTER:  Sure.
6        MR. PERAKIS:  And could you go slow so I can
7    write it down?
8        COURT REPORTER:  Yes, sir.
9        MR. PERAKIS:  Thank you.  I'm sorry.
10       COURT REPORTER:  No problem.
11       (The requested material was read back by the
12   court reporter.)
13   Q  Doctor, so are you aware of what the medical
14   examiner said as it relates to causation of death?
15   A  I saw the report.
16   Q  And what was it?
17   A  I don't have the actual wording in front of me, but
18   it was, in essence, some complications of
19   benzodiazepine withdrawal.
20   Q  Did she also mention severe dehydration?
21   A  I'd have to pull the report up.
22   Q  Dr. Stoltz, did any medical health professional --
23   or excuse me, mental health professional call any
24   psychiatrist to evaluate David from June 18th to
25   his death?

Page 135

1    A  Well, that was part of the conference -- care
2    conference on the 26th.  And I believe an
3    appointment was set up for the 30th for a
4    psychiatrist to come see him.
5    Q  Okay.  So what you're telling me is from June 18th
6    until June 26th there was no referral to a
7    psychiatrist or mental health professional; is that
8    right?
9    A  Well, mental health was seeing him on a daily
10   basis.
11   Q  Well, I'm talking -- you understand that there are
12   higher levels of care, don't you, in the mental
13   health profession?
14   A  Yes.
15   Q  And that if a limited licensed social worker or
16   limited licensed professional doesn't know what's
17   going on, what is the proper protocol for a -- for
18   -- to -- that would provide a higher level of care?
19       MR. CHAPMAN:  Object to form and foundation.
20   Q  Go ahead, Doctor.
21   A  Well, generally, in their judgment, at what time
22   they feel someone else needs to be involved,
23   they'll contact someone higher up the chain of
24   command in the mental health.
25   Q  And that would be such as a psychiatrist, right?

Page 136

1    A  Could be.
2    Q  And what about a mental health professional like
3    Natalie Pacitto, the director of mental health?
4    Someone like her?
5    A  Yes, could be.
6    Q  Okay.  And up until the 26th, that never happened?
7    Neither Ms. Pacitto nor the psychiatrist on call
8    was ever -- was ever referred to to be seen by --
9    to see David, right?
10   A  I can't recall when Ms. Pacitto got involved.  I'd
11   have to look at the notes.
12   Q  Well, why don't you go ahead and look at your notes
13   because -- just go ahead and look at your notes.
14   A  (Witness complies with request.)
15       (A discussion was held off the record.)
16   Q  Any luck in finding something about Ms. Pacitto?
17   A  No, I'm still looking.
18       MR. CHAPMAN:  What was the question?  I got
19   distracted.  What's he looking for?
20       MR. PERAKIS:  I'm sorry about this, Court
21   Reporter.  Could you please ask the question again?
22       COURT REPORTER:  No problem.
23       (The requested material was read back by the
24   court reporter.)
25       MR. PERAKIS:  Thank you.

Page 137

1    COURT REPORTER: You're welcome.
2    Q Any luck yet, Doc?
3    A No.
4    Q Do you -- I'll just -- let me ask you this. You
5      know, we've had about ten minutes or so for you to
6      look at the records pertaining to the psychiatric
7      for Ms. Pacitto, and you haven't been able to find
8      it, right?
9        MR. CHAPMAN: Wait a second. Wait a second.
10     I strongly object to that. I'd stepped out of the
11     room at 1:59, and you hadn't even asked the
12     question yet, and now it's 2:04. That's less than
13     five minutes.
14       MR. PERAKIS: Oh, I'm sorry. I'll -- whatever
15     time it was. I wasn't trying to be abusive to the
16     time because it's hard to lie about time.
17       MR. CHAPMAN: Well, but most people do
18     exaggerate about it, not intentionally, but they do
19     because a minute seems a lot longer than it really
20     is.
21       MR. PERAKIS: Well, if he needs more time, I'm
22     not worried about it. That wasn't my point.
23       MR. CHAPMAN: I don't know whether he does or
24     not. I was just commenting on the ten minutes.
25   Q Dr. Stoltz, do you have any idea how much more time

Page 138

1      you think you'll need? I don't want to waste your
2      time or ours.
3        MR. CHAPMAN: I would only object because how
4      could he know that?
5    A I've got all day.
6    Q Fair enough.
7        Well, Dr. Stoltz, I sure am glad I'm getting
8      that Medicaid rate. I really do appreciate that.
9    A You're a heck of a guy.
10       Yeah, I thought I had something in the notes
11     here that said that. I don't see it here, so maybe
12     they did not refer.
13   Q Okay, okay. So then I'll just ask you this
14     question. Whatever amount of time you had to look
15     at your records, do you see any -- do you see
16     anything in the records before you that demonstrate
17     that any medical or mental health CCS employees
18     referred David to a psychiatrist or Mental Health
19     Director Pacitto before his death?
20   A Let's see. I think I see something right here I'm
21     looking at. Well, I mean, in the deposition of
22     Chantalle Brock -- I just happened to pull this up
23     -- she did say she recalls speaking with her
24     supervisor, Natalie Pacitto, and also referred him
25     to a psychiatrist either the -- apparently on the

Page 139

1      27th.
2    Q Yeah, the 27th was when she -- she just finally
3      decided to refer him to a psychiatrist, right?
4    A From the note.
5        MR. CHAPMAN: Objection to the word "finally."
6      Pejorative.
7    Q Okay. So -- well, Doctor, I'm going to -- I'm
8      going to direct you to looking at -- so,
9      Dr. Stoltz, let me just conclude with this part of
10     it. Up until the date David died, which is
11     June 27th, did any mental health professional of
12     any type employed by CCS refer David for an
13     examination by a psychiatrist or by the higher
14     level mental healthcare -- mental healthcare
15     professional Natalie Pacitto?
16   A Well, according to the deposition not until the
17     27th.
18   Q Okay. So -- and that's Chantalle Brock's
19     deposition, right?
20   A Right.
21   Q Well, you know, just so you have an appreciation
22     for this, if you look at Chantalle Brock's
23     examination of -- the self-harm watch mental health
24     observation follow-up note that is dated June 27th,
25     if you have it --

Page 140

1      Any luck, Dr. Stoltz?
2    A Still thumbing through the pages here. What's the
3      question?
4    Q I'm sorry. Well, the question is, is on -- on --
5      you have to take a look at the document. On that
6      document, is there anywhere in there that suggests
7      that Chantalle Brock has decided on June 27th, six
8      hours before David dies -- or, no, seven hours, I'm
9      sorry, that she's decided to refer him to a
10     psychiatrist or -- or Pacitto?
11   A Not that I see on this page, no.
12   Q Okay. And on that page once again -- and I'll try
13     to avoid going through all of them, but you have
14     all the self-harm watch mental health observation
15     follow-up notes from the mental health people
16     because you feel that that was somehow a sufficient
17     monitor. Do you have the notes or those follow-up
18     notes from June 19th to June 26th --
19   A Yes.
20   Q -- 27th? I'm sorry. You do?
21   A Yes.
22   Q All right. So let's look at the June 27th one just
23     real quickly. And you agree, don't you, that in
24     the mental health status report on that particular
25     day, every -- every observation has with it unable

Page 141

1   to assess, patient refused except for the
2   appearance part, right?
3   A  Yes.
4   Q  All right.  Do you have any evidence that suggests
5   that the last one when it comes to cognitive
6   estimate is checked as average, why any mental
7   health person at this point would check average as
8   the cognitive estimate?
9   A  I don't know.  Maybe he responded.  I don't know.
10  Q  You don't know?  It doesn't show that he responded
11  anywhere, right?
12  A  No.
13  Q  Every one of those says unable to assess, patient
14  refused, right?
15  A  (No response.)
16  Q  I'm sorry.  Did you answer, Doc?  I didn't know if
17  I heard you.
18  A  Repeat.  What was your question?
19  Q  Yes.  You agree, don't you, on the mental status
20  assessment, every one of the observations say
21  exactly the same thing, unable to assess, patient
22  refused, the block -- the box "other" checked
23  except for the one about appearance, right?  And
24  that's -- you said correct?
25  A  Except appearance?  You mean -- you mean

Page 142

1   subcognitive --
2   Q  It's about the -- no, it's about the seventh one
3   down on mental status.  There's sensorium,
4   behavior, food --
5   A  Oh, yeah.  Yes.
6   Q  -- thought process.  Do you see that?
7   A  Yes.
8   Q  And all -- all -- and what she says is patient was
9   observed lying on floor, naked in cell, under bunk
10  bed with eye fluttering movements.
11  A  Yes.
12  Q  Do you see that?
13  A  Yes.
14  Q  Is a psychiatric evaluation or referral supposed to
15  be immediate, or are we supposed to wait over a
16  weekend for it?
17       MR. CHAPMAN:  Object to form and foundation.
18  Q  If you know.
19  A  Well, you can put a referral in immediately, but at
20  the time someone sees them, psychiatrist or
21  higher-level person, depends on when they're
22  available many times.
23  Q  Right.  And you agree, don't you, Doctor, that on
24  this particular document there is zero indication
25  that she has requested a referral to the

Page 143

1   psychiatrist or Ms. Pacitto, right?
2   A  Well, it's not on this document, but from my
3   understanding and information, there was a care
4   conference the day before to get a psychiatrist
5   referral set up.
6   Q  I understand that.  But you agree, don't you, that
7   the day after and even the day of the alleged care
8   team meeting -- or the care team meeting, the --
9   the people who are seeing David do not make that
10  recommendation, right?
11  A  I don't know if they already knew about the
12  recommendation or not.
13  Q  Well, wouldn't be it pertinent to put it in your
14  record if it was -- if they did?
15  A  It would be ideal.
16  Q  Well, but it would also be pertinent, not just
17  ideal, right?
18  A  Well, if you already knew it was going to happen,
19  you may not put it in the record.  You may not put
20  it in yourself.
21  Q  Okay.  So if we go to the day before, June 26th,
22  Ms. Nelson also has almost an identical form that
23  she's filled out; do you agree?  Now I'm talking
24  about in comparison to Ms. Brock.  Do you see that?
25  A  Very -- very similar.

