UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAFINKA STOJCEVSKI, as Personal
Representative of the Estate
of DAVID STOJCEVSKI,

                Plaintiff,                      Civil Case No. 15-11019
                                             Honorable Linda V. Parker

v.

COUNTY OF MACOMB, ET AL.

                Defendants.
_____/

## **OPINION AND ORDER**

On June 11, 2014, David Stojcevski ("David") began serving a thirty-day

sentence in the Macomb County Jail, which turned out to be a life sentence when

he died sixteen days later from acute withdrawal from chronic benzodiazepine,

methadone, and opiate medications. Claiming that Defendants' deliberate

indifference to David's serious medical needs caused his death, the personal

representative of David's estate ("Plaintiff") filed this action under 42 U.S.C.

§ 1983[1] against two groups of defendants. The Court will refer to these two groups

---

[1] Plaintiff also initially alleged a gross negligence claim under Michigan law
against Defendants. The Court entered a stipulated order dismissing that claim on
July 21, 2016. (ECF No. 56.) While the dismissal was without prejudice, Plaintiff
never moved to amend the complaint to reassert the claim. Nevertheless, after
Plaintiff moved and was granted leave to amend her complaint to add a § 1983
(Cont'd . . .)

as the "Macomb County Defendants" and the "Correct Care Solutions Defendants" (hereafter "CCS Defendants"). The Macomb County Defendants currently remaining in this action are: County of Macomb; Macomb County Sheriff Anthony M. Wickersham ("Sheriff Wickersham"); Macomb County Jail Administrator Michelle M. Sanborn ("Administrator Sanborn"); and Macomb County Corrections Deputies Walter Oxley, Paul Harrison, John Talos, Morgan Cooney, Brian Pingilley, Brian Avery, Steven Vaneenoo, Mitchell Blount, Keith Ray, David White, and Larry (James) Helhowski.[2]  The remaining CCS Defendants are: Correct Care Solutions, LLC ("CCS"); CCS Acting Director of Nursing Monica Cueny; CCS Medical Director Lawrence Sherman; CCS nurses Tiffany DeLuca, Mical Bey-Shelley, Vicky Bertram, Heather Erhlich, Sarah Breen, Thressa Williams, Linda Parton, and Amber Barber; CCS Health Services Administrator David Arft; CCS Mental Health Director Natalie Pacitto; and CCS Mental Health Professional Chantalle Brock.

---

claim against new defendants, she filed an amended pleading that again included her gross negligence claim (Count III).  (*See* ECF No. 104 at Pg ID 2321-2326.) Because Plaintiff never sought leave to re-assert her state law claim, the Court is sua sponte dismissing without prejudice Count III of the Second Amended Complaint.

[2] In her initial and First Amended Complaint, Plaintiff named "Deputy John/Jane Doe's" [sic] and "John/Jane Doe providers."  While Plaintiff did not include these unnamed individuals in her Second Amended Complaint, they were never terminated from this action.  The Court is doing so now, sua sponte.

The matter is presently before the Court on dispositive motions filed by: (1) Sheriff Wickersham ("Wickersham MSJ") (ECF No. 142); (2) Macomb County, Administrator Sanborn, and Sheriff Wickersham in their official capacities ("Macomb Cty. Official Capacity MSJ") (ECF No. 143); (3) the corrections deputy defendants ("Deputies' MSJ") (ECF No. 146); and (4) the CCS Defendants ("CCS Defs.' MSJ") (ECF No. 148). The motions have been fully briefed. Finding the facts and legal arguments fully developed in the parties' briefs, the Court is dispensing with oral argument with respect to Defendants' motions pursuant to Eastern District of Michigan Local Rule 7.1(f).

## I.    Summary Judgment Standard[3]

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one

---

[3] In their motions, the Macomb County Defendants seek summary judgment pursuant to Federal Rule of Civil Procedure 56, as well as dismissal under Rule 12(c). With respect to the latter, the Macomb County Defendants assert that Plaintiff fails to allege sufficient facts in her Second Amended Complaint to state plausible claims against particular defendants. As Plaintiff responds to the Macomb County Defendants' motions by setting forth particularized facts on which she premises her claims against each defendant, the Court is reviewing her claims under Rule 56's summary judgment standard only.

party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). After adequate time for discovery and upon motion, Rule 56 mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant has the initial burden of showing "the absence of a genuine issue of material fact." *Id*. at 323. Once the movant meets this burden, the "nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotation marks and citation omitted). To demonstrate a genuine issue, the nonmoving party must present sufficient evidence upon which a jury could reasonably find for that party; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252. The court must accept as true the non-movant's evidence and draw "all justifiable inferences" in the non-movant's favor. *See Liberty Lobby*, 477 U.S. at 255.

## II.    Factual Background

David was arrested by Roseville Police Department officers on June 10, 2014, at which time he had an outstanding bench warrant for the civil infraction of failing to pay or appear in court on a careless driving charge. (Deputies' MSJ Exs. 1, 2, ECF Nos. 146-2, 146-3.) On Wednesday, June 11, 2014, a judge in

Michigan's 39th District Court sentenced David to serve thirty (30) days in jail or pay $772.00 for the infraction. (*Id.* Ex. 1, ECF No. 146-3.) Later that day, David was transferred to the Macomb County Jail to serve his sentence, at which time Tiffany DeLuca, LPN ("Nurse DeLuca") collected intake medical information from him. (Medical/Mental Health Records (hereafter "HR") at 361, ECF No. 148-2.)[4]

Nurse DeLuca noted the following at David's intake: (a) he weighed 195 pounds; (b) his blood pressure was 120/84, his pulse rate was 97, and his respiratory rate was 12; (c) he had been prescribed methadone prior to incarceration; (d) his mental status was noted as "Alert orientation, Affect appropriate, Logical thought processes, Speech Appropriate, Mood Appropriate, Activity Appropriate"; (e) there were no indicators that David was suicidal; and (f) no history of psychotropic medications, psychiatric hospitalization or outpatient mental health treatment (*Id*. at 362-63.) Nurse DeLuca initiated the Clinical Opiate Withdrawal Scale ("COWS") protocol and ordered over-the-counter medications Meclizine, acetaminophen, and Loperamide for opiate withdrawal symptoms as needed. (*Id*. at 348-50, 392.)

---

[4] David's medical and mental health records from the Macomb County Jail are filed under seal.

David had been incarcerated in the Macomb County Jail on several previous occasions between September 2, 2006 and August 2009. (Deputies' MSJ Ex. 3, ECF No. 146-4.) The jail's records reflect that David in fact had a psychiatric history of depression, anxiety, and substance abuse that required prescriptions for Xanax and Klonopin (both of which are benzodiazepines), psychiatric hospitalization, and outpatient mental health treatment. (Pl.'s Resp. to CCS Defs.' MSJ Ex. 9 at 198-99, ECF No. 158-9.) He also had a history of cerebral trauma and seizure. (*Id.*) According to those records, David's weight between September 2006 and August 2009 fluctuated between 175 and 190 pounds. (*Id.* at 184-207.) Nurse DeLuca did not review David's prior jail records at intake, nor did she check David's prescription history through the Michigan Automated Prescription System ("MAPS"). MAPS reflected that David was being prescribed Xanax, Klonopin, and methadone from January 2014 until his June 11, 2014 incarceration. (*Id*. Ex. 10, ECF No. 158-10.)

Under the COWS protocol, a physician is to be notified if a prisoner has the potential for poly-substance withdrawal. (HR at 348.) Unaware of David's other medications, Nurse DeLuca did not notify CCS' Medical Director at the jail, Lawrence Sherman, MD ("Medical Director Sherman" or "Dr. Sherman"), or any other CCS staff of a potential for poly-substance withdrawal.

At 8:00 p.m. on June 11, 2014, Heather Erhlich, LPN ("Nurse Erhlich") performed a COWS assessment, noting that David's blood pressure was 132/90 and his pulse was 92. (HR at 398.) After assessing values to various conditions related to opiate withdrawal (e.g., sweating, restlessness, joint ache, tremors), Nurse Erhlich assigned David a COWS score of 4, which is ranked as "mild."[5] (*Id.*) Nurse Erhlich gave David acetaminophen and Meclizine at 10:22 p.m. (HR at 367.)

On Thursday, June 12, at approximately 5:00 a.m., Nurse Ehrlich visited David again and measured his vital signs (blood pressure: 116/76; pulse: 70) and recalculated his COWS score (3). (HR at 398.) Nurse Ehrlich gave David acetaminophen, Loperamide, and Meclizine at 6:48 a.m. (HR at 367.) CCS' Acting Director of Nursing at the time, Monica Cueny, RN ("Nursing Director Cueny"), reviewed David's COWS protocol initiation paperwork at 9:35 a.m. on June 12. (HR at 348-50.) At 1:00 p.m., a nurse rechecked David's vital signs (blood pressure: 110/78; pulse: 100) and assigned him a COWS score of 3. (HR at 398.) At approximately 8:00 p.m., Thressa Williams, LPN ("Nurse Williams") checked David's vital signs (blood pressure: 110/72; pulse: 74) and assigned him a

_____

[5] The scores are: 5-12=Mild; 13-24=Moderate; 25-36=Moderately Severe; and more than 36=Severe Withdrawal. (HR at 398.)

COWS score of 2. (*Id*.) At 10:42 p.m., Nurse Williams gave David acetaminophen and Loperamide. (HR at 367.)

On Friday, June 13, Nurse Williams visited David but apparently was not able to measure his vitals or assess his COWS score. (*See id*. at 398.) At 11:23 a.m., Amber Barber, LPN "(Nurse Barber") gave David acetaminophen. (*Id*. at 367.) At 1:00 p.m., Nurse Barber checked David's vital signs (blood pressure: 108/72; pulse: 88) and calculated his COWS score as 2. (*Id*. at 398.)

