## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN

DAFINKA STOJCEVSKI, as Personal
Representative of the Estate of DAVID
STOJCEVSKI, Deceased,

     Plaintiff,

v.

COUNTY OF MACOMB, et al.,

     Defendants.

Case No. 15-cv-11019
Hon. Linda V. Parker
Mag. Judge David R. Grand

---

| | |
|---|---|
| IHRIE O'BRIEN<br>Robert D. Ihrie (P26451)<br>Harold A. Perakis (P35921)<br>Attorneys for Plaintiff<br>24055 Jefferson Avenue, Suite 2000<br>St. Clair Shores, MI 48080<br>(586) 778-7778<br>ihrieobrien@aol.com<br>hperakis@ihrieobrienlaw.com | CHAPMAN LAW GROUP<br>Ronald W. Chapman Sr., M.P.A.,<br>LL.M. (P37603)<br>Madeline Young (P82140)<br>Attorneys for Correct Care Solutions<br>Defendants<br>1441 West Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326<br>rchapman@chapmanlawgroup.com<br>myoung@chapmanlawgroup.com |
| MACOMB COUNTY<br>CORPORATION COUNSEL<br>John A. Schapka (P36731)<br>Robert S. Gazall (P41350)<br>Attorneys for Macomb County<br>Defendants<br>One S. Main Street, 8th Floor<br>Mount Clemens, MI 48043<br>(586) 469-6346<br>john.schapka@macombgov.org<br>robert.gazall@macombgov.org | Wilson Elser Moskowitz Edelman &<br>Dicker, LLP<br>John T. Eads, III (P43815)<br>Cara M. Swindlehurst (P79953)<br>Co-Counsel for Macomb County<br>Defendants<br>17197 N. Laurel Park Dr., Suite 201<br>Livonia, MI 48152<br>(313) 327-3100<br>John.Eads@wilsonelser.com<br>Cara.Swindlehurst@wilsonelser.com |

**DEFENDANTS CORRECT CARE SOLUTIONS, L.L.C.; MONICA CUENY; CHANTALLE BROCK; MICAL BEY-SHELLY; VICKY BERTRAM; AND LAWRENCE SHERMAN, M.D.'S MOTION TO PRECLUDE PLAINTIFF FROM ELICITING EXPERT TESTIMONY FROM PLAINTIFF'S EXPERT ROBERT GREIFINGER, M.D.**

**EXHIBIT B**    Deposition Transcript of Robert B. Greifinger, M.D. dated April 4, 2018

GREIFINGER, M.D., ROBERT
04/04/2018                                                                        Pages 1–4

Page 1

```
1    UNITED STATES DISTRICT COURT
2    EASTERN DISTRICT OF MICHIGAN
3    -----------------------------------------------x
4    DAFINKA STOJCEVSKI, Individually, and as Personal
5    Representative of the Estate of DAVID STOJCEVSKI,
6    Deceased,
7                        Plaintiffs,
8          -against-
9    COUNTY OF MACOMB, et al.,
10                       Defendants.
11
12   -----------------------------------------------x
13
                          90 Broad Street
14                        New York, New York
15
                          April 4, 2018
16                        9:00 A.M.
17
18
19           EXAMINATION BEFORE TRIAL, of the
20   Expert Witness, ROBERT GREIFINGER, M.D., held at the
21   above time and place, pursuant to Order, taken
22   before Shea Sorensen, a Court Reporter and Notary
23   Public of the State of New York.
24
25
```

Page 2

```
1    APPEARANCES:
2
3         IHRIE O'BRIEN
          Attorneys for Plaintiff.
4         24055 Jefferson Avenue - Suite 2000
          St. Clair Shores, MI 48080
5
          BY:  HAROLD A. PERAKIS, ESQ.
6         Hperakis@ihrieobrienlaw.com
7
8
          LAW OFFICE OF ROBERT S. GAZALL
9         Attorneys for Defendants, Macomb County
          Corporation Counsel, Macomb County.
10        One S. Main Street - 8th Floor
          Mount Clemens, MI 48043
11
          BY:  ROBERT GAZALL, ESQ.
12        Robert.gazall@macombgov.org
13
14
          CHAPMAN LAW GROUP
15        Attorneys for Defendant, Correct Care
          Solutions.
16        1441 West Long Lake Rd., Ste. 310
          Troy, Michigan 48098
17
          BY: RONALD W. CHAPMAN, SR., M.P.A.
18             LL.M.
          RChapman@ChapmanLawGroup.com
19
20
21        WILSON ELSER MOSKOWITZ EDELMAN &
          DICKER, LLP
22        Co-Counsel for Defendants County of
          Macomb, Sheriff Wickersham and Michelle
23        Sanborn.
          17197 N. Laurel Park Dr., Suite 201
24        Livonia, MI 48152
25        BY: CARA M. SWINDLEHURST, ESQ.
```

Page 3

```
1         ROBERT GREIFINGER, M.D., the expert witness, having
2    been first duly sworn in by a Notary Public of the
3    State of New York, was examined and testified as
4    follows:
5    EXAMINATION BY
6    MR. CHAPMAN.
7         Q    Would you please state your name for
8    the record?
9         A    Dr. Robert Greifinger.
10        Q    What is your present address?
11        A    380 Riverside Drive, New York, New York
12   10025.
13             MR. CHAPMAN: Dr. Greifinger,
14        before we get going, let the record
15        reflect I am handing you a check for
16        $4,000.00.
17             THE WITNESS: Thank you very much.
18             MR. CHAPMAN: Thank you for
19        letting me bring it.
20             Dr. Greifinger, My name is, Ron
21        Chapman, and I represent all of the
22        medical mental health defendants in this
23        case.
24             I do not represent any of the
25        deputies of Macomb County.  Those are
```

Page 4

```
1    represented by other counsel, that are
2    here, okay.
3         I am going to be asking a series
4    of questions.  You have given your
5    deposition, I don't know how many times
6    before.
7         If you don't understand the
8    question that I ask, stop me and ask me
9    to repeat the question.  If you don't
10   answer, later on when the transcript is
11   read or looked at, I will assume the
12   ordinary meaning of my question and the
13   ordinary meaning of your answer, fair
14   enough?
15        THE WITNESS: Yes.
16        MR. CHAPMAN: I am not a doctor.
17        If I misstate a medical term or
18   something, please clarify me on that.
19   If I use a medical term that doesn't
20   make any sense for the question, call me
21   on it and we will try to correct the
22   question, fair enough?
23        THE WITNESS: Yes.
24        MR. CHAPMAN: I don't think you
25   are actively practicing, so you don't
```

GREIFINGER, M.D., ROBERT
04/04/2018

1  have the problem of other doctors do,
2  answering the phone and taking messages
3  and things?
4       THE WITNESS: Correct.
5       MR. CHAPMAN: If you need to take
6  a break for any reason, go to the
7  bathroom, phone a friend talk to
8  anybody, you may do that.  My only
9  requirement is you have to answer the
10  question that is on the table, then we
11  can take a break and move on.
12       Sometimes, I would like a little
13  bit of forewarning, because I might have
14  a line of question; 2, or 3 questions.
15  Since, you don't have counsel here, and
16  there is no attorney client privilege to
17  anything, if you do talk to anybody, I
18  will ask you, more likely than not, when
19  you come back, who did you talk to, what
20  did you talk to.  I don't care about
21  friends and relatives.  I actually care
22  about talking to Mr. Perakis, and I want
23  to know what you and he talked about and
24  then you are obligated to answer those
25  questions.

1            One other ground rule, that I
2            would like, not obligatory, but if the
3            question calls for a yes, no, I would
4            prefer a yes or no then an explanation,
5            if you need it.
6            If you can't answer a question
7            yes or no, just say I can't answer, yes,
8            no and we will move on, and do what we
9            have to do.
10       Q    Is it true you have not performed hands
11  on medical treatment to any adult patient, since
12  1985?
13       A    Yes.
14       Q    You were first licensed to practice
15  medicine in 1972, if I read your CV correctly,
16  right after you graduated from medical school?
17       A    Yes, soon after I graduated in '71.
18       Q    What states were you, I guess initially
19  licensed in?
20            I know your CV says New York, and I
21  believe Pennsylvania?
22       A    I was initially licensed in New York
23  and I have been licensed initially in New York.  My
24  Pennsylvania license is inactive.
25       Q    But you were licensed there at one

1  time?
2       A    I was licensed there, yes.
3            When I was engaged by the Pennsylvania
4  Department of Corrections, as a consultant it
5  required me to have a license.
6       Q    Were you, did you apply for a license
7  in any other areas any other states, other than
8  those two states?
9       A    I have been licensed in Illinois, 1972
10  to 1974.  Sometime, in that time.
11       Q    That is inactive as well?
12       A    That is not.
13       Q    Just don't have it?
14       A    Just don't have it anymore.  I was
15  licensed in Connecticut for a brief time, in the
16  '19 in the early 1980's.
17       Q    Have you ever applied for a state
18  license and were denied?
19       A    No.
20       Q    To the best of your knowledge, have you
21  ever been investigated, by a licensing board?
22       A    Not, to my knowledge.
23       Q    So I assume the next question is no,
24  correct you have never been disciplined?
25       A    Correct.

1       Q    Which would be represented by a letter
2  of consent anything of that nature?
3       A    Correct.
4       Q    Did you complete medical school in
5  1971?
6       A    Yes.
7       Q    Shortly after that, you entered a
8  pediatric residency program?
9       A    Pediatrics and social medicine,
10  combined residency.
11       Q    How do you define, pediatric?
12       A    It is a medical care for children and
13  adolescence.
14       Q    Is there an age a typical age perimeter
15  that children's easy to whatever, what about
16  adolescent, how do you define that?
17       A    It is prepped up over the years.
18            It was roughly 20, 21, back in the days
19  I was practicing.
20       Q    So you would treat people from 0 to 21?
21       A    Generally, yes.
22       Q    Were the majority of your patients
23  though in pediatrics, children 8, 9 school age
24  coming in for physicals and colds and flus, and
25  broken bones and what ever else kids have?

GREIFINGER, M.D., ROBERT
04/04/2018                                                        Pages 9–12

Page 9

1   A    Yes.
2   Q    Completed your residency program in
3   1976?
4   A    Yes.
5   Q    You would say you were also in social
6   medicine, I tried to find a definition of social
7   medicine.  I couldn't find one.
8        Is that a recognized subspecialty, by
9   the American Board of Subspecialities?
10  A    No, it is, I have been looking for a
11  definition too, since 1970.
12       It is a county health, public health,
13  epidemiology population based health care, it is
14  all those things and in some places, it is called
15  community health.  Other places, public health.  It
16  is a little variant on those.
17  Q    Were you board certified in social
18  medicine?
19  A    There is no board.
20  Q    There is a board for example
21  epidemiology.
22  A    No, that is not correct.
23  Q    You completed your residency in 1976.
24  Did you become board certified at some time after
25  your residency?

Page 10

1   A    Yes.
2   Q    When did you become board certified?
3   A    As soon as I was eligible.  That is on
4   my resume, if I can refer to it.
5   Q    Do you have a copy of your report, your
6   resume is attached to your report?
7        MR. PERAKIS:  I don't have his
8        resume.
9   A    As soon as I was eligible.
10  Q    You remained, board certified in
11  pediatrics until when?
12  A    Forever.
13  Q    That is because you were grandfathered
14  in, you are not required to take any retesting?
15  A    That is correct.
16  Q    When is the last time you actually
17  treated a pediatric patient?
18  A    1985.
19  Q    Even though you are board certified
20  today in pediatrics, 15, 23 years later, you
21  probably wouldn't venture to hold yourself out as a
22  pediatrician treating pediatrics would you?
23  A    Not, without some reeducation.
24  Q    During your pediatric residency, did
25  you treat pediatric patients that were experiencing

Page 11

1   substance abuse withdrawal issues such as
2   benzodiazepine or cocaine withdrawal?
3   A    I did during my residency.  I had
4   several rotations, at the Spofford Juvenile
5   Detention Center, and the adolescent unit on Rikers
6   Island.
7   Q    The rotation is for how long?
8   A    There were month long rotations.
9   Q    How many rotations, did you have
10  through either Rikers Island or the other?
11  A    Approximately, three.
12  Q    You would have spent approximately
13  three months combined in those rotations in those
14  institutions?
15  A    Yes.
16  Q    During that three month period, how
17  many pediatric patients did you treat that were
18  going through withdrawals of benzodiazepine or
19  cocaine, if you recall?
20  A    I have no idea.
21  Q    Since only there for three months, you
22  would agree with me it is a finite number?
23  A    Always a finite numbers.
24  Q    Agree with me be very small finite
25  number?

Page 12

1   A    Likely, yes.
2        MR. CHAPMAN:   Do you recall, and
3        I don't want you to guess, and that is
4        one of the admonitions I probably would
5        have given to you.
6        The only thing I am interested
7        today is what you know, because you read
8        it, you saw it you touched it you smelt
9        it, somebody told it to you; I don't
10       want you to speculate onto anything.
11       If you don't know the easiest way to
12       answer a question say I don't know, I
13       don't recall, and move on.
14  Q    So can you specifically in your mind
15  recall treating anybody that was going through
16  cocaine withdrawal, during that time period?
17  A    No.
18  Q    Can you specifically recall treating
19  anybody that was going through benzodiazepine
20  withdrawal, during that time period?
21  A    No.
22  Q    How about alcohol withdrawal during
23  that time period?
24  A    No.
25  Q    During your pediatric residency, or

GREIFINGER, M.D., ROBERT
04/04/2018                                                                    Pages 13—16

Page 13

1  after your residency during a period that you were
2  board certified in pediatrics, did you diagnose or
3  treat any pediatric patient who suffered from
4  catatonia?
5        A     No, I did not.
6        Q     Your work in pediatrics from 1976 until
7  1985, is it detailed in your resume, in your CV?
8        A     Yes.
9        Q     Did you ever apply for or attend a
10 neurological residency program?
11       A     No.
12       Q     Did you ever apply for or attend a
13 psychiatry residency program?
14       A     No.
15       Q     Ever apply for or attend an internal
16 residency program?
17       A     No.
18       Q     From 1977 through 1980 your resume
19 seems to indicate you practiced clinical pediatrics
20 at a community HMO, at Community Health Plan of
21 Suffolk?
22       A     Yes.
23       Q     What is that clinic?
24       A     It was a multi-speciality group
25 practice, established under the HMO act of 1973, to

Page 14

1  create prepaid group practices.
2        Q     So when you say HMO, actually was a
3  health maintenance organization?
4        A     Yes, licensed as an HMO.
5        Q     You were the one of the pediatricians
6  in that group?
7        A     Yes, I was also the medical director.
8        Q     Now the medical director, that would
9  have been an administrative position?
10       A     It is not hands-on practice but it has
11 to do with recruitment and retention of clinical
12 staff and quality management in general.
13       Q     But you as a medical director didn't
14 give you the ability to practice neurology in the
15 group, did it?
16       A     No, it didn't.
17       Q     Didn't give you the ability to practice
18 psychiatry in the group did it?
19       A     Correct.
20       Q     You still practiced pediatrics as your
21 medical specialty but you were involved in the
22 management of the organization; hiring, firings,
23 recruiting, setting up standards those types of
24 things?
25       A     Yes.

Page 15

1        Q     Watching the budget, I would assume
2  economic?
3        A     Yes.
4        Q     Didn't, what I am trying to get to,
5  sometimes I can beat a dead horse really good.
6              Even though, you were the medical
7  director it did not change the structure of the
8  practice of medicine that you performed.
9              You still practiced pediatrics?
10       A     Correct.
11       Q     From 1980 to 1985 your resume says you
12 worked as chief medical officer COO, of an HMO in
13 White Plains, New York.
14              Was the COO an administrative title, I
15 am assuming that means chief operating officer?
16       A     I don't recall that.
17       Q     Let me show you a copy of your resume.
18 Was in Westchester Community Health Plan?
19       A     Yes, I worked at Westchester Community
20 Health Plan as chief medical officer.  I don't
21 remember.
22       Q     I am going to show Dr. Greifinger, at
23 least a CD portion of expert report and I would
24 refer you to the first line under where it says,
25 vice-president and medical director.

Page 16

1        A     I guess so.  That is what I had.  That
2  was my title.
3        Q     COO means, chief operating officer?
4        A     Yes.
5        Q     That is an administrative position, I
6  assume?
7        A     Yes.
8        Q     Chief medical office again or medical
9  director again, is an administrative position?
10       A     Yes.
11       Q     You still practiced pediatrics here,
12 correct?
13       A     Yes.
14       Q     What percent of your time was spent
15 doing administrative duties under the chief medical
16 officer as chief operational officer assuming a
17 hundred percent work, what percent was
18 administrative verses non-administrative.
19       A     It was at least half administrative.
20       Q     From 1980 so from 1980 to 1985, even
21 though you were still practicing pediatrics, your
22 work time in pediatrics was basically cut in half,
23 because the other time was spent doing
24 administrative duties?
25       A     Yes.  May I explain?

