# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

DAFINKA STOJCEVSKI, as Personal
Representative of the Estate of DAVID
STOJCEVSKI, Deceased,

     Plaintiff,

v.

COUNTY OF MACOMB, et al.,

     Defendants.

Case No. 15-cv-11019
Hon. Linda V. Parker
Mag. Judge David R. Grand

---

| IHRIE O'BRIEN | CHAPMAN LAW GROUP |
|---|---|
| Robert D. Ihrie (P26451) | Ronald W. Chapman Sr., M.P.A., |
| Harold A. Perakis (P35921) | LL.M. (P37603) |
| Attorneys for Plaintiff | Madeline R. Young (P82140) |
| 24055 Jefferson Avenue, Suite 2000 | Attorneys for Correct Care Solutions |
| St. Clair Shores, MI 48080 | Defendants |
| (586) 778-7778 | 1441 West Long Lake Rd., Suite 310 |
| ihrieobrien@aol.com | Troy, MI 48098 |
| hperakis@ihrieobrienlaw.com | (248) 644-6326 |
| | rchapman@chapmanlawgroup.com |
| | myoung@chapmanlawgroup.com |
| MACOMB COUNTY | |
| CORPORATION COUNSEL | Wilson Elser Moskowitz Edelman & |
| John A. Schapka (P36731) | Dicker, LLP |
| Robert S. Gazall (P41350) | John T. Eads, III (P43815) |
| Attorneys for Macomb County | Cara M. Swindlehurst (P79953) |
| Defendants | Co-Counsel for Macomb County |
| One S. Main Street, 8th Floor | Defendants |
| Mount Clemens, MI 48043 | 17197 N. Laurel Park Dr., Suite 201 |
| (586) 469-6346 | Livonia, MI 48152 |
| john.schapka@macombgov.org | (313) 327-3100 |
| robert.gazall@macombgov.org | John.Eads@wilsonelser.com |
| | Cara.Swindlehurst@wilsonelser.com |

## DEFENDANTS CORRECT CARE SOLUTIONS, L.L.C.; MONICA CUENY; CHANTALLE BROCK; MICAL BEY-SHELLY; VICKY BERTRAM; AND LAWRENCE SHERMAN, M.D.'S MOTION IN LIMINE TO PRECLUDE THE USE OF THE SURVEILLANCE VIDEOS AS FOUNDATION FOR MEDICAL DIAGNOSIS/OPINION

NOW COMES Defendants CORRECT CARE SOLUTIONS, L.L.C.; MONICA CUENY; CHANTALLE BROCK; MICAL BEY-SHELLY; VICKY BERTRAM; LAWRENCE SHERMAN, M.D.; (the "CCS Defendants"), by and through their counsel Chapman Law Group, moves to preclude the use of the surveillance videos as foundation for a medical diagnosis/opinion, and state as follows:

1. Plaintiff's theory is the CCS Defendants provided inadequate medical care in allegedly failing to treat Mr. Stojcevski for a benzodiazepine withdrawal resulting in dehydration and, ultimately, his death. (**ECF No. 1**).

2. This theory is based in part on the findings documented by the Medical Examiner, Dr. Mary Pietrangelo, whose "final diagnosis" concluded acute withdrawal from chronic benzodiazepine, methadone, and opiate medications; dehydration with hypernatremia; and "seizure/seizure-like" activity. (**Exhibit A**).

3. Dr. Pietrangelo's conclusion that Mr. Stojcevski suffered acute withdrawal from chronic benzodiazepine, methadone, and opiate medications was based on her observation that Mr. Stojcevksi appeared to display "seizure-

like" activity when reviewing the Mental Health video surveillance footage of Mr. Stojcevski's jail cell. (**Exhibit B, p. 47:11-25**). This video documented his activity while he was housed in Macomb County Jail's high observation unit from June 11, 2014 to June 27, 2014.

4. Dr. Pietrangelo admits she cannot opine with certainty that Mr. Stojcevski experienced seizures, which is why she describes Mr. Stojcevski displayed "seizure-like" activity. (***Id*. at p. 92:6-16**).

5. There is no other corroborating evidence to support Mr. Stojcevski suffered from seizures while he was housed in Macomb County Jail's high observation unit.

6. The admission of this video for the purposes of medical diagnosis raises multiple evidentiary issues. First, this video cannot be properly authenticated under Fed. R. Evid. 901, which is a pre-requisite for its admission.

7. Secondly, any probative value of this video for the use of medical diagnosis is substantially outweighed by the dangers of misleading and confusing the jury under Fed. R. Evid. 403. The relevant peer reviewed literature, opinions of the relevant expert community, and case studies demonstrate this video surveillance system cannot be a reliable foundation for a medical opinion or diagnosis. The low quality of this video recording,

as addressed in detail in the accompanying brief in support, creates a propensity to have the recorded subjects appear "jerky" or "twitchy" while moving. This movement matches the description upon which Dr. Pietrangelo bases her opinion that Mr. Stojcevski appeared to experience "seizure-like" activity when reviewing his surveillance video. Thus, the appearance of this "seizure-like" activity is caused by the low-quality recording system and does not demonstrate Mr. Stojcevski experienced seizures during his incarceration, and therefore, this video must be precluded for this purpose. This is especially true considering the lack of corroborating evidence Mr. Stojcevski ever experienced seizures while being incarcerated.

8.  Third, Dr. Pietrangelo's opinion that Mr. Stojcevski suffered from seizure-like activity and therefore died of a withdrawal must be excluded under Fed. R. Evid. 702. She lacks the requisite qualifications to formulate a medical opinion based on a low-quality video, has no experience in diagnosing seizure using video technology, and the relevant literature, case studies, and expert community opine that Dr. Pietrangelo's methodology in formulating her opinion is unreliable. This video is not a trustworthy basis for a medical diagnosis, and especially a seizure diagnosis.

4

9. Lastly, if this Court allows Plaintiff to add an expert to authenticate this video for introduction into evidence, Defendants request the same relief.

10. Defense counsel contacted Plaintiff's counsel on January 13, 2021, via telephone to attain concurrence. Concurrence could not be obtained.

WHEREFORE, Defendants CORRECT CARE SOLUTIONS, L.L.C.; MONICA CUENY; CHANTALLE BROCK; MICAL BEY-SHELLY; VICKY BERTRAM; LAWRENCE SHERMAN, M.D.; by and through their counsel, CHAPMAN LAW GROUP, respectfully request that this Honorable Court enter an order with the following conditions:

1. Preclude the use of the surveillance videos; and

2. Preclude Dr. Pietrangelo's opinion that Mr. Stojcevski suffered "seizure-like activity" and therefore died from withdrawals under Fed. R. Evid. 702, or order a *Daubert* hearing to explore the basis of such opinion.