Page 144

1   Q  Very similar.  In fact, the only dissimilarity on
2   the first page is that she explains, in terms of
3   her view, the patient was playing on -- was
4   playing [as said] on floor cell -- floor in cell
5   with eye fluttering movement.  Do you see that?
6   A  Yes.
7   Q  Okay.  So what about page two of both reports on
8   the 27th and 27th?  Do you see that?
9   A  Yes.
10  Q  Yes?  Okay.  And you see that the -- it says review
11  status of factors that lead to placement or watch
12  observation.  And you see that those are almost
13  identical also, right?
14  A  Very similar.
15  Q  Okay.  And -- okay.  So will you agree with me that
16  as to the remainder of the self-harm watch notes,
17  by Ms. Mann on June 25th, by Ms. Brock on
18  June 24th, by Ms. Nelson on June 23rd, by Ms. Brock
19  on June 22nd, by Ms. Brock on June 21st, by Nelson
20  on June 20th and by Nelson on June 19th, you agree,
21  don't you, that none of those medical -- mental
22  health professionals were able to assess David's
23  mental health status?
24  A  Well, I guess I -- I agree, and also I would
25  comment that on the 23rd and 24th they make in

Page 145

1    their note mental health status, expects patient is
2    exaggerating symptoms for secondary gain. He's not
3    acted out self-injuriously within the facility.
4    Q Okay. Well, do you have any idea how that came
5        about, that all of a sudden he's exaggerating his
6        symptoms?
7    A Well, he was seen in medical twice.
8        MR. CHAPMAN: Objection to "all of a sudden."
9    Did you get my objection? Form and foundation.
10       COURT REPORTER: Would you --
11       MR. PERAKIS: I got it. I got it.
12       MR. CHAPMAN: Objection to the form of the
13   question. You might have it. I want to make sure
14   the court reporter did.
15       COURT REPORTER: Would you repeat your
16   objection, please?
17       (No response.)
18   Q Dr. Stoltz, do you under- -- do you know the
19       underlying facts that would cause these people to
20       not put exaggerating symptoms for secondary gain in
21       any of the other assessments?
22   A Well, I would -- you know, obviously, I'd be
23       guessing, but I would guess that the mental health
24       people look at the notes from the day before.
25       They've already talked about David. They're -- the

Page 146

1    whole team is probably aware of David. That's
2    usually what happens. And they're just going by
3    daily and evaluating him, and they feel the same
4    way. I mean, he'd been to medical twice with
5    thoughts of faking symptoms, so to speak. But also
6    mental health would even -- they did not give him
7    medications. He all of a sudden withdrew. So I'm
8    sure that's what their thought process was at the
9    time.
10   Q Well, you know, I was just -- I was just -- are you
11       done? I'm sorry.
12   A Yeah.
13   Q Okay. Well, I was just scolded by Mr. Chapman to
14       not use "all of a sudden," and then you just used
15       it. So are you telling me that you believe the
16       records indicate that all of a sudden he wasn't
17       cooperating?
18   A I don't see where it's all of a sudden. It started
19       awhile back when he --
20   Q Yeah. The fact is this claimed lack of cooperation
21       had been identified variously by the mental health
22       people as either unresponsive or refusing to
23       answer. You agree, right?
24   A Well, he -- he answered initially until they
25       wouldn't give him medication, and then he would not

Page 147

1    cooperate. And, you know, then when he came to
2    medical, he was --
3    Q All right. So --
4    A He came down in a wheelchair. And the next thing
5        you know, he walks out of medical and walks back
6        fine.
7    Q Well, how many days was that before he died,
8        Doctor?
9    A It was -- I -- approximately a week to ten days
10       before.
11   Q Okay. So are you telling me that the -- that the
12       staff all just decided he's exaggerating? He's
13       more than capable -- he's more than capable to do
14       what is necessary, but he's only doing it because
15       he's a drug seeker; is that what your testimony is?
16   A That, I don't -- I did not say that, but I don't
17       know that's the case.
18       MR. CHAPMAN: Object to form.
19   A I think the -- the medical staff and the mental
20       health staff obviously felt he was pulling their
21       chain a little bit. And then there was a note from
22       the nurse when she came in that he drank water. He
23       talked to her. Vital signs were stable multiple --
24       you know, several times that we talked about. You
25       know, it was just an unfortunate event David

Page 148

1    eventually passed away.
2    Q Well, but let me ask -- let me ask you this,
3        Doctor. You said he eventually passed away. Are
4        you telling me that there was no chance or
5        opportunity for anybody to save his life during the
6        last ten days of his life? Is that your testimony?
7    A Well, my testimony and my expert opinion would
8        be that --
9        MR. CHAPMAN: Object to form and found- --
10   wait, wait, wait. Object to form and foundation,
11   calls for speculation.
12       MS. SWINDLEHURST: I'll join.
13   Q Okay. What's your testimony?
14   A Well, I agree it calls for speculation. But in my
15       opinion, he was seen by medical, he was seen by
16       mental health. They felt he was medically stable,
17       although mentally unstable and uncooperative. And
18       they finally, you know, at the point later got a
19       psychiatrist consulted. You know, I think they had
20       -- they were surprised when the events ended as
21       they did.
22   Q Well, the psychiatrist never consulted with
23       anybody, did he?
24   A He was called to consult and never -- he did not
25       get there before he passed away.

37 (Pages 145 to 148)

Page 149

1    Q Well, where in the records does he say he was
2      called to consult?
3    A Well, it said on the 27th.
4        MR. CHAPMAN: Object to form and foundation.
5      That's the -- never mind.
6    Q Okay. What was that?
7    A On the 27th from the deposition --
8    Q Doctor, what was that?
9        MR. CHAPMAN: I think he's saying on the 26th.
10       MR. PERAKIS: Oh, okay.
11   Q But I think what you were talking about was that
12     Chantalle Brock had called for a referral to the
13     psychiatrist on the day he died, right?
14   A Well, the care team meeting, plus she mentioned
15     that on the 27th, right, in her deposition.
16   Q Doctor, do you have the care team meeting notes
17     with you?
18   A Not in front of me, no.
19   Q Can you get them, or shall we e-mail them over to
20     you? What do you think?
21   A You can e-mail them.
22   Q It will only take a minute.
23   A You can e-mail them?
24   Q What's that?
25   A E-mail is fine.

Page 150

1    Q I'll do that right now. Okay?
2    A Okay.
3    Q I will take two minutes.
4        (A discussion was held off the record, a
5      30-minute lunch recess was taken, and Mr. Perakis
6      disconnects from the Polycom.)
7        MR. IHRIE: The next phase I'm going to be
8      doing the questioning now.
9    EXAMINATION
10   QUESTIONS BY MR. IHRIE
11   Q Doctor, in your report I would ask you to look at
12     page four. I'm sorry, that's page five. Look at
13     page five. The last paragraph in the middle, I
14     would draw your attention to the last line of that
15     paragraph which says "then according to notes and
16     video..." I thought you indicated before that you
17     didn't look at video. Is that true or not true?
18   A No. Actually, I got that out of the deposition --
19     one of the depositions from the mental health --
20   Q Well, why would you say then that according to
21     notes and video became progressively more
22     withdrawn? Why wouldn't you say according to notes
23     and the report of X or Y or C?
24   A Well, I probably should have done that.
25   Q Why didn't you?

Page 151

1    A That's just the way I wrote the report.
2    Q That's inaccurate then?
3    A Well, it could have been written differently. It's
4      just a matter of semantics.
5    Q Just for clarification purposes, you testified that
6      when Dr. Sherman saw David on the 17th that he
7      suspected that David was faking his seizure
8      symptoms; is that correct?
9    A Yes.
10   Q Is that correct?
11   A Yes.
12   Q I didn't hear your answer, sir.
13   A "Yes."
14   Q Have you ever had an occasion to look at the cover
15     article of "Correct Care Solutions" magazine dated
16     the fall of 2017 entitled "Patient Malingering"?
17   A I may have. I don't recall offhand if I've seen
18     that or not.
19   Q I'm just going to read you one paragraph from it,
20     and I'm going to ask you if you agree with the
21     paragraph or not. The paragraph says even advanced
22     providers need to be very cautious about deciding
23     that a patient is malingering. One correctional
24     physician, Scott Savage, D.O., asserted that
25     malingering must always be considered a diagnosis

Page 152

1      of exclusion. Literally every other possible cause
2      of the patient's symptoms must be ruled out before
3      deciding if the patient is malingering. Do you
4      agree with that statement?
5    A Yes.
6        MR. CHAPMAN: I would object to form and
7      foundation --
8    Q Thank you.
9        MR. CHAPMAN: -- and use of the word
10     malingering. Let me finish before you jump in. I
11     know you're angry, and we can -- we know this from
12     your voice. But calm down and let me state my
13     objection on the record, please.
14   Q Now that you've indicated, Doctor, that you agree
15     with that statement, tell me what other -- what
16     other diagnoses that Dr. Sherman ruled out after
17     the 17th?
18   A Well, I can't speak for Dr. Sherman, but --
19       MR. CHAPMAN: Wait, wait, wait, wait, wait.
20     I'm going to -- I'm going to object to this line of
21     questioning. You can't switch attorneys in the
22     middle of questioning and have that attorney go
23     back over things that were already discussed.
24     That's inappropriate.
25       MR. IHRIE: Well, this was -- this was not

Page 153

1   already discussed, but...
2       MR. CHAPMAN:  Do you have a court rule that
3   allows you to do that?
4       MR. IHRIE:  All right.  Your objection is
5   noted.  Your objection is noted.
6   Q  So is there anything in the medical record that
7      indicates that Dr. Sherman ruled out any other,
8      quote, possible cause of the patient's symptoms,
9      unquote?
10  A  Well, as I was going to say, I can't speak for
11     Dr. Sherman.  But typically a physician, when you
12     would evaluate someone, you may not write every
13     potential differential diagnosis down on a list or
14     piece of paper and progress note, but you think in
15     your mind could this be this or that or whatever
16     else, and, you know, then you come up with your
17     conclusion I feel the patient is faking or feigning
18     the seizures.
19  Q  Well, I'm not asking you to decipher Dr. Sherman.
20     My question is very specific.  Is there anything in
21     the medical record that indicates that Dr. Sherman
22     took any steps of any kind to rule out, quote,
23     other possible causes of the patient's symptoms,
24     unquote?
25  A  Well, he medically evaluated him, and that was his

Page 154

1      conclusion in the impression and his plan.
2   Q  I understand that he evaluated him and that his
3      conclusion was that he was feigning and, to your
4      use word, faking.  My question is did he do
5      anything to rule out other causes of the symptoms?
6      Can you see anything in the medical record that he
7      did so?
8   A  Well, I -- I don't think you may necessarily see
9      that in any medical record unless -- it depends on
10     what the complaints are.  When the guy comes in and
11     he's blinking his eyes and stops to talk to him and he
12     stops or if he comes in in a wheelchair and the
13     next thing he's walking up and he's perfectly fine,
14     it's pretty obvious that there's nothing
15     significant going on at that moment in time.
16  Q  And that is -- and that's what Dr. Sherman
17     concluded, right, that he was faking?
18  A  Yes.
19  Q  In the article that I just told you, that
20     paragraph --
21     MR. CHAPMAN:  Mr. Ihrie, wait.  If you could
22     excuse me for a second.  I'm going to make a
23     continuing objection to all of your questioning.
24     There is case law that says only one attorney per
25     one side can begin and end the questioning of a

Page 155

1   witness.  I'm objecting to all of your questions.
2   It's inappropriate and it's against the current way
3   things are done in the Sixth Circuit.
4       MR. IHRIE:  Can you cite that -- can you cite
5   that case for me so we can take a break and look it
6   up?
7       MR. CHAPMAN:  Well, right now I'm looking at a
8   case from the American Bar Association, Best
9   Practices for Taking a Deposition.  I've only had a
10  second to do this.  I'm looking at multiple
11  statements that are here.  Do your own search.
12      MR. IHRIE:  Is there a court rule that --
13      MR. CHAPMAN:  I don't have the case right now,
14  but --
15      (Attorneys talking over each other.)
16      MR. IHRIE:  Is there a court rule that you
17  want to refer me to?
18      COURT REPORTER:  Guys, I'm not hearing you
19  when you're talking over each other.
20      (Attorneys continue to talk over each other.)
21      MR. CHAPMAN:  (Indecipherable.)
22      MR. IHRIE:  Is there a court ruling --
23      MR. CHAPMAN:  When you're all done, I'll talk.
24      MR. IHRIE:  All right.  One moment, please.
25  I'm asking you to consent, Ron, and all attorneys,

Page 156

1   to me making -- answering [as said] questions
2   because Harold has other responsibilities that he
3   has to get to right now.  But if you want me to get
4   him back in here, I will, and it's going to be a
5   much slower deposition then.  Will you consent to
6   my asking questions?
7       MR. CHAPMAN:  I don't care about that.  I
8   think it's inappropriate to be switching attorneys.
9   I don't have a case for you right now.  But I just
10  did a quick Google search and looked at the
11  American Bar Association.  And everything says best
12  practice is judges do not enforce it.  I know in
13  court you would not be allowed to switch attorneys
14  midstream because you're going over things he
15  already has, and that's problematic to me.
16  Whatever you have to do, I'd suggest you probably
17  do it, but my objection stands.
18      MR. GAZALL:  Also, for the record, the County
19  does not consent.
20      MR. IHRIE:  All right.  One moment.  All
21  right.  Your objection is noted.  I'm going to
22  continue.
23      So what was the last question that I had
24  asked, Court Reporter, please?  Thank you.
25      COURT REPORTER:  Just a moment.