On Saturday, June 14, Linda Parton, LPN ("Nurse Parton") checked David's vital signs (blood pressure: 120/84; pulse 84) and recalculated David's COWS score as "0." (*Id*.) At 1:00 p.m., another nursed checked David's vitals (blood pressure 130/84; pulse: 105) and recalculated his COWS score as 2. (*Id*.) The same nurse gave David acetaminophen at 1:33 p.m. (*Id*. at 367.) Nurse Barber visited David at 8:00 p.m., but was unable to assess him. (*Id*. at 398.)

Nurse Barber checked David's vital signs (blood pressure: 114/90; pulse: 98) and assessed his COWS score as 2 the following morning at 5:00 a.m., Sunday, June 15. (*Id*.) Another nurse checked David at 1:00 p.m., at which time his blood pressure was 134/78, his pulse was 97, and his COWS score was 2. (*Id*.) David received acetaminophen at 1:19 p.m. (*Id*. at 398.) Because the nursing staff assessed David's COWS score below 12 for 72 hours, he was deemed to have

completed the detoxification protocol and jail command was so notified. (*Id*. at 360.)

There are no entries in David's medical records for Monday, June 16, 2014. At approximately 7:50 a.m. the following day, however, Corrections Deputy William Licavoli requested assistance from medical staff after observing David "laying on his back on his bunk blinking his eyes" and seemingly "unable to speak or move." (CCS Defs.' Mot. Ex. C, ECF No. 148-4 at Pg ID 4094.) Mical Bey-Shelley, LPN ("Nurse Bey-Shelley") responded to David's cell. (HR at 395.)

In a late entry to David's medical records the following day, June 18, Nurse Bey-Shelley indicated that she responded to Deputy Licavoli's call to David's cell on June 17, at which time she took David's vitals and placed an ammonia inhalant under his nose, which caused him to "open[] his eyes wide." (*Id.*) Nurse Bey-Shelley reported that David continued to stare at the medical and corrections staff, but would not respond to the medical staffs' questions. (*Id*.) Nurse Bey-Shelley had David taken to the medical clinic in a wheelchair for further observation and to be seen by Medical Director Sherman.

During his deposition in this case, Dr. Sherman testified that he examined David in the medical clinic on June 17, although Dr. Sherman did not document his assessment at that time. (Sherman Dep. at 107, ECF No. 148-14 at Pg ID 4380.) While Dr. Sherman stated that he is "normally … very fastidious about

writing [his] notes as [he] see[s] the patient," he claimed that he failed to do so in this case because it was late in the day and the exam did not occur in his office. (*Id*. at 108, Pg ID 4380.)

At 7:29 p.m. on June 24, 2014, Dr. Sherman made a late entry in David's medical records regarding his assessment of David on June 17.[6] Dr. Sherman wrote:

> I went to see this patient who was being observed in the Medical Unit for questionable seizures. I observed him fluttering his eyes in what was certainly not a seizure but what was most likely his poor attempt to feign one. I shook his shoulders and told him to sit up, at which point he suddenly stopped the eye fluttering behavior and exclaimed, "What's happening?" as if he were unaware.

(HR at 393.) Dr. Sherman concluded that no further treatment was needed and instructed that David be returned to his general population housing. (*Id*.) According to Nurse Bey-Shelley's entry in David's medical records—also made late, but only one day after the June 17 encounter—David verbalized his understanding and was able to stand and walk back to the housing unit "with a steady gait." (HR at 395.)

At 3:48 p.m. on June 17, Corrections Deputy Campau observed David "[h]allucinating" and "talking to ppl [people] not there[.]" (HR at 366.)

---

[6] In the entry, Dr. Sherman indicated that he saw David on June 23 rather than June 17. (*See* HR at 393.) Dr. Sherman testified that this was a mistake. (Sherman Dep. at 107, ECF No. 148-14 at Pg ID 4380.)
(Cont'd . . .)

According to Deputy Campau, David also stated "that he died earlier today." (*Id.*)

Deputy Campau completed a form referring David to the jail's mental health unit,

checking "Other Inappropriate Behavior" as the reason for the referral.[7] (*Id.*) The

form reflects that "Danielle from MH [Mental Health]" instructed Deputy Campau

to place David in "HIG [High Observation Green]," which is for inmates

exhibiting active suicidal behavior and/or verbalizations. (*Id.*) Inmates in HIG are

placed in anti-suicide gowns. (Pacitto Dep. at 96, ECF No. 148-7 at Pg ID 4170.)

They cannot possess sheets, blankets, or personal property and are placed in a cell

where they are continuously monitored (i.e., twenty-four hours a day/seven days a

week) via closed circuit television by deputies on "mental health control duty."

(*Id.*; HR at 359; *see also* Avery Dep. at 11, ECF No. 162-9 at Pg ID 5580.)

The deputies assigned mental health control duty work at a desk or counter

across the hall from three video-monitored male mental health unit cells: "MH-1,"

"MH-2," and "MH-3". (Harrison Dep. at 12, ECF No. 162-19 at Pg ID 5780;

Deputies' MSJ Ex. 19, ECF No. 162-20.) There are seven television monitors on

the desk or counter that provide video feeds from the mental health unit cells.

David was housed in MH-1, which was approximately six or seven feet from the

---

[7] The form listed the following possible reasons for the referral: "Suicidal,"
"Homicidal, "Mutilative," "Hostile, Angry," and "Other Inappropriate Behavior."
(HR at 366.) In a comments section on the form, Deputy Campau described the
behavior he observed (and described above). (*Id.*)

monitoring location. (Harrison Dep. at 20, ECF No. 162-19 at Pg ID 5782.) From their duty station, the control officers can see into MH-1, which has a window that is approximately four feet tall by two or three feet wide. (*Id*. at 30-31, Pg ID 5785.) A "mental health runner" also is responsible for completing rounds of the unit every fifteen minutes to check on the inmates. (Harrison Dep. at 29, Pg ID 5785.)

Natalie Pacitto, CCS' Director of Mental Health at the Macomb County Jail during David's incarceration ("Director Pacitto"), testified that there are many reasons why an inmate may require high observation other than being suicidal; however, the jail's form only identifies that one reason for HIG placement. (Pacitto Dep. at 103, ECF No. 148-7 at Pg ID 4172.) At their depositions in this matter, the deputy defendants testified that they understand that an inmate in High Observation Green is suicidal and they were not advised otherwise in David's case. (*See, e.g.*, Avery Dep. at 21; ECF No. 162-9 at Pg ID 5583; Ray Dep. at 9-11, ECF No. 162-10 at Pg ID 5597; Harrison Dep. at 28-29, ECF No. 162-19 at Pg ID 5784-85.) Director Pacitto testified that when an inmate is placed in HIG, the jail's mental health professionals receive a referral and are responsible for evaluating the inmate. (Pacitto Dep. at 133, ECF No. 148-7 at Pg ID 4180.) In David's case, however, CCS' mental health professionals sent daily memos to jail command requiring them to keep David in HIG because they reportedly were unable to assess

12

his mental health status. (*See* HR at 351-59; *see* Pacitto Dep. at 69-, ECF No. 158-17 at Pg ID 5282.)

At approximately 7:25 p.m. on June 17, Deputy Paul Harrison observed David "twitching on the ground" in his mental health unit cell. (CCS Defs.' Mot. Ex. E, ECF No. 148-6 at Pg ID 4144.) Deputy Harrison entered the cell and asked David if he was ok, but David did not respond. (*Id.*) Deputy Harrison called nursing staff to his location. (*Id.*)

Vicky Bertram, RN ("Nurse Bertram"), Nurse Bey-Shelley, and Sara Breen, LPN, responded to Deputy Harrison's call. When they arrived, David was sitting on the floor of the cell and stated that "all his organs, but 10% of his heart was removed and his arms shreaded [sic] a couple days ago" while in the jail. (HR at 396.) David also told the nurses that he was taking "4 mg of [X]anax daily for anxiety and oxycodones for pain." (*Id.*) Nurse Bertram documented David's vital signs (blood pressure: 150/98; pulse: 77; respiratory rate: 18; pulse oximetry: 99), noted that his pupils were reactive bilaterally, and instructed David "to let corrections/medical staff know if symptoms worsen." (*Id.*) According to Plaintiff's summary of the cell video, the nurses spent seven minutes with David on this occasion. (Pl.'s Resp. to CCS Defs' Mot. Ex. 7 at 9, ECF No. 158-7 at Pg ID 4971.)

At 2:15 p.m. the following day, Wednesday, June 18, Mental Health

Professional Chantalle Brock ("MHP Brock") visited David to assess his mental

health status. (HR at 387.) David was lying on the lower bunk and exhibiting

"rapid eye movement."[8] (*Id.*) MHP Brock reported that she was "unable to

assess" David because he "refused to engage" with her. (*Id.*)

At her deposition in this case, MHP Brock was questioned about her

indication that David "refused to engage" with her. MHP Brock testified that she

believed David was able to respond to her, but chose not to do so. When asked

what criteria she used to make that determination, MHP Brock provided that David

was looking at her while she spoke to him from outside his cell, his eyelids were

moving, and she spoke loudly.[9] (Brock Dep. at 59-61, ECF No. 158-12 at Pg ID

5090.) MHP Brock acknowledged, however, that she did not know if David was in

a state of reality or psychosis and able to understand her at the time. (*Id.*) MHP

Brock referred David for a medical evaluation to determine whether he was

---

[8] MHP Brock testified that she meant to indicate that David was exhibiting "eyelid fluttering" (that is, he was moving his eyelids very fast) when she wrote "rapid eye movement." (Brock Dep. at 51-52 58, ECF No. 158-12 at Pg ID 5088, 5090.)
[9] MHP Brock testified that she never entered David's cell during her assessments of him and that she spoke to him through the food chute. (Brock Dep. at 87-88, ECF No. 158-12 at Pg ID 5097.) The cell video in fact does not reflect any mental health professional entering David's cell during their reported daily assessments of him.

detoxing or there was some other medical problem inhibiting his ability to respond to her.  (*Id.*)