GREIFINGER, M.D., ROBERT
04/04/2018

Page 17

1    Q    Any time.
2    A    I don't like passive voice.  You said,
3  my work time was cut off.  I cut my pediatric time
4  in order to be medical director of the group.
5    Q    I am not sure of the distinction.  I
6  wasn't implying somebody else cut it.  There is so
7  much work.
8    A    Wanted to clarify that.
9    Q    That is fine. From 1985 to 1989, says
10 you were employed at the probably mispronounced
11 this:  Montefiore Medical Center in the Bronx?
12   A    Yes.
13   Q    What did you do there?
14   A    Excuse me, it is the Bronx.
15        I had several roles.  When I left, I
16 was a vice-president and I was operationally in
17 charge of a variety of non-inpatient programs
18 including among others, management of the contract
19 that Montefiore had with the City of New York to
20 provide the medical care for the inmates on Rikers
21 Island which is New York City's Jail.
22   Q    Was your functions between 1985 and
23 1989, administrative?
24   A    Yes.
25   Q    So, this was the first position that

Page 18

1  you took or now your function was one hundred
2  percent administrative?
3    A    Correct.
4    Q    Your functions have remained one
5  hundred percent administrative, since then?
6    A    No, I haven't administered anything
7  other than my own life since I left the New York
8  State Department of Corrections in 1995.
9    Q    So, from 1985 to 1995, your
10 professional life was one hundred percent
11 administrative duties?
12   A    Correct.
13   Q    From 1995 till now, your no longer
14 administrating any businesses or functions or
15 philanthropic organizations or anything, you do
16 consulting work, now?
17   A    I do consulting work.  I have a sole
18 proprietorship and, so there are no employees and
19 nobody to administer.
20   Q    You don't have a hundred employees or 8
21 thousand employees or two hundred or anybody that
22 reports to you since 1985, other than maybe a part
23 time secretary or a clerical person?
24   A    I did have a few colleagues who work
25 with me where technically they report to me.  They

Page 19

1  are independent contractors.  Not with me, they are
2  independent contractors with the agency who I
3  consult with.
4    Q    From 1989 to 1995 says that you were,
5  Deputy Commissioner Chief Medical Officer of the
6  New York State Correctional Services?
7    A    Yes.
8    Q    I assume your duties there were
9  administrative?
10   A    Yes.
11   Q    From, 1995 through the present time,
12 you were involved according to your CV, consulting
13 in the area of design management operations,
14 quality improvement and utilization management for
15 correctional health care systems, correct?
16   A    Yes.
17   Q    No time has been spent in the active
18 clinical assessment or treatment of adult patients,
19 correct?
20   A    Correct.
21   Q    No time is spent in the active clinical
22 assessment of neurology patients, correct?
23   A    No time is spent in the assessment or
24 treatment of patients with neurological disease.
25   Q    No time is spent in the clinical

Page 20

1  assessment or treatment of psychiatric patients,
2  correct?
3    A    No.
4    Q    No time is spent in the clinical
5  assessment and treatment of patients suffering from
6  withdrawal, correct?
7    A    Correct, though I do evaluate and
8  monitor, jail detoxification withdrawal programs
9  particularly in Miami, New Orleans and Albuquerque.
10   Q    You would monitor those programs not
11 involved in the assessment or treatment of those
12 patients, correct?
13   A    Correct, I evaluate the assessment and
14 treatment of those patients.
15   Q    I understand as an administrator you
16 might evaluate what somebody does.
17        You are not the one that is doing it,
18 correct?
19   A    No, I am not an administrator.
20   Q    I want to say you do not do hands on
21 assessment and treatment of people suffering from
22 withdrawal, correct?
23   A    That is correct.
24   Q    Do you have a copy of your report with
25 you?

GREIFINGER, M.D., ROBERT
04/04/2018                                                                Pages 21–24

Page 21

1     A     Yes.
2     Q     Now, your deposition notice here today
3   was a deposition notice taken for you to bring all
4   of the records with you.
5           Did you do that?
6     A     Yes.
7     Q     I see you have a flash drive, correct?
8     A     Yes.
9     Q     In your report, I think it is page two
10  or so, you list some documents that you were given.
11          Are those the documents that are on
12  that flash drive?
13    A     Yes, but there are other documents that
14  I didn't put down in my report, in part because
15  just didn't, and other part because I didn't know
16  at the time if I was allowed to list documents, FBI
17  documents, and then by the time I found out it was
18  okay, I forgot to put them down.
19          I have a list for you, if you would
20  like it.
21    Q     Let's go back to the flash drive that
22  you have there.
23          That is all the documents that you have
24  looked at, in relation to this case?
25    A     I believe so, yes.

Page 22

1     Q     You believe so or you know so, I only
2   get one time to ask you questions.
3     A     I can't recall any questions that I
4   reviewed, that are not there.
5     Q     Can I see the flash drive?
6     A     Yes, I don't work with paper and so
7   this if it came electronically I likely saved it.
8           MR. CHAPMAN: Mr. Perakis, do you
9           have a problem if I plug this into my
10          computer, and see what is on it?
11          MR. PERAKIS:  No problem.
12          In January, several months before
13          we sent those documents for review, we
14          sent some of the FBI stuff we received
15          from subpoena, and I brought this
16          letter, so you know.
17          MR. CHAPMAN: Here is what my
18          demand was.
19          I have copies in front of me, of
20          everything you have looked at.  You have
21          represented to me this flash drive has
22          everything.  Are you now saying Dr.,
23          other documents you have looked at are
24          not on the flash drive?
25    A     No, I am saying, I did not list the

Page 23

1   documents that are listed here on the January 9,
2   2017 letter, from Mr. Perakis.
3     Q     They are on this flash drive?
4     A     They should be, yes.
5     Q     The way I understand this flash drive
6   contains documents that weren't listed on the list,
7   because you forgot or but it does contain all the
8   documents you looked at?
9     A     Yes, to the best of my knowledge.
10    Q     There are a lot of documents here.
11          Did you look at every single page of
12  every single document that is on this flash drive?
13    A     Yes.  I didn't necessarily read every
14  single page very carefully, but I scanned through
15  every page.
16    Q     Okay. You have billing records?
17    A     Yes, they are on the flash drive.
18    Q     Here is what I have on this flash, do I
19  have all that showed up, it is Perakis/Stojcevski
20  documents, Perakis/Stojcevski invoices.  According
21  to this, you don't have a copy to look at, looks
22  like you sent two invoices or 4 invoices.
23          One says 1/17, 6/17, 2/18, and 4/18.
24          Those are the numbers on the invoices?
25    A     Yes, that is a secret code that

Page 24

1   corresponds to the month and the year.
2     Q     Secret code that everybody knows the
3   4/8/18 invoice, I sent by e-mail last night and
4   gave it physically to Mr. Perakis, this morning.
5   According to the first invoice, 1/17 you spent 3.5
6   hours in reviewing documents, I assume that is the
7   invoice that you received, this flash drive, prior
8   to, to look at.
9           It is that correct?
10    A     I don't recall.
11    Q     So that is 3.5 hours.
12          Are your invoices accurate when you
13  billed them, I assume you are saying they are
14  accurate, correct?
15    A     Generally, I don't always bill for all
16  the hours for all the time, I put in.
17          Generally they are accurate.
18    Q     Then the next invoice which is in June.
19          It is 1.25 hours for reviewing
20  documents, and then three hours for drafting your
21  report and then, February 18, you sent another
22  invoice, give you the benefit of the doubt here, it
23  says document review in conference, 2.5 hours and
24  then you just sent one said -- and that was for
25  prep including travel for today that had nothing to

GREIFINGER, M.D., ROBERT
04/04/2018                                                          Pages 25–28

Page 25

1  do with anything other than reviewing documents
2  maybe to prep you for this dep.
3          Nothing, to do with preparing you for
4  this report?
5      A   Correct.
6      Q   Your report was drafted, and signed on
7  June 7, 2017, so I am going to assume, that since
8  you drafted your report in June of 2017, the only
9  two invoices that apply to any work that went into
10 these reports, were the January 17, and the June
11 17, because the other one were in '18, well after
12 you drafted your report?
13     A   Correct.
14     Q   And, in that, all of these documents on
15 this flash drive, you spent 4.75 hours to review?
16     A   You have to understand, I was familiar
17 with a lot of the documents from other work that I
18 had done, for another client, prior, regarding this
19 case.
20     Q   You did other work for another client
21 regarding this case; there is only one plaintiff in
22 this case, Mr. Stojcevski, it would be the personal
23 representative who is the other person in this
24 case, you would have done work for?
25     A   When I say, case, I mean the

Page 26

1  circumstances around Mr. Stojcevski' medical care,
2  that was the US attorney's office.
3      Q   I asked for all the documents you have
4  looked at.
5      A   I have a very strict confidentiality
6  agreement, also I understand I am unable to discuss
7  anything about what they told me, what I told them,
8  or what they sent me.  Unless, it otherwise comes
9  up. It was my understanding, that I could not share
10 any of those documents with you.
11     Q   Let me explore that a bit.
12         It is your belief that you have a
13 contingency agreement that prohibits you from
14 discussing or disclosing anything that you guys
15 talked about; you gave to them or you learned,
16 during that investigation?
17             MR. PERAKIS: Note for the record.
18             MR. CHAPMAN: Make an objection
19         nothing for the record.
20             MR. PERAKIS: All I am asking you
21         is to be clear.
22             When you say they or them, those
23         guys, who are you talking about?
24             MR. CHAPMAN: We were talking
25         about the FBI, make an objection form

Page 27

1          and foundation.
2              Want to make the question clear.
3      A   I am certain that I am not authorized
4  to respond to questions about what the US
5  attorney's office or the FBI told me, or what I
6  told them.  It is my understanding that I am not
7  allowed to share the set of documents, that I
8  received from them, but I did on my list of
9  documents say that I had reviewed the video
10 recording of the last whatever it was 7 days of Mr.
11 Stojcevski's life.
12     Q   Bare with me, this is important for me
13 to explore.  I am sure will be become the subject
14 of a motion.
15     A   Okay.
16     Q   Let me just explore it.
17         I want to give you an opportunity to
18 identify everything.
19         What I hear you saying is, you spent
20 time looking at this case at the request of the US
21 government?
22     A   Yes.
23     Q   And you spent time looking at documents
24 that they gave you to look at, correct?
25     A   Correct.

Page 28

1      Q   That they obtained through subpoenas, I
2  know I responded and gave them a bunch of documents
3  they got through subpoenas?
4      A   Correct.
5      Q   You spent time talking to
6  investigators, FBI agents, US attorneys, whatever
7  in discussions about this case, correct?
8          Don't tell me what you said, that you
9  talked to people about the case?
10     A   Yes.
11     Q   They provided, did they provide
12 additional opinions to you that maybe they got from
13 other sources?
14             MR. PERAKIS:  Objection, he said
15         he can't talk about opinions, that they
16         talked about.
17             MR. CHAPMAN: Form and foundation.
18         Did you, and if you can't talk about
19         it, you say you can't disclose that.
20         Move on.
21             MR. PERAKIS:  I am telling you,
22         you can't.
23             MR. CHAPMAN: Form and foundation.
24         Let me question this person on my own.
25             MR. PERAKIS:  He already

GREIFINGER, M.D., ROBERT
04/04/2018                                                    Pages 29–32

Page 29

1    explained to you he can't do it, and you
2    need to respect that.
3            MR. CHAPMAN: I don't need to
4    respect that at all, until he tells me
5    he can't answer the question, your not
6    his attorney let's not do that.
7            MR. PERAKIS:  He already told
8    you.
9            MR. CHAPMAN: No, he hasn't.
10           Be quiet and let him answer the
11   questions.
12   A    My understanding, I can't disclose
13   that.
14   Q    What you are telling me is, you have a
15   body of knowledge, that you have learned through
16   your work with the FBI and US government in this
17   case, that you applied to your opinions and things
18   in this case, but I am prohibited from questioning
19   you on those because of your disclosure agreement
20   with the government?
21   A    No, all of my opinions are based on
22   materials that I received from Mr. Perakis.  I did
23   not, I was just familiar for example, with the
24   clinical guidelines and the lesson plans not only
25   from work on this case, because I worked with CCS

Page 30

1    on other venues.
2    Q    Here is the thing that bothers me.
3            You said, I said and I am somewhat
4    shocked, but you could have gone to the Evelyn
5    speed reading course and been their stellar
6    performer for years, and you spent 4.75 hours
7    reading several pages of documents.  Your response
8    was, you have to understand, I am already familiar
9    with that material.
10           Did you gain your familiarity, while
11   working for the government?
12   A    In part, yes.
13   Q    But you are telling me because of your
14   non-disclosure, I cannot question you about what
15   you looked at during your employment, who you
16   talked to, what information they gave you to you,
17   what dialogue you had with investigators?
18   A    That is my understanding.
19           MR. CHAPMAN: Well, I think we
20   have a problem.  I am going to take a
21   break, Bob.
22   There is a serious problem here.
23           MR. GAZALL: Call me on my phone.
24           (Break taken at 9:46 a.m.)
25           (Back on the record at 9:58 a.m.)

Page 31

1            MR. CHAPMAN: Let's go back on the
2    record, Dr.
3    Q    The work that at least the work that
4    you billed Mr. Perakis for, is contained in your 4
5    invoices, correct?
6    A    No, it is not correct.
7            Mr. Perakis just reminded me that he
8    had sent me a 5,000.00 retainer which would have
9    paid for at least ten hours of work, that may not
10   be reflected on those invoices.
11           I looked up -- my, I did approximately,
12   twenty hours work.
13   Q    So you are saying total, you did
14   approximately twenty hours work?
15   A    For Mr. Perakis.
16   Q    Twenty hours including your $5,000.00,
17   and whatever?
18   A    Yes, yes.
19   Q    Let's, look at this, and see what we
20   have.
21           We have, and that is not counting my
22   prep yesterday.
23           That would be the bill you sent him for
24   418?
25   A    Yes.

Page 32

1    Q    Well sir, I I didn't add it up with a
2    calculator, so I might not be accurate.
3            Comes to 21.33 hours for your three
4    invoices.  Looks like all your time is accounted
5    for.
6    A    Then, it is all there, okay.
7    Q    Now, I see a copy of your report on
8    here.
9            One in word form as well as one in PDF
10   form.
11   A    I should have just put the PDF on
12   there.
13   Q    Now, for example on this list of
14   documents, you have here you have a number of
15   expert records from the defendants, your report was
16   drafted before those expert reports were ever
17   produced.
18           Your report was drafted quite a while
19   before those were ever produced?
20   A    That is correct.
21   Q    Those expert reports did nothing to
22   aide you in formulating opinions in your report,
23   correct?
24   A    That is correct.
25   Q    You would agree with me on I guess on a

GREIFINGER, M.D., ROBERT
04/04/2018

Page 33

1  hypothesis that any documents or any testimony
2  created after you formulated your report, could not
3  have been used by you in formulating your report,
4  correct?
5      **A     Yes.**
6      Q     Do you stand by your report as being
7  accurate and fairly reflecting all of your opinions
8  in this case?
9      **A     Yes, I did review the.**
10              MR. CHAPMAN: Mr. Perakis, the
11              doctor answered yes, and then you signal
12              to him, then he wants to amend his
13              answer.  You have got to stop that
14              stuff.
15              You can't counsel, correct, educate, or
16              assist or help the witness testify.
17              MR. PERAKIS:  That is fine.
18      Q     Looking at your report, Dr., is that
19  your signature at the end of the report?
20      **A     Yes.**
21      Q     Did you draft the report?
22      **A     Yes.**
23      Q     Were there other drafts of this report,
24  or was it just that particular draft?
25      **A     I draft my reports dynamically, that is**

Page 34

1  **I begin with an A template, which has my backroun**
2  **on it, and as I review materials, I add findings**
3  **which are pretty much historical and then I**
4  **complete the report with opinions.**
5      Q     So you don't just sit down, if I hear
6  what you are saying, you don't just sit down and 4
7  hours later there is a report.
8              It is a process that doesn't begin and
9  end in one sitting.
10     **A     Typically, that is correct.**
11     Q     And, and then that is your signature,
12 at the end, correct?
13     **A     Yes.**
14     Q     Is your CV reasonably accurate?
15     **A     Reasonably, so.**
16     Q     Have you had any publications that
17 aren't in your CV that relate directly to the
18 psychiatric treatment of patients in a county jail?
19     **A     I co-authored a chapter in the textbook**
20 **that I edited on treatment planning for mentally**
21 **ill inmates.**
22     Q     Did you do that after you prepared your
23 CV?
24     **A     No, it is on my CV.**
25     Q     Listen to my question.