Alternatively, should this Court deny this motion and allow Plaintiff to add a video forensic expert to authenticate the video, Defendants respectfully request this Honorable Court enter a mutual order and allow Defendants to also add a forensic video expert to opine on the authenticity and reliability of the surveillance video.

Respectfully submitted,
CHAPMAN LAW GROUP

Dated: February 4, 2021

/s/ Madeline R. Young
Ronald W. Chapman Sr., M.P.A.,
LL.M. (P37603)
Madeline R. Young (P82140)
Attorneys for the CCS Defendants
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
rchapman@chapmanlawgroup.com
myoung@chapmanlawgroup.com

6

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN

DAFINKA STOJCEVSKI, as Personal
Representative of the Estate of DAVID
STOJCEVSKI, Deceased,

     Plaintiff,

v.

COUNTY OF MACOMB, et al.,

     Defendants.

Case No. 15-cv-11019
Hon. Linda V. Parker
Mag. Judge David R. Grand

---

| | |
|---|---|
| IHRIE O'BRIEN<br>Robert D. Ihrie (P26451)<br>Harold A. Perakis (P35921)<br>Attorneys for Plaintiff<br>24055 Jefferson Avenue, Suite 2000<br>St. Clair Shores, MI 48080<br>(586) 778-7778<br>ihrieobrien@aol.com<br>hperakis@ihrieobrienlaw.com | CHAPMAN LAW GROUP<br>Ronald W. Chapman Sr., M.P.A.,<br>LL.M. (P37603)<br>Jonathan C. Lanesky (P59740)<br>Attorneys for Correct Care Solutions<br>Defendants<br>1441 West Long Lake Rd., Suite 310<br>Troy, MI 48098<br>(248) 644-6326<br>rchapman@chapmanlawgroup.com<br>jlanesky@chapmanlawgroup.com |
| MACOMB COUNTY<br>CORPORATION COUNSEL<br>John A. Schapka (P36731)<br>Robert S. Gazall (P41350)<br>Attorneys for Macomb County<br>Defendants<br>One S. Main Street, 8th Floor<br>Mount Clemens, MI 48043<br>(586) 469-6346<br>john.schapka@macombgov.org<br>robert.gazall@macombgov.org | Wilson Elser Moskowitz Edelman &<br>Dicker, LLP<br>John T. Eads, III (P43815)<br>Cara M. Swindlehurst (P79953)<br>Co-Counsel for Macomb County<br>Defendants<br>17197 N. Laurel Park Dr., Suite 201<br>Livonia, MI 48152<br>(313) 327-3100<br>John.Eads@wilsonelser.com<br>Cara.Swindlehurst@wilsonelser.com |

**<u>BRIEF IN SUPPORT OF DEFENDANTS CORRECT CARE SOLUTIONS, L.L.C.; MONICA CUENY; CHANTALLE BROCK; MICAL BEY-SHELLY; VICKY BERTRAM; LAWRENCE SHERMAN, M.D.'S MOTION IN LIMINE TO PRECLUDE THE USE OF THE SURVEILLANCE VIDEOS AS FOUNDATION FOR MEDICAL DIAGNOSIS/OPINION</u>**

**<u>PROOF OF SERVICE</u>**

# **TABLE OF CONTENTS**

INDEX OF AUTHORITIES.................................................................... iv

INDEX OF EXHIBITS .......................................................................... vii

STATEMENTS OF ISSUES PRESENTED ............................................x

CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT........ xi

I.   RELEVANT FACTUAL HISTORY ..................................................1

II.  LEGAL STANDARD ...................................................................3

III.   LEGAL ARGUMENT ................................................................3

  A.   Discussion Of The Unreliability Of The Video Footage. .............................4

  B.   This Video Cannot Be Authenticated...........................................8

  C.   This Video Will Mislead The Jury. ..............................................11

  D.   There Are No Other Corroborating Sources of That Mr. Stojcevski Experienced Seizures. ......................................................15

  E.   Dr. Pietrangelo's Opinion Must Be Precluded Because It Is Based On The Distorted Video, Which Lacks the Reliability Standards Set Forth In *Daubert*. .17

  F.   Defendants Request Mutual Relief To Add A Video Forensic Expert.........21

IV.   CONCLUSION ..........................................................................23

# <u>INDEX OF AUTHORITIES</u>

<u>CASES</u>                                                                                          <u>PAGE</u>

*Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994) .............................................18

*Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport*, 596 F.3d 357 (6th

    Cir. 2010)...............................................................................................................22

*Carlson v. Fewins*, No. 1:08-cv-991, 2016 U.S. Dist. LEXIS 183080 (W.D. Mich.

    Oct. 19, 2016) .......................................................................................................23

*Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993) .......... passim

*Frye v. CSX Trans., Inc.*, 933 F.3d 591 (6th Cir. 2019) ..........................................12

*Harlamert v. World Finer Foods*, Inc., 489 F.3d 767 (6th Cir. 2007) ..................x, 9

*Hopper v. Plummer*, 887 F.3d 744 (6th Cir. 2018)..................................................16

*In re Scrap Metal Antitrust Litig.*, 527 F.3d 517 (6th Cir. 2008) ............................ xi

*Inge v. Rock Fin. Corp.*, 281 F.3d 613 (6th Cir. 2002)...........................................22

*Jennings v. Fuller*, No. 13-13308, 2017 U.S. Dist. LEXIS 77945 (E.D. Mich. May

    23, 2017) ...............................................................................................................21

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137; 119 S. Ct. 1167 (1999).......... 17, 19

*Marie v. American Red Cross*, 771 F.3d 344 (6th Cir. 2014).................................21

*Martin v. Patterson*, No. 5:12-117, 2014 WL 769173 (E.D.Ky. Feb. 25, 2014) .. 12,

    13, 15

*Old Chief v. United States*, 519 U.S. 172; 117 S.Ct. 644; 136 L.Ed.2d 574 (1997) x,

    12

*Paschal v. Flagstar Bank*, 295 F.3d 565 (6th Cir. 2002).........................................12

*Powell v. Indus. Comm'n of Arizona*, 4 Ariz. App. 172; 418 P.2d 602 (Ariz. Ct.

    App. 1966) ............................................................................................................14

*Powell v. Indus. Comm'n of Arizona,* 102 Ariz. 11; 423 P.2d 348 (Ariz. 1967) .....14

*Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299 (6th Cir. 1997) ........................18

*State v. Muro*, 909 So. 2d 448 (Fla. 4th DCA 2005) ................................. 13, 14, 15

*Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665 (6th Cir. 2010) ....................................18

*Thomas v. City of Chattanooga*, 398 F.3d 426 (6th Cir. 2005) ...............................18

*U.S. v. Bonds*, 12 F.3d 540 (6th Cir. 1993)................................................................19

*U.S. v. Wiggan*, 700 F.3d 1204 (2012) ...............................................................x, 11

*United States v. Awadallah*, 436 F.3d 125 (2d Cir. 2006)...................................x, 12

*United States v. Brawner*, 173 F.3d 966 (6th Cir. 1999)..........................................3

*United States v. Hitt*, 981 F.2d 422 (9th Cir. 1992)....................................................x

*United States v. Martin*, 746 F.2d 964 (3d Cir. 1984).............................................15

*United States v. Parker*, No. 3:10-CR-133, 2011 U.S. Dist. LEXIS 29611 (E.D.