Page 157

1      (The requested material was read back by the
2    court reporter.)
3      MS. SWINDLEHURST:  And I would like to join in
4    that objection as well.
5      MR. IHRIE:  All right.  So noted.
6  Q  Doctor, my question remains.  Is there any
7    indication in the medical record that Dr. Sherman
8    took any steps to rule in or rule out his suspicion
9    that David was faking his seizures?
10     MR. CHAPMAN:  Objection, asked and answered
11   several hours ago.  This is completely
12   inappropriate.
13 Q  What is your answer, Doctor?
14 A  The only thing I could say is what's in his
15   progress note is what is there.
16 Q  Well, I understand.  We all know what's in his
17   progress note.  That's not my question.  My
18   question is, is there anything in the medical
19   record that indicates that he took any steps to
20   rule in or rule out the legitimacy of his suspicion
21   that David was faking?
22 A  He did not specifically write down a differential
23   diagnosis list.  His comment was as I had mentioned
24   previously.
25 Q  Thank you.  Now, are you aware -- or strike that.

Page 158

1      Have you read Dr. Sherman's deposition?
2  A  Yes.
3  Q  Are you aware that Dr. Sherman said that David
4    never told him that he had a seizure?
5  A  I'd have to look at his deposition to verify that.
6  Q  All right.  Are you -- are you aware that the --
7    that Dr. Sherman's deposition -- in his deposition
8    he listed all of the symptoms of seizures, none of
9    which David presented with?  Are you aware of that?
10 A  I'd have to look at it directly just to verify what
11   you're referring to.
12 Q  All right.  Let me do my best to locate that
13   particular portion of his deposition for you.
14 A  Okay.
15 Q  Doctor, I'm going to refer you to Sherman's dep,
16   page 137.  Tell me when you get there.
17 A  Okay.  Just a minute.
18 Q  All right.  Do you see on page 137 starting at line
19   7 -- I will read it.  Question -- this is to
20   Dr. Sherman when he's talking about David being
21   down in the -- in the medical cell on the 17th,
22   allegedly.  Your seeing him -- Question, "Your
23   seeing him several hours later would have given him
24   plenty of time to become responsive again,
25   correct"?  Answer, "That's correct."  "Did he tell

Page 159

1    you he had a seizure?"  "No."  "Did he ask for
2    something because he had a seizure?"  "No."  "Did
3    he tell you that because my eyes are fluttering
4    that must be an indication, Doctor, that I'm having
5    a seizure?"  "No, he didn't say that."  "Did he use
6    the word seizure at all?"  "No."  "Did you think or
7    suspect that by fluttering his eyes he was trying
8    to mimic a seizure?"  Answer, "Yes."  "Why did you
9    think that?"  "Because this was the behavior that
10   he had going on that whole day."  "How do you
11   know?"  "The nurses told me."
12     So does it sound to you like at that point,
13   Doctor, that David ever told Dr. Sherman that he
14   was having a seizure?
15 A  Oh, I don't think he told him he was having a
16   seizure, no.
17 Q  Well, who told the doctor, if you know, that he was
18   having a seizure or seizure-like activities?
19 A  Well, I think because he was doing the eye
20   movements, and I believe -- let me see back here
21   (indicating).
22 Q  Well, you would conclude, would you not, that he
23   was doing -- he had eye movement and eye fluttering
24   and rapid eye movement throughout his entire
25   ten-day stay up in the -- up in the mental health

Page 160

1    cell, correct?
2  A  I don't recall if he had it every -- all the time.
3  Q  Well, virtually every mental health professional
4    identified -- at least nine out of ten did, that --
5    nine out of ten days -- that he had eye fluttering
6    or rapid eye movement or rapid blinking, correct?
7  A  Right.  Until actually, I guess -- I was looking at
8    Michelle Bailey's -- or Bey-Shelley's note on the
9    16th.  Patient's eyes twitching ceased when
10   physician assessed him and spoke with the patient.
11 Q  Oh, I understand that's on the 17th.  But others
12   reported rapid eye movement or eye fluttering or
13   eye twitching until virtually the day he died,
14   every day; am I correct?  If you don't know, I'll
15   draw your attention to each of the -- let's start
16   with the 16th --
17 A  Well, yeah, but I --
18 Q  -- 18th, rather.
19 A  I mean, that's possible that she was -- we know
20   that Bey-Shelley was originally called to his cell
21   because of questionable seizure-like activity.
22 Q  Was rapid eye movement identified by the mental
23   health professional on the 18th?
24 A  I would have to pull that note up.
25 Q  All right.

Page 161

```
 1     A  You're jumping all over the place here on me.  I
 2        see it on the 19th.
 3     Q  Well, I know it's on the 19th.  If you look at the
 4        18th --
 5     A  Yeah.  I do see it on the 18th.  I do, yes.
 6     Q  Okay.  You see that he was identified as having
 7        rapid eye movement on the 18th, correct?
 8     A  Correct.
 9     Q  And rapid eye movement -- rapid eye movement on the
10        19th, correct?
11     A  Yes.
12     Q  And rapid eye movement on the 21st?  Can you look
13        at the 21st, please?
14     A  Yeah.  I don't see it on the 20th, so it must have
15        gone away on the 20th.
16     Q  I said 21st.
17     A  Oh, I was just making that comment.  But, yeah, I
18        see that on the 21st, yes.  I do not see it on the
19        22nd.  So apparently it was an intermittent thing,
20        so it's not -- it was not every day.
21     Q  I didn't say every day.  I said almost every day.
22     A  It wasn't on the 23rd.  It wasn't on the 24th, I
23        don't believe.  Not noted on the 24th, not noted on
24        the 25th.  So I would say not quite -- less than
25        half the days.
```

Page 162

```
 1     Q  Please look at the 26th.
 2     A  (Witness complies with request.)
 3     Q  Do you see where it identifies eye flutter?
 4     A  Yes.
 5     Q  And do you see it on the 27th?
 6     A  Yes.
 7     Q  Eight hours before he died, do you see it on that
 8        day also?
 9     A  Yes.
10     Q  So just as an expert, do you think he was faking
11        all those days?
12     A  I would assume he probably had an underlying mental
13        health disorder which contributed to that.
14     Q  Is that a yes or -- I'm sorry?  Is that a yes or a
15        no that he was faking -- you think he was faking
16        all those days?
17     A  That, I don't know.
18     Q  What could be done to rule that in or rule that
19        out?  What kind of testing could be done?
20     A  Well, he could have a neurologist and a
21        psychiatrist both involved in evaluating him.
22     Q  And that never happened, did it?
23     A  No.
24     Q  And I'll also ask you look at your report on page
25        four, second full paragraph.
```

Page 163

```
 1     A  (Witness complies with request.)  Okay.
 2     Q  I want to ask you to take a look at the second to
 3        the last sentence which reads, quote, "He also
 4        noted" -- talking about Dr. Sherman.  "He also
 5        noted that he did not feel that tapering David off
 6        benzodiazepines was necessary after he had been in
 7        jail for 6 or 7 days, since he did not show signs
 8        of withdrawal."  Do you see that statement?
 9     A  Yes.
10     Q  In point of fact, he was showing symptoms that were
11        consistent with benzodiazepine withdrawal on the
12        sixth and seventh day, wasn't he?
13            MR. CHAPMAN:  Object to form and foundation.
14            MR. IHRIE:  Objection noted.
15     Q  Go ahead and answer, Doctor.
16     A  Well, those could be symptoms from things other
17        than withdrawal.
18     Q  Now, please answer my question.  On the sixth and
19        seventh day, he was showing symptoms that were
20        consistent with benzodiazepine withdrawal; am I
21        correct?
22     A  He had some symptoms that could be potentially
23        associated with withdrawal, although he had no
24        vital sign changes of significance.  And
25        interestingly, his symptoms he had on those two
```

Page 164

```
 1        days, those symptoms resolved.  He didn't show
 2        further symptoms after that point.
 3     Q  That what?  You mean on the 18th he wasn't
 4        having --
 5     A  On the 17th --
 6     Q  I'm sorry.  I'm not sure if I'm hearing my own echo
 7        on this, but I'll repeat that again.
 8            Are you saying that because on the 18th
 9        there's no notation of hallucinations that the
10        hallucinations that he had on the 17th could be
11        disregarded?
12     A  Well, on the 17th and 18th he had -- there was some
13        notation of potential symptoms of hallucination,
14        and then after that point they resolved.
15     Q  No, they -- I will ask if I can properly correct
16        you.  They didn't say that he had symptoms of
17        hallucination.  They said he had hallucinations,
18        correct?
19     A  Signs of that, yes.
20     Q  And are you saying that because, let's say, on the
21        19th he wasn't having hallucinations that it was
22        appropriate for the medical personnel to disregard
23        the fact that he had had them on the 17th and/or
24        18th?
25     A  I'm saying if he had those and they were withdrawal
```

Page 165

```
 1      symptoms, they would have most likely got
 2      progressively worse.
 3   Q  Did David experience any withdrawal symptoms from
 4      benzodiazepines from the point he got in the jail
 5      until he died?
 6   A  Not that I can be sure of.
 7   Q  Oh, I didn't ask you to be sure of them.  Can you
 8      -- just can -- or do you see any symptoms that he
 9      had that were consistent with benzo withdrawal?
10   A  He had some symptoms that if you look at the
11      symptomatology with withdrawal, that could -- yes,
12      it could be part of the same symptomology.
13      Although the same symptomatology goes with other
14      mental health disorders as well.
15   Q  And what did Dr. Sherman do or a nurse do or
16      anybody do to rule -- to determine which it was,
17      benzodiazepine withdrawal symptoms or symptoms from
18      somebody else -- something else, rather?
19   A  Well, Dr. Sherman did not feel it was from
20      withdrawal.  And eventually they had their team
21      meeting on the 26th, including a psychiatrist, and
22      they referred him for a psychiatric evaluation.
23   Q  I didn't ask what Dr. Sherman felt.  I asked what
24      was done by Dr. Sherman or any other medical
25      personnel to rule in or rule out benzodiazepine
```

Page 166

```
 1      withdrawal.
 2   A  They monitored the patient.
 3   Q  I understand that he was monitored.  I'm not asking
 4      -- I'm not asking whether or not he was monitored.
 5      We fully acknowledge that he was thoroughly
 6      monitored.  My question isn't about monitoring.  My
 7      question is about what treatment did he receive to
 8      rule in or rule out whether the symptoms were
 9      caused by benzodiazepine withdrawal or by something
10      else.
11   A  Well, he had mental health -- put in a mental
12      health unit and mental health evaluation and follow
13      him.
14   Q  And mental health monitored him, correct?
15   A  Correct.
16   Q  And what treatment did mental health give to him --
17   A  Well, mental health --
18   Q  -- other than monitoring him?
19   A  Medical came by and saw him and checked vital signs
20      and checked on him, and mental health went by
21      daily.  And at one point initially when he refused
22      -- or they did not give him medications he wanted,
23      he became withdrawn and would not interact with
24      them much at all since.
25   Q  I understand that they monitored all that.  My
```

Page 167

```
 1      question is what treatment did he receive for
 2      either benzodiazepine withdrawal, if that was the
 3      cause of his symptom, or whatever was the cause of
 4      his symptoms?
 5   A  Well --
 6   Q  What treatment did he receive?
 7   A  He had no treatment for benzodiazepine withdrawal
 8      because they did not feel he had that.  But he was
 9      actually going to see a psychiatrist, but
10      unfortunately he passed away before.
11   Q  What did he re- --
12         MR. CHAPMAN:  Please don't interrupt him.
13         MR. IHRIE:  I didn't interrupt him.
14   Q  What did he receive treatment for?
15   A  He did not receive treatment for anything.
16   Q  Thank you.
17   A  He had no definitive diagnosis.
18   Q  Nobody diagnosed him?
19   A  He had no --
20   Q  So your testimony is A -- your testimony is, A,
21      nobody diagnosed him and, B, nobody treated him for
22      anything; is that correct?
23   A  He had no definitive diagnosis.  He was to see a
24      psychiatrist, and it's possible he had catatonia,
25      which is -- would be compatible with his condition.
```