At 2:57 p.m. on June 18, Nurse Bey-Shelley and Nursing Director Cueny visited David.  In a June 24, 2014 late entry to the health record, Nursing Director Cueny noted that David was lying on the lower bunk with his eyes closed and began "flutter[ing] his eyelids" open and closed when she approached him.  (HR at 394.)  Nursing Director Cueny recorded David's vitals ("Respirations even/nonlabored. Radial pulse strong, regular. BP 138/88 HT 98 reg SpO2 98% on room air") and reported that he did not appear to be experiencing auditory or visual hallucinations and was "not engaging initially with [her]."  (*Id.*)  David then told Nursing Director Cueny and Nurse Bey-Shelley that he "take[s] Klonopin 2-3 tabs at home, last taken 2 weeks ago for anxiety."  (*Id.*)  Although David stated that he had been prescribed Klonopin, he was unable to provide the name or location of the pharmacy where he filled the prescription.  (*Id.*)  Nursing Director Cueny did not recall asking David the dosage of his medications and her record does not include that information.  (*Id.*; *see also* Cueny Dep. at 90-92, ECF No. 148-3 at Pg ID 4040.)  She did ask David if he had ever had a psychiatric hospitalization for anxiety, and he nodded "yes," but was unable to state where or when.  (*Id.*)

Nurse Bey-Shelley and Nursing Director Cueny "encouraged" David to drink two 6-ounce glasses of water, which he "tolerated without difficulty."  (*Id.*)

They then instructed David to notify staff of any changes and notified the corrections deputies to inform the medical staff of any changes. (*Id.*) Nursing Director Cueny testified that she immediately went back to the medical clinic after visiting David, reviewed his medical chart, and telephoned Dr. Sherman who did not issue any additional orders. (Cueny Dep. at 103-07; *see also* HR at 394.) In her June 24, 2014 late entry to David's medical records regarding her June 18 assessment of him, Nursing Director Cueny wrote: "Continue with COW[S] protocol as ordered." (HR at 456.) As indicated, however, the COWS protocol had been terminated several days earlier, on June 15.

Later in the evening on June 18, Nurse Bertram and two other nurses visited David in his cell. (Bey-Shelley Dep. at 178-80, ECF No. 148-9 at 4307; Cell video at 19:21 on 6/18/14.)[10] No entries were made in the health record reflecting this visit.

At 9:50 a.m. on Thursday, June 19, Mental Health Professional Danyelle Nelson visited David. (HR at 385-86.) MHP Nelson noted that David was "laying on the floor naked in his room with one arm half in the air with rapid eye movement" and that he "refused to engage with [her]." (*Id.* at 386.) MHP Nelson

---

[10] Plaintiff submitted the video in the traditional manner and under seal. (*See* ECF No. 162-4.)

reported that she was "unable to assess" David's mental status, noting that he "refused." (*Id*. at 385-86.)

A notation in the Mental Health Log Book at 12:00 p.m. on June 19 reads that David was "more coherent" and was "[a]dvised he needs to eat." (CCS Defs.' Mot. Ex. G at 159, ECF No. 148-8 at Pg ID 4220.) At 12:43 p.m., David is seen eating the meal delivered to his cell. This is the first time he had eaten since entering the observation cell on June 17.

At 9:50 a.m. on Friday, June 20, MHP Nelson visited David again. (*Id*. at 383-84.) David was lying on the floor with his anti-suicide gown draped over his body. (*Id*.) MHP Nelson noted that he again "refused" to engage with her. (*Id*.) The Mental Health Log Book reflects that a nurse "cleared" David at 1:35 p.m. (CCS Defs.' Mot. Ex. G at 164, ECF No. 148-8 at Pg ID 4225), although there are no notations in David's medical records recording this visit. A review of the cell video reflects that this visit lasted forty seconds. At 6:12 p.m., David is seen in the jail video eating the meal delivered to his cell. At 10:21 p.m., another nurse is seen on the video visiting David for seven minutes, measuring his vital signs, and providing him with something to drink. (Cell video at 22:21 on 6/20/14.)

On Saturday, June 21, MHP Brock saw David at 9:35 a.m. (HR at 381-82.) She described David as "lying on the floor naked with rapid eye movement." (*Id*. at 382.) MHP Brock documented that David asked if he "will be receiving

17

medication within the facility" and "after learning medication has not been ordered at this time, … ended contact and refused to fully engage with [her]." (*Id.*) MHP Brock further documented that she had "received collateral information that [David] fully engaged with nursing staff prior to [her] visit[.]" (*Id.*) She therefore "suspect[ed]" and reported that David was "exaggerating sx's [symptoms] for secondary gain[.]" (*Id.*)

The cell video shows Nurse Bey-Shelley visiting David at 1:59 p.m. on June 21 for approximately five minutes. (Cell video at 13:59 on 6/21/14.) There are no notations in the health record documenting this visit.

On Sunday, June 22, 2014, an unidentified officer attempted to interview David to complete the Macomb County Jail Classification Checklist. (Pl.'s Resp. to Deputies' MSJ Ex. 1 at MC 40, ECF No. 162-2.)[11] The officer indicated on the form that he or she was "unable" to interview David because he was "incoherent." (*Id.*)

At 9:15 a.m. on the same date, MHP Brock visited David again. (HR at 379-80.) According to MHP Brock's notes, David was lying naked on the lower bunk and "refused" to engage with her. (*Id.*) In her notes, MHP Brock also repeated her assessment that David was exaggerating his symptoms for secondary gain. (*Id.*) No deputies or health care staff entered David's cell on this date.

---

[11] This record is sealed.

At 11:00 a.m. the following day, June 23, MHP Nelson saw David, who was naked and lying on the lower bunk. (HR at 377-78.) MHP Nelson was "unable to assess" David's mental status, noting that he "refused" to engage with her. (*Id*.) Nurse DeBene saw David at 3:47 p.m. and spent approximately two minutes with him. (Cell video at 3:47 p.m. 6/23/14; CCS Defs.' Mot Ex. G at 177, ECF No. 148-8 at Pg ID 4238.) There are no notations in David's health records regarding this visit. However, there is a notation in the Mental Health Log Book at the same time as Nurse DeBene's visit stating that David was "up and aware and drinking water." (CCS Defs.' Mot. Ex. G at 177, ECF No. 1488 at Pg ID 4238.)

David had defecated and urinated on the bunk shortly before Nurse DeBene visited him and he is seen in the jail video attempting to clean the mattress with toilet paper after Nurse DeBene left his cell. At 5:04 p.m., Nurse DeBene visited David again and took him to the medical unit for a shower. (*Id.* at 178, Pg ID 4239.) The jail cell video shows David eating an apple when he returned to his cell. At 8:14 p.m. on June 23, David can be seen lying down on the lower bunk, where he remained until 12:45 p.m. the following day.

On that date, Tuesday, June 24, MHP Brock visited David at 10:50 a.m., but he again "refused" to engage with her. (HR at 375-76.) MHP Brock noted that David was lying naked on the lower bunk. (*Id*.) The jail video reflects that David ate at 1:00 p.m. At 4:36 p.m., David lay on the floor, where he remained until 2:10

19

p.m. the following day.  A nurse and two corrections officers entered David's cell at 9:34 p.m. on June 24, although there are no notations in his health records regarding this visit and it is not evident from the video whether David's vitals were checked or if any other assessment(s) was made regarding his condition.  (Cell video at 9:34 p.m. 6/24/14.)  The nurse filled a cup of water for David and placed it on the counter.  (*Id*.)

At 2:10 p.m. on Wednesday, June 25, David got up and drank from the sink. Six minutes later, the video shows him lying down on the floor naked and experiencing convulsions that last almost a minute.  Approximately thirty minutes later, Mental Health Professional Kelly Mann conducted the daily assessment of David.  (HR at 373-74.)  According to her report, David was still lying naked on the floor.  (*Id*.)  MHP Mann recorded that David "refused" to engage with her. (*Id*.)  At 9:34 p.m., two deputies and a nurse entered David's cell for thirty seconds.  David, who is still lying naked on the floor, is unresponsive.  There is no notation in the health records regarding this visit, but notes were made in the Mental Health Log Book that David's vital check was "good."  (CCS Defs.' Mot. Ex. G at 188, ECF No. 148-8 at Pg ID 4240.)

On Thursday, June 26, Medical Director Sherman, Director of Nursing Cueny, Mental Health Director Pacitto, Health Services Administrator David Arft, RN, and CCS' psychiatrist at the jail ("Dr. Haque") attended a "Care Team"

meeting between 11:50 a.m. and 12:30 p.m. (CCS Defs.' Mot. Ex. J, ECF No. 148-11 at Pg ID 4313-16.) During the "open floor" portion of the meeting, Dr. Sherman brought up David and expressed that he feels David is "faking seizures, not even pseudo-seizures." (*Id.* at 3, Pg ID 4315.) Dr. Sherman stated that David's vitals were normal and that he (Dr. Sherman) was "[n]ot concerned." (*Id.*) Dr. Sherman added that the mental health staff indicated that David was "refusing or unable to engage in visiting with them" and suspected David was "med seeking." (*Id.* at 3-4, Pg ID 4315-16.) "[T]o rule out any possible new MH [mental health] condition[,]" the committee discussed David being seen by Dr. Haque on Monday, June 30. (*Id.*)

At 1:50 p.m. on June 26, MHP Nelson conducted the daily mental health assessment of David and found him lying on the floor of the cell, partially covered by the anti-suicide gown, "mildly shaking with eye flutters." (HR at 371-72.) David in fact had been lying on the floor on his stomach since 2:16 p.m. the day before. David was still in the same position at 11:23 p.m. on June 26, when a deputy entered the cell for thirty seconds. It appears from the cell video that the deputy attempted to engage David, who was unresponsive, and may have checked David's wristband for the headcount reflected at the same time in the Mental Health Log Book. (*See* CCS Defs.' Mot. Ex. G at 188, ECF No. 148-8 at Pg ID 4249.) At this point, David had been lying on the cell floor, primarily on his

stomach, for almost twenty-nine hours. He had not eaten since 1:00 p.m. on June 24, and had not consumed fluids since 2:10 p.m. on June 25.