Page 35

1      Q     I understand your CV.
2              You said it is fairly accurate.
3              My question is that, have you published
4  any publications relating to the treatment of
5  psychiatric patients in a county jail that is not
6  reflected in your CV; in other words, something you
7  might have done yesterday, a day before, a month
8  ago, a week before, or something?
9      **A     No.**
10     Q     Have you published anything relating to
11 the detoxification of people suffering from a
12 variety of addictions, that relate to
13 detoxification in a county jail that is not
14 reflected in your resume?
15     **A     I am co-author of a paper that was**
16 **recently published, regarding opiate substitution**
17 **therapy.  I am not sure if that is reflected on the**
18 **version of my resume that you got; I believe it is**
19 **but -- just to say for the the record that, that is**
20 **a fact.**
21     Q     Have you ever published anything
22 relating to catatonia?
23     **A     No.**
24     Q     Have you ever been involved in any
25 research projects that relate specifically to the

Page 36

1  diagnosis or treatment of catatonia?
2      **A     No.**
3      Q     Have you written or been involved in
4  any research projects that deal with forensic
5  pathology as a science in determining the cause of
6  death?
7      **A     No.**
8      Q     As to the cause of death of Mr.
9  Stojcevski in this case, am I correct in assuming
10 that you rely on the opinions of pathology experts
11 in this case; in other words, you defer to people
12 more learned than yourself in the science of
13 pathology?
14     **A     Yes.**
15     Q     With respect to the diagnosis and
16 treatment of neurological conditions, am I correct
17 that you defer to people that are board certified
18 and more highly trained in the science of neurology
19 than yourself?
20     **A     Yes.**
21     Q     With respect to the opinions relating
22 to psychiatric conditions Dsm-5 applications,
23 treatment of psychiatric conditions, you would rely
24 on people that are more learned in medicine than
25 yourself, to make those determinations and

Page 37

1  opinions?
2     A    Yes.
3     Q    I am assuming that this report that you
4  drafted June 7, 2017, at least completed on that
5  date, this is not your one and only expert report,
6  that you have ever drafted, not meaning this case,
7  other cases you have drafted the other reports?
8     A    Yes.
9     Q    And I say that, because you are
10 familiar with the requirements of expert reports in
11 federal litigation, correct?
12    A    Yes.
13    Q    Is it important to be truthful in
14 drafting a report an expert report that is
15 submitted to the federal court in support of
16 opinions you might have?
17    A    Yes.
18    Q    There is a section in your report, if
19 you can turn to it that is called, materials
20 reviewed.
21        Do you see that, I think it is, you got
22 ten items listed here. We have already had the
23 discussion.
24        There are other items that are on this
25 flash drive.

Page 38

1         Other than the items listed on this
2  flash drive and the one item that is listed here,
3  item number 16, which isn't on the flash drive.
4     A    Yes, it should be.
5     Q    The only thing you reviewed for this
6  case, that is on the flash drive other than all the
7  things you reviewed for the government?
8     A    Yes, that is correct, to the best of my
9  recollection.
10    Q    Now item number 14 says, video
11 recordings, relevant to Mr. Stojcevski's, period of
12 confinement.
13        What do you mean by, relevant?
14    A    I mean, I reviewed the video
15 recordings, to the extent they existed.
16        Let me say it a different way.
17        I reviewed the video recordings that I
18 got, from the Department of Justice.
19    Q    Okay. Now to the best of my knowledge
20 and Mr. Perakis will correct me here if I am wrong,
21 there are about 240 hours of video, if he was in a
22 video cell from June 11th, not June 11th, June 17th
23 at about 1350 hours, until June 27th, that is about
24 ten days.
25        Those hours, did you review all 250 so

Page 39

1  or hours that would be ten days of sitting in front
2  of a video machine?
3     A    I don't know, if I am allowed to
4  discuss that.
5     Q    That is because that might have been
6  something you did with the DOJ?
7     A    Yes.
8     Q    Not, to beat something up.
9         You don't know if you are allowed to
10 discuss it, you signed some kind of confidentiality
11 agreement, you think might be problematic, for
12 discussing it?
13    A    Yes, I am not trying to be difficult.
14 I am just trying to keep out of trouble with the
15 FBI.
16    Q    If you think you can't talk about, just
17 say you can't talk about.
18    A    I am not going to press. I will deal
19 with it later, if I think I need to deal with it.
20    A    Okay.
21    Q    These hours of tape, can you tell me
22 how many hours you reviewed, or you think that is
23 something you can't talk about?
24    A    I think, that is something I can't talk
25 about.

Page 40

1     Q    Can you tell me if you looked at these
2  tapes in fast forward; three times, 4 times, 5
3  times fast forward?
4     A    I can tell you I am very familiar with
5  fast forward.
6     Q    When you say, you are very familiar,
7  that means you probably used it in this case; if
8  you can't tell me, say you can't tell me.
9     A    I don't think, I can tell you that.
10    Q    Okay, look at item number 15, it says,
11 meal in hydration summary.
12        This is something that would be on this
13 drive?
14    A    Yes.
15    Q    Now is this some document that
16 Mr. Perakis prepared or someone from his office?
17    A    Yes, someone either he prepared it or
18 someone from his office did.
19        MR. CHAPMAN: Could you let me
20        turn this over here.
21        Can you maybe step up and find
22        the document, maybe Mr. Perakis is used
23        to or more familiar with what is there.
24        (Attorney and witness looking at,
25        computer screen.)

GREIFINGER, M.D., ROBERT
04/04/2018                                                               Pages 41-44

1     Q      Mr. Perakis identified a PDF folder
2  that is called, meals and hydrations.
3            Show you on the screen looks something
4  like that.
5            Is that what you are familiar with?
6     A      Yes.
7     Q      Did you prepare that or somebody
8  prepared that for you?
9     A      I did not prepare that.
10    Q      Do you know who prepared it?
11    A      No.
12    Q      Do you believe it was prepared by,
13 somebody from Mr. Perakis's office or Mr. Perakis?
14    A      Yes.
15    Q      How do you know it is accurate?
16    A      I don't.
17    Q      Is it typical for somebody on your
18 position to rely on information that they don't
19 know, if it is accurate or not accurate and it is
20 prepared in this case by somebody who has an
21 invested interest in this particular case.
22           It is not like an independent third
23 party coming in to prepare a document like maybe an
24 expert?
25           How do you know it is accurate?

1     A      I just list it as documents, they
2  reviewed.
3     Q      Do you agree that a human can go 21
4  days without any food whatsoever, and substantially
5  longer if they have a modicum of food?
6            MR. PERAKIS:  Objection to form
7         and foundation.
8     Q      If you don't know, say you don't know.
9     A      Can go before they die?
10    Q      Before they die.
11    A      To the extent someone is maintaining
12 some degree of hydration, they could go.
13    Q      I am not talking about hydration.  I am
14 talking about food.
15    A      I am qualifying my answer to the extent
16 they maintain some form of hydration, they can go
17 for without food for approximately three weeks,
18 without dying of starvation.
19    Q      We actually know from, and I don't want
20 to bring it up, we know from concentration camps
21 and other things, people can go substantially
22 longer than 21 days if they have some food.
23           MR. PERAKIS:  Objection to form
24        and foundation.
25           MR. CHAPMAN: Good objection.

1     A      Yes.  Your question was without food?
2     Q      Do you agree with no food, 21 days, but
3  they can go substantially longer, if they have some
4  food, periodically?
5     A      That is correct.
6     Q      Have you been trained in how to analyze
7  the body of a deceased person to determine whether
8  starvation was a cause of death?
9     A      No.
10    Q      Do you agree that a human can go one
11 week without any water and substantially longer if
12 they have some water?
13           MR. PERAKIS:  Objection to form.
14           We are not talking about any
15        human.
16           We are talking about one human.
17           MR. CHAPMAN: Form and foundation.
18           MR. PERAKIS:  And foundation.  Is
19        whether he is --
20           MR. CHAPMAN: No speaking
21        objections.
22           Go ahead and answer the question.
23    Q      Do you agree a human can go one week
24 without any water and substantially longer with
25 some water?

1     A      Some people can go, up to a week
2  without water, and most people could go
3  substantially longer, if they have some water.
4     Q      Were you aware that there is a working
5  faucet, in Mr. Stojcevski's cell during his entire
6  stay?
7     A      I don't recall.
8     Q      If you watched the videos, you might
9  have seen multiple times him actually getting up
10 and getting a drink of water from the faucet.
11           Did you see that?
12    A      I watched the videos.
13    Q      Did you see that?
14    A      I don't recall.
15    Q      Again, if you can't answer a question
16 because of this agreement you have with the
17 government, tell me and I will move on okay, fair
18 enough?
19    A      Yes.
20    Q      Did you watch him drink water?
21    A      I don't recall.
22    Q      Did you watch on the video, guards and
23 nurses periodically giving him water to drink?
24    A      Yes.
25    Q      Did you read any of the material where

GREIFINGER, M.D., ROBERT
04/04/2018

Page 45

1  nurses and guards, reminded him that you know, you
2  should drink water?
3      A    Yes.
4      Q    Item number 16, says that you looked at
5  an article from Dean Reager, that talks about the
6  difference between, malpractice and deliberate
7  indifference.
8           Can you please tell me what relevance
9  that has to do with anything we are talking about
10 today?
11     A    None, whatsoever.
12     Q    Why did you read it?
13     A    Because, I saw it and he was the chief
14 medical officer of CCS at the time, and this is a
15 case in federal court that from a legal point of
16 view has to do with deliberate indifference.
17     Q    But you understand or you agree don't
18 you, that that particular article was a
19 non-scientific, non-scholarly article that was
20 published that basically was about, let's just say
21 lacked depth, in talking about the difference
22 between malpractice and deliberate indifference.
23     A    You are asking me for my judgment about
24 that.
25     Q    Sure, you read it.

Page 46

1      A    Yes, I would agree with you.
2      Q    There is no basis in your opinion?
3      A    Absolutely not.
4      Q    Could you list for me or not for me,
5  for the record, any of your medical training in the
6  field of psychiatry, after you completed medical
7  school in 1971; formal training, not things you
8  might have read.  Formal training.
9      A    I had formal training during my
10 residency.
11     Q    After your residency then?
12     A    No formal training.
13     Q    In your formal training during your
14 pediatric residency, would that be in pediatric
15 psychiatry?
16     A    No, it was general psychiatry.
17     Q    Again, that would be, where you spent a
18 rotation in a psychiatric area?
19     A    No, the social medicine program had a
20 full time psychiatrist on the faculty and so we had
21 lots of lectures and workshops and seminars on
22 psychiatric issues.
23     Q    And this was a program you completed in
24 1976, correct?
25     A    Correct.

Page 47

1      Q    41 years ago?
2      A    Whatever, I am an old man.
3           MR. CHAPMAN: For the record, you
4      are not that old.
5      Q    Could you list all the medical training
6  you have received in the field of neurology, let's
7  say outside of or after your residency program that
8  you completed in 1976?
9      A    No, no formal training since that time.
10     Q    Can you list all your formal training
11 that you had in the field of forensic pathology
12 since your medical school training that ended in,
13 1971?
14     A    No, formal training since that time.
15     Q    Could you list all of your medical
16 training you received in the field of nursing?
17     A    No formal training, since that time.
18     Q    Please list all of your medical
19 training that you have received in the field of
20 addiction management and treatment since completing
21 your medical training in 1971?
22     A    No, formal training since that time.
23     Q    Are you, do you hold or have you ever
24 held --
25     A    I am sorry.  Since the end of my

Page 48

1  residency, I did have formal training, during my
2  residency, as I testified earlier.
3      Q    Sure.
4           Have you ever held the New York State
5  Certification of Certified Addiction Professional?
6      A    No.
7      Q    Could you please state the title and if
8  you need to look at your resume, we can get that to
9  you; the title of the last scholarly article that
10 you reviewed, that specifically dealt with,
11 withdrawal symptoms related to benzodiazepine, or
12 if you haven't looked at one in the last 5 years
13 say you haven't.
14     A    Oh, I have.  I just can't recall
15 specifically, I can't recall the specific article.
16     Q    Could you state the last scholarly
17 article that you reviewed that specifically dealt
18 with the diagnosis and treatment of catatonia?
19     A    No.
20     Q    Please state the title of the last
21 scholarly article that you reviewed that
22 specifically dealt with the treatment or death, as
23 a result of starvation?
24     A    I don't recall.
25     Q    Please state the title of the last

GREIFINGER, M.D., ROBERT
04/04/2018                                                                                    Pages 49—52

Page 49

1  scholarly article you reviewed that specifically
2  dealt with death, as a result of dehydration?
3      A    I don't recall.
4      Q    Could you list for me, the names and
5  the titles of individuals, that you believe
6  approximately caused the death of Mr. Stojcevski,
7  because of their actions or inactions; and be
8  specific.
9           I want the name and the title, after
10 the person.
11     A    Okay. I am going to refer to my report.
12     Q    You can refer to your report, sure.
13     A    For this purpose, Correct Care
14 Solutions, if that corporation counts as a person.
15 Dr. Sherman, who is the medical director at the
16 Macomb County Jail, excuse me, did you talk about
17 health care people or all people, clarify that.
18     Q    My question relates to health care,
19 don't know if you want me to explain it to
20 everybody.
21          Give me the name and title.
22     A    Correctional Officer Harrison, Mental
23 Health Director Natalie Pacito, David Arft who was
24 the health service administrator.  Ms. Cueny, who
25 is the registered nurse, and nursing director.  LPN

Page 50

1  Tiffany Deluca.  Nurses Heather Erlich, Teresa
2  Williams, Correctional Officer Likavoli.
3  Correctional Officer Campo, Mental Health
4  Professional Daniel Nelson, who was known at the
5  time as Daniel Covins.  LPN Breen.  LPN Lisa
6  Bingham.  Mental Health Professional Brock.  Mental
7  Health Professional, Kelly Mann.  Correctional
8  Officers, Oxly  Cueny, Gallos, McGilly, Avery,
9  Venio, Glout, Ray, White and Polasky.  LPN Bey
10 Shelly, LPN Breen, LPN Williams, LPN Parkin, MPN
11 Barber, LPN Havy.
12          I am not sure if I have the right title
13 for Kelly Mann.  It is a mental health
14 professional, that is all I can identify, at this
15 time.
16     Q    Let's start with first Deena Pavey.
17          Can you please give me the date of any
18 action or inaction, that she did that in your
19 professional opinion approximately caused the death
20 of Mr. Stojcevski; meaning if she hadn't done it,
21 or did it, Mr. Stojcevski would not have died?
22     A    I don't recall.
23     Q    In you are the expert.  You just said
24 that these individuals proximately caused the
25 death.

Page 51

1      I want to know the date and the act or
2  action that Ms. Pavey did, that which proximately
3  caused Mr. Stojcevski's death.  I got all day.
4           Look at anything you want.
5      A    I can state specifically, that all of
6  these people were aware of Mr. Stojcevski's
7  addiction, his condition, his tremors, his
8  unresponsiveness, his seizures, his lying naked on
9  the on the floor.  And, on a systematic basis,
10 persistently, not one of all these individuals, who
11 I mentioned, took any action to try to save his
12 life.
13     Q    I am going to go back and ask my
14 question again.
15          Liability in 1983, and you have been
16 around the block a long time, is not based on the
17 corrective action or inaction of groups of people,
18 individual acts.  What individual act or failure to
19 act, did Ms. Pavey do and give me the date she gave
20 it that approximately caused Mr. Stojcevski's
21 death.
22          If you don't know, or you can't tell me
23 because you learned about this through the DOJ,
24 tell me that.
25     A    No, I don't recall.

Page 52

1      Q    I will be here all day till you recall.
2           If you don't know say you don't know.
3  If you don't recall, read whatever you want.
4           MR. PERAKIS:  He has no
5           obligation to read the entire file.  If
6           you have questions about particular
7           documents, ask him.  He is not going to
8           sit here and go through 4000 pages.
9           It is your job to do that.
10          MR. CHAPMAN:  Sure, he can do
11          that.
12          MR. PERAKIS:  It is your job to do
13          that.  We disagree what your job is.
14          MR. CHAPMAN:  Object to form and
15          foundation.  Irrelevant to this
16          deposition.
17     Q    Sir, answer the question.
18     A    I can't answer it at this time.  I am
19 unable to do so.  I did not chronicle the
20 individual actions in that manner.  So, I don't
21 have easy access to that.
22     Q    What did Ms. Pavey do, what was her
23 involvement?
24     A    It is what she didn't do.
25     Q    What was her job?

GREIFINGER, M.D., ROBERT
04/04/2018

Page 53

1     A      Her job was to try to take care of her
2   patient to make sure her patient doesn't suffer
3   harm from being abandoned.
4     Q      Why did you believe that Mr. Stojcevski
5   was Ms. Pavey's patient what was Ms. Pavey's title;
6   what did she do, what was her function?
7     A   I don't recall.
8     Q      How can you make a conclusion she
9   failed to do something when you don't know what she
10  did?
11    A      My conclusion was based on the
12  aggregate as I mentioned before that nobody took
13  any action to save the life of a patient, who was
14  deteriorating and dying.
15    Q      Tell me specifically what Ms. Parton
16  did or did not do specifically to proximately cause
17  the death of this individual?
18    A   I have the same answer.
19    Q      Which is you don't know?
20    A      No, the answer is I didn't put my
21  report together in that manner so I didn't
22  chronicle each of those.
23    Q      You understand sir, I only get to
24  depose you once you can't point by saying well I
25  didn't put my report that way, because I will wait

Page 54

1   all day.
2     A      Sure, I didn't do my work in that
3   manner in a manner I can answer that question.
4     Q      You understand that is the critical
5   question that somebody can only be responsible if
6   they proximately cause the death of somebody?
7     A      If that is your testimony, that is not
8   -- that would be putting words in my mouth.
9     Q      Let me ask you this.  I am going to go
10  through all of these.  It your opinion with all of
11  the individuals on the medical side, if I ask you
12  the question to tell me specifically what they did
13  or did not do.  Give me the date and time that they
14  did not do something to proximately cause you're
15  your answer would be, I didn't look at the file, I
16  don't have the information.
17    A   I may be able to answer that for you.
18    Q   For which ones?
19    A   For Dr. Sherman and mental health
20  professionals.
21    Q   For all the other nursing professionals
22  your answer would be you don't have that
23  information?
24                 MR. PERAKIS:  Form and
25                 foundation.