   Tenn. Feb. 14, 2011)...............................................................................................16

*United States v. Seago*, 930 F.2d 482 (6th Cir. 1991) ...............................................3

*Utley v. Heckinger*, 235 Ark. 780, 362 S.W.2d 13 (Ark. 1962) .............................14

*Vance v. United States*, 182 F.3d 920 (6th Cir. 1999) .............................................22

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp.*, LLC, 571 F.3d 206 (2d

   Cir. 2009)..................................................................................................................9

**OTHER AUTHORITIES**                                              **PAGE**

*Can Juries Really Believe What They See? New Foundational Requirements for the

   Authentication of Digital Images*. (2002) 10 Wash. U. J.L. & Pol'y 267 .............9

**RULES**                                                          **PAGE**

Fed. R. Civ. P. 16(b) ...................................................................................... 21, 22

Fed. R. Civ. P. 37(c).............................................................................................22

Fed. R. Evid. 104(a) .............................................................................................18

Fed. R. Evid. 403 .......................................................................................... 3, x, 11

Fed. R. Evid. 702 ......................................................................................... passim

Fed. R. Evid. 901 ............................................................................. 3, x, 8

Fed. R. Evid. 901(a) ........................................................................... x, 8

Fed. R. Evid. 901(b)(1) .......................................................................... x

## <u>INDEX OF EXHIBITS</u>

**EXHIBIT A**      Autopsy Report, dated August 21, 2014

**EXHIBIT B**      Deposition Transcript of Mary E. Pietrangelo, M.D., dated December 19, 2017

**EXHIBIT C**      Deposition Transcript of Deputy Paul Joseph Harrison, dated June 1, 2017

**EXHIBIT D**      Deposition Transcript of Deputy Morgan Cooney, dated October 25, 2017

**EXHIBIT E**      Deposition Transcript of Deputy Brian Wade Pingilley, dated November 6, 2017

**EXHIBIT F**      Deposition Transcript of Deputy David Stephen White, dated December 1, 2017

**EXHIBIT G**      Deposition Transcript of Deputy Mitchell Lee Blount, dated December 1, 2017

**EXHIBIT H**      Deposition Transcript of Deputy Larry James, dated December 1, 2017

**EXHIBIT I**      Deposition Transcript of Deputy Walter Oxley, dated November 7, 2017

**EXHIBIT J**      Deposition Transcript of Detective John Talos, dated October 25, 2017

**EXHIBIT K**      Deposition Transcript of Steven Robert Vaneenoo, dated November 6, 2017

**EXHIBIT L**      Deposition Transcript of Lawrence Sherman, M.D., dated April 28, 2017 and September 20, 2017

**EXHIBIT M**    Defendant Macomb County Interrogatory Responses Regarding Video Surveillance

**EXHIBIT N**    Pelco DX8100 Manual

**EXHIBIT O**    Article: "*To Catch a Thief – You Need at Least 8 Frames Per Second: The impact of frame rates on user performance in a CCTV detection task*" published October 2008

**EXHIBIT P**    Article: "*High Speed Cameras for Motion Analysis in Sports Science*" published January 2016

**EXHIBIT Q**    Article: "*Delivering Diagnostic Quality Video Over Mobile Wireless Networks for Telemedicine*" published May 4, 2009

**EXHIBIT R**    2014 American Telemedicine Association Guidelines, published May 2014

**EXHIBIT S**    University of Missouri School of Medicine's Telemedicine Assistance Documents, published in 2004

**EXHIBIT T**    Article: "*Implementing Telemedicine in Correctional Facilities*" published May 2002

**EXHIBIT U**    Article: "*High Frame Rate Medical Quality Video Compression for Tele-EEG*" published August 2016

**EXHIBIT V**    Article: "*Improving Patient Care by Unshackling Telemedicine: Adaptively Aggregating Wireless networks to Facilitate Continuous Collaboration*" published November 12, 2010

**EXHIBIT W**    Article: "*Toward the Understanding of Topographical and Spectral Signatures of Infant Movement Artifacts in Naturalistic EEG*" published April 28, 2020

**EXHIBIT X**        Article: "*NeuroKinect: A Novel Low-Cost 3Dvideo-EEG System for Epileptic Seizure Motion Quantification*" published January 22, 2016

**EXHIBIT Y**        *States v. Parker*, No. 3:10-CR-133, 2011 U.S. Dist. LEXIS 29611 (E.D. Tenn. Feb. 14, 2011)

**EXHIBIT Z**        *Jennings v. Fuller*, No. 13-13308, 2017 U.S. Dist. LEXIS 77945 (E.D. Mich. May 23, 2017)

**EXHIBIT AA**     *Carlson v. Fewins*, No. 1:08-cv-991, 2016 U.S. Dist. LEXIS 183080 (W.D. Mich. Oct. 19, 2016

## <u>STATEMENTS OF ISSUES PRESENTED</u>

SHOULD THE COURT PRECLUDE THE USE OF THE MENTAL HEALTH VIDEO SURVEILLANCE FOR THE PURPOSE OF MEDICAL DIAGNOSIS/OPINION?

DEFENDANTS STATE:        YES.
PLAINTIFF STATES:         NO.

SHOULD THE COURT PRECLUDE DR. PIETRANGELO FROM OFFERING A MEDICAL OPINION BASED ON HER REVIEW OF THE VIDEO FOOTAGE PURSUANT TO *DAUBERT* AND FED. R. EVID. 702?

DEFENDANTS STATE:        YES.
PLAINTIFF STATES:         NO.

IF THIS COURT ALLOWS PLAINTIFF TO ADD A VIDEO FORENSIC EXPERT TO AUTHENTICATE THE ADMISSION OF THE VIDEO FOR THE PURPOSE OF MEDICAL DIAGNOSIS/OPINION, SHOULD THE COURT PERMIT DEFENDANTS TO ADD A VIDEO FORENSIC EXPERT TO OPINE ON THE AUTHENTICITY AND RELIABILITY OF THE VIDEO?

DEFENDANTS STATE:        YES.
PLAINTIFF STATES:         NO.

## CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT

Authentication is a pre-requisite to the admissibility of all evidence. Fed. R. Evid. 901(a). A witness must authenticate a piece of evidence in a manner "sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901. One way to authenticate a document is by offering testimony of a witness with knowledge. Fed. R. Evid. 901(b)(1); *Harlamert v. World Finer Foods, Inc.*, 489 F.3d 767, 773 (6th Cir. 2007) (authentication "requires some type of testimony showing that the document is what the party offering it says it is").

In applying the balancing test under Fed. R. Evid. 403, the court states that "[r]elevance is a fairly course filter, and when evidence is minimally relevant, it is likely to be minimally probative as well. Moreover, a decision regarding probative value must be influenced by the availability of other sources of evidence on the point in question." *U.S. v. Wiggan*, 700 F.3d 1204, 1213 (2012) (*See Old Chief v. United States*, 519 U.S. 172, 182-85; 117 S.Ct. 644, 651-52; 136 L.Ed.2d 574 (1997); *United States v. Awadallah*, 436 F.3d 125, 132(2d Cir. 2006). Further, "[w]here the evidence is of very slight (if any) probative value, it's an abuse of discretion to admit it if there's even a modest likelihood of unfair prejudice or a small risk of misleading the jury." *U.S. v. Wiggan*, 700 F.3d 1204, 1213 (2012) (citing *United States v. Hitt*, 981 F.2d 422, 424 (9th Cir. 1992)).

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)

requires that this Court, "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."

Under the *Daubert* standard, the factors that may be considered in determining whether the methodology is valid are: (1) whether the theory or technique in question can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) its known or potential error rate; (4) the existence and maintenance of standards controlling its operation; and (5) whether it has attracted widespread acceptance within a relevant scientific community.

"The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation." *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529-530 (6th Cir. 2008), citing Fed. R. Evid. 702.

# I.  RELEVANT FACTUAL HISTORY

Plaintiff's theory is the CCS Defendants provided inadequate medical care in allegedly failing to treat Mr. Stojcevski for a benzodiazepine withdrawal resulting in dehydration and, ultimately, his death. (**ECF No. 1**). This theory is based in part on the findings documented by the Medical Examiner, Dr. Mary Pietrangelo, whose "final diagnosis" concluded acute withdrawal from chronic benzodiazepine, methadone, and opiate medications; dehydration with hypernatremia; and "seizure/seizure-like" activity. (**Exhibit A**). Dr. Pietrangelo's conclusion that Mr. Stojcevski suffered acute withdrawal from chronic benzodiazepine, methadone, and opiate medications was based on her observation that Mr. Stojcevksi appeared to display "seizure-like" activity when reviewing the Mental Health video surveillance footage of Mr. Stojcevski's jail cell. (**Exhibit B, p. 47:11-25**). This video documented his activity while he was housed in Macomb County Jail's high observation unit from June 11, 2014 to June 27, 2014. The seizure-like activity is the reason why she believes Mr. Stojcevski suffered from acute withdrawal. (**_Id._**). However, Dr. Pietrangelo admits she cannot opine with certainty that Mr. Stojcevski experienced seizures, which is why she describes Mr. Stojcevski displayed "seizure-like" activity. (**_Id._ at p. 92:6-16**).

There is no other corroborating evidence to support Mr. Stojcevski suffered from seizures while he was housed in Macomb County Jail's high observation unit.

Deputy Paul Harrison testified that Mr. Stojcevski was seen "shaking," but could not tell if it was a seizure. (**Exhibit C, p. 54:7-24**). The following deputies either specifically denied Mr. Stojcevski suffered seizures or don't remember anything out of the ordinary regarding Mr. Stojcevski's behavior:

- Morgan Cooney (**Exhibit D, p. 28:13-15**);

- Brian Pingilley (**Exhibit E, pp. 20:24-21:1**);

- David White (**Exhibit F, p. 13:14-17**);

- Mitchell Blount (**Exhibit G, p. 8:15-22**);

- Larry James (**Exhibit H, pp. 30:22-31:3**);

- Walter Oxley (**Exhibit I, pp. 61:21-62:1**);

- John Talos (**Exhibit J, p. 86:5-9**);

- Steven Vaneenoo (**Exhibit K, p. 20:9-14**).

Importantly, Mr. Stojcevski's treating provider, Defendant Dr. Lawrence Sherman, performed a neurological examination and determined he was not experiencing seizures. (**Exhibit L, pp. 147:20-23; 148:21-24**). Mr. Stojcevski was noted to have rapid eye fluttering (not rapid eye movement) (***Id*. at pp. 134:18-135:12**), did not display any hallmark signs of a seizure (***Id*. at p. 146:5-8**), nor did he present with any signs or symptoms that would suggest he had a propensity for seizures. (***Id*. at pp. 142:25-143:3; 145:17-22**). Dr. Sherman's medical opinion was that Mr. Stojcevski was "feigning" seizures. (***Id*. at pp. 147:20-23; 148:21-24**).

2

## II. <u>LEGAL STANDARD</u>

"The Federal Rules of Evidence, the Federal Rules of Criminal and Civil Procedure and interpretive rulings of the Supreme Court and this court all encourage, and in some cases require, parties and the court to utilize extensive pretrial procedures — including motions in *limine* – in order to narrow the issues remaining for trial and to minimize disruptions at trial." *United States v. Brawner*, 173 F.3d 966, 970 (6th Cir. 1999). District courts have broad discretion over matters involving the admissibility of evidence at trial. *United States v. Seago*, 930 F.2d 482, 494 (6th Cir. 1991).

## III.  <u>LEGAL ARGUMENT</u>

There are a handful of evidentiary barricades obstructing the admission of the video surveillance footage and its use for a medical diagnosis. First, this video cannot be properly authenticated. Plaintiff will need to retain a video forensic expert to introduce this video into evidence.

Secondly, the relevant peer reviewed literature, opinions of the relevant expert community, and case studies demonstrate this video surveillance system cannot be a reliable foundation for a medical opinion or diagnosis. The low-quality recording system generates distorted and "jerky" motions that do not otherwise exist in "real-time." For this reason, it may appear Mr. Stojcevski displayed "seizure-like" activity when in fact he demonstrated normal behavior. Without any corroborating evidence,

3

it would be highly prejudicial and misleading should the distorted video provide any basis for a medical diagnosis.

Third, Dr. Pietrangelo's opinion that Mr. Stojcevski suffered from seizure-like activity and therefore died of a withdrawal must be excluded under Fed. R. Evid. 702. She lacks the requisite qualifications to formulate a medical opinion based on a low-quality video, has no experience in diagnosing seizure using video technology, and the relevant literature, case studies, and expert community opine that Dr. Pietrangelo's methodology in formulating her opinion is unreliable. This video is not a trustworthy basis for a medical diagnosis, and especially a seizure diagnosis.

Lastly, if this Court allows Plaintiff to add an expert to authenticate this video for introduction into evidence, Defendants request the same relief.