Page 168

```
 1   Q  Well, possibly, I suppose.
 2   A  There's a lot of hypothetical things to consider.
 3   Q  Nobody --
 4         MR. CHAPMAN:  You guys are talking over each
 5      other.  I wish you would slow down, Mr. Ihrie.  I
 6      know you're upset, but try to slow down and let him
 7      answer.
 8         MR. IHRIE:  My name is pronounced Ihrie.
 9         MR. CHAPMAN:  Mr. Ihrie then, I wish you would
10      slow down.  I know you're upset, but you can't talk
11      over the witness.
12         MR. IHRIE:  I'm not upset at all, Ron.  I'm
13      not upset at all.
14         MR. CHAPMAN:  Then why are you screaming?
15         MR. IHRIE:  Well, maybe I'm speaking a little
16      loud because it's so hard for me to hear.  I'm
17      thinking that maybe it's hard for you guys to hear
18      too, so...
19         MR. CHAPMAN:  No.  We can hear you fine.
20         MR. IHRIE:  All right.  Thank you.
21   Q  I'm going to draw your attention now to the care
22      team meeting note on the 26th, Doctor.
23   A  Yes.
24   Q  What is a care team meeting, if you know?
25         MR. CHAPMAN:  I'm sorry.  What was the
```

Page 169

1    question? Where is it or what is it?
2    Q The question was what is a care team meeting, if
3      you know?
4    A Well, typically different jails will have care team
5      meetings to discuss particular patient issues and
6      get different parties involved to develop a plan of
7      attack, so to speak, on what needs to be done
8      further for a patient.
9    Q So at a care team meeting, is every patient that is
10     under medical or mental healthcare -- is every case
11     reviewed, you know, dozens or --
12   A No.
13   Q -- scores or hundreds of them?
14   A No. There tend to be select --
15   Q No?
16   A The select top -- or more complicated cases.
17       MR. CHAPMAN: You need to let him answer. You
18   can't interject. Please. Go ahead.
19       MR. IHRIE: I didn't say anything, Ron. I
20   didn't say anything.
21       MR. CHAPMAN: You did.
22   Q I'm sorry, Doctor. Go ahead.
23   A There tends to be select, more complicated cases
24     where you get different parties together that could
25     have input on how to evaluate someone further.

Page 170

1    Q So David's case would have been one of the more
2      complicated ones?
3    A Most likely.
4    Q And what would make David's case more complicated?
5    A Well, as you mentioned previously, he was failing
6      to respond to mental health people. He had what
7      was thought to be fake seizures. He was -- would
8      come down to medical in a wheelchair, could not
9      walk away -- or walked away just fine after his
10     evaluation. So he -- there was -- obviously he was
11     brought to evaluate him further from a mental
12     health standpoint.
13   Q And could we add into that list the fact that he
14     had had hallucination?
15   A Could be.
16   Q And eye fluttering?
17   A Could be.
18   Q And rapid eye movement?
19   A Could be.
20   Q And shaking?
21   A Could be.
22   Q And nonresponsiveness or either unwilling or unable
23     to speak, those things?
24   A If it was my care team meeting, I hope that every
25     symptom and every issue was brought to the table to

Page 171

1    discuss further about the patient.
2    Q So was that a yes to my question?
3    A I thought I just answered your question.
4    Q All right. So was Dr. Sherman at the care team
5      meeting?
6    A From the attendees list, yes.
7    Q Does that mean that when you're at -- when
8      Dr. Sherman was there, that he either had -- that
9      he either gave input or had the opportunity to?
10   A That's generally why you're there.
11   Q And do you see at the bottom of page -- the second
12     page, do you see at the bottom where it says
13     Natalie pass --
14   A Yes.
15   Q -- under -- do you see that? So Natalie Pacitto,
16     the director of mental health, she passed. Does
17     that indicate to you she had nothing to say?
18   A I don't know.
19   Q Monica Cueny, the director of nursing, do you see
20     where she passed?
21   A Yes.
22   Q Does that indicate that -- would you conclude from
23     that that she didn't have anything to say either?
24   A Well, I -- I don't know. I mean, it's possibly at
25     these meetings Dr. Sherman is the one that brought

Page 172

1    David to the attention, and he was going to be the
2    one to discuss it. I don't know how that works at
3    their actual meeting.
4    Q Now -- I suppose anything is possible. I'm just
5      looking at what the document says. Dr. Haque was
6      the psychiatrist. Does it appear that he passed as
7      well?
8    A I don't know. That's what it says, pass.
9    Q Well, it says pass, doesn't it?
10   A It says passed.
11   Q Then we get to Dr. Sherman. Do you see where it
12     says seen in clinic on 6-24?
13   A Yes.
14       MR. CHAPMAN: I'm going to object to the line
15   of questioning.
16   Q And was --
17       MR. CHAPMAN: He didn't -- wait a second. I
18   object to the questioning. He didn't draft the
19   document. The document and the author speak for
20   the document, not this witness.
21       MR. IHRIE: Well, I'm asking this witness
22   about this document.
23   Q Do you see where it says that the -- David was seen
24     in the clinic on June 24th?
25   A It says that.

Page 173

1    Q Pardon me?
2    A It does say that.
3    Q Was that true?
4    A I can't remember if he got brought down to the
5      clinic on the 24th or not for an evaluation. I'd
6      have to look back.
7    Q So do you see where it says next that Dr. Sherman
8      symptoms says not concerned?
9        MR. CHAPMAN: Object to form and foundation.
10   No foundation Dr. Sherman said that.
11   A I see it says that.
12   Q Who would you conclude that's saying they're not
13     concerned, Doctor, after looking at this document?
14   A Well, just if I would just look at the document, I
15     would think from a medical standpoint he was not
16     medically concerned. He was --
17   Q Who was not medically concerned?
18   A Dr. Sherman did not feel he had medical concerns.
19     His vital signs were normal, he didn't feel he
20     was medically concerned, but mental health staff
21     had issues going on with him.
22   Q And then it next says that mental health staff
23     indicates he is refusing or unable to engage in
24     visits with them. Do you see that?
25   A Yes.

Page 174

1    Q What is the difference between somebody refusing or
2      somebody being unable to engage?
3    A Well, they -- they did not know.
4    Q No. What is -- I'm asking you the difference
5      between refusing to be engaged or being unable to.
6      Is there a difference between the two?
7    A Sure. He can refuse -- he can -- I could sit and
8      refuse to answer your questions right now. If I
9      had a stroke and I couldn't speak --
10   Q That's right.
11   A -- I'm unable to answer your questions.
12   Q Thank you. There is a difference between the two,
13     isn't there?
14   A Yes.
15   Q And it says mental health staff is also suspecting
16     that he may be med seeking, correct?
17   A Correct.
18   Q And can you tell me, up until the 26th, did the
19     mental health staff or -- which would include
20     Pacitto or the psychiatrist, did they do anything
21     to rule in or rule out whether or not he was simply
22     -- his conduct was simply an effort to be seeking
23     meds?
24   A Well, I believe that the time that -- and I don't
25     remember the visit date now offhand, when he was

Page 175

1    asking for medication and then they said no, he
2    withdrew at that point.
3   Q I understand that. But this note doesn't say that
4     the mental health staff has concluded, does it? It
5     says that mental health staff has suspected. Isn't
6     that what it says?
7   A Well, and then also it says but to rule out any
8     possible mental health condition, he will be seen
9     by a psychiatrist on Monday. So they felt he
10   needed --
11   Q Now answer --
12   A -- to be seen by a psychiatrist.
13   Q Are you finished?
14   A Yes.
15   Q Are you finished? Okay. Now answer my question.
16     It doesn't say that the mental health staff has
17     concluded; it says that they're suspecting that he
18     may be med seeking, correct?
19   A Correct.
20   Q What did they do to rule in or rule out their
21     suspicion?
22   A They have set up a psychiatrist visit for him.
23   Q In fact, the note specifically says to rule out any
24     possible new condition, he will be seen by a
25     psychiatrist on Monday, correct?

Page 176

1    A Correct.
2    Q Now Dr. Sherman understands -- or would understand,
3     in your opinion, would he not, that David is being
4     reviewed because it's a complex case, that he is --
5     he may be unable to communicate and that -- at
6     least those two things, correct?
7    A That's speculation, but I would hope he -- he was
8     at the point something needed to be done further to
9     evaluate what's going on with him.
10   Q And so could he have gone to see David that day?
11   A Well, Dr. Haque was at the -- the psychiatrist, was
12     at the meeting. And if he felt that it was an
13     urgent issue, I would have hoped he would have gone
14     to see him that day.
15   Q I'm talking about Dr. Sherman. Could Dr. Sherman
16     have gone to see him that day?
17   A Well, he could have, but I think it's -- it was
18     more of a psychiatric issue, they felt, than a
19     medical issue.
20   Q Well, with somebody potentially unable to engage,
21     that could be either a psychiatric or it could be
22     something physical, correct?
23   A It could be, but he was displaying symptoms of a
24     psychiatric issue.
25   Q And Dr. Haque was actually at this meeting,

Page 177

1    correct?
2    A  That's correct.
3    Q  Could Dr. Haque, when he left the meeting, maybe
4       take a little walk down the hallway and up an
5       elevator floor to go see this complex case named
6       David Stojcevski?
7    A  Well, I would presume, how it was discussed and
8       presented at the meeting, if he felt that it was an
9       urgent condition or an urgent issue, he would have
10      seen him that day.
11   Q  My question is, could he have gone to see him that
12      day?
13   A  Well, sure.
14   Q  But he didn't, did he?
15   A  No.
16   Q  And Dr. Sherman didn't go see him that day either,
17      did he?
18   A  No.
19   Q  And Nurse Cueny who was there didn't go see him
20      either that day to follow up, did she?
21   A  Not that I am aware of.
22   Q  And Natalie Pacitto didn't go see him either that
23      day, did she?
24   A  Not that I'm aware of.
25   Q  And he died the next day, didn't he?