At 10:40 a.m. on Friday, June 27, MHP Brock conducted the daily mental health assessment of David, who was still lying on the floor naked, but had moved under the bunk. (HR at 369-70.) MHP Brock noted "eye fluttering movements" and that David "refused" to engage with her. (*Id*.) She therefore wrote that she was "unable to assess" his mental status. (*Id*.) A review of the video from this date shows David apparently sweating and experiencing significant twitching, convulsions, and involuntary movements of his arms and legs. He seems to be writhing across the cell floor at times and his breathing appears labored. At approximately 5:20 p.m., two deputies entered David's cell and found him unresponsive and without a heartbeat or pulse. (HR at 400-02, 454-55.) The deputies called for medical staff assistance and began performing CPR, which the medical staff continued when they arrived. (*Id*.) An ambulance was summoned, and David was transported at 5:50 p.m. to the hospital, where he was pronounced dead.

Mary E. Piettangelo, MD, Deputy Medical Examiner for the Macomb County Medical Examiner's Office, performed on autopsy on June 30, 2014. (Autopsy Report, ECF No. 148-12.) David weighed 151 pounds at the time of his death. In a report dated August 21, 2014, Dr. Piettangelo determined that the cause

of David's death was acute withdrawal from chronic benzodiazepine, methadone, and opiate medications. (*Id.* at 2, Pg ID 4320.) Dr. Piettangelo's final diagnosis of David's condition was: "Acute Withdrawal from Chronic Benzodiazepine, Methadone and Opiate Medications[,] Dehydration with hypernatremia[, and] Seizure/Seizure-like activity." (*Id.*)

## III. Applicable Law

### A. 42 U.S.C. § 1983 Generally

Plaintiff asserts § 1983 claims against Defendants for the violation of David's rights under the Eighth and Fourteenth Amendments. Specifically, Plaintiff alleges that Defendants were deliberately indifferent to David's serious medical needs.

"Section 1983 establishes 'a cause of action for deprivation under color of state law, of any rights, privileges or immunities secured by the Constitution or laws of the United States.'" *Jones v. Muskegon Cty.*, 625 F.3d 935, 940-41 (6th Cir. 2010) (quoting *Horn v. Madison Cty. Fiscal Court*, 22 F.3d 653, 656 (6th Cir. 1994)). A plaintiff asserting a § 1983 claim must show: "(1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006)). The Macomb County Defendants are undoubtedly state actors. The CCS Defendants, who were providing services to Macomb County Jail

23

inmates under a contract with the county, are deemed to be acting under color of state law for purposes of § 1983, as well. *West v. Atkins*, 487 U.S. 42 (1988).

### B.    Qualified Immunity

Qualified immunity protects state actors sued under § 1983 from damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quotation marks omitted).  The determination of whether a government official is entitled to qualified immunity is a two-step inquiry: "First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred?  Second, was the right clearly established at the time of the violation?" *Miller v. Sanilac Cty.*, 606 F.3d 240, 247 (6th Cir. 2010) (internal quotation marks and citations omitted).

As early as 1972, the Sixth Circuit recognized that "'where the circumstances are clearly sufficient to indicate the need of medical attention for injury or illness, [a state actor's] denial of such aid constitutes the deprivation of constitutional due process.'" *Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005) (quoting *Fitzke v Shappell*, 468 F.2d 1072, 1076 (6th Cir. 1972)).

### C.    Deliberate Indifference

The Eighth Amendment "forbids prison officials from 'unnecessarily and wantonly inflicting pain' on an inmate by acting with 'deliberate indifference'

toward his serious medical needs." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). An Eighth Amendment deliberate indifference claim has two components—one subjective and one objective. *Id.*

To satisfy the objective component, the plaintiff must demonstrate "the existence of a 'sufficiently serious' medical need." *Jones*, 625 F.3d at 941 (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (citations omitted)). A sufficiently serious medical need is one "'that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Id.* (quoting *Harrison v. Ash*, 539 F.3d 510, 518 (6th Cir. 2008)).

The subjective component requires proof "that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he [or she] did in fact draw the inference, and that he [or she] then disregarded the risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). The Supreme Court has advised that "'an official's failure to alleviate a significant risk that *he should have perceived but did not*, while no cause for commendation, cannot under [the Supreme Court's] cases be condemned as the infliction of punishment.'" *Id.* (emphasis in original) (quoting *Farmer*, 511 U.S. at 838). However, the Court also has warned that a prison official may "not

escape liability if the evidence showed that he merely refused to verify underlying facts that he strongly suspected to be true, or declined to confirm inferences of risks he strongly suspected to exist." *Farmer*, 511 U.S. at 843 n.8.

"Officials, of course, do not readily admit this subjective component, so 'it is permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge.'" *Preyor v. City of Ferndale*, 248 F. App'x 636, 642 (6th Cir. 2007) (unpublished) (brackets omitted) (quoting *Comstock*, 273 F.3d at 703). "A genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component." *Estate of Carter*, 408 F.3d at 313. "'[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious[.]'" *Preyor*, 248 F. App'x at 643-44 (quoting *Farmer*, 511 U.S. at 842).

### D. Supervisory Liability

"Government officials may not be held liable for the unconstitutional conduct of their subordinates under the theory of *respondeat superior*." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). "[S]upervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)). This does not mean that the supervisor had to "have physically put his [or her] hands on the injured party or even physically been

present at the time of the constitutional violation." *Id.* Supervisory liability may attach where the supervisor "'encouraged the specific incident of misconduct'" or "'implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending offic[ial]s.'" *Shehee v. Luttrell*, 199 F.3d 295, 300 (1999) (quoting *Hays v. Jefferson Cty.*, 668 F.2d 869, 874 (6th Cir. 1982)).

Where a supervisor also is a policymaker, care must be taken to distinguish an individual-capacity claim against the supervisor and an official-capacity or municipal claim, as they turn on two different legal principles. *See Essex v. County of Livingston*, 518 F. App'x 351, 355 (6th Cir. 2013) (unpublished) (citing cases explaining the distinction).

### E. Municipal or Official-Capacity Liability

Suits against state officials in their official capacities "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Kentucky v. Graham*, 473 U.S. 159, 165 (1985) (quoting *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978)). As such, suits against state officials in their official capacities are treated as suits against the State. *Id.* at 166. Unlike individual liability claims, official capacity or municipal liability claims do not require direct participation in or encouragement of the unconstitutional conduct and such claims may be based on a failure to act. *Heyerman v. County of Calhoun*, 680 F.3d 642, 648 (6th Cir. 2012).

Municipal or official-capacity liability may arise where the "moving force" behind the alleged injury, *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 404 (1997), is "(1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Baynes v. Cleland*, 799 F.3d 600, 621 (6th Cir. 2015). To find a municipality liable, there must be "a direct causal link between the custom and the constitutional deprivation; that is, [the plaintiff] must show that the particular injury was incurred because of the execution of that policy." *Id.* (internal quotation marks and citation omitted). With respect to a municipality's "inaction" in the face of federal violations (that is, the latter two bases above), the plaintiff must show the following:

> (1) a clear and persistent pattern of unconstitutional conduct by [municipal] employees; (2) the municipality's notice or constructive notice of the unconstitutional conduct; (3) the municipality's tacit approval of the unconstitutional conduct, such that its deliberate indifference in its failure to act can be said to amount to an official policy of inaction; and (4) that the policy of inaction was the moving force of the constitutional deprivation....

*Winkler v. Madison Cty.*, 893 F.3d 877, 902 (6th Cir. 2018) (quoting *D'Ambrosio v. Marino*, 747 F.3d 378, 387-88 (6th Cir. 2014)) (additional quotation marks, citation, and brackets omitted). Alternatively, the plaintiff could show "that the constitutional violation alleged was a patently obvious and 'highly predictable

consequence' of inadequate training." *Essex*, 518 F. App'x at 356 (quoting *Bryan Cty.*, 520 U.S. at 409).

## IV. Analysis

### A. Objective Component

The cause of David's death was acute withdrawal from chronic benzodiazepine, methadone, and opiate medications. David reported taking methadone, Xanax, Klonopin, and oxycodones days before his incarceration. As the Sixth Circuit Court of Appeals has observed: "Courts have found withdrawal symptoms to qualify as a serious medical need." *French v. Daviess Cty., Ky.*, 376 F. App'x 519, 522 (2010) (unpublished) (Xanax withdrawal) (citing *Mayo v. County of Albany*, 357 F. App'x 339, 341-42 (2d Cir. 2009) (unpublished) (heroin and alcohol withdrawal); *Sylvester v. City of Newark*, 120 F. App'x 419, 423 (3d Cir. 2005) (unpublished) (acute drug withdrawal); *Foelker v. Outagamie Cty.*, 394 F.3d 510, 513 (7th Cir. 7005) (methadone withdrawal)).

Plaintiff therefore satisfies the objective prong of her deliberate indifference claim for purposes of Defendants' summary judgment motions.

### B. Subjective Component

The Sixth Circuit has instructed that "'the subjective component of a deliberate indifference claim must be addressed for each officer individually.'" *Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 542 (2008) (quoting *Garretson v. City*

*of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005)).  This Court will heed

those instructions, but will discuss some of the defendants together to the extent

they had the same or similar exposure to and/or interactions with David.

### 1.    CCS Defendants David Arft, Sarah Breen, Thressa Williams, Linda Parton, and Amber Barber

Plaintiff closes her response brief to the CCS Defendants' summary

judgment motion stating: "Plaintiff respectfully requests that, *except as to the*

*claims against* Defendants David Arft, Sara[h] Breen, Thressa Williams, Linda

Parton, and Amber Barber, that Defendants' Motion be denied in its entirety."