Page 55

1     A      You didn't let me finish my September
2   and for Nurse Cueny, Monica Cueny.
3     Q      For all of the other nursing
4   professionals your answer would be you don't have
5   that information?
6                 MR. PERAKIS:  That is not what he
7                 has testified to, he said I don't recall
8                 that is your job if you actually want
9                 his opinion.
10    Q      Doesn't give speaking opinions, shut
11  up?
12                 MR. PERAKIS:  If you truly want
13                 his opinion ask him questions like you
14                 are interested in his answers.
15                 MR. CHAPMAN:  I am very
16                 interested in his answers.
17                 MR. PERAKIS:  Apparently you are
18                 not.
19                 MR. CHAPMAN: Don't give
20                 objections that are allowed under the
21                 court rules.
22                 Let's do that please.
23                 MR. PERAKIS:  I will do what I
24                 feel is appropriate under the
25                 circumstances, and this is appropriate.

Page 56

1                 You are not prepared for this
2                 deposition, it is clear, because you
3                 don't know what records he reviewed you
4                 are not willing to go through the
5                 records that he reviewed.  If you were,
6                 you would get answers.
7     Q      Dr., tell me specifically what Ms.
8   Pacito did that proximately caused the death of
9   Mr. Stojcevski?
10    A      Ms. Pacito failed to train and
11  supervise the mental health professionals who
12  worked for her and if there is something further
13  then I will look at my report.  Natalie Pacito was
14  apparently told by Lisa Bingham, on June 20, that
15  Mr. Stojcevski behavior was bizarre, and she didn't
16  take any action, as a matter of fact he was on
17  suicide watch for reasons I could never understand
18  because there was no indication or documentation in
19  the medical record that he should have been
20  classified as such but she certainly didn't take
21  any action to try to get at what the source of this
22  bizarre behavior was.
23    Q      Since those individuals gave those
24  depositions after your report, how would you know
25  that?

GREIFINGER, M.D., ROBERT
04/04/2018                                                          Pages 57—60

---

Page 57

1      **A      This is in my report.**
2      Q      It is in your report, they gave your
3   deposition after your report.
4             How would you know that; did you learn
5   that through the DOJ?
6      **A      No.**
7      Q      How would you know it?
8      **A      Because it was in the medical records.**
9             MR. CHAPMAN: Here is a copy of
10            the medical records.  Find me the
11            medical records where it is in.
12            MR. PERAKIS: For the record, it
13            is not in the medical records.
14            MR. CHAPMAN: Do not testify for
15            him.
16            MR. PERAKIS:  I am going to
17            testify about what you are doing, you
18            know what the facts are.  They are in
19            the complaint.
20            MR. CHAPMAN: The complaint has
21            nothing do with the facts.
22            MR. PERAKIS:  The complaint has
23            everything to do with the facts.
24            MR. CHAPMAN: You are losing your
25            case and trying to direct your witness.

---

Page 58

1   This is absolutely bizarre.  You cannot
2   do this.
3             MR. PERAKIS: I can do what I feel
4   is appropriate.
5             You are not asking the questions
6   based on the records that he looked at.
7   You prefer to have these
8   generalizations, without getting any
9   answers.  You know what the answers are
10  going to be.  They are not going to
11  benefit you, that is not the purpose of
12  the deposition.  The purpose of the
13  deposition is get to the facts and your
14  not doing it.  If you don't want to know
15  the facts, fine why even do the
16  deposition.
17            MR. CHAPMAN: You know, sir.  I am
18  fed up with your diatribes, and trying
19  to coach your witnesses.  It is beyond
20  professionalism, as an attorney.
21            MR. PERAKIS:  I disagree with
22  you.
23            MR. CHAPMAN: Take a break for a
24  second, Bob.
25            We will call you in a minute.

---

Page 59

1             (A break was taken at 10:42 a.m.)
2             (The deposition resumed at 10:50
3   a.m.)
4      Q      What were you looking at, first?
5      **A      I was looking at the fact chronology.**
6      Q      Dr., could you please explain to me
7   what action or inactions Mr. Arft did that
8   proximately caused the death of Mr. Stojcevski and
9   the date of those actions or in actions?
10     **A      He failed to train and supervise the**
11  **staff who reported to him, which included among**
12  **others Monica Cueny and the licensed practical**
13  **nurses.**
14            **His failure to do that prior to the**
15  **incarceration of Mr. Stojcevski, was an proximate**
16  **cause of his abandoning this patient, watching the**
17  **deteriorating, unresponsive patient die before**
18  **their eyes.**
19     Q      What specific training did they fail to
20  do?
21     **A      He failed to assure that they were**
22  **trained in the clinical guidelines for, withdrawal.**
23  **They failed to, effectively convey the lesson plan**
24  **on detoxification and withdrawal, failed to, follow**
25  **the CCS policy of, I don't remember his specific**

---

Page 60

1   **words, but to protect, to provide timely care in an**
2   **appropriate level for the patients in their charge,**
3   **so this was in one of the policies that I reviewed.**
4   **He also failed to assure that they knew what to do**
5   **to monitor a patient who is unresponsive.  I have**
6   **to monitor them with vital signs and with intake**
7   **and output measurements and to try to determine the**
8   **reason for physical and mental deterioration.**
9      Q      What clinical guidelines did he
10  specifically not train somebody on?
11     **A      The clinical guideline on**
12  **detoxification and withdrawal.**
13     Q      What specific part did he not train
14  somebody on?
15     **A      Let's go find the policy and look at**
16  **it.**
17     Q      I asked you to bring everything that
18  you looked at.  Here is the flash drive.
19     **A      Now you are playing games.**
20            MR. PERAKIS:  You said.
21     Q      I am here to depose you with all of the
22  documents.
23     **A      It is right here.**
24     Q      No, if you need a computer to look at
25  this -- did you bring a computer to look at these

---

GREIFINGER, M.D., ROBERT
04/04/2018                                                                    Pages 61–64

Page 61

1  documents; you knew I was going to depose you on
2  those.
3      **A    I did not bring a computer.**
4      Q    Why would you not bring the document
5  when I asked you; I subpoenaed, I filed a subpoena
6  duces tecum.
7          Why did you not bring sufficient means
8  to go through the documents so I could question
9  you?
10     **A    It is my understanding that counsel**
11  **informed you that I was going to bring a flash**
12  **drive and a copy of my report, that there were no**
13  **objections to that, on your part.**
14                 MR. PERAKIS:  That is accurate.
15     Q    What did you need to look at my
16  computer, to find something?
17          I am not leaving the question until you
18  tell me specific what part of a guideline did
19  Mr. Arft, have to train somebody on?
20     **A    Okay let's look at your computer,**
21  **another one.**
22     Q    Ms. Deluca, would you please tell me
23  the dates of any action or inactions that
24  proximately caused the death of Mr. Stojcevski?
25     **A    I don't recall.**

Page 62

1      Q    Heather Ehrlich, can you tell me the
2  date of any act or inaction that proximately called
3  the death of Mr. Stojcevski?
4      **A    I don't recall.**
5      Q    Ms. Williams, Ms. Teresa Williams.
6          Any act or inaction that she performed
7  or did, the date that proximately caused the death
8  of Mr. Stojcevski?
9      **A    I don't recall.**
10     Q    Ms. Nelson, could you please tell me
11  the date of any act or inaction that proximately
12  caused the death of Mr. Stojcevski?
13     **A    I don't recall.**
14     Q    Ms. Bertram, can you tell me the
15  date and act or inaction that proximately cause the
16  death of Mr. Stojcevski?
17     **A    I don't recall.**
18     Q    Ms. Breen, can you tell me the
19  date of the act or inaction that proximately caused
20  the death of Mr. Stojcevski?
21     **A    I don't recall.**
22     Q    Should say proximately caused.
23     **A    The same with Ms. Bingham.**
24          **Can you please tell me the date of the**
25  **act or inaction that proximately caused the death**

Page 63

1  of Mr. Stojcevski.
2                 MR. PERAKIS:  Bob, for the record
3          you are aware that Ms. Bingham, was
4          dismissed out of the case, right?
5                 MR. GAZALL: I am.
6      Q    He listed somebody who is liable.  I am
7  going through, I understand it was dismissed to go
8  ahead, and answer the question, sir.
9      **A    I don't recall.**
10     Q    Dr., let's continue.
11          Can you please tell me the date of the
12  act or inaction, of Michael Bey-Shelly, that
13  proximately caused the death of Mr. Stojcevski?
14     **A    I don't recall.**
15     Q    Can you please tell me the act or
16  inactions of Ms. Breen that proximately caused the
17  death of Mr. Stojcevski?
18     **A    I don't recall.**
19     Q    Now, I think I asked you on these so
20  can you clarify.
21          Can you please tell me the date of the
22  action or inactions of Ms. Pavey, that proximately
23  caused the death of Mr. Stojcevski?
24     **A    What is the name?**
25     Q    Ms. Pavey.

Page 64

1      **A    I don't recall.**
2      Q    Can you please tell me the date or the
3  date of act or inactions, of Ms. Barber, that
4  proximately caused the death of Mr. Stojcevski?
5      **A    I don't recall.**
6      Q    Before we go down that list.  We were
7  talking about Mr. Arft.  You said Mr. Arft trained
8  staff on the typical guidelines.
9          What clinical guidelines, are you
10  referring to?
11     **A    I have already testified the clinical**
12  **guidelines.**
13     Q    What specifically did he fail to train
14  them on, and I have your file up here, as well.
15          Could you identify the document in the
16  record here?
17          Don't help him find documents.
18                 MR. PERAKIS:  He can't see it.
19                 MR. CHAPMAN:  No, you can't see
20          it and identify for him.
21                 MR. PERAKIS:  Ask him questions
22          about your policies and procedures.  You
23          have copies of them.  It is your client.
24          If you want answers, you ask questions.
25                 MR. CHAPMAN:  I am waiting for

GREIFINGER, M.D., ROBERT
04/04/2018                                                                    Pages 65—68

Page 65

1   the answer right now.
2          MR. PERAKIS:  This is how he is
3   testifying at this point.  You have his
4   report.  You have full ability to look
5   at the report and make the
6   determinations how he based his opinion.
7   If you don't want to do it, that is fine
8   by me.
9          MR. CHAPMAN: Please don't help
10  him find documents.
11         MR. PERAKIS:  I can do what I
12  want.
13         MR. CHAPMAN: You cannot direct
14  him to find documents.
15         Let the record reflect, that
16  Mr. Perakis is looking at the document
17  trying to get him to answer questions.
18         MR. PERAKIS:  Let the record
19  reflect, they are in his report the
20  specific notification to you of the
21  specific policy, and why it was
22  violated.  You don't want to talk about
23  his report, and that is okay.  If you
24  don't want more information about his
25  report, go for it, then finish the dep

Page 66

1                  and be done with this.
2                     He is giving you the report.
3                  Look at it.
4   **A     I don't know how to find it. Well, they**
5   **are in here some way.  I don't know how to find it.**
6       Q      I am waiting for you to find it, sir?
7   **A     I know, you are.**
8       Q      This flash drive that you have in the
9   computer, the court reporter is kind enough to loan
10  us, is the way you received the files from
11  Mr. Perakis, correct?
12  **A     That is correct.**
13      Q      Those are the ways, you would have
14  looked at it.  I opened every file.  Now, you can
15  continue to find them.
16         MR. PERAKIS:  What is the point
17                  here if he referenced your policies,
18                  that you are well aware of, in his
19                  report, that is sufficient for you to
20                  question him about.  If you are claiming
21                  that somehow he doesn't have the
22                  documents, I don't know what to tell you
23                  except he had them.  If they are not in
24                  here, that doesn't do anything for you.
25                  Take a break.

Page 67

1          MR. CHAPMAN: There is a question,
2   on the table.
3          MR. PERAKIS:  Take a break.
4          MR. CHAPMAN: Continue to the
5   documents.
6   **THE WITNESS: I can't find the**
7   **documents right now.  I have cited the**
8   **bates numbers and those should be**
9   **available through, either parties.**
10         MR. CHAPMAN: I appreciate that,
11  sir.  I would like you to find it on the
12  documents you have.
13  Those are the only documents you looked
14  at.  If you continue to do it, if you
15  are refusing to look through your file
16  to find a document then say you refused
17  it; otherwise, I have the time.  It is
18  my deposition.  Look for them.
19         MR. PERAKIS:  For the record, he
20  has already told you he tried looking
21  for them.  He can't find that.  He
22  already said that.  If you want more,
23  you are not going to get it.  If you
24  want to know the truth about his report,
25  ask him about the report.  If you want

Page 68

1   to talk bull, do it.  If you want to
2   bring up some technicality that you
3   think is important, go for it.
4          MR. CHAPMAN: You are being
5   unprofessional, Mr. Perakis.
6   Pejorative. Let me just ask the
7   questions.
8          MR. PERAKIS:  You are being
9   pejorative.
10      Q      Dr., I prefer you to look through.
11         If you have exhausted every file in
12  that folder and you say it is not there, then tell
13  me it is not there.
14  **A     I have cited the page.  I have not**
15  **looked through every single folder.**
16      Q      Could you please look through that
17  folder?
18  **A     There are thousands of pages here.**
19      Q      Look through them, Dr.  I am ready to
20  wait.
21         MR. PERAKIS:  This will be the
22                  full deposition then won't it.
23                  If he doesn't want to ask you
24                  questions about your report.  That is
25                  fine.

GREIFINGER, M.D., ROBERT
04/04/2018                                                                                  Pages 69–72

Page 69

1        THE WITNESS: Okay, I would like
2   to take the flash drive out of this and
3   put it on the Mac, that would be easier
4   so.
5            (A break was taken at 11:24 a.m.)
6            (The deposition resumed at 11:35
7   a.m.)
8        Q    Dr., we have been or you have been
9   looking at the computer screen for about ten
10  minutes or so, trying to find these clinical
11  guidelines and you are -- am I correct, unable to
12  locate them on your floor drive at least with the
13  amount of time you have looked at them?
14       A    That is correct.
15       Q    You haven't looked through everything,
16  you couldn't find them in the ten minutes or so
17  looking through it?
18       A    That is correct.
19       Q    You had mentioned clinical guidelines.
20           What do you been mean by clinical
21  guidelines?
22       A    Clinical guidelines is a term of art, I
23  guess, that are generally accepted guidelines based
24  in large part in science, as to how to handle
25  certain situations.  They are used for physicians

Page 70

1   and health care staff.
2        Q    And you agree that guidelines are not,
3   they don't make the standard of care or they don't
4   determine what is deliberately, indifferent,
5   correct; if you don't know the case law, say you
6   don't know.
7        A    They don't determine deliberate
8   indifference, that is correct.  They are the CCS,
9   clinical guidelines for in 2014 were excellent,
10  they were based on standard of care.
11       Q    A facility, could a facility, any
12  facility we could deal specifically with jails and
13  prisons, if that is what you are more familiar
14  with, but a facility could create policy or
15  clinical guidelines far superior to the standard of
16  care, correct?
17       A    I don't know what the word, superior
18  means in terms of standard of care.
19           MR. PERAKIS:  Let him finish his
20           question.
21       Q    For example, if the standard of care
22  says, that you should give somebody access to the
23  phone every 30 minutes, and your guidelines states,
24  you know what we are going to give somebody access
25  to the phone every 15 minutes, you could do that,

Page 71

1   write a policy for your staff that says this is
2   about what we are going to do, correct?
3        A    Yes, but the access to the phone
4   wouldn't be clinical standard of care.
5        Q    My hypothetical, the phone is sitting
6   there.  I am using as an example for you, the
7   standard of care, you check somebody's blood
8   pressure every 4 hours.  I want to run a superior
9   organization so we are going to check this person's
10  blood pressure every two hours.
11           I could do that, correct?
12       A    Yes.
13       Q    That would be superior to the standard
14  of care that everybody else is doing, if that truly
15  was the standard of care, every four hours.
16       A    If waking people up every two hours,
17  instead of every four hours, that would be below
18  the standard of care.
19       Q    You are going way beyond and adding.
20           Don't add to my questions.
21           MR. PERAKIS:  Let him finish your
22           question.
23       A    I understand what you are saying, but I
24  just can't think of examples, giving people more
25  medication would not necessarily be better.  Giving

Page 72

1   people more observation, might not be better.
2        Clinical guidelines are based on, the
3   best information that people have at that point in
4   time, based on evidence, usually clinical trials,
5   or other scholarly work as to what works best.
6        Q    In your opinion CCS clinical
7   guidelines, or what was the term you used?
8        A    More than adequate.  They were good.
9   They are good.
10       Q    Now, you said that you believed that
11  Mr. Arft's action of not training people on the
12  clinical guidelines proximately caused the death of
13  Mr. Stojcevski.
14           What evidence do you have that he
15  didn't personally train people?
16       A    I didn't exactly say that.  He didn't
17  insure that training and supervision happened.
18           What evidence is that they, every
19  single health care professional, who was involved
20  in this case, acted in a manner contrary to the
21  clinical guidelines, so he couldn't have
22  successfully trained them and had them supervised
23  or had them trained and supervised.
24       Q    I had gone through everybody you
25  listed, all the health care people, and asked you

GREIFINGER, M.D., ROBERT
04/04/2018

Page 73

1  to tell me what this action or inaction they did,
2  that was contrary to clinical guidelines.
3          Be specific.  You said, you couldn't do
4  that.
5      A      I answered that generally for all of
6  them.
7          Specifically, for all of them I
8  couldn't give you the dates and times.
9      Q      Or specific actions?
10     A      Well, it was inactions.  It was their
11  inactions, this is a tragedy with inaction.
12     Q      Let he give you an example here, sir.
13          Ms. DeLuca was involved in the intake
14  on June 11th, and never again was involved in
15  anything to do with Mr. Stojcevski who died 16 days
16  later.
17          How could anything she have done,
18  proximately cause his death?
19     A      She didn't verify his medication.
20     Q      What did that have to do with causing
21  his death?
22     A      Had they verified his medication, he
23  would have been perhaps treated differently.
24     Q      Perhaps you don't know, that he would
25  have.