### A. Discussion Of The Unreliability Of The Video Footage.

The video surveillance footage in question was recorded by the Pelco DX8116- 250 video recording system. Macomb County Jail set this system at a *maximum* frame rate of seven (7) frames per second ("fps") with a resolution of 704x480 on motion, and one (1) fps with a resolution of 704x480 constant recording. (**Exhibit M, p. 2**). This is a motion-recorded device, meaning the mode alters the camera to trigger recording only during a set time block once a motion event is detected in the camera's predefined motion field. (*Id*.). This device is prompted by a twenty percent (20%) change of image contrast. Thus, the camera is set to record

at seven (7) fps when motion event is detected and continuously records at one (1) fps when a motion event is not detected.

A video is a collection of still pictures, taken at a given rate. The DX8100 model will export video so it can be played back in real time (thirty (30) fps) for the same length of time as the original recording. (**Exhibit N, p. 107**). For example, if the video was recorded at one (1) fps, the DX8100 will insert twenty-nine (29) null frames for every one (1) frame of actual video. (***Id.***) Thus, if the motion was recorded at seven (7) fps, there remains twenty-three (23) missing frames out of thirty (30) and only 23.33% of the video was captured. Likewise, a recording at one (1) fps only captures .03% of the video. The missing frames results in distorted, abrupt, and "jerky" movements during the recorded playback as opposed to the fluid real-time motions intended to be captured. In sum, videos monitoring systems with higher frame rates and resolution capture fluid and more accurate motions.

A peer-reviewed article titled, "*To Catch a Thief – You Need at Least 8 Frames Per Second: The impact of frame rates on user performance in a CCTV detection task*," discusses the need for a least eight (8) fps to for event detection. (**Exhibit O, p. 941**). This is based on a case study involving eighty (80) participants who viewed thirty-two (32) video scenes at one (1), six (6), eight (8), and twelve (12) fps. (***Id*.**) The task required observers to determine if one of three possible events occurred:

5

a) A person wearing a rucksack stops and asks a passer-by what time it is;

b) A person steals something from the passer-by who is wearing a rucksack;[1] or

c) A person walking behind the rucksack carrier attempts to steal something from him but does not succeed.

(*Id*. **at p. 942**). The results showed that when the frame rate was lowered from eight (8) fps, the number of correct detections and task confidence decreased significantly. (*Id*. **at pp. 943-944**).

To contextualize recording technology, sport action cameras typically capture up to two hundred forty (240) fps to determine whether an athlete simply "steps out of bounds." (**Exhibit P, p. 57**). The article titled "*High Speed Cameras for Motion Analysis in Sports Science*," addresses the need for higher frame rates to capture fast-moving objects (greater than two hundred forty (240) fps). (*Id*.) The lowest frame rate available in sports science is twenty-four (24) fps. (*Id*.) This is used for mainly for notational analysis only, and it is discussed that this frame rate is too low to capture moving objects – specifically throwing and hitting balls. (*Id*.) However, even the average smartphone captures up to one hundred twenty (120) fps with high-definition formats, such as 1280x720. (*Id*.).

Literature surrounding the increase in use of telemedicine technology addresses the need for a higher frame rates, even just to conduct a physical exam. A

---

[1] This was the correct scenario. (**Exhibit O at p. 942**).

peer-reviewed article titled, "*Delivering Diagnostic Quality Video Over Mobile Wireless Networks for Telemedicine*," discussed that thirty (30) fps provides the high-quality necessary for diagnosis and treatment of patients, as well as confidence among treating doctors. (**Exhibit Q, p. 2**). In 2014, when the video of Mr. Stojcevski was recorded, the American Telemedicine Association guidelines for telehealth services recommended at least 640x480 resolution at thirty (30) fps. (**Exhibit R, p. 9**). Higher frame rates for telemedicine are also generally accepted by the relevant expert community. (**Exhibit S**[2]). The University of Missouri School of Medicine's telemedicine assistance documents outlines that the recommended video frame rate for telemedicine is at least thirty (30) fps. (***Id*. at p. 334**). The assistance documents outline that fifteen (15) fps "tends to look a little jerky," while the frame rate of thirty (30) fps makes for a smoother picture "*as long as* there is no broad, sudden, or exaggerated changes/movement taking place on the screen." (***Id*. at p. 335**). For the most accurate picture, the recommended frame rate is sixty (60) fps. (***Id*.**).

Correctional facilities are also looking to increase their frame rates. The article, "*Implementing Telemedicine in Correctional Facilities*," states that the appropriate frame rate is twenty-five (25) to thirty (30) fps. This is considered "full motion" and most broad-cast video operates at this rate. A frame rate of fifteen (15)

---

[2] Defendants have only included the relative sections cited for Exhibit S due to its size. Defendants are willing to produce the entire exhibit should the Court or Plaintiff request it.

fps is noted to be "noticeably jerky." This article warns that slower frame rates may be inadequate for observing and analyzing gait and motion. (**Exhibit T, p. 68**).

It is important to note that Dr. Pietrangelo testified that an EEG is necessary to definitively diagnose seizures (**Exhibit B, p. 92:9-10**); however, the peer-reviewed literature demonstrates that a frame rate of *at least* twenty-five (25) per second is necessary for a diagnosis. (**Exhibit U**). Peer-reviewed literature emphasizes the use of increased frames per second when observing and diagnosing seizure activity. (**Exhibit V, p. 4**). Typically, thirty (30) frames per second are used for video-EEG technology. (**Exhibit W, p. 6; Exhibit X, p. 3**). The recent literature, however, suggests that frame rates of at least <u>one hundred (100) fps</u> with a resolution of full-HD frames (1920x1080) should be required to accurately detect seizures on a patient. (**Exhibit U**).

In sum, the relevant literature demonstrates that one (1) and seven (7) fps is egregiously low-quality and will lead to the distortion of real-time action and "jerky" movements. This evidence is unreliable and should be excluded.

## B. This Video Cannot Be Authenticated.

Authentication is a pre-requisite to the admissibility of all evidence. Fed. R. Evid. 901(a). A witness must authenticate a piece of evidence in a manner "sufficient to support a finding that the matter in question is what the proponent claims." Fed. R. Evid. 901. One way to authenticate a document is by offering testimony of a

witness with knowledge. Fed. R. Evid. 901(b)(1); *Harlamert v. World Finer Foods*, Inc., 489 F.3d 767, 773 (6th Cir. 2007) (authentication "requires some type of testimony showing that the document is what the party offering it says it is").

The video recordings presented by Macomb County Jail are played back in actual time on security monitors, while also saving a copy of the recording on the system. Datanet Systems, Inc., maintains the video recorders, while the actual cameras are maintained by "Technical Services". (**Exhibit M, p. 3**). In the event that the actual timed recordings were not viewed by an individual, there may be authentication issues in reporting differences between the copy and original videos at trial. See *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp*., LLC, 571 F.3d 206, 214 (2d Cir. 2009) (photographs were properly excluded for lack of foundation when there was no testimony that they were an accurate portrayal of the subject contained in the photographs).