Page 178

1    A  He did.
2    Q  One moment, please.  All right.  Doctor, does it
3       appear to you from looking at these care team notes
4       that Dr. Sherman, on the day of this care team
5       meeting, felt that David was faking seizures?
6    A  That's what the note says.
7    Q  And how would Dr. Sherman know that he was faking
8       seizures if he hadn't even seen him for ten days?
9       MR. CHAPMAN:  Wait a second.  You didn't
10      understand his answer, sir, or you're intentionally
11      mischaracterizing your question.
12      MR. IHRIE:  Ron, may I make a request of you?
13      Would you quit accusing me of intentionally asking
14      questions that are -- that are wrong or -- I'm not
15      intentionally doing any of those things.  All
16      right?
17      (Attorneys talking over each other.)
18      MR. CHAPMAN:  (Indecipherable) and your
19      question is incorrect.  So you either do it
20      accidentally or intentionally.  I don't know what
21      it means.  What was the question then?
22      MR. IHRIE:  All right.  What was the answer to
23      his question that I didn't understand correctly?
24      MR. CHAPMAN:  He said no, and your question
25      came back that how could -- how could Dr. Sherman

Page 179

1    know that he was faking seizures.  You should have
2    listened to his answer.
3       MR. IHRIE:  Well, maybe I didn't hear him
4    correctly, so I'll ask the question again.
5    Q  How was it that Dr. Sherman knew he was faking
6    seizures on the 26th when he hadn't seen him for
7    ten days -- or not ten days, when he hadn't seen
8    him for -- hadn't seen him for nine days?
9       MR. CHAPMAN:  I'm going to object to the form
10   of your question.  You didn't hear his answer to
11   the previous question.  You should go back and
12   listen to it.
13      MR. IHRIE:  His said -- his answer to the
14   previous question was that's what the note says.
15      MR. CHAPMAN:  I don't believe so.
16      MR. IHRIE:  Yes, that is exactly what it was.
17   Q  So my next follow-up question is, how could
18   Dr. Sherman say on the 26th that he was faking
19   seizures when he hasn't seen him for nine days,
20   Doctor?
21   A  Well, I'll clarify things.  That's not what I said.
22   What I said -- you asked me if the care note said
23   -- did it say in the care note Dr. Sherman feels he
24   is faking seizures.  Yes, that's exactly what it
25   says there.  It does not -- it doesn't say anything

Page 180

1    about on June 26th.  Dr. Sherman saw him on 6-17
2    after he was referred down there from one of the
3    nurses for possible faking seizures.  After his
4    evaluation he felt he was faking seizures and sent him
5    back to general population.
6    Q  Well, let me ask -- let me ask it differently.
7       This care meeting is happening on the 26th of
8    June, correct?
9    A  Yes.
10   Q  And Dr. Sherman is present, correct?
11   A  Yes.
12   Q  And the note says Dr. Sherman feels.  Is the word
13   feels past tense or present tense, Doctor?
14   A  To me, the note essentially is kind of giving the
15   history of what's going on with this gentleman,
16   with David.  It doesn't say what specific day he
17   felt he was doing this or doing that.  It was --
18   that's part of the history of telling the care team
19   what's going on with this guy.
20   Q  Is the word "feel" past tense or present tense?
21   A  It could be used either way.
22   Q  Please use the word "feel" in a sentence that is
23   past tense.
24   A  Well, when you're speaking from medical and
25   someone's writing -- and I don't see -- I'm going

Page 181

1   to say I felt, but if someone says he feels that
2   he's faking seizure, that could be yesterday. It
3   could be a month ago. It could have been a year
4   ago. It doesn't mean necessarily today.
5   Q So what you're testifying is that the word "feels"
6   -- and if you go two words later, it says "is" --
7   "is" is present tense, not past tense, right?
8   A Well, who knows who's typing up this message in the
9   notes.
10  Q I don't know who's typing it up. Just answer my
11  question, please. Is the word "is" past tense or
12  present tense?
13  A Well, it says mental health indicates he is
14  refusing or unable to engage -- that, to me, would
15  be more present tense or at least recently, recent
16  tense.
17  Q So your testimony is that you don't know what day
18  he was talking about, whether it was that day, the
19  day before, or the 17th? It could be present
20  tense. It could be past tense. You just don't
21  know; is that your testimony?
22  A My testimony is the only thing in the medical
23  record where Dr. Sherman mentioned that he's
24  possibly faking seizures was on the 17th.
25  Q Well, what about this note?

Page 182

1   A I don't know who typed the note, what words they're
2   using. I'm just telling you what's in the medical
3   record.
4   Q All right. Good enough. One moment.
5   Dr. Sherman's phrase "not concerned," is that
6   past tense or present tense?
7   A There's not enough information there for me to tell
8   you.
9   Q So is he saying -- in this note, is he saying he
10  wasn't concerned on the 17th, or is he saying on
11  the 26th he's not concerned?
12  A I don't know.
13  MR. CHAPMAN: I'm going to object to form and
14  founda-- wait. I'm going to object to form and
15  foundation.
16  MR. IHRIE: So noted.
17  Q What's the answer to my question, Doctor?
18  A This is such a brief summary note that I -- I could
19  not tell you for sure.
20  Q So it may mean that he's not concerned on the 26th,
21  correct?
22  A I don't know.
23  Q Well, if you don't know, then my statement is
24  correct. It may be or it may not be, correct?
25  A Well, it's possible.

Page 183

1   MR. CHAPMAN: Object to form and foundation.
2   You're being argumentative. He already answered
3   the question.
4   MR. IHRIE: I'm not being argumentative, but I
5   want an answer to the question.
6   Q If you don't know, that means that it could -- it
7   could be today, the 26th, or it could be a previous
8   day, correct?
9   A There could have been a longer discussion at this
10  meeting and someone's just abbreviating the
11  answers. I don't know.
12  Q Now answer my question. The day that he says he's
13  not concerned could be the 26th or some previous
14  day, correct?
15  A Could be.
16  MR. CHAPMAN: Objection, asked and answered.
17  MR. IHRIE: I want an answer to my question.
18  It has not been answered.
19  Q What day was he not concerned, Doctor?
20  A I've answered it four times, I think. I don't
21  know.
22  Q Thank you. Please look at the last page of the
23  note. Do you see it?
24  A Yes.
25  Q Do you see where it says no prior mental health

Page 184

1   history, never housed in MH?
2   A Yes.
3   Q When this says no prior mental health history,
4   didn't Nurse Cueny indicate in her note that he had
5   been psychiatrically hospitalized for anxiety?
6   A Yes.
7   Q So is this note in the nursing -- in the care team
8   note, is that accurate or inaccurate that he didn't
9   have any -- no prior mental health history?
10  A I'd say there's inaccuracy there.
11  Q And didn't he also -- wasn't he also prescribed
12  Xanax and Klonopin prior to coming into the jail?
13  A That's what he said.
14  Q Isn't anxiety a mental health issue?
15  A Yes.
16  Q So this note that says he had never -- he had no
17  mental health history, as you've testified or I
18  think you've testified, that is inaccurate,
19  correct?
20  A According to medical records, yes.
21  Q Thank you. One moment.
22  So according to this note, it indicates that
23  David will be seen by a psychiatrist on Monday,
24  correct?
25  A Correct.

Page 185

1  Q  So any explanation as to why this complicated case
2     would require the psychiatrist to wait four days to
3     go see him since this meeting on the 26th occurred
4     on Thursday?
5  A  The only thing I could do would be speculate.
6     Obviously, the meeting -- I don't -- they probably
7     don't put the whole notes in the -- in your
8     healthcare service meeting here, what all was
9     discussed.  Obviously, medical thought he was
10    stable.  Mental health thought he was not
11    responding to them but stable.  And so they felt he
12    could wait until Monday.  Otherwise, Dr. Haque --
13    they could have said Dr. Haque, you need to see him
14    today or send him out to the ER if they thought he
15    was that unstable.
16 Q  Does the -- is a person's nutrition important when
17    somebody is in a high observation cell?
18       MS. SWINDLEHURST:  Objection to form and
19    foundation.
20 Q  I'm going to ask it a little differently.  Is
21    somebody who was at the jail, is their -- is
22    nutrition important?
23 A  Yes.
24       MS. SWINDLEHURST:  Same objection, form;
25    foundation.

Page 186

1  Q  Go ahead, Doctor.
2  A  Nutrition is important whether you're in jail or
3     out of jail.
4  Q  Tell me why it's so important.
5  A  Just for proper body health.
6  Q  Physical health?
7  A  Yes.
8  Q  And mental health?
9  A  Can be, yes.
10 Q  But at least physical health, correct?
11 A  Correct.
12 Q  Under whose direction or umbrella or auspices does
13    an inmate's physical health fall --
14       MR. CHAPMAN:  Objection to the form of the
15    question.
16 Q  -- in a jail setting?
17       MS. SWINDLEHURST:  Same objection, form and
18    foundation.
19 Q  Doctor, go ahead and answer.
20 A  Well, the -- a person's physical health is under
21    the auspices of the medical department.
22 Q  And how does the medical department make sure that
23    somebody is getting adequate food or water?
24 A  Well, it's up to the custody of the jail to
25    actually see that inmates get their food,

Page 187

1     nutrition, water, whatever.  And generally medical,
2     unless they're made aware of someone not eating or
3     having issues with diet, inmates complaining about
4     diet or custody, they would be unaware if there was
5     an issue.
6  Q  Would a medical director want to know what the
7     procedure was for custody's monitoring of food and
8     water intake?
9        MS. SWINDLEHURST:  Object to form and
10    foundation.
11       MR. CHAPMAN:  Could you read the question back
12    for me?  I didn't quite get it.  Could somebody
13    please read the question back to me?  I didn't hear
14    it very well.
15    (Court Reporter begins to read the question
16    back.)
17 Q  I'll try to repeat it for you.
18       COURT REPORTER:  Okay.
19 Q  Would custody -- I'm sorry.  Would the medical
20    director want to know how custody was monitoring
21    food and water intake of a patient or inmate?
22       MR. SWINDLEHURST:  Form and foundation.
23       MR. CHAPMAN:  Object to form and foundation.
24    Speculation.
25 A  They would want to be aware that they're being fed.

Page 188

1  Q  Well, what is the jail that you are medical
2     director for?  What's it called?
3  A  Vanderburgh County.
4  Q  And one other, correct?
5  A  Vanderburgh County and Warrick County correctional
6     facilities.
7  Q  As the medical director there, do you know how
8     custody monitors food and water intake of a patient
9     in a high observation cell?
10 A  Actually, no.  I would hope they would let medical
11    know -- the nurses or someone know if there's an
12    issue going on.
13 Q  Does custody monitor food and water intake in the
14    jails that you oversee?
15 A  Not on a close basis.  If there's someone that is
16    not eating on a regular basis or on a hunger strike
17    or says they're not going to eat or drink, period,
18    then they'll let medical know.
19 Q  Well, what if somebody doesn't declare a hunger
20    strike, but they just essentially don't eat or
21    don't eat enough or drink enough to stay alive?
22    Who would know that?
23 A  Custody staff would let medical know if there's --
24    they feel there's an issue going on.
25 Q  And how would they determine if an issue was going

Page 189

1    on?
2         MS. SWINDLEHURST:  Objection, form,
3    foundation, calls for speculation.
4    A  I don't know exactly what their --
5         MR. CHAPMAN:  Same objection.
6    A  -- standards are, how much intake they -- before
7    they'd notify medical.
8    Q  So if somebody brings meals to an inmate in close
9    observation and those meals don't get opened or
10   eaten, but they get carried back out by the food
11   deliverers and food pickup people, isn't that
12   something that custody would be able to see?
13        MS. SWINDLEHURST:  Objection to form and
14   foundation.
15        MR. CHAPMAN:  Objection, form and foundation.
16        MS. SWINDLEHURST:  Calls for speculation.
17        MR. CHAPMAN:  He's not here as a custodial
18   expert, and he's not answering questions regarding
19   custody.
20   Q  Well, would you think, as somebody who was in
21   charge of somebody's physical health, that --
22   strike that.
23        Are you -- as somebody who is in charge of
24   somebody's physical health in the jail setting, are
25   you just assuming that jail staff is evaluating

Page 190

1    somebody in high observation with respect to their
2    food and water intake?
3         MS. SWINDLEHURST:  Objection to form and
4    foundation, calls for speculation.
5         MR. CHAPMAN:  Objection to form and
6    foundation.  He's not a custodial expert.  He's not
7    here to testify on the requirements of being a
8    custodial expert.
9         MR. IHRIE:  No, but he's a medical director.
10   And he just testified that somebody's nutrition is
11   important.  So I'm going to ask the question.
12   Q  How do you determine -- as the medical director,
13   whether or not somebody who has not declared a
14   hunger strike but is simply not eating or drinking,
15   how do you determine if that's occurring or not
16   occurring, or how is that determined, rather?
17        MR. CHAPMAN:  Objection, asked and answered.
18   He told you how.
19        MS. SWINDLEHURST:  Join.
20   Q  So Doctor, you just assume that it's happening?
21   A  (No response.)
22   Q  Doctor?
23   A  I don't know exactly how each facility manages that
24   or oversees intake.
25   Q  Well, in your jails --

Page 191

1    A  I'd have to look at the custodian --
2    Q  -- how do you -- I'm sorry.
3    A  I'd have to look at the policies of our custody in
4    regards to that.
5    Q  All right.  All right.
6         Dr. Sherman testified as follows, and I want
7    to know if you agree or disagree with what he said,
8    and I'm referring to page 139, line 23.  I will
9    read.  "I tell you that unfortunately one of the
10   issues in this case was failure to write notes and
11   not just the nurses, but I was guilty of it.  The
12   director of nursing was guilty of it, and certainly
13   the many nurses who saw him were guilty of that.
14   It was a mistake of not sitting down and writing
15   out things.  I think a lot of times they feel that
16   if they don't see anything significant that they
17   don't really need to write it out.  Obviously,
18   that's not correct."  Do you agree with that
19   statement?
20   A  Well, I agree that there was multiple times in the
21   -- in this case that better note taking could have
22   been done.  I don't think the actual outcome or the
23   treatments would have been any different with the
24   notes.  I think he was still managed appropriately
25   from a medical standpoint.