(Pls.' Resp. Br. at 45, ECF No. 158 at Pg ID 4858, emphasis added.)  In their reply

brief, the CCS Defendants therefore surmise that Plaintiff explicitly abandoned her

claims against the above-named individuals.  (*See* Reply Br. at 3, ECF No. 170 at

Pg ID 6502.)  This in fact appears to be the case as Plaintiff also does not set forth

any arguments for why these individuals should be found to have been deliberately

indifferent to David's serious medical needs.

The Court therefore is granting summary judgment to Defendants Arft,

Breen, Williams, Parton, and Barber, is dismissing Plaintiff's claims against them

with prejudice, and is dismissing them as parties to this lawsuit.

### 2.    CCS Nurse Tiffany DeLuca

Nurse DeLuca's only interaction with David was on June 11, 2014, when he

first was transferred to the Macomb County Jail.  Nurse DeLuca collected intake

medical information from David and, upon learning of his prior methadone use, initiated the COWS protocol.

Plaintiff contends that Nurse DeLuca exhibited deliberate indifference to David's serious medical needs by failing to verify his prescription for methadone and obtain information regarding other medications prescribed to him. Plaintiff argues that Nurse DeLuca could have easily found this information in the Macomb County Jail's records from David's prior incarcerations. According to Plaintiff, the treatment and monitoring of David would have significantly changed had Nurse DeLuca uncovered David's long-standing psychiatric history of depression, anxiety, and substance abuse, history of cerebral trauma and seizure, and prescriptions for Xanax and Klonopin.

The Sixth Circuit recently rejected a similar approach to holding a medical provider liable in *Baker-Schneider v. Napolean*, 2019 WL 1748704, -- F. App'x – (April 16, 2019) (unpublished). As the court explained in that case, the liability of a defendant medical provider "does not hinge on whether she should have logged onto her computer to review [the inmate's medical history]." at *3. Instead, wrote the court, the focus is the defendant's "actions given the knowledge she possessed when she examined [the inmate]." *Id*. Following the instruction of that ruling, the Court finds that the record does not reflect anything about David's condition when

Nurse DeLuca conducted her intake examination of him that would have alerted her to the need to do more to address his medical needs.

The Court therefore is also granting summary judgment to Defendant DeLuca, dismissing Plaintiff's claims against her with prejudice, and terminating her as a party to this lawsuit.

### 3.    CCS Nurses Vicky Bertram and Mical Bey-Shelley and Nursing Director Monica Cueny

Nurses Bertram and Bey-Shelley and Nursing Director Cueny interacted with David on several occasions during his incarceration and, most significantly, after he completed the initial COWS protocol but nevertheless began exhibiting withdrawal symptoms.

On June 17, 2014, Nurse Bey-Shelley responded when a deputy called for medical assistance after finding David "laying on his back on his bunk blinking his eyes … seem[ingly] unable to speak or move[.]"  While Nurse Bey-Shelley took David to the medical clinic for further observation and assessment by Dr. Sherman and Dr. Sherman determined no further treatment was needed, Nurse Bey-Shelley, along with Nurse Bertram, were again called to David's cell later in the day when a deputy noticed David hallucinating and talking to people not there.  The nurses reported that David  was "'vaguely' responsive" and stated "that 'all his organs, but 10% of his heart was removed and his arms shreaded [sic] a couple days ago.'"  David also informed the nurses that he was taking Xanax for anxiety and

oxycodones for pain.  As such, they were made aware that David was at risk for poly-substance abuse withdrawal.  In response, the nurses simply checked David's vitals and told him to let corrections and medical staff know if his symptoms worsened.

At the request of the mental health staff, Nurse Bey-Shelley and Nursing Director Cueny saw David again during the afternoon of June 18, 2014.  During this visit, David reported that he also had been taking Klonopin for anxiety prior to his incarceration and had prior psychiatric hospitalization.  The nurses again simply checked David's vitals, which they reported as normal, encouraged him to drink water, and instructed him to notify staff of any changes.  There is evidence that Nurse Bey-Shelley and/or Nursing Director Cueny discussed David's case with Dr. Sherman, but there is no indication in the record that Dr. Sherman followed-up and personally assessed David before issuing "no new orders."  (HR at 394.)

Nursing Director Cueny did not enter information about David's use of Klonopin into his medical records until *six days later*, on June 24.  The same progress note belatedly instructed medical staff to "continue with COW[S] protocol" (even though it had been terminated on June 15) and to monitor David for changes, although the evidence reflects that David's condition significantly

worsened after this date with nothing done to help him.[12]  Moreover, there is no indication that these nurses ever informed corrections staff or other members of the medical staff of what they should be looking for with respect to David's condition.

Under these circumstances, a reasonable jury could find that the response of these nurses to David's risk of polysubstance abuse withdrawal was so inadequate as to be "patently unreasonable."  *See Cairelli v. Vakilian*, 80 F. App'x 979, 984 (6th Cir. 2003) (unpublished).  A reasonably jury could also conclude that reliance on an individual at risk for polysubstance abuse to self-report his or her worsening condition constitutes deliberate indifference.  These defendants, along with Dr. Sherman and CCS' mental health professionals, appear to have concluded early on that David was feigning or faking his symptoms despite the fact that they were consistent with the symptoms of benzodiazepine withdrawal identified in CCS' training materials, *see infra*, and they were informed that he had been taking two benzodiazepine medications, as well as other drugs, prior to his incarceration. Instead of monitoring David to determine whether he was in fact faking his symptoms, these health care providers ignored him and therefore his worsening condition leading to his death.  *See Smith v. Campbell Cty., Ky.*, No. 16-13-DLB-CJS, 2019 WL 1338895 (E.D. Ky. Mar. 25, 2019) (unpublished) (finding issue for

---

[12] Nurse Bey-Shelley visited David again on June 21, 2014 at 1:59 p.m., although there are no notes in the medical records reflecting what she did, if anything, to check on his condition.

jury as to whether medical staff's belief that that pretrial detainee was malingering in the face of his worsening condition constituted deliberate indifference); *see also Brookes v. Shank*, 660 F. App'x 465, 469 (6th Cir. 2016) (unpublished) (holding that "there is at the very least a question of fact" as to whether a doctor who withheld treatment for an inmate "was actually motivated by a sincere concern that [the inmate] was a drug seeker"); *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) ("The possibility that [the defendants] did not do more for [the plaintiff] because they thought he was malingering and did not really have a severe medical need is an issue for the jury.").

For these reasons, the Court is denying summary judgment to Defendants Cueny, Bey-Shelley, and Bertram.[13]

### 4.    CCS Medical Director Lawrence Sherman

Like the nurses above, Dr. Sherman saw David after he completed the COWS protocol and exhibited symptoms consistent with benzodiazepine withdrawal. When David was first brought to Dr. Sherman's attention on June 17,

---

[13] Plaintiff alleges that Nurse Cueny is liable under § 1983 based on her direct involvement with David and her official role supervising the nursing staff as CCS's Acting Director of Nursing during the relevant period. With respect to the latter, Plaintiff alleges that Nurse Cueny failed to properly train and supervise the nursing staff. To the extent Plaintiff asserts that CCS, at Nurse Cueny's direction, maintained a general practice of inadequately training and/or supervising the nursing staff, this is a claim against CCS. *See Phillips v. Roane Cty., Tenn.*, 534 F.3d 531, 543-44 (6th Cir. 2008). Therefore, the Court will address Plaintiff's claim based on this theory in the section concerning CCS' liability.

2014 "for questionable seizures[,]" Dr. Sherman determined that his symptoms were "most likely his poor attempt to feign one." Dr. Sherman's notes from this encounter—entered into the system a week late—fail to reflect what, if anything, Dr. Sherman did to reach this conclusion other than shaking David's shoulder. Dr. Sherman appears to have maintained his belief that David was malingering, despite learning the following day that he had been taking Xanax, oxycodones, and Klonopin prior to his incarceration and therefore risked polysubstance abuse and benzodiazepine withdrawal.

While Dr. Sherman testified that he believed the window for David to experience acute benzodiazepine withdrawal had passed by June 18, a reasonable jury could conclude that this was patently unreasonable, particularly where Dr. Sherman made no attempt to determine the dosage of David's medications or the length of his past use, his physical evaluation of David was cursory at best, and David in fact was exhibiting and continued to exhibit signs of withdrawal for days thereafter until his death.[14] Moreover, Dr. Sherman took no further action to

_____

[14] The CCS Defendants cite the decision to have the jail's psychiatrist, Dr. Haque, evaluate David as evidence that they were not deliberately indifferent to his serious medical needs. This decision was not made until the June 24 CARE Team meeting. A reasonable jury might not find this evidence persuasive, particularly where it came after the mental health staff had been reporting for more than a week that its professionals were unable to assess David and when, at the same time, medical and mental health staff were doing little (or nothing) to assess David's (Cont'd . . .)

confirm that David was not in fact experiencing the life-threatening symptoms that CCS' own literature warns can arise if an inmate is removed from a benzodiazepine medication cold-turkey.

The Court therefore is denying summary judgment to Dr. Sherman.[15]

### 5.    CCS Mental Health Professional Chantalle Brock

Mental Health Professional Brock ("MHP Brock") was responsible for assessing inmates placed on suicide watch and responding to reports of inmate mental health issues.  (Brock Dep. at 11, ECF No. 158-12.)  She was the mental health professional tasked with assessing David on June 18, 2014, after a deputy placed him on high-observation green status after finding him in his cell hallucinating and talking to people not there.

MHP Brock visited David at 2:15 p.m. on June 18, 2014, and found him lying on the lower bunk "with rapid eye movement."  MHP Brock reported that she was unable to assess David because "[patient] refused to engage" but she did nothing to determine if David voluntarily chose not to respond to her or was incapable of doing so.  (*Id.* at 58-60, ECF No. 158-12 at Pg ID 5090.)  MHP Brock

---

worsening physical and mental condition as reflected in the videotape of him in his cell.