Page 74

1      A      If they were doing a good job they
2  would have treated him differently.
3      Q      He came in and said that he took
4  Methadone, what he said on his intake, correct?
5      A      Yes.
6      Q      He was asked what medications did he
7  take, he chose to lie and not say he was taking
8  Xanax and, Klonopin and heroine and cocaine, and
9  all the other stuff he was taking, is that correct?
10         MR. PERAKIS:  Objection.  No
11  basis.
12     A      All I can say, he did not reveal that
13  information at the time.  I wouldn't say that he
14  chose to lie.
15     Q      What do you call it when you don't tell
16  a health care provider who says, give me all the
17  medication you are on?
18     A      People might not have the presence of
19  mind to mention it, or they don't want to mention
20  it, at that time.
21          He did reveal that information later.
22     Q      Methadone, when you are on methadone
23  generally, according to the CCS policies would
24  require the implementation COWS protocol, correct?
25          Methadone is an opiate.  COWS protocol

Page 75

1  is protocol for opiates.
2          Did they do that?
3      A      I don't know, because there was a page
4  missing.
5          Page one of the COWS protocol was
6  missing.
7      Q      You don't know, whether the COWS
8  protocol was implemented?
9      A      I know part of it was, page two and
10  beyond.  I don't know about page one, that wasn't
11  produced in discovery to me.
12     Q      Did Ms. DeLuca, start the COWS
13  protocol?
14     A      I don't recall.
15     Q      Let's assume hypothetically that she
16  started the COWS protocol, isn't that the treatment
17  you get when you are on methadone?
18     A      COWS protocol is not a treatment, it is
19  a monitoring.  It is a tracking.
20     Q      I am confused as to why you said it
21  does call for certain things including some
22  medications to be given, doesn't it?
23     A      Only by a physician's order it is
24  monitoring signs and symptoms and vital signs.
25     Q      So what treatment --

Page 76

1      A      COWS protocol, again passive voice,
2  protocols can't call for anything, but there is the
3  COWS protocol is a scoring system and has certain
4  scoring points, the physician should be notified,
5  and the physician or other practitioner might order
6  medication.
7      Q      If I give you some medical records,
8  turn to page 7, 8 and 9.  I think, you might see
9  Nurse DeLuca started the COWS protocol and
10  performed her intake.
11          I know you are not a nurse, but tell me
12  specifically what she did wrong there?
13     A      What page?
14     Q      7, 8, 9.
15         MR. PERAKIS:  To the extent he is
16  not a nurse, you made it clear, he
17  doesn't have certain training.  There
18  are other experts that will handle that
19  aspect of it.
20         But, if you wish him to opine in
21  an area you are an expert in, go ahead.
22     Q      You are opining Nurse DeLuca, did
23  something wrong?
24     A      I already answered your question that
25  was in regard to not having medications verified or

Page 77

1  not making sure his reported medication were
2  verified.
3        Q    I am saying to you, how did not
4  verifying that he in fact was taking methadone, on
5  June 11th, proximately cause his death on June
6  27th?
7        A    Because, had they verified his
8  methadone they would have found the prescriptions
9  that he had for the benzodiazepine medications;
10  Xanax and Klonopin.
11       Q    Who was prescribing the methadone, to
12  him?
13            Where did he get the Methadone from?
14       A    I don't know.
15       Q    How do you know they would have found
16  out he was on benzodiazepine and Klonopin?
17       A    Because it, the --
18       Q    You are guessing?
19       A    I know how it works in New York and
20  Massachusetts.  I assume it works the same in
21  Michigan.
22       Q    You are guessing?
23       A    I am not guessing.  I am making an
24  educated assumption.
25            There is a medication profile, whoever

Page 78

1  was prescribed the methadone and whoever was
2  administering the methadone would have a record of
3  all the other active prescriptions that he was on.
4        Q    Let's follow your rational basis, had
5  she done that, would have presented something that
6  have occurred 16 days later, but 6 days later, the
7  17th, and 18th, he said he was taking Klonopin and
8  Xanax, right?
9        A    Yes.
10       Q    He got the things on 16th, and 17th or
11  17th and 18th?
12       A    They did.
13       Q    How did whatever she did on the 11th,
14  cause this gentleman's death?
15       A    It was an example of inaction of
16  ignoring a potential medical need, which put him at
17  serious risk at harm.
18            This is not a malpractice issue.  This
19  is a, risk of harm, is a very serious thing.  It is
20  very serious condition, and her inaction as well as
21  all the other health care staff inaction, together,
22  it describes a systematic inattention to this
23  patient's serious medical needs.
24       Q    I am not asking about all the others.
25            I am focusing on Ms. DeLuca, now.

Page 79

1        The only information Ms. Deluca had is,
2  he was taking methadone, she didn't have any other
3  information he was on any other drug.
4        What you are saying is, what she should
5  assume that he was taking all kinds of other drugs?
6        A    No, I answered that question, already.
7        Q    Since the only drug he said he was
8  taking was methadone and methadone is never
9  prescribed in a jail?
10       A    No.
11       Q    Not in Macomb County Jail?
12       A    Is that your testimony?
13       Q    Macomb County Jail doesn't prescribe
14  it?
15       A    Thank you for your testimony.
16       Q    He would have been put on COWS protocol
17  and he was.
18            You see 7, 8 and 9, he was by Ms.
19  DeLuca.
20            How could anything she had done
21  conceivably led to this gentleman's death?
22            MR. PERAKIS:  How many times.
23       Have you answered that question?
24            THE WITNESS:  I have answered
25       that question.

Page 80

1            MR. PERAKIS: He is not answering,
2       it anymore.
3            He answered it three times.  Move
4       on.
5        Q    Now, Mr. Perakis made a statement
6  earlier you are not a nurse, you are not giving
7  testimony as to whether nurses did anything against
8  the standard of care deliberately?
9            MR. PERAKIS: You have answered
10       the question and he answered it, as to
11       the nurses.  As to each nurse.
12            You are the one that asked the
13       questions.
14            MR. CHAPMAN: Will you shut up.
15       Say form and foundation.
16            Read the court rules.
17            MR. PERAKIS:  Listen, let me tell
18       you something.  I can say whatever you
19       want, if what you are doing on the one
20       hand asking him questions about people
21       where he is not an expert.
22            On the other hand, you are saying
23       he can't testify to it.
24            MR. CHAPMAN: I never said he
25       can't testify.

GREIFINGER, M.D., ROBERT
04/04/2018                                                                Pages 81–84

Page 81

1        Simply ask him the question.
2   I am asking questions not directing
3   anything.
4        MR. PERAKIS: He is smarter than I
5   am.
6        I don't know, what you are
7   talking about.
8        MR. CHAPMAN: Answer the question
9   please, Dr.
10       MR. PERAKIS: You already answered
11  it, haven't you?
12       THE WITNESS: Yes.
13  Q    Yes to what?
14  A    I answered the question about
15  medication, about how her failure to verify
16  medications contributed to my conclusion, about
17  systemic failures to reduce risk of harm that lead
18  to the death of this patient.
19  Q    Continue to explore this about Ms.
20  DeLuca.
21       What was the serious medical need that
22  you are aware of at the time, that she failed to
23  act on?
24  A    She failed to?
25  Q    What was the serious medical need?

Page 82

1   A    The serious medical need, potential
2   from withdrawal from benzodiazepine.
3   Q    That is not a need she was aware of.
4   A    She would have become aware of it, if
5   she done her job.
6   Q    She was not aware of it, on the 11th.
7   He didn't tell her, correct?
8   A    He didn't tell her she would have been
9   aware of it, had she done her job.
10  Q    My question to you is: What is the
11  serious medical need she was aware of; not the
12  potential future need she might have been aware of,
13  if she had done something.
14       What is the serious medical need she
15  was aware on July 11th, other than he was on
16  methadone and needed to be placed on the COWS
17  protocol?
18  A    That is it.
19  Q    Now, you said with respect to Mr. Arft,
20  he didn't you said something relating to intake and
21  output documentation. Where is there any
22  requirement to do intake and output documentation
23  of somebody in high observation?
24  A    It would be required for someone who is
25  not eating or drinking, or not eating or drinking

Page 83

1   very much, in that would be in this CCS, is hunger
2   strike policy.
3   Q    It is the hunger strike policy unless
4   made aware that somebody was on a hunger strike,
5   right?
6   A    Oh, these nurses that saw him enough
7   times to know he was lying on the floor naked with
8   tremors, and being unresponsive. It was derelict
9   in their duty to care for their patient not to
10  inquire, whether he was eating or drinking and how
11  much he was eating or drinking.
12       This is acceptable accept for the last
13  three days, when they totally abandoned him as they
14  were dying.
15       They saw him almost every day, the
16  nurses and as did the mental health workers.
17  Q    Do you know how many people lie on the
18  floor naked, in high observation?
19  A    Two.
20  Q    Two?
21  A    No, you are asking how many.
22       What do you mean how many?
23  Q    Is it a common thing, does it happen
24  all the time, is it infrequent?
25  A    No, it is not common. It happens

Page 84

1   sometimes.
2   Q    Have you read the deposition of all the
3   corrections officers who say it is pretty darn
4   common, it is not an unusual thing?
5        MR. PERAKIS: For the record,
6        they not uncommon. They didn't say it
7        was common, that it happens a lot.
8        MR. CHAPMAN: Don't testify.
9        MR. PERAKIS: You are testifying.
10       MR. CHAPMAN: He can tell me if he
11       believes I am wrong. He has read the
12       transcript, I assume. Answer the
13       question.
14  A    I read the depositions, and I have also
15  been in approximately three hundred correctional
16  facilities in the course of my career.
17  Q    You haven't been in Macomb County?
18  A    No, sorry, I missed that. It happens,
19  but it is not -- when that happens, it is people
20  with very, very serious medical needs, whether it
21  is mental illness, or physical illness that is
22  causing that. It is not a healthy state, it is not
23  a healthy state to be lying on the floor naked with
24  tremors.
25  Q    With what?

GREIFINGER, M.D., ROBERT
04/04/2018                                                    Pages 85—88

Page 85

1     A     Tremors and babbling.  It is a clear
2  sign of serious acute, serious medical need.
3     Q     Do you know that whenever the nurses
4  saw him, his vital signs were normal?
5     A     No, I don't think his vital signs were
6  being taken after the first few days.
7     Q     You looked at the jail logs have you?
8     A     I may have.  I don't recall.
9     Q     4 times in the jail logs, that the
10  nurses were in, and vital signs were done?
11     A     I would have to go back and look.
12     Q     You are not here giving testimony as to
13  whether or not the nurses violated some sort of
14  standards, correct?
15     A     I would like to.
16     Q     You are not a nurse, are you?
17     A     I am not a nurse.
18     Q     You never trained nurses, did you?
19     A     But I oversee medical care for three
20  federal judges in three large jails in the United
21  States.  I have managed nursing care in a state
22  correctional system, what at the time was the
23  largest jail in the United States.
24     Q     Ancient history 30 years ago.
25     A     Not the New York State Prison System.

Page 86

1  That was twenty something years.
2              I don't think that kind of nursing care
3  has changed as much over the decades.  Other things
4  have changed.
5     Q     Look at your report paragraph 25,
6  please.
7              If I am reading that correctly, one of
8  your criticism is the 14 day, health assessment and
9  screening wasn't completed.
10              So arguably, it was two days later?
11     A     It wasn't done at all.
12     Q     I understand he died on the 16th day.
13  It was two days late, so is it really your
14  testimony that being two days late somehow was
15  deliberate, and caused this person's death?
16     A     Yes, because had they done the 14 day
17  assessment they would have begun to evaluate the
18  cause of his physical and mental status and
19  discovered that he was not well, and that he needed
20  hospital care.
21     Q     What is the 14 day assessment, that was
22  done on June 15?
23              MR. PERAKIS: Objection it not
24              part of the evidence in the record.
25              Nothing in that.

Page 87

1              MR. CHAPMAN:  Form and
2  foundation.
3              Counselor, go back to law school.
4              Can you answer my question, sir?
5     A     This is just another example of the
6  health care staff not following sound correctional
7  health care policies.
8     Q     Could you answer my question, you are
9  given hypothetical that had they had done this they
10  would have found this.
11              What if assessment was done on the June
12  15?
13              MR. PERAKIS:  It was
14              hypothetical.
15              MR. CHAPMAN: You are so abusive
16              in violating the ethical rules of taking
17              the deposition.
18              Answer the question, Dr., please.
19     A     If it was done on the 15th, they might
20  have missed it.
21     Q     He was in the COWS protocol, until the
22  evening of the 15th, the morning of the 16th,
23  correct?
24     A     Don't recall.
25     Q     His assessments were done everyday

Page 88

1  taking vitals every so many hours, correct?
2     A     There were vital signs, taken the first
3  few days, of incarceration?
4     Q     He had a complete assessment within,
5  almost daily by the nurses, one could argue that?
6     A     That would be your testimony following
7  the COWS protocol, is not a complete assessment, a
8  physical assessment by an LPN; it is not an
9  adequate assessment.
10              Just taking vital signs and asking
11  about selected focused symptoms, is not a
12  comprehensive health assessment in the sense that
13  term is used, by the National Commission on
14  Correctional Health Care or the American
15  Correctional Association or the American Jail
16  Association.
17     Q     Dr., doing an assessment and even
18  having the policy that everybody gets assessed in
19  the 14 days, is really to protect those people that
20  have no contact with medical at all, and that they
21  are seen by somebody within 14 days, isn't that
22  really if you look at the underlying notes, if we
23  are going to talk about the NCC, as to why that
24  policy is there?
25     A     That is part of it.

GREIFINGER, M.D., ROBERT
04/04/2018

1    It is also to pick up things that might
2  have been missed during the initial assessment,
3  where the whole story doesn't always get told for a
4  variety of reasons, during the initial assessment,
5  so it is to give it a little bit of time and sit
6  down when people are sober and feeling a little
7  better, than the day they get arrested and detained
8  say, okay let's go over again, let's go over your
9  medical history and drug use history, let's do a
10 physical examination and a physical examination,
11 include the mental status exam including a
12 neurological screen, it includes listening to heart
13 and lungs and feeling the belly.
14    Had that been done anywhere around his
15 so called 14 day, they would have determined that
16 he was really, really not well.
17            MR. PERAKIS:  Take a break.
18            (A break was taken at 11:50 a.m.)
19            (The deposition resumed at 11:52
20            a.m.)
21 Q    36 to 41, has the specification.
22    One thing I am looking at on June 17th
23 at 1750 hours, Michael Bey-Shelley responded to the
24 call performed an assessment, brought the inmate
25 down to be seen by the doctor?

1    36 to 41, has a whole bunch of
2  allegations regarding Michael Bey-Shelley talking
3  about the June 17, 715 hours.
4    What more are you saying she should
5  have done?
6  A    I am sorry, 36 I don't see.
7  Q    Talking here about him being brought
8  down to Dr. Sherman.
9    You know that Michael Bey-Shelley is
10 the one who saw him and brought him down to see Dr.
11 Shelly, are you aware of that?
12 A    Yes.
13 Q    There is not much more the nurse can do
14 than go up do an assessment if she feels the person
15 needs a doctor bring him down to see the doctor,
16 right?
17 A    In that case, yes, in that case, yes.
18 Q    Michael Bey-Shelley saw him again on
19 the 18th with Ms. Cueny and on the later on the
20 17th, with another nurse where he said he was
21 taking Xanax.  Both the Xanax and Klonopin was
22 reported to Dr. Sherman on the 18th by Ms. Cueny,
23 correct, along with her assessment of the 18th?
24            MR. PERAKIS:  Is that your
25            testimony?

1    MR. CHAPMAN: I said, is that
2  correct; listen please.
3            MR. PERAKIS:  I am listening.
4  A    It is not clear to me that Dr. Sherman
5  saw Mr. Stojcevski on the 17th.  He was brought
6  down by the nurse that I saw documentation of that,
7  but it is my recollection there was no progress
8  note or records of that encounter, and then there
9  was an entry of June 24th, which might have
10 referred back to June 17th or to June 23rd.
11 Q    Why don't you turn to page 16, of the
12 medical record, while you are doing that, if you
13 can answer a question.
14    You are aware that there was only one
15 medical doctor at the jail that is Dr. Sherman, one
16 physician?
17 A    Right.
18 Q    Do you see where Michael Bey-Shelley in
19 her note says, physician into access and speak with
20 patient, for the 17th?
21 A    Could you just let me read it?
22 Q    Sure.
23 A    There is no clinical note by Dr.
24 Sherman.
25 Q    That is not my issue.  She writes her

1  note, she says the physician is in to see him,
2  physician into access.
3  A    I don't know, what that means.
4  Q    You did, you read her transcript?
5  A    I did.
6  Q    What did she say about that?
7  A    She said, Dr. Sherman saw him, the
8  patient.
9  Q    Do you have any evidence to suggest
10 that Michael Bey-Shelley, is not telling the truth?
11 A    No.
12 Q    Now, later on the 17th, he is seen
13 again?
14 A    Who we don't know what Dr. Sherman did,
15 if he did see this patient, did he look, did he
16 evaluate, did he examine, did he get a history.
17            MR. CHAPMAN:  Move that, that be
18            stricken.
19    My question isn't about what Dr.
20            Sherman did.  What did Michael
21            Bey-Shelley, she brought the patient
22            down, put him in an observation room and
23            testified the doctor was in to see him.
24 Q    That is about all you can expect an LPN
25 to do, isn't it?