Further, with technological advancements in video digitalizing systems, it is imperative that courts begin to take note of distortions that take place when digitalizing a video such as the one in this case. *See Can Juries Really Believe What They See? New Foundational Requirements for the Authentication of Digital Images*. (2002) 10 Wash. U. J.L. & Pol'y 267. ("There are significant differences, however, between traditional photographs and digital images that may necessitate different evidentiary treatment than that normally given to traditional photographs.

The digital image creation process and the susceptibility of digital images to manipulation make digital images sufficiently different from photographs to necessitate different treatment under the Federal Rules of Evidence."):

> It is impossible to determine which image is a first-generation image and is therefore the 'original.' The lack of an 'original' for comparison with the offered image reduces the opportunity to verify that the image has not been altered or has only been altered in an acceptable manner, thereby increasing the likelihood that changes will not be discovered unless the proponent of the image reveals them.

*Id*.

If an individual cannot attest to the original copy of the video or did not physically witness the Decedent seizing in his cell, the video is at risk. Here, none of the deputies or other witnesses can verify Mr. Stojcevski suffered any seizures. (*See* **Exhibits C-L**).

This lack of foundation is specifically disturbing in relationship to the frame rates of the video in question. The video may have been recorded between only one (1) fps and seven (7) fps, as opposed to the thirty (30) fps typical for video cameras. As discussed above, the low frame rate means continuity is missing from the clips. Those missing spaces are crucial in determining whether a "jerky" motion was actually a seizure or a normal shift in body weight.

Without a proper chain of custody and considering the antiquity of the Pelco system that captured the pertinent events, there remains the ability to affect the image

through everchanging technical developments both at the time the Video was made and throughout its possession by Datanet Systems, Inc., technical services, and Plaintiff.

Based upon the foregoing, there is no foundation of accuracy and fairness of the video that would allow its admission as evidence in this matter. Plaintiff would need to add a video forensic expert to assess the chain of custody, reliability, and authentication issues for it to be admissible.

### C. This Video Will Mislead The Jury.

The Court should exclude the video depicting Mr. Stojcevski allegedly seizing because the danger that the jury will be confused and misled substantially outweighs the value of the evidence itself under the balancing test under Fed. R. Evid. 403. A court may exclude relevant evidence under Federal Rule of Evidence 403 "if its probative value is substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. In applying the balancing test, the court states that "[r]elevance is a fairly course filter, and when evidence is minimally relevant, it is likely to be minimally probative as well. Moreover, a decision regarding probative value must be influenced by the availability of other sources of evidence on the point in question." *U.S. v. Wiggan*, 700 F.3d 1204, 1213 (2012) (See *Old Chief v. United States*, 519 U.S. 172, 182-85;

117 S. Ct. 644, 651-52; 136 L.Ed.2d 574 (1997); *United States v. Awadallah*, 436 F.3d 125, 132 (2d Cir. 2006). Evidentiary rulings are made subject to the district court's sound discretion. *Frye v. CSX Trans., Inc.*, 933 F.3d 591, 598 (6th Cir. 2019); *see also Paschal v. Flagstar Bank*, 295 F.3d 565, 576 (6th Cir. 2002) ("In reviewing the trial court's decision for an abuse of discretion, the appellate court must view the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value.").

The "jerky"/"twitchy" movements caused by the low-quality surveillance videos will mislead and confuse the jury into mischaracterizing the distorted motions as "seizures" despite the lack of scientific corroborating evidence to this medical condition. The jury will give this evidence considerable weight because the medical examiner partially based her opinion on his video, despite her caveat that she cannot definitively diagnose the movement she saw as a seizure. However, it would be impossible to un-ring that bell.

In *Martin v. Patterson*, the Court excluded relevant video evidence of the event in question due to its incomplete nature. *Martin v. Patterson*, No. 5:12-117, 2014 WL 769173, *4 (E.D.Ky. Feb. 25, 2014). In *Martin*, the Plaintiff was arrested, further accused of resisting arrest, and subsequently alleged that the arresting officer used excessive force against Plaintiff during Plaintiff's arrest. *Id*. The video in

question was a series of videos compiled from cameras located around the premises

of the store. *Id*. at *11. The cameras were motion-activated, thus capturing the event

in question only when the parties stepped into view of a particular camera. *Id*. This

resulted in portions of the event in question not being captured on the video at all.

*Id*. For example, there existed a forty (40) second gap between the first and second

videos. *Id*. The Court stated that:

> [t]he problem with this footage is not simply that it has a
> portion of it missing, **but that the missing portion is**
> **crucial to the particular claims in this case**. [A]n
> excessive force case requires analyzing [Defendant's] use
> of force in light of the totality of the circumstances to
> determine if it was reasonable. By the time the video
> begins, [Defendant's] use of force had already escalated in
> response to [Plaintiff's] unseen resistance. Thus, the video
> has limited probative value- if any at all- because a viewer
> is unable to weigh [Defendant's] actions in light of the off-
> camera resistance. Moreover, the compelling nature of
> pictographic evidence such as video footage is
> substantially likely to mislead and confuse a jury as it
> displays only a portion of the circumstances to the
> exclusion of other highly relevant details.

*Id*. at *11-13 (*emphasis added*).

Accordingly, the Court excluded the video, as the danger of misleading and

confusing the jury substantially outweighed the value of the video evidence. *Id*. at

*13.

A Florida court in *State v. Muro* found for a nanny who was accused of

abusing a child. The evidence incriminating her was a jerky home surveillance video

that portrayed the defendant lifting the child into the air and slamming him down. *State v. Muro*, 909 So. 2d 448 (Fla. 4th DCA 2005). Videotape experts, one hired by the state and one by the defense, concluded that the abrupt movements on the tape could be attributed to missing frames. *Id*. at 449. The "nanny cams" captured no more than seven point five (7.5) frames per second, as opposed to the thirty (30) frames per second typically captured by video cameras. *Id*. The video was suppressed in the circuit court (*Id*. at 451-52); however, the suppression order was reversed in the 4th district of appeals (*Id*. at 455). Ultimately, the jury found for the nanny because such jerking movements could be seen as the nanny's movements or a faulty frame.

In *Powell v. Indus. Comm'n of Arizona*, 4 Ariz. App. 172, 418 P.2d 602, 610 (Ariz. Ct. App. 1966), rev'd on other grounds, 102 Ariz. 11, 423 P.2d 348 (Ariz. 1967), the Arizona Court of Appeals ruled that a "speeded up" motion picture should not have been admitted in a workers' compensation case because it unfairly portrayed the claimant as having worked at a faster rate of speed than had been the actual case.