Page 192

1    Q  Is there any part of that statement that I read
2    that you disagree with?
3    A  (No response.)
4    Q  Doctor?
5    A  I agree with what Dr. Sherman said there.
6    Q  Thank you.  Do you have an opinion as to whether or
7    not Nurse Monica Cueny saw David -- or I'm sorry,
8    spoke with David Sherman on the 18th in person or
9    on the telephone?
10   A  That, I'm not sure.  I would presume on the
11   telephone, but I don't know.
12   Q  Doctor, I'm going to ask you to look at page 130 of
13   the Sherman dep.
14   A  Okay.
15   Q  I'm going to ask you to look at line 12, and I'll
16   read it.  "But the second thing is that not really
17   expecting this to be a case that was going to come
18   to litigation, I just wrote down the pertinent
19   parts of that exam."  Do you see those words?
20   A  Yes.
21   Q  Should whether or not what a doctor writes down in
22   his notes be determined by whether or not he
23   believes a case is going to come to litigation?
24   A  Well, I -- I would suppose at times when you think
25   there's a higher risk of litigation, you may

Page 193

1    document a whole lot more, especially if an inmate
2    says, I mean, even in my jail, said I'm going to
3    sue the jail and everybody else, I would probably
4    write a whole lot more than I would somebody that I
5    would feel would be just a routine, everyday case.
6        MR. CHAPMAN:  I would also object to the
7    question.  For completeness, you should have read
8    everything the doctor said there on page 132 and
9    131.  It's a much more fuller answer.
10        MR. IHRIE:  You can cross examine him on that.
11    Q  So is that a yes to my question then?
12        MR. CHAPMAN:  You should do that.
13    Q  Is that a yes to my question then, Doctor, that
14    it's okay to write a different note depending upon
15    whether or not you feel that the case may come to
16    litigation or not?
17    A  (No response.)
18        MR. CHAPMAN:  Asked and answered.
19    Q  Doctor, is that a yes?
20    A  Yes, you may -- I mean, I've answered that already.
21    You may document more on a higher-risk litigation
22    case than a -- than a lower-risk.
23    Q  Doctor, you've indicated that some of the symptoms
24    that David was exhibiting could be considered signs
25    of benzodiazepine withdrawal -- perhaps other

Page 194

1    things but also benzodiazepine withdrawal, correct?
2        MR. CHAPMAN:  Objection, mischaracterizes
3    prior statement.
4        MR. IHRIE:  All right.
5    Q  Is what I said correct?
6    A  You're going to have to repeat that again.
7    Q  You had testified, had you not, that the symptoms
8    that David was exhibiting could be signs of
9    benzodiazepine withdrawal, but they also could be
10    signs of other things such as a mental health
11    problem, correct?
12    A  Correct.
13    Q  I'm going to draw your attention to page 59 of
14    Sherman's dep.  And I'm going to ask you to look at
15    page 59, line 3 where it says the following:  "Our
16    feeling is that starting a patient on a withdrawal
17    protocol is probably a safer step to protect them
18    than to react to them if -- if they suddenly start
19    showing signs of withdrawal.  So we are proactive
20    rather than responsive."
21        Would you agree that is a proper methodology
22    of dealing with somebody who may be going into or
23    may begin to show symptoms of benzodiazepine
24    withdrawal?
25    A  Yeah, that's typically what we do in my jail when a

Page 195

1    patient enters the jail and says he's taking
2    benzodiazepines or we confirm it with a pharmacy.
3    Q  Is this case a typical case, or is this a
4    complicated case?
5    A  Well, obviously, with the outcome, it's a
6    complicated case.  We don't typically start a
7    withdrawal protocol six or seven days after the
8    person comes into the jail.  We start it on the day
9    they walk in.  Usually by the sixth or seventh day,
10    they've already gone through severe withdrawal if
11    they're going to have severe withdrawal problems.
12    Q  But in your report you indicate the symptoms can
13    start six or seven days after cessation or abrupt
14    stop, correct?
15    A  Well, you can have -- going off long-term
16    benzodiazepines, you can have some funny symptoms
17    for, as you mentioned -- someone mentioned
18    previously, for months and years.
19    Q  And that's true, correct?
20    A  Yes.  They're generally not life-threatening events
21    after being in for a week.
22    Q  I would like you to look at your report, page five,
23    please.
24    A  (Witness complies with request.)  Okay.
25    Q  How long had -- on the 17th and 18th, how long had

Page 196

1    David been in the jail?  Your answer is going to be
2    two separate numbers, I understand.  But on the
3    17th and 18th, how long had David been in the
4    jail --
5    A  It's my understanding he came in --
6    Q  -- starting on the 11th?
7    A  -- on the 11th.
8    Q  Right, he came in on the 11th.  So on the 17th and
9    18th, how many days had he been in the jail?
10    A  17th seven, and 18th eight.
11    Q  So if he got in on May 11th, 24 hours from the
12    11th, the first day would be on the 12th, correct?
13    A  Well, the first day would be considered the day he
14    came in the jail, on the 11th.
15    Q  Well, I'm talking about a day being 24 hours.  So
16    24 hours from the day he got in, the first day
17    would have been completed on the 12th, correct?
18    A  If you say 24 hours, I guess if you would --
19    Q  The first 24-hour period?
20    A  Sure.
21    Q  Yes?
22    A  Sure.
23    Q  The second day would have been completed on the
24    13th, correct?
25    A  Yes.

Page 197

1   Q And the third day on the 14th, the fifth day on the
2     15th, the sixth day on the 16th and the seventh day
3     on the seven- -- I'm sorry, I think I'm one day
4     off. So the seventh day would have been on the
5     18th, and the sixth full day would have been on the
6     17th, correct?
7   A Okay.
8   Q Now, I'm going to ask you to read the second
9     sentence of your report on the first -- or second
10    full paragraph. It starts "medically speaking."
11    Please read it out loud.
12  A "Medically speaking, most of the significant
13    benzodiazepine withdrawal symptoms will occur
14    within the first few days or week of stopping this
15    class of drugs, especially the short-acting ones
16    like Xanax."
17  Q Thank you. So the 17th was a pretty eventful day
18    for David, wasn't it?
19  A Well, he had stopped the medicine a week before he
20    came in, so that was two weeks after he -- almost
21    two weeks -- 13 days after he stopped taking the
22    medication according to him.
23  Q When did he stop taking the Xanax?
24  A Well, one day -- as Monica says, one day he said
25    Xanax, the next day he said lorazepam.

Page 198

1   Q So what day did he stop taking Xanax is my
2     question?
3   A I don't know.
4   Q Does anybody know in the record? Do you see
5     anywhere in the record where anybody knew the
6     answer to that question?
7   A Well, I believe from Monica's note was that -- her
8     thought was that he was not taking both; he was
9     taking one or the other, but I don't know.
10  Q Well, you better look at her note for me, please,
11    and tell me where it says that.
12  A At one point, she says one day he said he was
13    taking Xanax, and the next day he's taking
14    lorazepam, in her deposition.
15  Q Right. So in two days he acknowledged taking both
16    -- two separate benzodiazepines, correct?
17  A Well, there was still, I guess, some confusion in
18    my mind that he was taking them both at the same
19    time, but he could have been, yes.
20  Q All right. So now tell me, please, in Monica's
21    note where he indicated the last time he took
22    Xanax.
23  A Don't know.
24  Q All right. So is there any record that shows the
25    last time he had Xanax?

Page 199

1   A No, not that I know of.
2   Q Hold on. So if the last day he had Xanax was the
3     day he came into the jail, that would have been six
4     days after he was an inmate, correct?
5   A Yes.
6       MR. CHAPMAN: I object to the mathematics.
7   A Approximately.
8   Q How many days would that have been? Let me ask it
9     differently.
10    If he took Xanax the day he went into the
11    McComb County Jail, how many days was the 17th --
12    how many days would he have been in the jail on the
13    17th?
14  A Six.
15      MR. CHAPMAN: Object to form and foundation,
16    mischaracterizes the evidence. We know when he
17    took it. It wasn't then.
18      MR. IHRIE: How do we know, Ron?
19  Q If we know when he took it -- do you agree with
20    that, Doctor, that quote/unquote we know when he
21    took it, meaning Xanax?
22  A I don't know when he took it.
23  Q Thank you. Now, how many days -- if he took Xanax
24    the day he went in on the 11th, how many days would
25    it -- would he have been in jail on the 17th?

Page 200

1   A Six.
2   Q And isn't that within your -- the time period that
3     you speak of and your report that says most of the
4     significant withdrawal symptoms will occur within
5     the first few days or weeks of stopping this class
6     of drugs? Wasn't the 17th within the first few
7     days or a week of when he came into the jail?
8   A It was the end of the first week. However, this
9     case is interestingly pharmacokinetically quite
10    complicated, in that if he was on lorazepam, which
11    has a very long half-life of 30 hours plus, it will
12    stay in your system for several weeks. So he would
13    have been having lorazepam still in his system
14    covering any withdrawal from Xanax during that
15    first week, or even longer, to make it very
16    complicated, if you want to get into that long
17    discussion.
18  Q Would you please repeat that for me, Doctor? I
19    want to make sure I understand what you're saying.
20      MR. CHAPMAN: Well, can we have -- wait, wait.
21    Instead of repeating it, have the court reporter
22    read it back.
23      MR. Ihrie: All right. Fair enough.
24      (The requested material was read back by the
25    court reporter.)