[15] Plaintiff also is suing Dr. Sherman in his official capacity as CCS' Medical Director at the Macomb County Jail, alleging that he failed to properly train and supervise the medical staff.  This is a claim against CCS.  *See Phillips*, 534 F.3d at 543-44 (6th Cir. 2008).  The Court will address Plaintiff's claim against CCS based on this theory separately.

acknowledged during her deposition that she did not know if David was in a state of unreality or psychosis and incapable of understanding what she was saying to him when she visited him.  (*Id.*)  MHP Brock never entered David's cell on this occasion or on the four subsequent occasions when she was tasked with assessing his status.

In her notes from this visit, MHP Brock wrote that she consulted with nursing staff to assess David "for detox or medical condition" and she testified at her deposition that she spoke with Nurse Cueny "about medical doing an assessment[.]"  (*Id.* at 84, Pg ID 5096.)  There is no evidence, however, of anyone on the medical staff conducting such an assessment and MHP Brock acknowledged that she never checked the nursing progress notes to confirm that an assessment had been done.  (*Id*. at 70-72, Pg ID 5093.)  MHP Brock testified that it is "very rare" for her to look at the medical notes for an inmate.  (*Id*. at 71, Pg ID 5094.)

When MHP Brock visited David at 9:35 a.m. on June 21, 2014, she found him lying naked on the floor with rapid eye movement and reported  that he refused to engage with her despite "collateral information that [he] fully engaged with nursing staff prior to [her] visit."  The Mental Health Log Book reflects that a nurse was in the unit at 9:00 a.m., but there is no evidence that any nurse visited David specifically at that time.  At her deposition in this matter, MHP Brock

testified that she received this "collateral information" from one of the guards, although she could not name which guard it was.  (*Id.* at 102, Pg ID 5101.)

In the assessment MHP Brock completed on June 21, she wrote that she "suspects [David] is exaggerating [symptom]s for secondary gain[.]"  When asked at her deposition why she wrote this, MHP Brock testified that David did speak with her that day, asking if he would be receiving medication from the facility. (*Id.* at 106, Pg ID 5102.)  MHP Brock further testified that when she told David that mental health medication had not been ordered, he then refused to engage with her.  (*Id.*)  MHP Brock acknowledged at her deposition that she never inquired of David or investigated further to determine what medications he believed he should be receiving.  (*Id.* at 111, Pg ID 5103.)

MHP Brock was responsible for assessing David again on June 22, 24, and 27, 2014.  On each occasion, she reported that David "refused" to engage and that she therefore was "unable" to assess him.  MHP Brock also restated her suspicion that David was feigning his symptoms.  David's withdrawal symptoms and deteriorating condition as reflected on the continuous video monitoring of his cell should have been obvious to MHP Brock on the occasions when she visited him. Most notably, she "assessed" David at 10:40 a.m. on June 27, just hours before he died.

MHP Brock acknowledged during her deposition that David's behavior was "different" on June 27, and she claimed that *she* therefore decided to refer him to a psychiatrist. (*Id*. at 139-40, Pg ID 5110.) MHP Brock did not make note of any changes to David's behavior in her assessment notes, however. Nor did she record her plan to refer him to a psychiatrist. (*See* MC 370.) Instead, she continued to check only the box to "Continue watch – daily follow up." (*Id.*) In any event, a reasonable jury could find that MHP Brock's response was too little and too late.

According to the CCS Defendants, the evidence does not suggest that MHP Brock perceived David to be suffering from anything other than a risk of self-harm. The videotape evidence, however, reflects that David was experiencing symptoms that even the deputy defendants recognized to be typical symptoms of drug withdrawal. MHP Brock recorded her observation of some of these symptoms in her notes. As the Sixth Circuit has advised, subjective knowledge can be found "based on the obviousness of the risk." *Bertl v. City of Westland*, No. 07-2547, 2009 WL 247907, at *5 (6th Cir. Feb. 2, 2009) (unpublished) (citing *Farmer*, 511 U.S. at 842); *see also Estate of Carter*, 408 F.3d at 312 (finding a question of fact regarding the defendant's subjective knowledge of an arrestee's serious medical needs where the arrestee was exhibiting "the 'classic' signs of a serious illness," despite the defendant's claim that he did not actually believe the arrestee was ill).

For these reasons, a reasonable jury could find MHP Brock deliberately indifferent to David's serious medical needs and thus the Court is denying summary judgment to her.

### 6.     CCS Mental Health Professionals Nelson and Mann and CCS Mental Health Director Natalie Pacitto

In response to the CCS Defendants' summary judgment motion, Plaintiff discusses the individual liability of Mental Health Professionals Danyelle Nelson and Kelly Mann and CCS Mental Health Director Natalie Pacitto. (Pl.'s Resp. at 22-31, ECF No. 158 at Pg ID 4835-4845.)

Plaintiff identified Nelson and Mann as defendants in her initial complaint and in the amended pleading she filed on June 1, 2015. (*See* ECF Nos. 1, 9.) Because Plaintiff failed to set forth facts in her Amended Complaint establishing the personal involvement of these individuals with regard to David's care, the Court dismissed Plaintiff's claims against them on November 9, 2015. (*See* Op. & Order, ECF No. 42.) While the Court informed Plaintiff that she could move to re-name these individuals if, through discovery, she uncovered evidence that they were aware of and were deliberately indifferent to David's serious medical needs (*id*. at 19 n.6, ECF No. 42 at Pg ID 898), Plaintiff never did so. Plaintiff did subsequently move and was granted leave to file her Second Amended Complaint, but Danyelle Nelson and Kelly Mann were not among the individuals she

identified as the defendants she wished to add.  (*See* Mot. ¶ 5, ECF No. 70 at Pg ID 1231; *see also* Order at 3, ECF No. 99 at Pg ID 2140.)

Plaintiff did move and was granted leave to add CCS Mental Health Director Pacitto as a defendant in her Second Amended Complaint.  (*Id*.)  However, Plaintiff indicated to the Court and Defendants that her claim against Mental Health Director Pacitto "related to [her] supervisory and/or policy-making role[]s …."  (*Id*.)  In fact, in response to the CCS Defendants' summary judgment motion, Plaintiff identifies her claim against Pacitto as a basis for *Monell* liability, only. (*See* Pl.'s Resp. Br. at 39-43, ECF No. 158 at Pg ID 4852-56.)

A suit against a municipal employee in his or her official capacity "is … essentially and for all purposes, a suit against the [municipality] itself."  *Leach v. Shelby Cty.*, 891 F.2d 1241, 1245-46 (6th Cir. 1989); *see also Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) ("Official-capacity suits[ ] 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'") (quoting *Monell*, 436 U.S. at 690, n.55).  As such, where a plaintiff brings a *Monell* claim against a municipal employee in his or her official capacity and also names the municipality as a defendant, courts routinely dismiss the employee as a party to the lawsuit because naming both is "redundant."  *See Foster v. Michigan*, 573 F. App'x 377, 390 (6th Cir. 2014) (unpublished) ("where the entity is named as a defendant, an official-capacity claim is redundant"); *Faith Baptist*

*Church v. Waterford Twp.*, 522 F. App'x 332, 327 (6th Cir. 2013) (unpublished) ("Having sued Waterford Township, the entity for which Bedell was an agent, the suit against Bedell in his official capacity was superfluous.").

For these reasons, the Court is dismissing Defendant Pacitto as a party. As indicated, Plaintiff's claims against Defendants Nelson and Mann were dismissed in 2015, and they have been long-absent from this action.

### 7. CCS

While Plaintiff acknowledges that CCS prepared policies and training materials with respect to inmates experiencing benzodiazepine withdrawal symptoms (*see, e.g.,* Pl.'s Resp. Br. to CCS Defs.' MSJ at 2, ECF No. 158 at 4815), she argues that its medical and mental health staff were not properly trained to monitor and respond to inmates, like David, experiencing benzodiazepine withdrawal. Plaintiff does not provide evidence of a previous Macomb County Jail inmate dying or suffering other serious harm as a result of this alleged inadequate training of CCS' staff.[16] As such, Plaintiff must fit her claim within that "'narrow

---

[16] In her response brief, Plaintiff discusses at length the June 2013 death from acute sepsis of Macomb County Jail inmate Jennifer Meyers. However, at the time of David's incarceration a year later, there had been no finding of unconstitutional conduct in connection with Ms. Meyers' death to put CCS on notice that its training was deficient. *See Hubble v. County of Macomb*, No. 2:16-cv-13504, 2019 WL 1778862, at *1 (E.D. Mich. April 23, 2019) (unpublished). Judge Borman in fact has granted summary judgment to the defendants on the deliberate indifference claims brought by Ms. Meyers' estate. *Id.* As such, there has been no (Cont'd . . .)

range of circumstances' where a federal rights violation 'may be a highly predictable consequence of a failure to equip [employees] with specific tools to handle recurring situations.'" *Shadrick v. Hopkins Cty., Ky.*, 805 F.3d 724, 739 (6th Cir. 2015) (quoting *Bryan Cty*, 520 U.S. at 409).

The evidence reflects that many individuals incarcerated at the Macomb County Jail used medications, including benzodiazepines (e.g. Xanax and Klonopin) and opiates (e.g. oxycodone), before their incarceration and therefore are likely to experience withdrawal while in jail. (*See* Pl.'s Resp. to CCS Defs.' Mot. Ex 4 at 3, ECF No. 158-4 at Pg ID 4882) ("Withdrawal and detoxication from opiates are common problems in the jail intake population."). As such, CCS instituted several policies designed to identify inmates at risk of serious withdrawal symptoms, detect and monitor the symptoms, and provide medical and mental health care to those inmates. (*See, e.g., id.* Exs. 3-4, ECF Nos. 158-3, 158-4.) Those training materials state that benzodiazepine withdrawal "is a potentially life-threatening condition!"[17] occurring "when someone who has been taking this type of medication for a long period of time abruptly stops taking the medication." (*Id.* Ex. 3 at 0694, ECF No. 158-3 at Pg ID 4865.) The materials advise that the

---

determination that anyone in the Macomb County Jail engaged in unconstitutional conduct in connection with Ms. Meyers.