GREIFINGER, M.D., ROBERT
04/04/2018                                                          Pages 93–96

Page 93

1     A     Yes.
2     Q     Later on that night and the next
3  morning, later on that night, she went to see him
4  and the next morning, she went to see him with Ms.
5  Cueny, he said he had taken Xanax and taken
6  Klonopin and she was with the director of nursing,
7  correct?
8     A     Yes.
9     Q     It would be reasonable for an LPN to
10 assume that the director of nursing would follow-up
11 with a phone call to the doctor and what needed to
12 be taken care of, right?
13    A     Yes, except for the verification which
14 would have been done by the, LPN?
15    Q     The verification of what?
16    A     Xanax and Klonopin.
17    Q     You are assuming in some kind of a
18 policy that says it was Michael Bey-Shelley to do
19 something?
20    A     There is a policy that when --
21    Q     Don't give me a general policy.
22 Tell me a specific policy, you might
23 know that applies to Macomb County Jail CCS.
24          If you don't know say you don't know,
25 but don't give me a generalized one that you have

Page 94

1  learned over the years of doing this.
2     A     Okay, I don't know the specific policy
3  of the Macomb County Jail.
4     Q     We do know that those are the three
5  times Ms. Michael Bey-Shelley had involvement with
6  the patient, correct?
7     A     Yes.
8     Q     You would agree with me she did what
9  she was supposed to do?
10    A     In those cases, yes.
11    Q     Ms. Cueny saw the patient one time on
12 the 18th, correct?
13    A     Yes.
14    Q     You can look if you want on page 20, I
15 believe.  If you want the medical records, page 20,
16 sir.
17    A     I do see paragraph 28.
18          This CCS policy, medication services
19 that talks about verifying prescriptions to assure
20 continuity of care, so that is in my report, I will
21 give the page cite.
22    Q     A generalized policy to verify, but you
23 were saying that somehow it was the LPN's job.
24          There is no policy that says in this
25 context, it was Michael Bey-Shelley's job.

Page 95

1          If you do, cite it to me, that is not
2  what that policy says?
3     A     I don't recall, whether that is
4  specified in the policy.
5     Q     We do know the director of nursing was
6  in seeing the patient and wrote an extensive note?
7     A     The director of nursing wrote a note,
8  yes.
9     Q     Look at the note.  Seems to be
10 extensive.
11          Have you looked at a few notes in your
12 time?
13    A     Perhaps.
14          MR. PERAKIS:  Page twenty.
15    Q     Have you read that note, before?
16    A     Yes.
17    Q     You would agree that that is a pretty
18 extensive note isn't it?
19    A     That is a note, yes.
20    Q     Did you read her deposition?
21    A     I did.
22    Q     Did she say that she relayed that
23 information together with that fact that she
24 learned that he also was taking Xanax, to Dr.
25 Sherman?

Page 96

1     A     Yes.
2     Q     Isn't that what a director of nursing
3  or any nurse really should be, examine a patient,
4  write a note if they believe it is necessary, call
5  the doctor, accurately relay the information to the
6  doctor?
7     A     That is one of the things they should
8  do.
9          They are independently licensed and
10 they have an independent duty to let me -- let me
11 read the language for you. In the -- this has to do
12 with the initial health assessment.
13          "It is the goal of CCS to prevent
14 deterioration of the inmates health during
15 incarceration and to improve vital functions with
16 whenever possible."
17          I think, talking with Dr. Sherman was
18 the right thing to do, but I don't think that her
19 duty ended there, because.
20    Q     Sir, I am not asking you to comment on
21 that.
22          You are not a nurse.  You can't comment
23 on what her duty was writing a note and calling the
24 doctor.
25          What you would expect the nurse to do,

GREIFINGER, M.D., ROBERT
04/04/2018

---

Page 97

1 right?
2     **A**     **Yes.**
3     Q     Dr. Sherman responded to her, that is
4 in his transcript, also in her transcript, also in
5 a note, right?
6     **A**     **Yes.**
7     Q     And he made no further orders, correct?
8     **A**     **Yes, correct.**
9     Q     In other words, to get to the point, he
10 did not place him, being Mr. Stojcevski, on
11 benzodiazepine, CW protocol, correct?
12     **A**     **Correct.**
13     Q     Now, starting on the 18th, the mental
14 health workers, Ms. Brock, B-R-O-C-K, based on the
15 referral by Officer Campo, I believe, when up to
16 assess whether or not, he could be removed from
17 suicide watch.
18     Do you understand that?
19     **A**     **Okay.  Could you say it again?**
20     Q     Did you read the testimony of Ms.
21 Brock?
22     **A**     **Yes.**
23     Q     Is it your understanding that she
24 believed her function was to communicate or to
25 assess the patient to determine the patient could

---

Page 98

1 be removed from suicide watch.
2     Is that what she testified was her job?
3     **A**     **Yes.**
4     Q     And you agree with me for the most
5 part, she was the mental health worker that went up
6 there the most, correct?
7     **A**     **I would have to look back through my**
8 **notes.  That is possible.**
9     Q     Assume for me, I think there were two
10 other visits by two other people.  She was there
11 the majority of the time.  Each time she went up
12 there, she stated that he refused to talk to her,
13 correct, or refused to cooperate with mental health
14 providers, that is your exact words, correct?
15     **A**     **That is what she said.**
16     Q     That is what is in your report?
17     **A**     **That is what she wrote, yes.**
18     Q     Do you know what Websters definition
19 of, refused, is?
20     **A**     **Not offhand.**
21     Q     Paragraph 65 of your report you accuse
22 Kelly Mann and Chantelle Brock of fabricating, that
23 he refused; paragraph, 65.
24     Ask you a question.
25     **A**     **I have it.**

---

Page 99

1     Q     Any time I ask you to refer to a
2 paragraph or document, take all the time to read
3 it, tell me when you are done.
4     **A**     **Okay, I have read it.**
5     Q     For two definitions in, Websters
6 Intercollegiate Dictionary, for refused:
7     Quote, to express oneself as unwilling
8 to accept, end quote or two quote to decline.
9     Do you agree in a fair determination
10 that Mr. Stojcevski declined to talk to her?
11     **A**     **No.**
12     Q     Did he talk to her?
13     Answer my question.
14     Did he talk to her?
15     **A**     **No, but I disagree strongly.**
16     Q     I don't care whether you disagree
17 strongly or not.  I am the one asking the
18 questions.
19     He did not talk to her on the 18th,
20 19th, or 20th, correct?
21     **A**     **That is correct because he was**
22 **unresponsive, he was unable to.**
23     Q     That is your determination, I am
24 asking.
25     **A**     **That is my opinion.**

---

Page 100

1     Q     I don't want your opinion.  I am asking
2 you facts.  The facts are, he did not talk to her
3 on the 18th, 19th and 20th, correct?
4     **A**     **That is correct.**
5     Q     On the 21st, he did talk to her,
6 correct?
7     **A**     **I don't recall.**
8     Q     Why don't you turn to page 29.
9     MR. PERAKIS:  Just for the
10     record, Ron, the pages you are
11     referencing are paginated and they just
12     say MCJ Medical.
13     D. Stojcevski, and then they have
14     the page number.
15     Q     I have no idea if you could turn to
16 page 29, should be the only page number on there?
17     MR. PERAKIS:  There is also pages
18     two of two.
19     MR. CHAPMAN: Those are the
20     internal pages of the document. You know
21     what I am referring to. The doctor,
22     knows what I am referring to.
23     Q     Are you on page 9, Dr?
24     **A**     **Yes.**
25     Q     Here the note says, "MH staff received

---

Page 101

1  collateral information that patient fully engaged
2  with nursing staff prior to inmates visit."
3         Can you see that?  MH staff received
4  collateral information that patient fully engaged
5  with nursing staff, prior to inmates visit.
6         Do you see that, Dr?
7     **A    Yes.**
8     Q    So, he was able to talk, correct?
9     **A    I didn't see that on the video.**
10    Q    Oh, now did you watch all the video
11 because before you told me you couldn't tell he
12 about that?
13    **A    I said, I watched the video.**
14    Q    I was questioning you on, you have a
15 gag order from the government and you can't talk to
16 me about it?
17        Which is it, can you or can't you?
18    **A    I don't know the answer to that.**
19    Q    Well, you have to give me the answer
20 now.
21        Which is the answer, you want to go
22 with?
23    **A    Okay, my question to your question is,**
24 **I can't verify that collateral information.**
25    Q    Here it says, "The nurse or the nurse

Page 102

1  mental health worker Brock said that she received
2  collateral information that he fully engaged with
3  nursing staff."
4         That is what she wrote there, correct?
5     **A    That is correct.**
6     Q    That is information she had and she
7  testified that he was talking to nurses, correct?
8     **A    That she heard that.**
9     Q    Isn't that a natural conclusion for
10 somebody to make, if somebody has the ability to
11 talk to other people and he won't talk to me, and
12 he has declined to talk to me?
13    **A    No, you have no --**
14    Q    That is not a reasonable thing to
15 conclude.
16    **A    Not reasonable, you have no sense of**
17 **how these neurological conditions are.  There are**
18 **people who are unresponsive one minute and perhaps**
19 **responsive another minute.**
20    Q    That is your opinion. You are not a
21 psychiatrist, a neurologist, you have no training
22 in regards to that so let's not go down that route.
23        MR. PERAKIS:  He is answering
24        questions.  Listen, he is not finished
25        answering your question.  You asked him

Page 103

1  a question he is answering it.
2         Let him finish the question.  You
3  don't let him finish the question.  He
4  will stop answering your questions.
5         MR. CHAPMAN:  Don't threaten me?
6         MR. PERAKIS:  What was your
7         answer, Dr.
8     **A    My answer is, just because he had been**
9  **in a conversation, doesn't mean he was faking.**
10 **Withdrawal includes changes in cognition among**
11 **other things, that vary overtime.  Things become**
12 **clear, then they become foggy.  They become**
13 **responsive and unresponsive.**
14    **It is not simplistic the way you are**
15 **describing.**
16        MR. CHAPMAN:  Move to strike as
17        having your statement stricken.
18        Clearly, outside your expertise.
19    Q    He did talk to her on the 21st, didn't
20 he?
21    **A    Yes.**
22    Q    He said, where is my medication, right?
23    **A    Yes.**
24    Q    He could talk to her and chose to talk
25 to her on the 21st, right?

Page 104

1     **A    That doesn't mean he was able to.**
2     Q    I am not asking you what it means.
3         Acknowledge the fact that he did.
4     **A    I acknowledge that, but I don't**
5  **acknowledge the, could.**
6     **I don't acknowledge.  You asked me if**
7  **he thereby could and I said no to that.**
8     Q    He opened his mouth and words came out,
9  that means he had the anatomical ability to speak,
10 right, words came out?
11    **A    He had the anatomical ability.**
12    Q    That is all, I asked you Dr.
13        I am not asking your opinion on that.
14 You don't have the expertise, to give your opinion.
15        MR. PERAKIS:  Off the record.
16        (A discussion was held off the
17        record.)
18    **A    May I add an exact to an answer, I gave**
19 **a little bit earlier, in your, we were talking**
20 **about the documentation of Ms. Cueny's visit, with**
21 **Mr. Stojcevksi.**
22    **She wrote that note on June 24th, which**
23 **was approximately one week after the encounter.**
24    Q    What fact do you base that on?
25    **A    It was a late entry that is marked on**

GREIFINGER, M.D., ROBERT
04/04/2018

1  the record.
2  Q  Did you read her transcript?
3  MR. PERAKIS:  Ha, ha, ha, ha.
4  MR. CHAPMAN: Mr. Perakis, you
5  laugh and carry on, be quiet.  Be quiet.
6  Q  Did you read it?
7  A  I did, I don't recall, what it says.
8  Q  Do you know that it says she put it in
9  on the 18th, didn't hit submit and the computer
10 system at that time had a problem and he hung up
11 and they would not be posted until they were
12 submitted.
13 Did you follow that?
14 A  Blaming the computer is like blaming
15 the victim.
16 Q  Did you read that?
17 A  I read it.
18 Q  Did you read it, when Mr. Arft said the
19 same thing with the computer system, most of the
20 nurses said the same thing.
21 Did you read that?
22 A  I am reporting what is documented on
23 page twenty of this set of medical records.
24 Q  I am asking you if you read that in
25 your transcript to know their explanation for that?

1  A  I already answered, yes.
2  Q  Did you also see, as an attachment the
3  computer printout that said it was in fact posted
4  on the 18th, it was put on the 18th, wasn't posted
5  until the 24th.
6  Did you see that?
7  A  I don't recall that.
8  Q  When is the last time if ever that you
9  prescribed Xanax or Klonopin, to a patient?
10 A  I never did.
11 Q  Do you know the difference between
12 Xanax and Klonopin, as far as clearing through the
13 body?
14 Don't guess, I want to know.
15 A  They, I know that they are different.
16 Q  Do you know the difference?
17 A  I don't know.
18 Q  Do you know the difference half-life of
19 the two drugs?
20 A  No.
21 Q  Do you know if half-life means anything
22 with respect to whether or not someone would begin
23 withdrawal or go through withdrawal, or how long
24 withdrawal might last; don't guess.
25 A  I know, that it is sometimes a

1  consideration, but I also know with benzodiazepine
2  withdrawal signs and symptoms can occur weeks after
3  the last dose.
4  Well, beyond the half-life of whatever
5  drug it was.
6  Q  Are you aware of the currently
7  identifiable stages of benzodiazepine withdrawal.
8  Do you know them?
9  A  Yes.
10 Q  What are they?
11 A  They are autonomic reactions,
12 elevations of pulse, blood pressure, of
13 respiration.
14 Q  What you are giving me is the symptoms
15 of someone going through withdrawal.
16 That is not my question to you?
17 Do you know the identifiable stages of
18 benzodiazepine withdrawal, not the symptoms
19 somebody might have?
20 A  I am not sure what you mean by that.
21 Q  Are you aware that there are specific
22 stages of withdrawal that benzodiazepine, they are
23 very specific things may or may not happen?
24 A  I don't know what you mean by, stages.
25 Q  That is fair, if you don't know you

1  don't know.
2  Are you aware that people that suffer
3  from catatonia, do not have pain?
4  A  No.
5  Q  Do you know anywhere in the record or
6  did you see from anything, did Mr. Stojcevksi ever
7  tell anyone, he was in pain?
8  A  No.
9  MR. CHAPMAN: Turn to your
10 paragraph 61, please.
11 If you want to read your paragraph
12 first, go ahead and do that, then we
13 will have a question for you.
14 Ready.
15 Q  If you look down about, a little more
16 than halfway over on the 5th line you use the
17 phrase, "each of them made choices to ignore?"
18 Do you see that phrase?
19 A  Yes.
20 Q  I have very specific questions to ask
21 you.
22 I am going to ask you 4 of them if you
23 can tell me.
24 I want to know:  Specifically what
25 choice, who made it, when they made it, and how it

MIdeps@uslegalsupport.com
Ann Arbor | Detroit | Flint | Jackson
U. S. LEGAL SUPPORT
Bingham Farms/Southfield | Grand Rapids
Phone:  888.644.8080
Lansing | Mt. Clemens | Saginaw | Troy

GREIFINGER, M.D., ROBERT
04/04/2018

Page 109

1  caused the death of Mr. Stojcevksi, specifically.
2           Not generalized.  They made choices.
3           I want to know the specific choice, who
4  made it, when they made it, and how it caused his
5  death.
6           Or, if you can't do that because you
7  are talking more systemic and it is more general
8  say that?
9       A    **Yes, I am talking systemic, generally.**
10      Q    Look at page 63.  Not page 63,
11 paragraph 63.  I will leave that.
12          Go to paragraph 66.  Please read that.
13      A    **Out loud?**
14      Q    No, no.
15          Read it to yourself.  Counsel, has
16 stated that you need time to look at it, and you
17 should.
18      A    **Okay.**
19      Q    Dr. Sherman testified that he only saw
20 the patient once on the 17th, that is his
21 testimony, correct?
22          Do you agree?
23      A    **Yes, but to contradict that, he wrote.**
24      Q    That is not my question.
25          I don't have a question posed to you.

Page 110

1  I want to know, is that his testimony?
2       A    **I didn't finish my sentence.**
3       Q    I said yes or no, he said yes or no, so
4  you finished it.
5           MR. PERAKIS:  If he needs to
6           explain his answer, yes or no, he needs
7           to explain it and you are willing to
8           allow him to do it an hour and a half
9           ago.
10      Q    I don't want to drag that out.
11          Say whatever you want to say.
12      A    **On June 24th, he wrote that the visit**
13 **occurred on June 23rd.**
14      Q    Correct, he testified differently,
15 correct?
16      A    **That is correct.**
17      Q    And Michael Bey-Shelley testified on
18 the 17th, the doctor saw him, correct?
19      A    **That is correct.**
20      Q    So referring to page 66, what proof is
21 there that Dr. Sherman made a choice to ignore
22 Mr. Stojcevski, altered consciousness.
23          Please state the date and the
24 circumstances that Dr. Sherman made the choice to
25 ignore altered consciousness.