Similarly, in *Utley v. Heckinger*, 235 Ark. 780, 362 S.W.2d 13, 17 (Ark. 1962), a case involving a collision between an automobile, a wrecker, and a truck, the Arkansas Supreme Court concluded that the jury should not have been shown a portion of a motion picture which appeared to depict the automobile driver as walking faster than she had actually walked.

14

The instant case is most analogous to *Martin* and *Muro* in that the video does not completely portray the events of the incident in question, which is crucial to the particular claims in this case, and it should be precluded for a basis of a medical diagnosis. Courts have recognized that when a video is shown of an event to the jury that a jury will accept the video as the whole truth. *See, e.g., United States v. Martin*, 746 F.2d 964, 972 (3d Cir. 1984) (citation omitted) ("Eyewitness testimony is often dramatic and convincing, but its effectiveness and convincing power are almost negligible in comparison with a film or videotape of actual events. When the videotape shows a crime actually being committed, it simply leaves nothing more to be said.").

Therefore, Defendants will be manifestly prejudiced should the distorted images of the video hit the jury's eyes without any qualification or special instruction to identify the movements seen are not seizures. Otherwise, the jury would be introduced to improper foundational evidence for an unsubstantiated medical opinion.

### D. There Are No Other Corroborating Sources of That Mr. Stojcevski Experienced Seizures.

The admission of this video for a medical diagnosis is especially problematic given there is no corroborating evidence to otherwise support the theory that Mr. Stojcevski experienced seizures while he was incarcerated during the time incident in question. Without other corroborating evidence to diagnose a seizure, this video

15

should be excluded from such purpose. *See Hopper v. Plummer*, 887 F.3d 744, 749 n.2 (6th Cir. 2018) (A video recorded at four (4) fps necessitated the support by other record evidence, including deposition testimony, for factual depiction); *United States v. Parker*, No. 3:10-CR-133, 2011 U.S. Dist. LEXIS 29611, at *34 n.5 (E.D. Tenn. Feb. 14, 2011) (The officer who possessed the incomplete "in-car video" documenting the pursuit of the defendant required the officer's testimony for recount of the factual events). (**Exhibit Y**).

As discussed above, Dr. Pietrangelo's hypothesis that Mr. Stojcevski's demise was caused by dehydration stemming from a possible benzodiazepine, methadone, and opiate withdrawal is <u>solely</u> based on the "seizure-like" activity he displayed. (**Exhibit B, p. 92:6-16**). Dr. Pietrangelo testified this could only be confirmed by way of an EEG diagnostic test. (***Id*. at p. 92:9-10**). She could not point to any other signs or symptoms that support this theory. Moreover, Defendant Dr. Sherman opined that Mr. Stojecvksi was "feigning" a seizure based on his "full and thorough" evaluation of the patient, which included a neurological examination. (**Exhibit L, pp. 147:20-23; 148:21-24**). Mr. Stojcevski was noted to have rapid eye fluttering (not rapid eye movement) (***Id*. at pp. 134:18-135:12**), did not display any hallmark signs of a seizure (***Id*. at p. 146:5-8**), nor did he present with any signs or symptoms that would suggest he had a propensity for seizures. (***Id*. at pp. 142:25-143:3; 145:17-22**).

16

Thus, without any corroborating evidence necessary to support the possible events observed in this incomplete video, it would be completely misleading should the video be presented to the jury as gospel.

### E. Dr. Pietrangelo's Opinion Must Be Precluded Because It Is Based On The Distorted Video, Which Lacks the Reliability Standards Set Forth In *Daubert*.

Dr. Pietrangelo's opinion that Mr. Stojcevski suffered from "seizure-like activity" and therefore died of a benzodiazepine withdrawal must be excluded. The base of this opinion is the unreliable video footage, which simply does not meet the rigorous reliability standards set forth in Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc*., 509 U.S. 579 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137; 119 S. Ct. 1167 (1999) The relevant literature, case studies, and expert community reject the use of this video as a reliable foundation. Without any additional scientific corroborating evidence, Dr. Pietrangelo's opinion must be excluded.

This Court has the duty to be the gatekeeper as to scientific evidence, which requires this Court to assess whether the medical opinions are actually supported by science and not just accept the opinions because of the nature of the expert's qualifications: "**The trial court's gatekeeping function requires more than simply taking the expert's word for it. [A court being] presented with only the experts' qualifications, their conclusions and their assurances of reliability [is**

17

**not enough under *Daubert*].**" *Thomas v. City of Chattanooga*, 398 F.3d 426, 432

(6th Cir. 2005) (*emphasis added*). Further, Fed. R. Evid. 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Thus, an expert's opinion that is based upon speculation is not admissible,

because "the courtroom is not the place for scientific guesswork, even of the inspired

sort." *Tamraz v. Lincoln Elec. Co.*, 620 F.3d 665, 670-672 (6th Cir. 2010).

Under *Daubert*, the "gatekeeping" function, *supra*, 509 U.S. at 597, consists

of three (3) steps. First, it must be determined whether the witness is qualified as an

expert. "When making a preliminary finding regarding an expert's qualifications

under Fed. R. Evid. 104(a), the court is to examine 'not the qualifications of a witness

in the abstract, but <u>whether those qualifications provide a foundation for a witness</u>

<u>to answer a specific question</u>.'" *Smelser v. Norfolk Southern Ry. Co.*, 105 F.3d 299,

303 (6th Cir. 1997) (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir.

1994) (*emphasis added*)). Second, it must be determined whether the testimony is

reliable. See *Daubert,* 509 U.S. at 590. The Court in *Daubert* listed several factors

for consideration in assessing the reliability of scientific testimony, including:

- Whether a "theory or technique . . . can be (and has been) tested";
- Whether it "has been subjected to peer review and publication";
- Whether, in respect to a particular technique, there is a high "known or potential rate of error" and whether there are "standards controlling the technique's operation"; and
- Whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."

*Kumho Tire,* 526 U.S. at 149-150 (quoting *Daubert,* 509 U.S. at 592-594). The focus

must be on the principles and methodologies on which the expert's opinion is based,

and not on the merits of the expert's conclusions. *Daubert,* 509 U.S. at 594-595 n.

12; *U.S. v. Bonds*, 12 F.3d 540, 556 (6th Cir. 1993) (district courts "are not to be

concerned with the reliability of the conclusions generated by valid methods,

principles and reasoning."). Finally, this Court must determine whether the expert's

reasoning or methodology properly applies to the facts at issue: i.e., whether the

opinion is relevant. See *Daubert*, 509 U.S. at 591-593. To be relevant, the testimony

must "assist the trier of fact to understand the evidence or to determine a fact in

issue." Fed. R. Evid. 702. This relevance requirement ensures that there is a "fit"

between the testimony and the issue to be resolved at trial. *Bonds*, 12 F.3d at 555.