Page 201

1   Q  So Klonopin is lorazepam, correct?
2   A  Correct.
3   Q  And that is short acting or long acting?
4   A  Long acting.
5   Q  And Xanax is short acting, correct?
6   A  Correct.
7   Q  Would you expect a medical doctor that is medical
8      director of a jail that has inmates that come into
9      it that are either addicted or on prescription
10     medication to know whether or not Xanax is a long
11     acting or a short acting drug?
12  A  I would expect them to probably know that, yes.
13  Q  And would you expect them to know whether Klonopin
14     is a long acting or a short acting drug?
15  A  Yes.
16  Q  What would you conclude -- did you read, rather, in
17     Dr. Sherman's deposition that when I asked him
18     which one was which, he didn't know?
19  A  I'm not sure --
20  Q  What would you conclude from that?
21  A  I don't know if every physician would know that.
22     But when you go to medical school and you go
23     through training, you know which ones are the ones
24     you've got to be more -- most careful with when you
25     take them all.  Xanax happens to be one of the ones

Page 202

1      for sure because it's short acting and you can have
2      early withdrawal symptoms and the risk of death --
3      seizures and death.  So those -- if you know
4      someone that comes into your jail, you want to get
5      them on withdrawal protocol right away.
6          This gentleman was interesting in the fact he
7      had been on the long acting one and stopped it
8      prior to the Xanax possi- -- I don't know when he
9      -- honestly, I don't know when he stopped both of
10     them.  But if he did, he actually was self-tapering
11     himself off Xanax, which is a very interesting
12     case.
13  Q  All right.
14         MR. CHAPMAN:  I would also object to the prior
15     question as mischaracterizing the record that
16     that's what Dr. Sherman testified to.
17  Q  So acknowledging the last comment, Doctor,
18     Dr. Sherman, in testifying at least the day that I
19     asked him, not knowing what was a long acting or a
20     short acting, he wouldn't be able to make that kind
21     of a conclusion, would he?
22  A  Well, to discuss it further would be even if he did
23     not have any clue about that.  It's the short
24     acting ones you worry about having the biggest risk
25     of withdrawal, not the long acting ones.  The long

Page 203

1      acting ones get out of your system very slowly
2      whereas as short acting ones get out of your system
3      quick.  He knew the guy had been off of it at least
4      for six days when he got the information about his
5      whatever -- hallucinations, whatever.  And so the
6      risky period had already been over at that point of
7      withdrawal.  And that's why he felt he did not need
8      to be put on the protocol or withdrawn further at
9      that point.
10  Q  So since he's taking two separate -- presuming he's
11     taking two separate benzodiazepines, one short
12     acting and one long acting, is it your testimony
13     that the symptoms of withdrawal could show up
14     either sooner or later because of the two half
15     lives of the medication?
16  A  Well, in my pharmacologic -- or I guess
17     pharmacology background and doing clinical research
18     trials for many years looking at half lives as well
19     as working in jails and knowing the short acting
20     versus long acting benzodiazepines, my comment
21     would be the Xanax would get out of his system
22     quick, but the other drug, Klonopin, will stay in
23     it for longer and would still cover withdrawal from
24     Xanax, most likely.  And that's why he didn't have
25     any symptoms in the first six days and why

Page 204

1      Dr. Sherman did not put him on another protocol or
2      a taper.
3   Q  When did he start to have symptoms of benzo
4      withdrawal?
5   A  Well, according to what you've told me, he started
6      having those symptoms the day -- on the 17th.
7   Q  Well, I'm not asking you to mimic what I said.
8      You're the one -- you're the doctor and the expert,
9      and you looked at the medical records.  When did he
10     begin to have symptoms of benzo withdrawal?
11  A  I'm not sure he had symptoms of benzo withdrawal at
12     all.
13         MR. CHAPMAN:  I'm sorry.  Could you repeat
14     that, Doctor?  I didn't hear you.
15         THE WITNESS:  I said I'm not sure David had
16     symptoms of withdrawal at all.
17  Q  Is that your testimony, that he didn't have any
18     withdrawal symptoms of benzodiazepine?  Is that
19     your testimony?
20  A  My testimony is I'm not sure he had symptoms of
21     benzodiazepine withdrawal at all.  He may have had
22     an underlying psychiatric condition that caused his
23     symptomatology.
24  Q  As the medical director of a jail, if you found out
25     that your patient had been taking Klonopin and

Page 205

1    Xanax and was hallucinating and had been abruptly
2    stopped sometime prior to entering the jail within
3    a week or so and you saw those symptoms, what would
4    you have done?
5    A  A mental health consult.
6    Q  With who?
7    A  Well, our mental health department.
8    Q  Well, a department isn't -- doesn't talk.  People
9    in the department do.  So who would you have met
10   with or consulted with?
11   A  It could have been a social worker, could have been
12   a counselor, could have been any one to go in and
13   evaluate him.
14   Q  And what would you have asked him to do?
15   A  To evaluate the patient to see what they think's
16   going on with him.
17   Q  Assess the patient?
18   A  Yes.
19   Q  And what if they couldn't assess him?  Would you
20   expect them to report back to you?
21   A  I would suspect -- I would refer them for mental
22   health evaluation.  I would hope they would refer
23   them on for -- to evaluate them, do what they have
24   to do and, I mean, similar to what happened in
25   David's case; follow him and see what's going on,

Page 206

1    and at some point, if you're not getting anywhere,
2    you get a psychiatrist involved.
3    Q  And at what point weren't they getting anywhere?
4    A  At what point?
5    Q  In this case.
6    A  Well, obviously, they had -- ended up having to
7    have the care conference on the 26th.  I presume
8    they felt they weren't getting anywhere at that
9    point and it's time to do something different.
10   Q  So did Dr. Sherman refer him to mental health --
11   refer David to mental health?
12   A  Well, I believe originally the -- the guards put
13   him in the suicide watch because of bizarre
14   behavior.
15   Q  Now, answer my question.  Did Dr. Sherman refer him
16   to mental health?
17       MR. CHAPMAN:  Objection.  Don't be
18   argumentative.  He did answer your question.
19       MR. IHRIE:  No, he didn't.  I want an answer
20   to that question.
21   Q  Did Dr. Sherman refer him to mental health?
22   A  I don't think Dr. Sherman did himself, no.
23   Q  In fact, Dr. Sherman sent him back to the general
24   population, correct?
25   A  Correct.

Page 207

1    Q  And that was on the 17th, correct?
2    A  Yes.
3    Q  And on the 18th, after talking to Cueny, he still
4    didn't refer him to mental health, did he?
5    A  Well, I believe at that point he was already placed
6    in the mental health unit by the guards because of
7    bizarre behavior the evening before.
8        MR. CHAPMAN:  Mr. Ihrie, do you have any idea
9    how much longer you're going to be?
10       MR. IHRIE:  I don't think we're going to be
11   that much longer, Ron.
12       MR. CHAPMAN:  Okay.  Thank you, sir.
13   Q  Doctor, continuing, what was causing David's
14   symptoms of hallucination, shaking, eye fluttering,
15   et cetera?  All the symptoms that he was identified
16   with having by mental health, what was causing
17   those?
18   A  I wish I knew a hundred percent for sure.
19   Q  Do you think that the mental health was curious
20   about what was causing what they were seeing?
21   A  Well, I think that's why --
22       MR. CHAPMAN:  Objection, calls for
23   speculation.
24   Q  All right.  Do you think they were curious?
25   A  I think that's why eventually they got a mental

Page 208

1    health -- or a psychiatry consult set up.
2    Q  At what point after your review of the records did
3    they become curious as to why he was exhibiting
4    those symptoms?
5    A  Well, it seemed like those symptoms dissipated
6    somewhat, but he just would not respond to mental
7    health at all.  But being as medical came by and
8    checked him and he seemed to be stable, he was not
9    changing much from the mental health standpoint,
10   but he just never got better or different, they
11   finally got him set up with a care conference and
12   referred.
13   Q  Now, what's the answer to my question?  At what
14   point did they become curious about what was
15   causing his symptoms?
16       MR. CHAPMAN:  Object to form and foundation,
17   calls for speculation.
18   A  I don't know.
19   Q  I'm going to ask you to take a look at Chantalle
20   Brock's notes dated June 18th.
21   A  Which exhibit was that?
22   Q  I'll tell you in a moment.
23   A  On June 18th?
24   Q  Yes.  So one moment, please.  All right.  Do you
25   have that, Doctor, the 18th note?  I believe it was

Page 209

1      from Chantalle Brock.
2  A   Yes.
3  Q   Self-harm watch/mental health, do you have that?
4  A   Yes.
5  Q   All right.  So if I understand, your testimony is
6      that Dr. -- is that David was referred by medical
7      to mental health -- or was referred at one point
8      and was up in mental health and was going to be
9      sort of handed off to mental health; is that
10     correct?
11 A   Well, the way I understood it was, he was having
12     bizarre behavior, hallucinating, and the off- --
13     per observation from the officer put him in the
14     mental health unit.  And the next day on --
15     actually -- yeah, on the evening of the 17th.  And
16     then the 18th, that's when he was referred by
17     Chantalle Brock.  And she actually referred him to
18     medical to be evaluated as well.  And that's when
19     Monica Cueny evaluated him.
20 Q   So he was put into mental health, and then mental
21     health -- the first time mental health went to see
22     him, she said well, I've got to send this -- I want
23     to -- I want to send him back to medical to have
24     medical evaluate him because of refusing to engage
25     with mental health staff, rapid eye movement,

Page 210

1      bizarre behavior, et cetera, correct?  So she asked
2      this to be reviewed by mental health -- or by
3      medical again, correct?
4  A   Correct.
5          MR. CHAPMAN:  I'm going to object to form and
6      foundation.  It's a compound question and grossly
7      mischaracterizes the evidence of why she made the
8      referral.
9  Q   Well, look at -- look at her note -- Brock's note
10     self-harm watch on the 18th.  Why did she make the
11     referral, Doctor, back to medical?
12         MR. CHAPMAN:  Object to form and foundation.
13 A   Well, she based it on mental health consulted with
14     the nursing staff to assess patient.
15 Q   For what?
16 A   For detox or a medical condition.  Please refer to
17     the nursing progress note which Monica Cueny did.
18 Q   And so after that referral, that's what triggered
19     Monica Cueny coming up to see him, correct?
20 A   Correct.
21 Q   And then Monica Cueny said after finding out that
22     he was on Klonopin and that -- though we don't know
23     if she reviewed -- if she saw Bertram's note, it
24     was available to her, was it not?
25 A   From what I understand, yes.

Page 211

1          MR. CHAPMAN:  Object to form and foundation.
2  Q   She then reported to Dr. Sherman her findings,
3      correct?
4  A   Correct.
5  Q   And that was what she -- what she saw and allegedly
6      reported to Dr. Sherman was a change in
7      circumstances from what Dr. Sherman had seen with
8      respect to David on the -- earlier on the 17th,
9      correct?
10 A   Well, she reevaluated him and actually had a more
11     thorough note that day on the 18th.
12 Q   And reported to Dr. Sherman -- allegedly reported
13     to Dr. Sherman that there had been a change in what
14     -- or a change later on the 17th and early on the
15     18th from what Dr. Sherman had seen when he
16     evaluated him on the 17th, correct?
17 A   There was some change, yes.
18 Q   Dr. Sherman knowing that, please tell me why
19     Dr. Sherman didn't reevaluate him.
20 A   Well, according to the note it says case discussed
21     with Dr. Sherman, no new order received at this
22     time, but continue in -- to house in mental health
23     high observation.
24 Q   Is there anything in the medical record that you
25     saw any orders of any kind with respect to David --

Page 212

1      David's medical treatment, from Dr. Sherman?
2  A   Well, just with Monica Cueny's note about
3      continuing to observe in the high -- mental health
4      high observation unit.
5  Q   Now, what's the answer to my question?  Did you see
6      in the medical record any notes or any orders of
7      any kind relating to David Stojcevski from
8      Dr. Sherman?
9  A   I'd have to look through actually the record to see
10     if there was any orders at all.  Not that I recall,
11     no.
12 Q   All right.  Thank you.
13         Continuing to look at Brock's self-harm watch
14     on the 18th, do you see that Brock at the top of
15     her note indicated that she was watching him on a
16     self-harm watch, but she changed that to
17     decompensation -- she marked decompensation reason
18     for watch?  Do you see that?
19 A   Yes.
20 Q   And what does that mean to you when you see that?
21 A   Well, there's got to be a reason why are you
22     putting someone on a 15-minute self-harm watch.
23     What's the reason?  You've got to have some kind of
24     reason -- mental health has to have some kind of
25     reason.  So her reasoning is he's had a change in

53 (Pages 209 to 212)

Page 213

1    behavior or something needs to be followed more
2    closely.
3    Q  Now, you can't get much more closely than watching
4       somebody 24 hours a day every 15 minutes on a video
5       monitor, can you?
6    A  Well, you can have --
7          MS. SWINDLEHURST:  Object to form, foundation.
8    A  You can have one-on-one observation where you're
9       watching them 24/7 with one person watching them --
10      looking at them the whole time.  That's done as
11      well.
12   Q  Did you see in every mental health self-harm watch
13      document that the reason that he was placed in high
14      observation was for -- because he was actively
15      suicidal?
16   A  Well, I saw -- I mean, he was placed in there by
17      the officer because of bizarre behavior and
18      possible hallucinations.
19   Q  Doctor, have you had an opportunity to look at what
20      it means for somebody to be placed in high
21      observation green, which is where David was?
22   A  What's the question?
23         MR. CHAPMAN:  I'm sorry.  What was the
24      question?
25   Q  Did you have an opportunity to look at what it