[17] In fact, under this statement is a picture of the Grim Reaper. (*See* Pl.'s Resp. to CCS Defs.' Mot. Ex. 3 at 0696, ECF No. 158-3 at Pg ID 4867.)

symptoms of withdrawal include nausea and vomiting, shaking, agitation/anxiety, hallucinations, headaches, disorientation, and unusual sensations. (*Id.*)

CCS' training materials list information that should be obtained from patients using benzodiazepines, including a history of their benzodiazepine use (i.e., what kind of medications they are taking, how much, and the last dose), a history of their abuse or dependence on other drugs, and a history of other serious medical conditions they may have. (*Id.* at 0698, Pg ID 4869.) CCS instructs that withdrawal should be managed by "[p]roviding a benzodiazepine (i.e. Librium) based on a fixed dose pattern" and "[m]onitor[ing] patient[s] **closely**" using the Clinical Institute Withdrawal Assessment Scale for Alcohol, Revised ("CIWA-Ar"). (*Id.* at 0700, Pg ID 4871, emphasis added.) CCS' materials further instruct that Librium "should ideally be started in the intake/booking area BEFORE any symptoms are present!!" (*Id.* at 0702, Pg ID 4873, emphasis in original.) Abrupt or overly rapid dosage reduction of a benzodiazepine medication can provoke life-threatening withdrawal symptoms. (*See* Fillman Report at 3, ECF No. 158-11 at Pg ID 5047.) CCS has prepared a form to monitor inmates withdrawing from benzodiazepines. (*See* Pl.'s Resp. to CCS Defs.' Mot. Ex. 4 at 22-23, ECF No. 158-4 at Pg ID 4901-02.)

CCS has prepared a "Nursing Pathway" addressing opiate withdrawal. (*Id.* Ex. 4 at 3-6, ECF No. 158-4 at Pg ID 4881-85.) The Nursing Pathway warns that

the symptoms "are uncomfortable and disturbing, but not usually life-threatening – except for persons who are clinically fragile or pregnant." (*Id.* Ex. 4 at 3, ECF No. 158-4 at Pg ID 4882, emphasis in original.) The Nursing Pathway describes such circumstances as including "[i]nmates with a history of … seizures" and "[i]nmates with psychiatric disorders[.]" *Id.* The opiate withdrawal Nursing Pathway also warns that "[p]ersons with severe addictions often neglect their nutrition." *Id.* at 4, Pg ID 4883. Thus nurses are instructed to "[m]ake a gross determination of nutritional status[.]" *Id.*

CCS, however, failed to train and supervise its medical and mental health staff to respond to inmates who were using benzodiazepines and opiates prior to their incarceration and thus face the risk of experiencing severe and life-threatening withdrawal symptoms in jail. In this Court's view, the complete failure of CCS' medical and mental health staff to adhere to standing protocols in their handling of David's condition creates a genuine issue of material fact with regard to a lack of proper training and supervision. Moreover, Mental Health Professionals Brock and Nelson testified that they never received any training on withdrawal from drugs in general or benzodiazepines in particular. (Brock Dep. at 153, Nelson Dep. at 173.) Brock further testified that she was not trained regarding the function that nutrition has with respect to mental health and she did not know if there was a connection between the two. (Brock Dep. at 127-29.)

Similarly, Nelson testified that she was not trained to observe inmates' weight or their food and water consumption. (*Id*. at 86.)

The failure to train the medical and mental health staff to monitor the food and water consumption of inmates going through withdrawal is evident from the testimony of CCS' Medical Director at the jail, Dr. Sherman, who testified that CCS medical personnel "completely rely" upon custodial staff to do this.[18] (Sherman Dep. at 191.) Yet, Dr. Sherman did not know how or even if custodial staff had been trained in this area. (*Id*. at 188-89.) Further, when Plaintiff's counsel asked the individual defendants about their duty to monitor the food and/or water consumption of inmates, they acknowledged a duty to do so only for inmates engaged in a hunger strike.[19]

For these reasons, the Court is denying summary judgment to CCS.

### 8. Macomb County Corrections Deputies Brian Avery, Paul Harrison, Morgan Cooney, John Talos, Brian Pingilley, Steven Vaneenoo, and Walter Oxley

---

[18] Defendants contend that no clearly established federal law requires prison staff to monitor the consumption of food and/or water by inmates. The Court believes that this mis-characterizes the issue, however. As stated earlier in this decision, it is well-established that the denial of needed medical attention for a serious health risk constitutes deliberate indifference. *See Estate of Carter*, 408 F.3d at 313 (quoting *Fitzke*, 468 F.2d at 1076). Thus, if prison employees are aware that inmates experiencing drug withdrawal are likely to not eat and/or hydrate themselves and that this could pose a serious health risk to them, the Court finds it well established that failing to monitor their food and/or water consumption constitutes deliberate indifference.

[19] Admittedly, as Defendants point out, starvation was not identified as a cause of David's death. Dehydration was, however.

Deputies Avery, Harrison, Cooney, Talos, Pingilley, Vaneenoo, and Oxley were each on duty in the mental health unit for numerous shifts (5-8) while David was housed in one of the unit's cells. Most significantly, these shifts included several days immediately before David died and, except for Deputy Cooney, the date of his death. These deputies were responsible for monitoring the video feed from David's cell and/or making routine rounds to check on the inmates in the unit. They were aware that David was exhibiting symptoms associated with drug withdrawal. (*See* Avery Dep. at 52-53, Oxley Dep. at 21-22, Vaneenoo Dep. at 24; Harrison Dep. at Cooney Dep. at 27-28; Talos Dep. at 49-50, Pingilley Dep. at 20-21.) The video from David's incarceration in the mental health unit reflects that his condition was deteriorating over this time-period and that he was exhibiting classic symptoms of drug withdrawal, including hallucinations, sweating, seizure-like activity, and lethargy.

Based on this evidence, a reasonable jury could conclude that these deputies were subjectively aware of David's serious medical needs.[20] *See Estate of Carter*,

_____

[20] The CCS Defendants argue that the deputies believed they were monitoring David for suicidal behavior and thus "it is this limited knowledge against which [their actions] should be measured." (CCS Defs.' Reply Br. at 7, ECF No. 171 at Pg ID 6529.) The Court does not agree where David was exhibiting signs of a different serious illness that even laypersons could be expected to identify. If an inmate on suicide watch shows the warning signs of an impending heart attack or cuts him- or herself and begins bleeding profusely, jail staff certainly cannot ignore (Cont'd . . .)

408 F.3d at 312; *Preyor*, 248 F. App'x at 636. Undoubtedly, there were occasions when the deputies called the jail's medical staff to attend to David. Nevertheless, they did not summon medical staff at any point on June 26 or 27 and no member of the jail's medical staff checked on David on either of those dates. In fact, aside from a thirty second visit by a nurse on June 25, David had not been physically checked by a nurse or doctor since June 23, 2014.

The Macomb County Defendants argue that the deputies are entitled to summary judgment because they called medical and/or mental health personnel to address David's needs, the medical staff told them David was medically cleared, and the deputies knew that medical and/or mental health staff were in the unit every day during David's incarceration. The Sixth Circuit has held that, in general, non-medical prison staff will not be found to have acted with subjective deliberate indifference where a prisoner is under the care of medical experts. *See, e.g., McGaw v. Sevier Cty., Tenn.*, 715 F. App'x 495 (6th Cir. 2017) (unpublished) (concluding that jail officers did not act with deliberate indifference when they left jail detainee in observation cell and provided no additional care for alcohol and opiate use based on licensed practical nurse's examination and recommendation to leave the detainee in the cell overnight for monitoring); *see also Spruill v. Gillis*,

_____

those signs and escape liability because they were tasked with preventing the inmate's suicide.

372 F.3d 218, 236 (3d Cir. 2004) ("If a prisoner is under the care of medical experts … a non-medical prison official will generally be justified in believing that the prisoner is in capable hands."); *Griffith v. Franklin Cty., Ky.*, No. 3:16-cv-00077, 2019 WL 1387691 (E.D. Ky. Mar. 27, 2019) (unpublished) (granting summary judgment to jail officers, finding that they were not deliberately indifferent to pretrial detainee who experienced withdrawal symptoms but had been placed on medical observation, had been evaluated by medical staff in more than a cursory way, and his condition had not declined).

Nevertheless, the Sixth Circuit has not foreclosed the possibility of finding non-medical staff liable whenever medical staff has attended to an inmate. As the *McGaw* court stated, to avoid liability, the non-medically trained officer must have "'*reasonably* deferred to the medical professionals' opinions.'" 715 F. App'x at 498 (emphasis added) (quoting *Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006)); *see also Spruill*, 372 F.3d at 236 ("*[A]bsent a reason to believe* (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official … will not be chargeable with … deliberate indifference.") (emphasis added); *Colson v. City of Alcoa, Tenn.*, No. 3:16-cv-377, 2018 WL 1512946 (E.D. Tenn. Mar. 26, 2018) (unpublished) (denying summary judgment to officer, finding a question of fact for the jury where the officer had reason to believe that a nurse's assessment of the plaintiff's condition was not

reliable).  Under the circumstances of this case, a reasonable jury could find that Deputies Avery, Harrison, Cooney, Talos, Pingilley, Vaneenoo, and Oxley did not reasonably defer to the jail's medical staff.

As mentioned earlier, no member of the jail's medical staff checked on David on June 26 or 27.  Aside from a thirty second visit by a nurse on June 25, David had not been physically examined by a nurse or doctor since June 23, 2014. When nursing staff did visit David's cell, the examination could be described as cursory, at best.  The record reflects that David lost approximately forty pounds during his incarceration. [21]  As the videotape evidence shows, despite whatever treatment David was receiving (which a reasonable jury could determine was no treatment at all), he continued to experience what appeared to be tremors, hallucinations, and seizure-like activity during the eleven days he was under the watch of these deputy defendants.  Moreover, a reasonable juror viewing the videotape of David could conclude that his physical and mental health were significantly deteriorating despite any treatment he was receiving from medical and mental health staff.  Tellingly, during his deposition in this matter, Deputy

---

[21] According to Defendants, David's weight was auto-populated from his prior incarceration records and they therefore appear to be challenging whether he in fact weighed 195 pounds at intake.  (*See* CCS Defs.' Mot. Ex. L at 13, ECF No. 148-13 at Pg ID 4341.)  Defendants present no contrary evidence regarding David's weight, however.  Moreover, on summary judgment, the Court must view the facts in the light most favorable to Plaintiff.  *Liberty Lobby*, 477 U.S. at 255.