Page 111

1           So first identify when did he have
2  altered consciousness, that Dr. Sherman ignored?
3       A    **I need to go back to the medical**
4  **records.**
5       Q    Feel free.
6           On the 17th, there is a documentation
7  in the medical record that he was hallucinating and
8  there is a note by LPN Bertram that patient was
9  vaguely responsive, that he had all of his organs
10 but ten percent of his heart had been removed and
11 his arms had shredded a couple of days ago.  All
12 that was documented in the medical record, by the
13 time that Dr. Sherman saw the patient.  Also
14 documented by, Nurse Cueny that he had fluttering
15 eyelids, etcetera.  So, he failed to do a physical
16 examination and neurologic examination or a mental
17 status examination, in the face of the patient who
18 had, clear changes in mental status?
19      Q    I am confused, Dr.
20          If you read the records, I am sure that
21 you did on June 17th, he did do an examination of
22 the patient.
23          He testified to an examination in the
24 observation room.
25          My question is, not that these things

Page 112

1  were reported what is your evidence he ignored
2  them.  He testified he examined the patient.
3       A    **He didn't testify as to the nature of**
4  **his examination.**
5           **He did to.**
6           **Did you read his transcript?**
7       A    **I did.**
8       Q    He didn't say what he did?
9       A    **He didn't do the kind of evaluation,**
10 **that I would have expected him to do under the**
11 **circumstances.**
12      Q    You are a practicing physician you
13 haven't evaluated anybody since 1985?
14      A    **That is also correct.  A physical**
15 **examination hasn't changed in more than a hundred**
16 **years.**
17      Q    I don't know whether it has or hasn't.
18 Not only have you not done one, you haven't been
19 employed as an educator educating or training
20 physicians on how to do examinations at least since
21 1985, correct?
22      A    **That is correct.**
23      Q    ==My question to you is, not that these==
24 ==things happen.==
25          ==My question to you is on the 17th he==

GREIFINGER, M.D., ROBERT
04/04/2018                                                                    Pages 113—116

Page 113

1  did do an examination.
2           What proof do you have that he ignored
3  them, he came to a conclusion, you might not agree
4  with them.
5           What proof do you have that he ignored
6  them?
7       A    That is my opinion.
8       Q    And the same question would be, what
9  proof is there that Dr. Sherman made a choice to
10 ignore Mr. Stojcevski's disturbed cognition.
11          Is it your same opinion that you don't
12 think he did an adequate enough exam?
13      A    That is correct.
14      Q    The same would be with respect to what
15 proof is there that Dr. Sherman chose to ignore
16 Mr. Stojcevski temors.
17          Is it again your opinion that on the
18 17th, he didn't do a good enough exam?
19      A    Well, either that or he just ignored
20 the tremors, that he saw.
21      Q    He testified that he did in fact
22 examine those tremors, and did in fact talk to the
23 patient and came to the conclusion, he thought the
24 patient was fading, right?
25      A    That is correct.

Page 114

1       Q    So he considered them, he came to a
2  different conclusion then you might want him to
3  come to, but he considered them and came to a
4  conclusion, right?
5       A    Correct.
6       Q    Now, the next one is what proof is
7  there that Dr. Sherman made a choice to ignore
8  Mr. Stojcevski's history of benzodiazepine
9  medication.
10      A    He didn't treat him in the face of a
11 history, and physical and signs, and symptoms of
12 benzodiazepine withdrawal.
13      Q    I assume, you are speaking of the 18th
14 now, when Ms. Cueny called him?
15      A    Yes.
16      Q    That would have been the only time he
17 learned about this?
18      A    That is correct.
19      Q    You would agree with me that Ms. Cueny
20 called him, relayed her information to him, which
21 included the Xanax and Klonopin, the other
22 information about the things in the records about
23 his organs and those kind of things.
24          What evidence is there that Dr. Sherman
25 ignored them; I know he made a conscious medical

Page 115

1  decision, and included in his transcript talking
2  about it, that he did not believe that I should put
3  him on benzodiazepine protocol, for benzodiazepine
4  withdrawal, because sufficient time had lapsed and
5  he wasn't in withdrawal.
6           That is a conscious choice he made
7  though right, Dr. Sherman?
8       A    He made that in the face of clear,
9  either delusion or delirium, with the statements
10 about the arms and the heart.
11      Q    That is your opinion.
12          My question is not your opinion as a
13 physician, because frankly, I am not very
14 interested in that opinion.
15          I don't think you are qualified to give
16 that opinion.
17          But, in this particular case, the only
18 thing I am trying to say to you, is you say he
19 deliberately ignored him.
20          He took the information in.
21          He didn't do with it, what you thought
22 should have done, didn't ignore it.  Took it in and
23 chose to use it or not use it, he considered it, in
24 fact his deposition says he considered it?
25      A    That is my opinion.

Page 116

1       Q    Do you agree that in his deposition he
2  said he considered it and decided that he didn't
3  believe he should be on benzodiazepine withdrawal?
4       A    Yes.
5       Q    So what evidence do you have? You said
6  that you read Dr. Sherman's deposition, where is it
7  that you have the evidence that he precisely
8  intended to not do a mental status examination,
9  when he said that he did one?
10      A    In order to answer that question, I
11 would have to look at the deposition.  If you could
12 direct me, I would be happy to do that.
13          MR. CHAPMAN: Let the record
14      reflect that Mr. Perakis is helping the
15      doctor.  I don't believe, he can.  It is
16      inappropriate in a deposition for him to
17      be directing him and helping him.
18          MR. PERAKIS:  Looking for a
19      deposition transcript.
20          MR. CHAPMAN: I don't know what
21      you are doing.
22          You have been guiding him and
23      trying to get him to testify your way
24      all along.
25          I don't think you should be able

GREIFINGER, M.D., ROBERT
04/04/2018                                                                    Pages 117—120

Page 117

```
1              to help him or guide him, he knows how
2         to use a Mac that is what he said, he
3         can find it.
4                   (A break was taken at 12:35 p.m.)
5                   (The deposition resumed at 12:46
6         p.m.)
7         Q    Sir, referring to specifically to
8    paragraph 71, of the report. I want to ask you a
9    couple of questions.
10             If you want to look at it, feel free to
11   and tell me when you have looked at it.
12        A    Okay.
13        Q    I assume you read all or at least some
14   of the health care defendant's transcripts?
15        A    Yes.
16        Q    Every one of the health care persons
17   that testified said that they were aware of the
18   guidelines for withdrawal, correct?
19             You were questioned by Mr. Perakis?
20        A    I recall, that they testified they were
21   aware of the risks of withdrawal.  I just don't
22   recall one way or the other about their awareness
23   of the guidelines.
24        Q    What about the hunger strike CCS,
25   hunger strike policy.
```

Page 118

```
1              Can you testify they were aware of
2    that?
3         A    I just don't recall.
4         Q    What about the mental health care, the
5    mental health staff testified that they were aware
6    of this duty with respect to suicide watch,
7    correct?
8         A    I don't recall.
9         Q    Well, I need to explore, 75.
10             You say here, that CCS failed to train
11   and supervise, so all of the CCS employees said
12   that they were aware of these policies, they were
13   trained on them.
14             They knew the policies.
15             Where was it that you had information
16   that CCS failed to train and supervise, that is
17   different, somebody didn't follow a policy?
18        A    Well, they didn't, if CCS handled,
19   failed to train and supervise, then that would say
20   that this behavior by all these people was
21   intentional, and but I am not testifying to that
22   but that would be the only other logical
23   conclusion.
24        Q    Well -- let's explore that.
25             Let's take for example let's take for
```

Page 119

```
1    example, Ms. Brock.
2              She was aware of the mental health
3    policies, correct, you testified she was, nobody
4    questioned her and she said I wasn't aware of
5    whatever it was, I was questioned on, right?
6         A    She testified to that.
7         Q    She testified that she was not a
8    medical doctor, and she didn't make medical
9    decisions, right?
10        A    Yes.
11        Q    If she felt that if somebody needed
12   medical determination, refer that to medical?
13        A    Yes.
14        Q    On the 18th she referred it to Monica
15   Cueny.  She personally asked if Monica, could see
16   the patient, correct?
17        A    Yes.
18        Q    She said that her job was to determine
19   whether or not Mr. Stojcevski needed to remain on
20   suicide watch, or not that was her primary job,
21   right she testified to?
22        A    That was her understanding, but I mean
23   that was her understanding, but that is the face of
24   no information that suggests he was ever suicidal.
25        Q    He was put on suicide watch by Officer
```

Page 120

```
1    Campo, correct?
2         A    I don't recall who put her on suicide
3    watch.
4         Q    Let's assume he was placed on suicide
5    watch, you have worked enough in jails, I believe
6    once somebody takes the step to place somebody on
7    suicide watch, you now can't just arbitrarily
8    remove the person from suicide watch, somebody has
9    to.  The mental health or physician or a nurse,
10   some learned person in the health care arena, has
11   to make the determination this person is no longer
12   suicidal?
13        A    That is correct.
14        Q    If they don't, they are going to open
15   themselves up for tremendous liability if 24 hours
16   later somebody hangs themselves?
17        A    Right.
18        Q    A guard can't take somebody off suicide
19   watch they put them on?
20        A    They shouldn't be able to take them
21   off.
22        Q    Let's assume that the policies in
23   Macomb County there is no allegation here, that
24   anybody has taken somebody off suicide watch.
25             So once somebody with an abundance of
```

GREIFINGER, M.D., ROBERT
04/04/2018

Page 121

1  caution puts somebody on suicide watch, you need a
2  mental health person now, to attempt to evaluate
3  that person, to see if they can come off suicide
4  watch, right?
5      A    Correct.
6      Q    Ms. Brock said she saw that as her
7  primary job, right?
8      A    Yes, she did.
9      Q    She went up there every day which was
10 the policy to go see the person once a day, right?
11 Right?
12     A    Yes.
13     Q    She went up there once a day, and she
14 would try and communicate.
15          She said, she would knock on the door,
16 beat on the door, to get the person's attention,
17 try to get the person to communicate.
18          She was unable to do that, right?
19     A    Yes.
20     Q    She did that on repeatedly, on the
21 21st.
22          She would talk to her?
23     A    Yes.
24     Q    He didn't talk to her on the 22nd.  I
25 don't know if she was there on the 22nd, but the

Page 122

1  rest of the day she was there, he wouldn't talk to
2  her, or didn't talk to her or failed to communicate
3  whatever word you want to use.
4      A    I don't believe she was there, all the
5  rest of those days.
6      Q    I am not assuming she was.
7          She was there some of them, I don't
8  know the exact days.  She was there some of the
9  days between the 21st and 27th, right?
10     A    Certainly not the last three days.
11     Q    Ms. Brock, I am talking about?
12     A    I don't recall her being there the last
13 three days.
14     Q    I believe, you are mistaken but that is
15 not germane to my question.
16          She was actually the one there on June
17 27th, and made another call for a psychiatrist?
18     A    I have been mistaken.
19     Q    That is not my issue and that is not
20 germane to my question.
21          For all the times she was there, she
22 would come up, try to communicate with him and for
23 whatever term you want to put on it, communication
24 didn't occur, and in her mind she said I am unable
25 to clear him from being on suicide watch, right?

Page 123

1      A    Yes.
2      Q    Let me give you a hypothetical.
3          Let's assume on the 20th, she said you
4  know what, she doesn't talk to me, he looks like a
5  fine young man, I don't think he has any problems
6  take him off suicide watch.
7          The 21st he hangs himself.
8          Do you think Ms. Brock would be in hot
9  water?
10         MR. PERAKIS:  Hypothetical.
11     A    Yes.
12     Q    So, she has to get some information to
13 determine whether he was is or isn't suicidal,
14 right; she can't take him off without information?
15     A    Yes, but that is not her only role.
16     Q    That is what she says her role is.
17          Do you have any information that her
18 role is different from what she says and what
19 Natalie Pacito says her role was?
20     A    Yes.
21     Q    What I am looking for is not general,
22 interpretations, working in Pennsylvania, Illinois,
23 and New York and all these other fine places.
24          I want to know from policies or
25 procedures of Macomb County, CCS in particular, is

Page 124

1  there something you can point me to that says her
2  role was definitely different than what she said
3  her role was?
4      A    I am talking about her duty as a mental
5  health professional, when she can't intervene
6  constructively, it is her duty to consult a hire
7  level authority, which in her case would be a
8  psychiatrist.
9          MR. CHAPMAN:  I am not asking for
10         your opinion.  I am going move to have
11         that stricken on what the standard of
12         care is or standard of care is for a
13         mental health person.  That is not my
14         inquiry.
15     Q    My inquiry is:  She has to get some
16 information before she can clear him from suicide
17 watch, correct?
18     A    Yes.
19     Q    Do you know in Macomb County, what are
20 the mechanisms an inmate can utilize in order to
21 obtain medical care?
22     A    Yes.
23     Q    One of them is they could fly a kite?
24     A    Yes.
25     Q    One of them is they could ask a guard,

GREIFINGER, M.D., ROBERT
04/04/2018

1  I need to see medical, correct?
2      A    Yes, I know what the term kite means.
3           I didn't know, it was used in Macomb
4  County.
5      Q    You understood the word kite, basically
6  means it is a slip of paper you can say what your
7  condition ailment whatever it is, you give it to a
8  guard, put it in a slot and the guard takes care of
9  it?
10     A    In modern day historically, it is a
11  rolling paper, for cigarettes.
12     Q    I have seen the transcripts of the
13  various depositions.  The word kite has been used
14  quite a bit.
15     A    Now, that you mention it, I recall.
16     Q    You can access medical care by a kite.
17     A    Yes.
18     Q    Did you see that every inmate that come
19  in the facility is given a handbook, and in the
20  handbook it tells them how to access health care,
21  do you see that?
22     A    Yes.
23     Q    That is pretty good.  Most jails do?
24     A    They do.  That works for inmates who
25  are not illiterate, or functionally illiterate,

1  which is about half of the inmates.
2      Q    You are making generalizations.
3           You don't know the percentage of
4  illiterate inmates in Macomb County, do you?
5      A    No, that is true much more.
6      Q    I don't want you to make just
7  generalized statements of the nature of things of
8  New York and apply them to Macomb County.
9           They could be more, better or worse. We
10  don't know.  I want to know facts, that you know
11  about this case.
12          So you could do a kite, you can ask a
13  guard or you could be perceived by a guard that
14  says there is a problem and the guard could call
15  medical, right, or a fellow inmate can call
16  medical, for you, or yell and say this person needs
17  medical?
18     A    Or a medical health professional or a
19  nurse or doctor?
20     Q    Or somebody that walks by or sees you,
21  or can render medical care, correct?
22     A    Correct.
23     Q    You agree a number of times where the
24  guards said, you know nurse you are here on
25  med-pass, I think you should look in on

1  Mr. Stojcevski, right?
2      A    Yes.
3      Q    And each time those nurses that were
4  there on med-pass, look on him basically take his
5  vitals.
6           Is that your testimony in the record?
7      A    I don't recall, if it was each time.
8           His last vitals were done on as I
9  recall on July 21st.
10     Q    Understand my premises to you though,
11  the only time that the nurses after he gets placed
12  in high observation see him, is when basically the
13  guards or Ms. Brock called medical or saw them on
14  med-pass, says you need to see this person or I
15  would like you to see this person, right?
16     A    Right, that is because there is no
17  individualized care plan for him.
18     Q    My question is: That is how he got seen
19  by people from basically the 18th to the 27th,
20  correct?
21     A    Well, he wasn't seen by nurses for the
22  last days.
23     Q    I know, you keep focusing on that.
24          From the 18th to the 27th, that was the
25  method he received medical care.  Basically, either

1  a health care, mental health worker or a guard
2  would call medical, or see medical and look at
3  Mr. Stojcevski?
4      A    He didn't receive any medical care.
5      Q    You are trying to be pejorative with
6  me.
7           I am asking you the process.
8      A    I am answering the question.
9           You asked me a question that included a
10  phrase that said he received medical care.
11          That is a distortion of the facts.
12  That is his testimony that I am supposed to be
13  giving, and I will tell you he did not receive
14  medical care.
15     Q    That is not my question, sir, you are
16  being argumentative.
17          The process by which he would get
18  medical care would be if the guards, or a mental
19  health person would see or believe he needed some
20  care and call and get somebody, correct?
21     A    No.
22     Q    I have another method by which he
23  received medical care.
24     A    He didn't receive medical care.  You
25  are not listening to me.