    First, Dr. Pietrangelo lacks the appropriate qualifications to opine on whether

Mr. Stojcevski suffered seizures during his incarceration. She is not a video forensic

expert, has no background in video forensics, and has no experience reviewing and assessing video recordings for a medical diagnosis. (**Exhibit B pp. 54:9-12; 88:4-89:19**). She cannot determine whether the "jerkiness" in the video was "seizure-like activity" or the result of missing frames. Secondly, her opinion is unreliable. The articles cited to above discuss that a video recording at one (1) to seven (7) frames per second is not the requisite quality to make a conclusive medical diagnosis. All the relevant peer-reviewed literature, case studies, guidelines, and relevant expert community demonstrate that at least twenty-five (25) to sixty (60) fps are necessary to properly formulate a medical diagnosis. For video-EEG and seizure diagnosis, recent literature recommends at least one hundred (100) fps. Thus, Dr. Pietrangelo's opinion does not apply a reliable scientific methodology to the facts at hand. Her opinion is speculative at best. Lastly, Dr. Pietrangelo's opinion does not appropriately apply the facts to the present matter and cannot assist a jury in determining whether the "jerkiness" of the video is a seizure or poor frame quality. She assumes the movements of the video represent "seizure-like" activity, but admittedly cannot opine with a reasonable degree of medical certainty that Mr. Stojcevski suffered from seizures. This is especially problematic because there is no other scientific corroborating evidence to support her opinion that Mr. Stojcevski suffered seizures. Her opinion that Mr. Stojcevski suffered from "seizure-like and therefore died of a benzodiazepine withdrawal must therefore be excluded under

Fed. R. Evid. 702, or a *Daubert* hearing is warranted to explore the basis of such opinion.

**F.  Defendants Request Mutual Relief To Add A Video Forensic Expert**.

Should this Court allow Plaintiff to add a video forensic expert to satisfy the authenticity pre-requisite for its admission, then CCS Defendants request the same relief to add a video forensic expert. Video forensic experts are needed to authenticate the video and aid the jury in interpreting contents of the video that are "otherwise unclear":

> The video was not a continuous stream. Time passes between frames. Due to the low rate of frames per second, a critical eye is needed to decipher what changes between frames mean given the increment of time. This is true for events occurring in a single frame (e.g., the taser being applied). An ability to analyze "motion blur" in the picture gives a viewer information as to speed and timing. Glaza's testimony in this regard aided the jury in interpreting contents of the video that were otherwise unclear.

*Jennings v. Fuller*, No. 13-13308, 2017 U.S. Dist. LEXIS 77945, at *30 (E.D. Mich. May 23, 2017) (**Exhibit Z**).

The rules of civil procedure afford district courts broad authority and discretion to manage the discovery process in cases and control their dockets. *Marie v. American Red Cross*, 771 F.3d 344, 366 (6th Cir. 2014). Fed. R. Civ. P. 16(b) requires district courts to issue a scheduling order in each case. And Rule 16(b)(4) states that the scheduling order may be modified "only for good cause and with the

judge's consent." Fed. R. Civ. P. 37(c) prohibits parties from using a witness who has not been identified unless the failure was "substantially justified or is harmless."

The two rules impose different burdens on the moving party. The "primary measure" for establishing good cause to amend the scheduling order under Rule 16(b) is the "moving party's diligence in attempting to meet the case management order's requirements." *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 625 (6th Cir. 2002) (citation omitted). Courts should also consider possible prejudice to the party opposing the modification. *Id.* The test in Rule 37(c) is whether the moving party has offered a "reasonable explanation" for why it did not comply with the disclosure requirements or the mistake was harmless. *Bessemer & Lake Erie R.R. Co. v. Seaway Marine Transport*, 596 F.3d 357, 370 (6th Cir. 2010) (quoting *Vance v. United States*, 182 F.3d 920 (6th Cir. 1999) (unpublished table opinion)).

This video cannot be introduced into evidence without proper authentication. If Plaintiff wishes to introduce this video, then she will need to authenticate it using a video forensic expert. Defendants are simply requesting the same relief. Defendants have been diligently pursuing this lawsuit and are requesting to add an expert in response to the admissibility issues stemming from the evidence Plaintiff wishes to show the jury.

Moreover, the stay in this case was lifted in October 2020. Defendants are seeking leave to add a new expert only three (3) months later after this stay has been

lifted, and in response to admissibility issues regarding evidence for trial. District courts have found requesting such relief in less than four (4) months after a stay has been lifted is a reasonable time. *Carlson v. Fewins*, No. 1:08-cv-991, 2016 U.S. Dist. LEXIS 183080, at *3-4 (W.D. Mich. Oct. 19, 2016) (**Exhibit AA**). Thus, this motion is substantially justified.

## IV.   <u>CONCLUSION</u>

WHEREFORE, Defendants CORRECT CARE SOLUTIONS, L.L.C.; MONICA CUENY; CHANTALLE BROCK; MICAL BEY-SHELLY; VICKY BERTRAM; LAWRENCE SHERMAN, M.D.; by and through their counsel, CHAPMAN LAW GROUP, respectfully request that this Honorable Court enter an order with the following conditions:

1. Preclude the use of the surveillance videos; and

2. Preclude Dr. Pietrangelo's opinion that Mr. Stojcevski suffered "seizure-like activity" and therefore died from withdrawals under Fed. R. Evid. 702, or order a *Daubert* hearing to explore the basis of such opinion.

Alternatively, should this Court deny this motion and allow Plaintiff to add a video forensic expert to authenticate the video, Defendants respectfully request this Honorable Court enter a mutual order and allow Defendants to also add a forensic video expert to opine on the authenticity and reliability of the surveillance video.

Respectfully submitted,
CHAPMAN LAW GROUP

Dated: February 4, 2021          /s/ Madeline R. Young
                                 Ronald W. Chapman Sr., M.P.A.,
                                 LL.M. (P37603)
                                 Madeline R. Young (P82140)
                                 Attorney for the CCS Defendants
                                 1441 West Long Lake Rd., Suite 310
                                 Troy, MI 48098
                                 (248) 644-6326
                                 rchapman@chapmanlawgroup.com
                                 myoung@chapmanlawgroup.com

## PROOF OF SERVICE

I hereby certify that on February 4, 2021 I presented the
foregoing paper to the Clerk of the Court for filing and
uploading to the ECF system, which will send notification
of such filing to the attorneys of record listed herein and I
hereby certify that I have mailed by US Postal Service the
document to the involved non participants.

                                 /s/ Madeline R. Young
                                 Madeline R. Young (P82140)
                                 1441 West Long Lake Rd., Suite 310
                                 Troy, MI 48098
                                 (248) 644-6326
                                 myoung@chapmanlawgroup.com