Page 214

1    means -- why one would be placed in high
2    observation green in any of the records that you
3    reviewed?
4          MS. SWINDLEHURST:  Objection, form,
5       foundation.
6          MR. CHAPMAN:  Same objection.  Join.
7    A  Well, that there was concern of self-harm, that's
8       why those boxes were checked.
9    Q  Well, I want you to assume that high observation
10      green is for people who are actively suicidal.
11      After reviewing the records, did you see any
12      indication at any time of David's stay where he was
13      actively suicidal?
14         MS. SWINDLEHURST:  Objection, form,
15      foundation.
16   A  Well, it's not uncommon in jails that the only
17      reason you're put in a -- in the green smocked suit
18      is because of being suicidal.  There may be --
19      there may be a potential for suicide or there's
20      concern the person's acting bizarre and could
21      self-harm, so they may be put in green.  But I did
22      not see David, you know, doing self-harm to
23      himself.
24   Q  So your testimony is that you did not see any
25      evidence in the records that David was actively

Page 215

1    suicidal; is that correct?
2    A  No.
3    Q  Is that -- I'm sorry.  Is that correct?
4    A  Or that's correct, yes.
5    Q  Thank you.
6          Doctor, I'm going to draw your attention to
7       page 59 of the Sherman dep.  Please tell me when
8       you're there.
9    A  Okay.  Just a minute.
10   Q  And while you're getting there, Dr. Sherman
11      believed, did he not, that somebody that had been
12      on benzos -- strike that.
13         Dr. Sherman was aware, was he not, and
14      believed that benzodiazepine withdrawal can last
15      for a period of days, weeks or even months?  He,
16      himself, believed that, didn't he?
17   A  If that's what he said.
18   Q  He says that at line 17, correct?
19   A  Yes.
20   Q  So when he says, well, it had been awhile since he
21      was -- since he stopped taking benzos, he believed
22      that symptoms of withdrawal could last beyond a
23      week or two, correct?
24   A  A week.
25         MR. CHAPMAN:  I object.  Mischaracterizes

Page 216

1    testimony.
2    Q  Well, that's what he says in line 17, doesn't he?
3          MR. CHAPMAN:  Objection.  In rule of fairness,
4       you're not reading the entire portion and putting
5       it in context.
6          MR. IHRIE:  Well, you can cross examine him.
7          MR. CHAPMAN:  Well, I'm just pointing out that
8       you're misleading him.
9    A  Well, my comment would be we discussed that
10      probably several times earlier.  But yes,
11      benzodiazepine -- taking someone off that's been on
12      them long-term, taking them off, they can have
13      potentially withdrawal symptoms for months --
14      weeks, months or years.  But the acute dangerous
15      symptoms usually occur within days -- usually
16      within the first week if it's -- especially for the
17      short acting benzodiazepines.  That's why when
18      people come into jails, they put them on CIWA
19      protocols or they put them on tapering doses when
20      they know they're on it when they first come in.
21   Q  So you've testified that the serious symptoms
22      usually occur -- are within the first week,
23      especially with the fast acting benzodiazepines?
24      Like Xanax is fast acting, correct?
25   A  Well, it's got --

Page 217

1      MR. CHAPMAN: Objection, mischaracterizes his
2   testimony.
3      MR. IHRIE: That's exactly what he said.
4   That's exactly what he said.
5      MR. CHAPMAN: No, it is not.
6      MR. IHRIE: So if you want to read it back,
7   we'll read it back. Please read it back. Please
8   read it back, if you would, Ms. Court Reporter.
9      COURT REPORTER: I'm sorry. What are you
10  asking me to read back?
11     MR. IHRIE: I'm going to ask you to read back
12  about the last time that the doctor was speaking.
13     COURT REPORTER: Okay. Just a moment.
14     (The requested material was read back by the
15  court reporter.)
16     MR. IHRIE: All right. Thanks. Okay. So
17  back on the record.
18  Q So the acute serious symptoms that you're talking
19    about from short acting usually occur within a
20    week, you said, correct?
21  A Correct.
22  Q And Xanax is short acting, correct?
23  A Correct.
24  Q And David's symptoms occurred on the 17th within a
25    week, correct?

Page 218

1      MR. CHAPMAN: Objection, mischaracterizes the
2   timeline and your mathematics.
3      MR. IHRIE: Well, from the 11th to the 17th is
4   within a week, is it not?
5      MR. CHAPMAN: But you know that he wasn't
6   incarcerated on the 11th. He was incarcerated on
7   the 10th at Roseville and brought over on the 11th.
8      MR. IHRIE: All right.
9   Q So from the 10th to the 17th, that's approximately
10    one week; am I correct?
11  A So generally significant --
12  Q Is that --
13  A -- withdrawal would happen within the first seven
14    days, so that was actually after the first seven
15    days.
16  Q So what are you going to do, Doctor? Are you going
17    to nail this down to the exact hour and minute as
18    to when the symptoms might begin, or can you say
19    approximately within the first week?
20  A Well, I say in general. Every patient's --
21  Q In general. Thank you.
22  A -- obviously different. Some people are slow
23    metabolizers, some people are rapid metabolizers.
24    I could go all day talking about that, if that's
25    what you want. But in general terms, if you look

Page 219

1   at the literature, most people are going to have
2   the significant problems within the first three to
3   five days, usually. That's why you put people on
4   protocols to taper them off. That's why when an
5   alcoholic comes in, you put them on a long acting
6   benzodiazepine such as Valium or librium for a few
7   days. You don't do it long term; you do it for a
8   few days because they self -- the drugs self taper.
9   It's a long acting drug.
10  Q So a doctor who sees the patient and knows the
11    patient has been taking a fast acting
12    benzodiazepine and finds out about the symptoms
13    that allegedly he was told by Monica Cueny -- if
14    you were told of those symptoms, wouldn't you have
15    put him on a benzodiazepine protocol just to be
16    safe?
17  A Not after he's been there for a week.
18  Q Okay. All right.
19     Doctor, do you dispute the medical examiner's
20    conclusions in this case in any way?
21  A Actually, to be honest with you, I was kind of
22    surprised when I saw a -- I assume that it was a
23    pathologist. But when they put in that report that
24    it was a benzodiazepine withdrawal, I'm not sure
25    how you could say that for sure from an autopsy,

Page 220

1   but -- now, possibly, you know, because of the
2   electrolyte imbalance -- and my guess was the
3   person probably had an arrythmia and died from that
4   or dehydration and electrolyte imbalance and
5   arrhythmia. But to say it was from benzodiazepines
6   for sure, I'm not sure I could say that. I'm not
7   sure what you could do to prove that in an autopsy,
8   what tissue would look like from benzodiazepine
9   withdrawal.
10  Q Do you have expertise in making the determination
11    as to why somebody, like in David's case, died?
12  A No, other than looking at he had, apparently,
13    sodium electrolyte changes, and that actually can
14    induce arrhythmias. And my guess, if I was going
15    to speculate, that's probably what he died of, an
16    arrhythmia.
17  Q Is it your testimony that the medical personnel did
18    everything correctly in this case?
19  A Well, in my opinion --
20  Q And under medical -- excuse me. Under medical, I'm
21    including what you have testified to, which
22    includes medical including nursing and mental
23    health.
24  A Well, I think, in general, medical did the
25    appropriate thing. When he came in, they got a

## Page 221

1  history.  They found out later that he had been on
2  benzodiazepines.  They -- he had already been
3  tapered off it for a week.  They had him on a COWS
4  protocol when he first came in because he said he
5  was taking Methadone.  They ended up having him see
6  mental health.  They -- mental health seen him --
7  saw him every day.  And medical kept seeing him and
8  just kept doing vital signs that remained stable.
9  He -- and then at a point he just didn't turn
10  around, mental health got -- had a care team
11  meeting; got a psychiatrist involved.
12  Unfortunately, he expired.  But I don't see where
13  they grossly did gross negligence.  They for sure
14  didn't just leave him in a cell and let him rot
15  away and never see the guy.  They saw him every
16  day.  So I don't see any terrible mistakes that
17  medical made to avoid taking care of him in a jail.
18  They did what they -- they did what they thought
19  was appropriate from the information they knew at
20  the time.
21  Q  And your testimony before was that he was
22  monitored, but there was no treatment for him?  Do
23  you recall testifying to that?
24  A  Well, he --
25  Q  Do you recall that testimony?

## Page 222

1  A  Yeah, he was monitored.  They did not -- other than
2  treatment from mental health evaluations, they
3  didn't put him on specific medication for
4  treatment, no.
5     MR. IHRIE:  No other questions.
6     COURT REPORTER:  Does anybody else have any
7  questions?
8     MR. CHAPMAN:  No, I have no questions.
9     MS. SWINDLEHURST:  No, I don't have any
10  questions either.
11     (Deposition concludes at 3:50 p.m.)

## Page 223

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAFINKA STOJCEVSKI, a/k/a   )
STEPHANIE STOJCEVSKI,   )
Individually, and as   )
Personal Representative of   )
the Estate of DAVID   ) Case No.
STOJCEVSKI, Deceased,   ) 15-cv-11019
              Plaintiffs,   )
   -v-   )
COUNTY OF MACOMB, SHERIFF   )
ANTHONY M. WICKERSHAM,   )
MICHELLE M. SANBORN,   )
CORRECT CARE SOLUTIONS   )
(CCS), LAWRENCE M. SHERMAN,   )
M.D., DAVID ARFT, NATALIE   )
PACITTO, MONICA CUENY,   )
R.N., TIFFANY DELUCA, LPN,   )
VICKI BERTRAM, LPN, SARA   )
BREEN, LPN, MICAL   )
BEY-SHELLEY, LPN, DIXIE   )
DEBENE, LPN, THRESSA   )
WILLIAMS, LPN, LINDA   )
PARTON, LPN, AMBER BARBER,   )
LPN, DEANN PAVEY, LPN,   )
CHANTALLE BROCK, LPN, KELLY   )
MANN, DANYELLE NELSON, MHP,   )
OXLEY, COONEY, HARRISON,   )
TALOS, PINGILLEY, AVERY,   )
VANEENOO AND HELHOWSKI,   )
              Defendants.   )

Job No. 128398

## Page 224

The deposition of RANDALL STOLTZ, M.D., taken
in the above-captioned matter, on April 30, 2017, and at
the time and place set out on the title page hereof.
   It was requested that the deposition be
transcribed by the reporter and that same be
reduced to typewritten form.

STEWART RICHARDSON & ASSOCIATES
Registered Professional Reporters
20 N.W. Fourth Street
Evansville, IN  47708
(812) 477-4449

Page 225

1   STATE OF INDIANA      )
                          )
2   COUNTY OF WARRICK     )

3

4        I, Sherry D. Lenn, RPR, and Notary Public in
5   and for said county and state, do hereby certify that
6   the deponent herein, RANDALL STOLTZ, M.D., was by me
7   first duly sworn to tell the truth, the whole truth,
8   and nothing but the truth in the aforementioned
9   matter;
10       That the foregoing deposition was taken on
11  behalf of the Plaintiffs; that said deposition was
12  taken at the time and place heretofore mentioned
13  between 9:06 a.m. and 3:50 p.m.;
14       That said deposition was taken down in
15  stenograph notes and afterwards reduced to typewriting
16  under my direction; and that the typewritten
17  transcript is a true record of the testimony given by
18  said deponent;
19       I do further certify that I am a disinterested
20  person in this cause of action; that I am not a
21  relative of the attorneys for any of the parties.
22
23
24
25

Page 226

1        IN WITNESS WHEREOF, I have hereunto set my
2   hand and affixed my notarial seal this 15th day of
3   May, 2018.
4        _____
             Sherry D. Lenn, RPR
5            Notary Public - State of Indiana
             My Commission Expires:  08-02-2024
6
7
8
9
     Job No. 128398
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25