Oxley admitted that he was disturbed when he saw a portion of the video capturing David during his incarceration on the news after his death. (Oxley Dep. at 49, ECF No. 162-11 at Pg ID 5615.) When asked why, Deputy Oxley responded: "Just to see, knowing this person was actually going through a lot of pain." (*Id.*)

For these reasons, the Court is denying summary judgment to Macomb County Corrections Deputies Brian Avery, Paul Harrison, Morgan Cooney, John Talos, Brian Pingilley, Steven Vaneenoo, and Walter Oxley.

### 9. Macomb County Corrections Deputies Keith Ray, David White, Mitchell Blount, and Larry (James) Helhowski

In comparison to the defendants discussed in the preceding section, Deputies Ray, White, Blount, and Helhowski had minimal contact with David during his incarceration. Deputies Ray and Blount were on duty for a single midnight shift (10:30 p.m. to 6:45 a.m.) between June 26 and 27, 2014. (*See* CCS Defs.' Mot. Ex. G, ECF No. 148-8.) Deputy Helhowski was on duty for a single afternoon shift (2:45 p.m. to 10:30 p.m.) on June 26, 2014. (*Id.*) Deputy White covered the day shifts (6:45 a.m. to 2:45 p.m.) on June 25 and 26, 2014. (*Id.*)

Having watched the videotape of David during these shifts, the Court does not believe that a reasonable jury could find Deputies Ray, White, Blount, or

Helhowski deliberately indifferent to his serious medical needs.[22]  These deputies

were unaware of David's previous condition and thus would not have recognized

his deterioration.  They would not have known that David had consumed little food

or water and had been experiencing withdrawal symptoms for days.  Notably,

Deputies White, Blount, and Helhowski worked as runners during their shifts, so

they were not responsible for continuously watching David via the video feed.

Further, David was lying down and appeared to be sleeping for the majority of the

time these deputies were on duty.  This would not have appeared unusual during

the midnight shift that Deputies Ray and Blount worked.

Accordingly, the Court is granting summary judgment to Macomb County

Corrections Deputies Keith Ray, David White, Mitchell Blount, and Larry (James)

Helhowski, is dismissing Plaintiff's claims against them with prejudice, and

terminating them as parties to this lawsuit.

### 10.    Macomb County Sheriff Anthony Wickersham

Plaintiff is suing Sheriff Wickersham in his individual and official

capacities.  With respect to the former, Sheriff Wickersham seeks summary

judgment because he had no personal involvement with David and because, he

---

[22] The Court would have reached a different conclusion, notwithstanding these deputies worked only one or two shifts, if those shifts had been during the day or afternoon on June 27, 2017—a period during which the videotape reflects what could be viewed as alarming changes in David's condition.

contends, there is no evidence that he "'authorized, approved, or knowingly acquiesced in [any] unconstitutional conduct'" concerning David. *See Coley v. Lucas Cty., Ohio*, 799 F.3d 530, 542 (6th Cir. 2015) (quoting *Taylor v. Mich. Dep't of Corrs.*, 69 F.3d 76, 81 (6th Cir. 1995)) (emphasis, additional quotation marks, and citation removed).

Plaintiff's allegations concerning Sheriff Wickersham relate to his conduct after the 2013 death of another Macomb County Jail inmate, Jennifer Meyers, and David's death and his alleged failure to train the jail staff. Plaintiff does not claim that Sheriff Wickersham had actual knowledge of David or his condition until after his death. Plaintiff also does not claim that Sheriff Wickersham took any specific action to authorize, approve, or knowingly acquiesce in the alleged unconstitutional treatment of David. As such, Plaintiff appears to be "'improperly conflat[ing] a § 1983 claim of individual supervisory liability with one of municipal liability.'" *Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (quoting *Phillips v. Roane Cty.*, 534 F.3d 531, 543 (6th Cir. 2008)).

Sheriff Wickersham therefore is entitled to summary judgment to the extent he is sued in his individual capacity.

### 11.    Macomb County

Plaintiff asserts a *Monell* claim against Macomb County and Sheriff Wickersham and Administrator Sanborn in their official capacities. Finding at

least two bases on which a reasonable jury could find in favor of Plaintiff on this claim, the Court concludes that summary judgment is improper. First, this Court already has found a genuine issue of material fact with respect to CCS' failure to train the jail's medical staff in connection with inmates exhibiting potentially life-threatening withdrawal symptoms. "'[C]ontracting out prison medical care does not relieve the [municipality] of its constitutional duty to provide adequate medical treatment to those in its custody[.]'" *Leach*, 891 F.2d at 1250 (quoting *West*, 487 U.S. at 56). Accordingly, courts have held that where a municipality delegates the final authority to make decisions about inmate medical care to a private vendor, the vendor's policies or customs become those of the county. *See Estate of Walter v. Corr. Healthcare Co.*, 323 F. Supp. 3d 1199, 1215-16 (D. Colo. 2018) (citing *King v. Kramer*, 680 F.3d 1013, 1020 (7th Cir. 2012)); *see also Dunn v. Dunn*, 219 F. Supp. 3d 1100, 1159 (M.D. Ala. 2016) (citing *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700 (11th Cir. 1985)).

*Walter* was a § 1983 action brought by the estate of a pretrial detainee who died from benzodiazepine withdrawal. The decedent's medications had been discontinued pursuant to the "no benzo" policy of the private vendor the county hired to provide medical care at its detention facility. The estate sued the county, the healthcare contractor, and several individuals. The district court denied summary judgment to the county, finding that if the "no benzo" policy was a

moving force behind the inmate's death, the healthcare vendor's policies where also the county's policies.[23]  323 F. Supp. 3d at 1215-16.

Second, as discussed earlier, Macomb County Jail personnel are likely to encounter inmates experiencing severe and serious drug withdrawal symptoms, including potentially life-threatening symptoms from the withdrawal of benzodiazepine medications.  As such, the county's need to train its jail staff regarding drug withdrawal, in general, and benzodiazepine withdrawal, in particular, is obvious.  *See City of Canton v. Harris*, 489 U.S. 378, 390 (1989) ("[I]t may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.").  Yet, a reasonable jury could conclude from the evidence that Macomb County's training was inadequate.

Plaintiff has named Macomb County as a defendant, as well as Sheriff Wickersham and Administrator Sanborn in their official capacities.  As discussed above with respect to CCS Mental Health Director Pacitto, a suit against Sheriff

---

[23] After dispositive motions were filed, a settlement was reached between the plaintiff and the private vendor defendants (i.e., the vendor and several of its health care employees).  *See* Notice of Settlement, *Estate of Walter*, No. 16-cv-00629 (D. Colo. Oct. 18, 2018), ECF No. 280.

Wickersham and Administrator Sanborn in their official capacities "is …essentially and for all purposes, a suit against [Macomb County] itself." *Leach*, 891 F.2d at 1245-46. As such, the Court is dismissing Sheriff Wickersham and Administrator Sanborn in their official capacities and as defendants in this lawsuit. Macomb County remains.

## V.    Conclusion

In summary, the Court finds that Plaintiff demonstrates a genuine issue of material fact with respect to her deliberate indifference claim against the following Defendants: Vicky Bertram, Monica Cueny, Mical Bey-Shelley, Lawrence Sherman, Chantalle Brock, CCS, Brian Avery, Paul Harrison, Morgan Cooney, John Talos, Brian Pingilley, Steven Vaneenoo, Walter Oxley, and Macomb County.

In comparison, the Court concludes that the following Defendants are entitled to summary judgment: Tiffany DeLuca, Keith Ray, David White, Mitchell Blount, Larry (James) Helhowski, and Anthony Wickersham to the extent he is sued in his individual capacity. Further, Plaintiff's claims against Sheriff Anthony Wickersham and Jail Administrator Michelle Sanborn in their official capacities are duplicative of Plaintiff's claims against Macomb County.

In Count III of her Second Amended Complaint, Plaintiff includes a claim for gross negligence; however, the parties previously stipulated to an order

dismissing that claim without prejudice and Plaintiff never sought Defendants'

consent or leave of Court to re-assert that claim. The Court, therefore, is sua

sponte dismissing that claim again without prejudice. The Court also is sua sponte

dismissing the John and Jane Doe defendants still identified as parties to this

action, despite the fact that they are not named in Plaintiff's currently pending

pleading.

Accordingly,

**IT IS ORDERED** that Count III of Plaintiff's Second Amended Complaint

is **DISMISSED WITHOUT PREJUDICE**;

**IT IS FURTHER ORDERED** that Defendant Anthony Wickersham's

Motion for Summary judgment (ECF No. 142) is **GRANTED** and Plaintiff's claim

against him in his individual capacity is **DISMISSED WITH PREJUDICE**.

Because Plaintiff's claims against Defendants Wickersham and Sanborn in their

official capacities are duplicative of Plaintiff's claim against Macomb County, the

Court is **DISMISSING** Defendants Wickersham and Sanborn **AS PARTIES** to

this lawsuit;

**IT IS FURTHER ORDERED** that the remaining motions for summary

judgment (ECF Nos. 143, 146, and 148) are **GRANTED IN PART AND**

**DENIED IN PART** in that the Court is **DISMISSING WITH PREJUDICE**

Plaintiff's claim against the following defendants, <u>only</u>: Tiffany DeLuca, Keith

Ray, David White, Mitchell Blount, and Larry (James) Helhowski.  These defendants are **DISMISSED AS PARTIES** to this lawsuit.  The John and Jane Doe defendants also are **DISMISSED AS PARTIES**.

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: September 30, 2019