GREIFINGER, M.D., ROBERT
04/04/2018                                                          Pages 129–132

Page 129

```
1     Q     No, no.
2     A     I would like to finish my sentence.
3     Q     When a nurse goes up and sees him, that
4   is not medical care?
5     A     Correct.
6     Q     So, you define medical care to me.
7     A     Medical care includes, active and
8   constructive attention to, evaluation, and
9   treatment and includes treatment plan.
10          This poor guy, was deteriorating under
11  their eyes and they watched him deteriorating, and
12  they looked at him, but that is not medical care.
13          They didn't get him evaluated, they
14  didn't get him hydrated. They didn't check his
15  weight.  They didn't address his mentation.
16          They didn't deal with his delirium or
17  delusions.
18          They ignored him.  That is not medical
19  care.
20    Q     I am sure you have read multiple
21  medical opinions you engage, Ipsum Dickson.
22          Basically, you make statements which
23  say they are true, because I say they are true.
24          You have read those court opinions like
25  the Duke's opinions and other opinions from federal
```

Page 130

```
1   courts that have excluded your testimony?
2     A     Yes.
3     Q     I don't want you to do that here.
4           I am asking you and saying to you, you
5   disagree with me or not,  but if a nurse gives you
6   a pill because it is med-pass.
7           That is a form of medical care,
8   correct?
9     A     Yes.
10    Q     If a nurse takes your vital signs, that
11  is a form of medical care, correct?
12    A     No.
13    Q     Taking vital signs is not a form of
14  medical care?
15    A     It is a part of medical care.
16    Q     Don't be argumentative with me.
17    A     I am saying it is a part.
18    Q     Is talking to a patient saying, "Hey
19  John I see you are a little down what is going on
20  today, is there something I can do, have a drink of
21  water."
22          That is part of delivering medical
23  care, isn't it?
24    A     It is part of.
25    Q     Yes or no, is it part of delivering
```

Page 131

```
1   medical care?
2     A     Yes.
3     Q     So, when the nurses were on the floor,
4   and the guards on a number of times all throughout
5   their log they would say, hey nurse, could you go
6   look at Mr. Stojcevksi.  And the nurse would go in
7   there. Sometimes give them some water, sometimes
8   talk to them, take his vital signs.  That is
9   medical care; may not be the quality you want it to
10  be.
11          That is a form of medical care, isn't
12  it?
13    A     It is not the medical care he needed.
14    Q     I am not asking you that question.
15          It is a form of medical care, correct?
16    A     If you are really.
17    Q     Yes or no?
18    A     I can't answer that as a yes or no.
19    Q     I just want to make the record clear.
20          I want to make the record clear.
21          You are saying when a guard says "Nurse
22  Chapman, can you go see Mr. Stojcevski," I would
23  say, "No problem, Joe."  I walk in there, and I
24  take his vital signs.  Vital signs are normal,
25  everything is good.  You are trying to tell me it
```

Page 132

```
1   is not a form of medical care?
2     A     Not, the form of medical care for him.
3     Q     Is it a form of medical care, yes or
4   no?
5     A     I can't answer that as a yes or no.
6     Q     If you can't answer it, how in the heck
7   do you expect a guard to ask a nurse, to see a
8   patient; answer it.
9     A     Is that a rhetorical question, I don't
10  know.
11    Q     Now, you tell me.
12    A     I don't understand your question.
13    Q     It is very basic.
14          A guard says to a nurse, "please see
15  this patient."
16          The nurse sees the patient, says his
17  vital signs are normal.
18          How is a guard not to assume that is
19  delivering some form of medical care?
20    A     I can't speak to the mind of a guard.
21          MR. CHAPMAN: God bless you.
22          I have no further questions.
23  EXAMINATION BY
24  MS. SWINDLEHURST:
25          MS. SWINDLEHURST: We met
```

GREIFINGER, M.D., ROBERT
04/04/2018                                                    Pages 133—136

Page 133

1          previously. My name is Cara Swindlehurst
2          and I represent the Macomb County
3          defendants in this matter.
4               I am going to start briefly on
5          qualifications as it relates to the
6          corrections field.  Mr. Chapman has done
7          a fine job as it relates to all the
8          medical care and opinions with regard to
9          that.
10     Q    Are you certified by the State of
11    Michigan, to be a corrections officer or certified
12    in any state to be a corrections officer?
13     A    No.
14     Q    Have you ever completed any courses in
15    the Michigan Sheriffs Training Counsel?
16     A    No.
17     Q    Have you ever authored any correctional
18    law policy that has been adopted by the Michigan
19    Sheriff's Training Counsel?
20     A    No.
21     Q    Have you ever authored any policy that
22    has been adopted by Michigan Commission on Law
23    Enforcement Standards?
24     A    No.
25     Q    Have you ever served as faculty at any

Page 134

1    colleges in the State of Michigan?
2     A    No.
3     Q    Have you actually reviewed the training
4    records of the various officers in this case?
5     A    No.
6     Q    Is it, that you haven't reviewed any of
7    their training records?
8     A    **No, I don't recall reviewing them.**
9     Q    Has any state court in Michigan ever
10    recognized you as an expert in the field of police
11    procedures?
12     A    **State court?**
13     Q    Correct Michigan State Court.
14     A    No.
15     Q    Has any state court in Michigan ever
16    recognized you as as expert as it relates to
17    correctional operations outside the scope of
18    health?
19     A    No.
20     Q    Has any federal court in the State of
21    Michigan ever recognized you as an expert in the
22    field of police procedures?
23     A    No.
24     Q    Has any federal court in the state of
25    Michigan ever recognized you as an expert as it

Page 135

1    relates to correctional operations, ever outside
2    the scope of health?
3     A    No.
4     Q    Today, are you offering an opinion on
5    the correctional policies in this case?
6     A    No.
7     Q    Are you aware of any deaths in Macomb
8    County Jail that allegedly rose out of acute
9    withdrawal for current benzo-methadone and opiate
10    medications?
11     A    No.
12     Q    I know you can't discuss what you did
13    do for the DOJ.
14          Did you, were you ever asked to look at
15    the actions of the correctional officer within
16    that?
17     A    No.
18     Q    Do you have an individual opinion, you
19    stated earlier there are particular CO's that you
20    believe did specific actions, incorrect, correct?
21     A    **Correct.**
22     Q    Now, for those specific CO's, and we
23    will go through each one of them.
24          Can you explain to me exactly what this
25    officer, either the act or omission that occurred

Page 136

1    which you think means they were  a proximate cause
2    of Mr. Stojcevski's death?
3     A    **Yes, could you ask that again?**
4     Q    Absolutely.
5          Are you able to point to any individual
6    CO's their individual specific acts or omissions
7    that led to the proximate cause of Mr. Stojcevski's
8    death?
9     A    **No, I could just talk to them in the**
10    **aggregate, excuse me.  I can speak to that in the**
11    **aggregate.**
12     Q    That speaks to just the systemic
13    generalized action of the whole?
14     A    **Yes, while they recognized that to some**
15    **extent that he needed help, they did not track his**
16    **meals and his fluid intake.  They did not initiate**
17    **a hunger strike policy, which would have been**
18    **appropriate.  They did not notify their command**
19    **staff that he was not eating or drinking much and**
20    **while one officer did encourage him to drink, it**
21    **clearly wasn't effective. So, they should have**
22    **notified command staff who would hopefully then**
23    **would have worked with health care staff, to get**
24    **him hospitalized.**
25     Q    Okay, have you reviewed the Macomb

GREIFINGER, M.D., ROBERT
04/04/2018                                                            Pages 137–140

Page 137

1    County Jail policies and procedures?
2        A.    No.
3        Q.    You have no opinion on those policies
4    and procedures?
5        A.    Correct.
6        Q.    You did mention the hunger strike
7    policy, previously.
8            Were you referring to the Macomb County
9    Sheriff, hunger strike policy or CCF hunger strike
10   policy?
11       A.    I believe, I did review the Macomb
12   County Jail hunger strike policy.  I was referring
13   to that.
14       Q.    As it relates to the Macomb County Jail
15   hundred strike policy, did you have any opinions on
16   the policy itself?
17       A.    No.
18       Q.    Did you have any problems with the
19   policy, itself?
20       A.    Not, that I recall.
21       Q.    Now, you stated that as a whole you
22   feel that the officers, it was a systemic issue,
23   correct?
24       A.    Yes.
25       Q.    Now, did you ever review the deposition

Page 138

1    transcript of all the officers?
2        A.    I know, I read at least one.
3        Q.    Would that be I believe in your report,
4    number 72 it states that you relied on the
5    testimony of CO Harrison?
6        A.    Yes.
7        Q.    Did you rely on any other testimony in
8    arriving at your conclusions, as it relates to the
9    CO officer any other CO testimony?
10       A.    No.
11       Q.    Okay, so to the extent that the
12   deposition transcript, of those other CO officers,
13   included statements where the officer contacted
14   medical with concerns, you wouldn't have any reason
15   to dispute that?
16       A.    Correct.
17       Q.    And earlier you started to speak on
18   this a little bit, to the extent that those
19   officers did contact medical, would that be a
20   sufficient step for Mr. Stojcevski's well being?
21       A.    Of that, those were good steps, but not
22   sufficient.
23       Q.    Okay. Have you testified regarding this
24   type of, whether it was sufficient enough to call
25   medical, in the past?

Page 139

1        A.    Yes.
2        Q.    Okay do you happen to recall a case
3    that was Clemmons vs. Corrections Corporations of
4    America back in 2013.
5        A woman's fetus had died in uterus?
6        A.    Yes.
7        Q.    And now, in that deposition do you
8    recall whether you stated that was sufficient for
9    the corrections staff to contact medical, that more
10   could have been done but that was a sufficient step
11   for the corrections officer to have taken?
12       A.    I don't recall, but I don't doubt what
13   you are, that that might be correct.
14       Q.    So if it was a sufficient step, for the
15   corrections officer in that case to contact
16   medical, was it also a sufficient step here?
17       A.    No, I don't think so because this
18   gentleman was morbid.
19       Q.    He was what?
20       A.    He was dying.
21       Q.    Wasn't the fetus also dying?
22       A.    The fetus was dying but -- -- the
23   problem there, as I recall was the transportation,
24   problem, that is my recollection.
25       Q.    Okay, and let me try to refresh your

Page 140

1    recollection on this case a little bit more, and
2    you can correct me if I am wrong.
3            On this particular case, there were
4    instances where Ms. Clemmons was seen bleeding and
5    the corrections officer asked one of the nurses to
6    look at it and the nurse in fact ignored that
7    request, and that went on for a couple of hours,
8    and then there was a transportation issue you are
9    discussing.
10           Does that refresh your recollection a
11   little bit more?
12       A.    Yes.
13       Q.    And so in that particular case, the
14   corrections officer had notified the nurse and the
15   nurse made a conscious decision not to take any
16   steps, okay?
17       A.    Yes.
18       Q.    And you had stated that perhaps the
19   corrections officer could have gone up the ladder;
20   but their steps were in fact sufficient merely
21   reporting it to medical?
22       A.    Yes, and what is different about this
23   case from that case in Tennessee, was that this
24   went on for day after day after day, and then I
25   think would have, should have resulted in

GREIFINGER, M.D., ROBERT
04/04/2018

Pages 141–144

Page 141

1  notification of command staff, to take a look and
2  do something about it with the health care staff
3  who of course are accountable to the county.
4      Q    You have stated that you in fact only
5  reviewed Sgt. Harrison's deposition transcripts.
6          Do you have any knowledge, whether or
7  not command was notified by any of the other
8  officers, if they testified to that in their
9  deposition?
10     A    I don't know.
11     Q    Okay.
12         As we have already discussed we
13  actually can't point to any action, within each
14  individual officer that someone did something
15  incorrect?
16     A    That is correct.
17     Q    Okay.
18         MR. PERAKIS: Form and foundation.
19         MR. CHAPMAN: Do not testify for
20         the witness; form and foundation.
21     Q    You stated earlier when you read the
22  names you did not in fact make an opinion as to
23  Sheriff Wickersham.
24         Is that to mean Sheriff Wickersham, you
25  do not have an opinion?

Page 142

1      A    I was asked about the correction
2  officer, not asked about the Sheriff.
3      Q    Is there anyone on the corrections side
4  of it other than the correctional officers you have
5  mentioned previously, that you think had a specific
6  actions or omissions had a proximate cause on Mr.
7  Stojcevski's death?
8      A    If you are counting the sheriff, I
9  don't count the Sheriff as the corrections side.
10         I count the sheriff as the boss, but if
11  the sheriff is definitely accountable for the
12  medical care in the facility and for oversight of
13  the medical care to assure that the providers of
14  care, the health service administrator, the
15  director of nursing physician, follow the policies
16  and procedures that are approved by the sheriff.
17  In that sense, I would hold the sheriff
18  accountable.
19     Q    Just to clarify. I picture anything I
20  think corrections is anyone that works for Macomb
21  County Sheriff's Department?
22     A    Including contracted contractors.
23     Q    No, that is a separate contract.
24         I am saying specifically their employer
25  is the Macomb County Sheriff's Department.

Page 143

1      A    That is a semantic, but yes, the
2  sheriff is accountable in my opinion.
3      Q    Anyone else who you think is
4  accountable for Mr. Stojcevski's death?
5      A    The jail administrator.
6      Q    Do you have any knowledge or
7  information that Sheriff Wickersham had any
8  individual involvement with David Stojcevski?
9      A    I do not.
10     Q    Do you have any knowledge or
11  information that the jail administrator Michelle
12  Sanborn, had any individual knowledge or
13  interactions with Mr. Stojcevski?
14     A    If she didn't she should have but the
15  answer is no.
16     Q    Have you reviewed Sheriff Wickersham's
17  deposition testimony?
18     A    I don't recall.
19     Q    Do you know if you reviewed --
20  actually, Michelle Sanborn hasn't been taken yet,
21  so.
22         As it relates to David Stojcevski's
23  alleged weight loss while he was in jail.
24         What records are you relying on for
25  this opinion?

Page 144

1      A    The intake weight that was recorded and
2  the weight recorded by the medical examiner.
3      Q    Do you have any knowledge, or
4  information that that intake weight was in fact
5  accurate or that a scale was ever used?
6      A    I recall, someone saying or telling me
7  or reading that they didn't even have a scale, but
8  so the answer is no I have no idea if it was
9  accurate but it was clear to me that he was losing
10  weight, as time went on.
11     Q    How is it clear to you?
12     A    From the video.
13     Q    That you can't talk about?
14     A    I can't talk about what I told the FBI,
15  and I can't talk about what the FBI told me, or
16  asked me.
17     Q    But you didn't specifically review the
18  video for this case, is that correct?
19     A    I don't how to answer it.
20         I reviewed the video of the events
21  surrounding the medical care and the death of this
22  individual.
23     Q    After you were retained by Mr. Perakis'
24  firm, did you ever review the video again?
25     A    No.

GREIFINGER, M.D., ROBERT
04/04/2018                                                    Pages 145–148

---

Page 145

```
 1       Q     You relied on your prior knowledge, is
 2  that correct?
 3       A     Yes.
 4              MS. SWINDLEHURST: I don't have
 5         anything further.
 6              MR. CHAPMAN: Mr. Perakis, do you
 7         have a follow-up or two?
 8              MR. PERAKIS:  No.
 9  FURTHER EXAMINATION BY
10  MR. CHAPMAN:
11              MR. CHAPMAN: I have a follow up
12         question or two.
13       Q     I tried to question you regarding this
14  video including what speed you watched, how much
15  you watched.  You told me you were unable to talk
16  about it.
17              That is still your testimony, correct?
18       A     Yes.
19              MR. CHAPMAN: I would like to mark
20         David Stojcevski's CCS medical records
21         pages, 1 through 51, as exhibit 1, and
22         then we have a flash drive that Dr.
23         Greifinger has testified, these are the
24         records he has reviewed for Mr. Perakis.
25         We can mark this as exhibit two, and
```

---

Page 146

```
 1  then I think Mr. Perakis, has kindly
 2  agreed to make three flash drives, exact
 3  copies of this, and send one to Mr.
 4  Gazall, one to Cara, and one to myself.
 5      MR. PERAKIS:  Thank you.
 6      (Marked for Identification,
 7  Stojcevski's Exhibit 1, CCS Medical
 8  Records, pages 1 to 51, dated April 4,
 9  2018.)
10      (Marked for Identification,
11  Stojcevski's Exhibit 2, Flash Drive,
12  dated April 4, 2018.)
13   (Time noted: 1:30  p.m.)
14
15
16          _____
                DR. ROBERT GREIFINGER
17
18
19
20
21
22
23
24
25
```

---

Page 147

```
 1
 2
 3              I N D E X
 4
 5  WITNESS               EXAMINATION BY        PAGE
 6  Robert Greifinger, M.D    Mr. Chapman        3, 145
 7                           Ms. Swindlehurst     132
 8
 9              E X H I B I T S
10
11  Stojcevski      DESCRIPTION           PAGE
12  1           CCS Medical Records.       146
13              Pages 1 -51
14  2           Flash Drive.               146
15
16      (Exhibit 2 retained by counsel.)
17   R E Q U E S T E D    I N F O R M A T I O N
18
19  DESCRIPTION                          PAGE
20
21
22              R U L I N G S
23                  PAGE
24
25
```

---

Page 148

```
 1          C E R T I F I C A T E
 2  STATE OF NEW YORK )
                      ) ss.:
 3  COUNTY OF NEW YORK )
 4
 5      I, SHEA SORENSEN, a Notary Public in and
 6  for the County of New York, State of New York, do
 7  hereby certify that the foregoing examination of
 8  DR. ROBERT GREIFINGER, was taken on the 4th day of
 9  April 2018 pursuant to Order and recorded
10  stenographically by me; and that the foregoing
11  examination is a correct and accurate transcript
12  of my stenographic notes.
13      I further certify that the witness was
14  duly sworn by me, prior to testifying, to tell
15  the truth, the whole truth, and nothing but the
16  truth.
17      I further certify that I am not an
18  attorney or counsel for any parties or any of the
19  attorneys in this action, and that I am not
20  financially interested in this action.
21      IN WITNESS WHEREOF, I have hereunto set
22  my hand this 4th day of April, 2018.
23          _____
                SHEA SORENSEN
24
25
```

---